# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

W.L. GORE & ASSOCIATES, INC.,     :
    :
       Plaintiff,     :
    :
       v.     :     C.A. No. 11-515-LPS
    :
C.R. BARD, INC. and BARD     :
PERIPHERAL VASCULAR, INC.,     :
    :
       Defendants.     :

---

Adam W. Poff, Pilar G. Kraman, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, DE

James W. Poradek, Kevin P. Wagner, Elizabeth Cowan Wright, Katherine S. Razavi, Lauren J. Frank, Timothy M. Sullivan, Linzey A. Erickson, FAEGRE BAKER DANIELS LLP, Minneapolis, MN

      Attorneys for Plaintiff W.L. Gore & Associates, Inc.


Jack B. Blumenfeld, Michael J. Flynn, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE

Steven Cherny, KIRKLAND & ELLIS LLP, New York, NY

Edward C. Donovan, KIRKLAND & ELLIS LLP, Washington, DC

John L. Strand, WOLF, GREENFIELD & SACKS, P.C., Boston, MA

      Attorneys for Defendants C.R. Bard, Inc. and Bard Peripheral Vascular, Inc.

---

## MEMORANDUM OPINION

**UNSEALED ON
JULY 29, 2016**


July 27, 2016
Wilmington, Delaware

**STARK, U.S. District Judge:**

Pending before the Court are (1) Defendants C.R. Bard, Inc. and Bard Peripheral Vascular, Inc.'s ("Bard") Motion for Summary Judgment of No Lost Profits and No Standing (D.I. 566) ("Bard's Motion") and (2) Plaintiff W.L. Gore & Associates, Inc.'s ("Gore") Motion for Sanctions Against Bard (D.I. 509) ("Gore's Motion").  For the reasons discussed below, Bard's Motion will be granted in part and denied in part and Gore's Motion will be denied.

## I.   BACKGROUND

Gore, together with Gore Enterprise Holdings, Inc. ("GEH") (collectively, "Plaintiffs"), sued Defendant C.R. Bard, Inc. for infringement of U.S. Patent No. 5,735,892 ("'892 patent") on June 10, 2011.  (D.I. 1)  Plaintiffs filed an amended complaint on August 19, 2011, adding Bard Peripheral Vascular, Inc. as a defendant.  (D.I. 11)  On November 29, 2011, the Court referred the case to Magistrate Judge Christopher J. Burke "to hear and resolve all pretrial matters, up to and including the resolution of case-dispositive motions."  (D.I. 20)

On October 18, 2012, pursuant to an Order by Judge Burke granting a stipulation between the parties (D.I. 63), Gore (without listing GEH as co-plaintiff) filed a Second Amended Complaint against Bard, alleging infringement of the '892 patent as well as U.S. Patent Nos. 5,700,285 ("'285 patent") and 8,221,487 ("'487 patent").  (D.I. 64)  In its Second Amended Complaint, Gore averred the following:

> W.L. Gore & Associates, Inc. is the owner of all right, title, and interest in the '892, '285, and '487 patents, including the right to sue, enforce, and recover all damages, past and future, for all infringements.
>
> . . .

1

> Gore Enterprise Holdings, Inc. was previously the owner of the '892 and '285 patents and W.L. Gore & Associates, Inc. was the licensee of the '892 and '285 patents with rights to practice those patents in the United States.  On January 30, 2012 Gore Enterprise Holdings, Inc. assigned all right, title, and interest in the '892 and '285 patents to W.L. Gore & Associates, Inc., including the right to seek damages for past infringement thereof.

(D.I. 64 at 3)  Gore subsequently dropped its assertion of the '487 patent.  (D.I. 194 at 3)  On September 28, 2015, the Court adopted Judge Burke's recommendation with respect to non-infringement of the '285 patent and granted Bard summary judgment of non-infringement of the '285 patent, leaving only the '892 patent as the basis for Gore's infringement case.  (*See* D.I. 405 at 10-11)

On November 2, 2015, Bard filed a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(h)(3).  (D.I. 414)  The parties completed briefing on Bard's motion on November 24, 2015.  (D.I. 415, 453, 471)  In support of its motion, Bard argued that (1) there was insufficient evidence of a valid assignment from GEH to Gore of rights to the '892 patent and, (2) even assuming a valid assignment, Gore lacked standing to recover lost profits damages arising before the assignment.  (D.I. 415 at 1-2)  In support of the latter argument, Bard argued that Gore was never an exclusive licensee to the '892 patent, citing evidence from state tax proceedings in which Gore personnel represented that Gore was not an exclusive licensee.  (*See, e.g.*, *id.* at 1)

Gore opposed Bard's motion by arguing that GEH validly assigned all rights related to the '892 patent to Gore, including a right to recover pre-assignment lost profits damages.  (D.I. 453 at 1-2, 7-8)  Gore also argued that Bard's motion was untimely because evidence underpinning the motion was available to Bard in 2012 but Bard "deliberately" delayed in

2

bringing the motion until late 2015.  (D.I. 453 at 13-16)[1]

The Court heard oral argument on the motion to dismiss at a pretrial conference on

November 25, 2015.  (*See generally* Pretrial Transcript ("Tr.") (D.I. 502))  At that point a jury

trial was scheduled to begin on December 7.  The Court questioned Bard regarding the timeliness

of its motion:

> THE COURT: When exactly did you have this information
> in hand?  And how soon after that did you file your motion and
> turn the information over to the plaintiff?
>
> MR. BLUMENFELD: I can answer that fairly precisely in
> terms of when it started because I remember we were sitting in a
> conference room on Sunday, October 11th of this year, 2015,
> talking about this.  And shortly after that, we started investigating,
> doing Internet searches to see what we could find about the
> relationship between Gore and GEH.  So I can't tell you the exact
> dates after that.
>
> THE COURT: So to the extent there is a suggestion you
> have been sitting on this argument for a year or two or some
> substantial amount of time and you threw it at us to blow up
> everybody's trial preparations, you would say not guilty.  We have
> started this October 11th.
>
> MR. BLUMENFELD: That is correct, Your Honor.

(*Id.* at 24-25)  In light of the issues raised by Bard's motion, and given the proximity to trial, the

Court bifurcated the issue of damages for a later trial.  (*Id.* at 110)

The parties appeared for trial on non-damages issues on December 7, 2015.  (*See* Trial Tr.

(D.I. 503))  At the outset, Gore raised an objection to Bard's use of two slides prepared for

---

[1]Gore previously insisted it was an exclusive licensee at the pertinent time.  (*See* D.I. 453
at 18-20)  It later abandoned that contention.  (*See* D.I. 505) ("Gore has concluded that the best
course is to withdraw its exclusive licensee argument as a basis for standing to obtain pre-
assignment lost profits damages.")

Bard's opening statement.  (*Id.* at 7-8)  The slides referred to an expert report authored by Dr.

David Teece ("Teece Report"), which Gore had submitted during the tax proceedings cited in

Bard's motion to dismiss briefing.  (*Id.*)  Gore objected to Bard's use of the Teece Report on the

bases of hearsay and lack of relevance.  (*Id.* at 8)  Bard responded that its slides contained

excerpts of the Teece Report that originated from "knowledgeable Gore people," rather than Dr.

Teece himself, and argued that the slides were therefore party admissions and not hearsay.  (*See*

*id.* at 12-13)  In addition, Bard argued that the slides were relevant because Gore intended to

prove secondary considerations of non-obviousness, which Bard would seek to rebut with the

Teece Report's characterization of the '892 patent as a "minor improvement."  (*Id.* at 9, 13)

Gore confirmed that it planned to present argument regarding the relative importance of the '892

patent, including argument related to long-felt need as a secondary consideration of non-

obviousness.  (*Id.* at 18-19)

 Bard moved to continue the trial and requested additional discovery related to the tax

proceedings, explaining that it found the Teece Report from publicly available sources and did

not know whether additional, related documents existed.  (*Id.* at 14-15)  Bard also noted that

Gore had not produced the Teece Report during discovery despite Bard's request for "all

documents regarding the '892 patent."  (*Id.* at 9)  The Court asked Gore if it had searched for

additional documents since the time Bard had first referenced the tax proceedings in support of

Bard's motion to dismiss.  (*Id.* at 20)  Gore responded that it had not.  (*Id.*)

 After a recess, Gore informed the Court that it had decided to join Bard's request for a

continuance in order to facilitate discovery related to the tax proceedings.  (*See id.* at 27-32)  The

Court, very reluctantly, granted the parties' joint request for a continuance of trial.  (*Id.* at 34)

("I'm extremely reluctant to grant a continuance of a trial, even a joint request, on the morning when you are all ready for trial, we're ready, and the jury pool is downstairs. So it's not something I really want to do.")

On January 4, 2016, Gore moved for sanctions against Bard. (D.I. 509) The parties completed briefing on Gore's Motion on February 1, 2016. (D.I. 510, 516, 528) In Gore's Motion, Gore argues that Bard falsely stated to the Court that Bard had only recently found the Teece Report and related tax documents in public records. (D.I. 510 at 6-7) Gore contends that counsel for Bard was aware of the Teece Report in 2009 during litigation involving Gore and Bard in the District of Arizona. (*Id.* at 1-2) Bard opposes Gore's Motion, characterizing it as a "confected conspiracy theory" based on "false accusations against respected members of the Bar." (D.I. 516 at 1) The Court heard argument on Gore's Motion on March 17, 2016. (*See* D.I. 553 ("Mar. Tr."))

On May 16, 2016, the Court ordered the parties to submit letters on whether Bard's motion to dismiss for lack of standing raised non-jurisdictional arguments that could only be resolved by converting Bard's motion into a motion for summary judgment. (D.I. 554) "'[A] district court must take care not to reach the merits of a case when deciding a Rule 12(b)(1) motion.'" *Davis v. Wells Fargo*, 2016 WL 3033938, at *10 (3d Cir. May 27, 2016) (quoting *CNA v. United States*, 535 F.3d 132, 144 (3d Cir. 2008), *as amended* (Sept. 29, 2008)).

On May 23, 2016, having reviewed the parties' letters, the Court denied Bard's motion to dismiss but permitted Bard to file a motion for summary judgment on the same issues raised in

its original motion.[2]  (D.I. 559)  Bard's original motion attacked Gore's right to recover pre-assignment lost profits damages based on arguments that did not challenge Bard's ultimate standing to assert the '892 patent.  (*See, e.g.*, D.I. 567 at 5-6) (arguing that Gore, as assignee, cannot recover more than GEH could recover as assignor)  These non-jurisdictional arguments, if meritorious, would not have divested the Court of subject matter jurisdiction and were therefore not properly considered under Rule 12(b)(1).  *See Albright v. Keystone Rural Health Ctr.*, 320 F. Supp. 2d 286, 288 (M.D. Pa. 2004) (holding that analysis under Rule 12(b)(1) would have been improper with respect to arguments that "do not affect" subject matter jurisdiction and therefore converting Rule 12(b)(1) motion to motion for summary judgment).

Bard filed a new motion pursuant to the Court's instructions on June 6, 2016.  (D.I. 566) (Bard's Motion)  The parties completed additional briefing on Bard's Motion on June 13, 2016. (D.I. 567, 569, 573, 574)  As discussed below, Bard's Motion challenges (1) the validity of the GEH-Gore assignment – a challenge to Gore's standing under Rule 12(b)(1) – and (2) Gore's ability to recover pre-assignment lost profits damages – an issue properly analyzed under Rule 56's summary judgment standard.

## II.   LEGAL STANDARDS

### A.   Standing

"Standing is a constitutional requirement pursuant to Article III and it is a threshold jurisdictional issue." *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1363 (Fed. Cir. 2010) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  The plaintiff bears

---

[2]Bard's Motion under Rule 56 invokes "greater procedural safeguards" for Gore as the non-moving party than would otherwise be afforded under Rule 12(b)(1). *Davis*, 2016 WL 3033938, at *10.

the burden of persuasion to show it has standing. *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991); *Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005). "Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a complaint for lack of jurisdiction over the subject matter, or if the plaintiff lacks standing to bring his claim." *Samsung Elec. Co., Ltd. v. ON Semiconductor Corp.*, 541 F. Supp. 2d 645, 648 (D. Del. 2008).

"A challenge to subject matter jurisdiction under Rule 12(b)(1) may be either a facial or a factual attack." *Davis v. Wells Fargo*, 2016 WL 3033938, at *8 (3d Cir. May 27, 2016). "The former challenges subject matter jurisdiction without disputing the facts alleged in the complaint." *Id.* However, where subject matter jurisdiction is challenged based upon the sufficiency of jurisdictional facts, the Court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). When considering a factual challenge to standing, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006).

Standing "is comprised of both constitutional and prudential components." *Oxford Assocs. v. Sys. Auth.*, 271 F.3d 140, 145 (3d Cir. 2001). The requirement of constitutional standing derives from the Article III "case" or "controversy" requirement, compelling "a plaintiff to demonstrate that he or she suffered [i] 'injury in fact,' that [ii] the injury is 'fairly traceable' to the actions of the defendant, and that [iii] the injury will likely be redressed by a favorable decision." *Id.* "[T]he touchstone of constitutional standing in a patent infringement suit is whether a party can establish that it has an exclusionary right in a patent that, if violated by

another, would cause the party holding the exclusionary right to suffer legal injury." *WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257, 1265 (Fed. Cir. 2010).[3]

Prudential standing requires, among other things, that a litigant assert his or her own legal rights and not rely on the rights or interests of third parties. *See Hill ex rel. Hill v. Pennsylvania Dept. of Corr.*, 521 Fed. Appx. 39, 40 (3d Cir. Apr. 3, 2013) (citing *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). "Prudential standing to sue for patent infringement derives from 35 U.S.C. § 281: 'A *patentee* shall have remedy by civil action for infringement of his patent.'" *Int'l Gamco, Inc. v. Multimedia Games, Inc.*, 504 F.3d 1273, 1276 (Fed. Cir. 2007) (emphasis added). The word "patentee" in § 281 "includes the patentee's successors in title." *Id.* (citing 35 U.S.C. § 100(d) (2000)).

A patent is "a bundle of rights which may be divided and assigned, or retained in whole or part." *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 875 (Fed. Cir. 1991). As a general rule, the "rights in an invention belong to the inventor." *Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys.*, 131 S. Ct. 2188, 2192 (2011). However, an inventor may assign his rights in an invention, *see* 35 U.S.C. § 261, and the recording of an assignment "creates a presumption of validity as to the assignment and places the burden to rebut such a showing on one challenging the assignment." *SiRF Tech. v. Int'l Trade Comm.*, 601 F.3d 1319, 1327-28 (Fed. Cir. 2010). When a "sufficiently large portion" of this bundle of rights "is held by one individual, we refer to that individual as the owner of the patent, and that individual is permitted to sue for infringement in his own name." *Alfred E. Mann*

---

[3]The core exclusionary right of a patent is the negative right of a "patentee" to "exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States." 35 U.S.C. § 154.

*Found. For Scientific Research v. Cochlear Corp.*, 604 F.3d 1354, 1360 (Fed. Cir. 2010).  Thus,

if a patentee transfers "***all substantial rights***" in the patent to an assignee, "this amounts to an

assignment or a transfer of title." *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1340 (Fed. Cir.

2007) (emphasis added).

Finally, "when a plaintiff files a complaint in federal court and then voluntarily amends

the complaint, courts look to the ***amended*** complaint to determine jurisdiction." *Rockwell Int'l*

*Corp. v. United States*, 549 U.S. 457, 473-74 (2007) (emphasis added).  Standing must exist

throughout litigation, not just when a lawsuit is initially filed. *See U.S. Parole Comm'n v.*

*Geraghty*, 445 U.S. 388, 397 (1980).

**B.     Summary Judgment**

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  The moving party bears the burden of

demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co.,*

*Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).  An assertion that a fact cannot be – or,

alternatively, is – genuinely disputed must be supported either by citing to "particular parts of

materials in the record, including depositions, documents, electronically stored information,

affidavits or declarations, stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other materials," or by "showing that the materials cited do

not establish the absence or presence of a genuine dispute, or that an adverse party cannot

produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).  If the

moving party has carried its burden, the nonmovant must then "come forward with specific facts

9

showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted).  The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted).  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").  Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be "evidence on which the jury could reasonably find" for the nonmoving party. *Anderson*, 477 U.S. at 252.

### C.    Lost Profits Damages

A patentee may recover lost profits caused by a defendant's infringement. *See Minco,*

*Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1118 (Fed. Cir. 1996). "Whether lost profits are

legally compensable in a particular situation is a question of law." *Poly-America, L.P. v. GSE*

*Lining Tech., Inc.*, 383 F.3d 1303, 1311 (Fed. Cir. 2004). "To recover lost profits damages, the

patentee must show a reasonable probability that, 'but for' the infringement, it would have made

the sales that were made by the infringer." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545

(Fed. Cir. 1995) (en banc). In addition, "[j]udicial limitations on damages, either for certain

classes of plaintiffs or for certain types of injuries, have been imposed in terms of 'proximate

cause' or 'foreseeability.'" *Id.* at 1546 (citing *Consolidated Rail Corp. v. Gottshall*, 512 U.S.

532, 546 (1994)).

"The general rule is that one seeking to recover money damages for infringement of a

United States patent . . . must have held the ***legal title*** to the patent ***during the time of the***

***infringement***." *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1579 (Fed. Cir. 1991)

(emphasis in original) (citing *Crown Die & Tool Co. v. Nye Tool & Mach. Works*, 261 U.S. 24,

40-41 (1923)). However, an exception to this general rule allows recovery of pre-assignment

damages, including lost profits damages, when "the assignment of a patent is coupled with an

assignment of a right of action for past infringements." *Id.*; *see also Minco*, 95 F.3d at 1116-21.

However, "a patentee may not claim, as its own damages, the lost profits of a related

company." *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 778 F.3d 1365, 1375 (Fed. Cir. 2015),

*vacated on other grounds*, *Medtronic Sofamor Danek USA, Inc. v. NuVasive, Inc.*, 136 S. Ct. 893

(2016). Related companies "may not enjoy the advantages of their separate corporate structure

and, at the same time, avoid the consequential limitations of that structure – in this case, the

inability of the patent holder to claim the lost profits of its non-exclusive licensee." *Poly-*

*America*, 383 F.3d 1303, 1311 (Fed. Cir. 2004).  Assignment of a right of action for past

infringements "cannot create lost profits . . . if there are none." *Id.*; *see also* 6 Am. Jur. 2d

*Assignments* § 144 (2002) ("[T]he assignee cannot recover more than the assignor could recover,

and the assignee never stands in a better position than the assignor.").

### D.      Sanctions - Court's Inherent Authority

"Courts of justice are universally acknowledged to be vested, by their very creation, with

power to impose silence, respect, and decorum, in their presence, and submission to their lawful

mandates." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991).  "These powers are 'governed

not by rule or statute but by the control necessarily vested in courts to manage their own affairs

so as to achieve the orderly and expeditious disposition of cases.'" *Id.* (quoting *Link v. Wabash

R. Co.*, 370 U.S. 626, 630-31 (1962)).  These powers include "the ability to fashion an

appropriate sanction for conduct which abuses the judicial process," including an assessment of

"attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive

reasons." *Id.* at 44-46 (internal quotation marks omitted).  "[A]n award of fees and costs

pursuant to the court's inherent authority to control litigation will usually require a finding of bad

faith." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 278 F.3d 175, 181 (3d

Cir. 2002).

### E.      Sanctions - Rule 37

Under Federal Rule of Civil Procedure 37(c)(1), when "a party fails to provide

information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use

that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the

failure was substantially justified or is harmless." Regarding Rule 37, the Third Circuit has

instructed: "In considering whether the exclusion of evidence is an appropriate sanction for

failure to comply with discovery duties, we must consider four factors: (1) the prejudice or

surprise of the party against whom the excluded evidence would have been admitted; (2) the

ability of the party to cure that prejudice; (3) the extent to which allowing the evidence would

disrupt the orderly and efficient trial of the case or other cases in the court; and (4) bad faith or

wilfulness in failing to comply with a court order or discovery obligation." *Nicholas v.

Pennsylvania State Univ.*, 227 F.3d 133, 148 (3d Cir. 2000) (citing *Konstantopoulos v. Westvaco

Corp.*, 112 F.3d 710, 719 (3d Cir. 1997)).[4]

## III.    BARD'S MOTION (D.I. 566)[5]

### A.    Gore's Standing

#### 1.    Assignment of the '892 Patent from GEH to Gore

Gore's Second Amended Complaint states that GEH "assigned all right, title, and

---

[4]In addition to seeking sanctions under the Court's inherent authority and Rule 37, Gore moves for sanctions pursuant to Federal Rules of Civil Procedure 16 and 26 and Delaware Local Rules 1.3 and 83.6(d). (*See* D.I. 509) However, in its briefing, Gore makes no specific arguments with respect to Rules 16 or 26 or Local Rule 1.3 in its briefing. Regarding Local Rule 83.6(d), Gore only mentions that the rule instructs District Courts in Delaware to apply the Model Rules of Professional Conduct in assessing potential attorney misconduct. (*See* D.I. 510 at 13) Because Gore makes no specific arguments under Rules 16 or 26 or Local Rule 1.3, to the extent Gore is asking for sanctions beyond those which are authorized by Rule 37, the Court will treat Gore's motion as a request for sanctions under the Court's inherent authority.

[5]Gore argued that Bard's original motion to dismiss was untimely because Bard unjustifiably delayed in filing the motion. (*See* D.I. 453 at 13-16) Bard argued that it did not unjustifiably delay because Bard had only recently discovered relevant documents at the time of filing. (*See* D.I. 471 at 8) The Court agrees with Bard that its motion was not untimely. Bard was reasonably diligent in filing the motion after discovering relevant documents.

interest" in the '892 patent to Gore on January 30, 2012, "including the right to seek damages for

past infringement thereof." (D.I. 64 at 3)  Gore admits that GEH – now a non-party – owned the

'892 patent before January 30, 2012 and that Gore was a non-exclusive licensee before January

30, 2012.[6]  (*Id.*; *see also* D.I. 505)  The January 30, 2012 assignment ("Assignment") is the only

basis on which Gore argues that it has standing to sue as "patentee" of the '892 patent.  (*See*

*generally* D.I. 569, 573)

"Patent ownership" is typically "determined by state, not federal law."  *Sky Techs. LLC v.*

*SAP AG*, 576 F.3d 1374, 1379 (Fed. Cir. 2009); *Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109

F.3d 1567, 1572 (Fed. Cir. 1997)).[7]  The Assignment includes no choice of law provision.

Therefore, the Court must apply the "most significant relationship" test to determine what state

law should govern interpretation of the Assignment.  *See Cohen v. Formula, Inc.*, 750 F. Supp.

2d 495, 501 (D. Del. 2010).  Under the "most significant relationship" test, "[t]he rights and

---

[6]Bard moved to supplement the record with additional evidence from *W.L. Gore & Associates, Inc. v. Medtronic, Inc.*, C.A. No. 10-441 (E.D. Va.).  (*See generally* D.I. 609)  Gore does not oppose Bard's motion.  (*See generally* D.I. 610)  Therefore, the Court will grant Bard's motion.  Bard's additional evidence from the *Medtronic* case provides additional proof that Gore was a non-exclusive licensee prior to January 30, 2012.  (*See, e.g.*, D.I. 609 at 1) (citing D.I. 609-1 Ex. 1 (Defendants' brief from *Medtronic* in support of motion to dismiss for lack of standing) at 4) (quoting Gore's expert as stating that, after March 31, 1989, "[Gore's] license agreement became a non-exclusive license to all patents owned by Gore Enterprise Holdings going forward")

[7]Bard argues, and Gore does not dispute, that state law, not federal law, should apply in this case.  (*See* D.I. 567 at 8; *see also generally* D.I. 569, 573)  The Court will apply state law.  *See Euclid Chem. Co. v. Vector Corrosion Techs., Inc.*, 561 F.3d 1340, 1343 (Fed. Cir. 2009).  In other circumstances, federal law might apply.  *See, e.g., DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1290 (Fed. Cir. 2008) ("[T]he question of whether a patent assignment clause creates an automatic assignment or merely an obligation to assign is intimately bound up with the question of standing in patent cases.  We have accordingly treated it as a matter of federal law.").

duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties . . . ." *Id.* GEH and Gore are Delaware companies, and the Assignment was executed in Delaware. (*See* D.I. 569-1 (Assignment) at WLG-11-515_00259999)  Thus, Delaware has the most significant relationship to the parties and the transaction, and the Court will apply Delaware law to interpret the Assignment.

Bard's Motion presents a factual challenge to Gore's standing by disputing the validity of the Assignment. (D.I. 567 at 7-10)  Bard argues that all patent assignments must be in writing, while "[t]he only writing Gore contends is an 'assignment' is a January 30, 2012 document that is insufficient as a matter of law to assign anything." (*Id.* at 7) (citing 35 U.S.C. § 261; *Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093 (Fed. Cir. 1998)).  The Court agrees with Bard that patent assignments must be in writing. *See Sky Techs.*, 576 F.3d at 1380.[8]  However, the Court does not agree with Bard that Gore's written Assignment is invalid.

Bard argues that the Assignment is invalid because it "does not even purport to be an assignment agreement between GEH and Gore" and is, instead, merely ***notice*** of a purported assignment. (D.I. 567 at 7-8)  The Court disagrees.  The Assignment specifies that GEH "by these presents ***does assign and transfer***" to Gore "the whole right, title, and interest" to the '892 patent (among other patents), including the right to seek past damages. (*See* Assignment at WLG-11-515_00259999)  "Present-tense language" usually "creates a present assignment,"

---

[8]This does not mean that "all conveyances of patent ownership" must be in writing to be valid. *Sky Techs.*, 576 F.3d at 1381 ("[N]o federal law preempts the use of the Massachusetts UCC foreclosure provisions to transfer patent ownership ***by operation of law***.") (emphasis added).

*Venture Corp. v. Barrett*, 2015 WL 8479475, at *4 (N.D. Cal. Dec. 9, 2015) (citing *Speedplay,*

*Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1253 (Fed. Cir. 2000)), and is not merely "notice" of a

purported assignment.  In light of the present-tense language in the Assignment, the Court

determines that the Assignment is not merely notice of an assignment.

Bard argues that the Assignment is invalid also because a representative from Gore did

not sign the Assignment.  (D.I. 567 at 8)  Again, the Court disagrees.  Gore recorded the

Assignment with the PTO on the same day that the Assignment was executed.  (Assignment at

WLG-11-515_00259998)  This evidences GEH's delivery and Gore's acceptance of the

Assignment.  *See Nebco & Associates v. United States*, 23 Cl. Ct. 635, 645 (1991) ("An

assignment, even if gratuitous, is irrevocable if . . . in writing, and either signed or delivered by

the assignor.").  A representative from Gore was not required to sign the Assignment because

only GEH, as the assignor, was entering into obligations by way of the Assignment.  *See Patriot*

*Universal Holdings, LLC v. Formax, Inc.*, 24 F. Supp. 3d 802, 804 (E.D. Wis. 2014) (stating that

assignor "is the only party whose clear consent would need to be obtained in order to make all

the representations, etc., found in the assignment" when "the assignee is not making any

covenants or representations" and when "the assignor is the only party entering into

obligations").

Next, Bard argues that the Assignment is invalid because, under Delaware law, "an

assignment – like any other legally enforceable agreement – is only valid if 'the parties

exchange[d] legal consideration'" and the Assignment does not recite consideration on the part of

Gore.  (D.I. 567 at 8) (quoting *Bryant v. Way*, 2011 WL 2163606, *4 (Del. Super. Ct. May 25,

2011))  Bard's argument is based on the proposition that patent assignments must always be

**contracts**, involving consideration on both sides, rather than gratuitous assignments. This proposition is not supported by the legal authority cited by Bard.

Bard's cited cases instead stand for the proposition that, **when a patent is conveyed via contract**, there must be consideration on both sides. (*See generally* D.I. 567 at 8-9) (citing *Diamond Coating Techs., LLC v. Hyundai Motor Am.*, 2016 WL 2865704, at *2 (Fed. Cir. May 17, 2016); *Memorylink Corp. v. Motorola Solutions, Inc.*, 773 F.3d 1266, 1270-71 (Fed. Cir. 2014)) The Assignment at issue in this case is clearly *not* a contract requiring consideration on both sides. (*See generally* Assignment) (evidencing no "meeting of the minds,"[9] consideration on part of Gore, or other indicia of a contract) Bard's cited cases are inapposite because consideration on the part of assignees is not required for gratuitous assignments.

As argued by Gore, gratuitous assignments are permissible under Delaware law "where 'there was an intention to make the gift and sufficient delivery.'" (*See* D.I. 569 at 3) (citing *Wilmington Trust Co. v. General Motors Corp.*, 51 A.2d 584, 593 (Del. Ch. 1947); Restatement (Second) of Contracts § 332 (1) ("[A] gratuitous assignment is irrevocable if . . . the assignment is in a writing either signed or under seal that is delivered by the assignor."); *Nebco*, 23 Cl. Ct. at 645 ("An assignment, even if gratuitous, is irrevocable if . . . in writing, and either signed or delivered by the assignor."); *Keller v. Bass Pro Shops, Inc.*, 15 F.3d 122, 124-125 (8th Cir. 1994) ("[A]n effective voluntary assignment of a patent need not be supported by consideration."); *El Paso Healthcare Sys. v. Molina Healthcare of New Mexico, Inc.*, 683 F. Supp. 2d 454, 459 (W.D. Tex. 2010)) The Assignment is valid as a gratuitous assignment because it was in writing,

---

[9]The Assignment states that Gore is "desirous of acquiring the entire interest" to the '892 and other patents, but this normative statement does not indicate Gore's assent to the creation of any legal obligation on its part. (Assignment at WLG-11-515_00259999)

signed by GEH, and delivered to Gore.

In light of the foregoing, Bard has failed to meet its burden of rebutting the Assignment's "presumption of validity." *SiRF Tech.*, 601 F.3d at 1327-28. Gore has met its burden of establishing that it has standing to sue for infringement of the '892 patent. *See Kehr*, 926 F.2d at 1409; *Sicom*, 427 F.3d at 976. Therefore, the Court will deny Bard's Motion to the extent it challenges Gore's standing.

### 2.     Gore-GEH merger

Bard acknowledges that GEH merged into Gore in May 2015. (D.I. 567 at 10) In light of the Court's ruling on validity of the Assignment, the Court need not decide whether this merger would independently have transferred rights associated with the '892 patent – including a right to sue for past damages – if the Assignment had not been valid. *See generally* 8 Del. C. § 259(a) (providing that property of merging corporations "shall be vested in the corporation surviving or resulting from such merger or consolidation").

### B.     Pre-Assignment Lost Profits Damages

Having concluded that Gore has standing to sue Bard for infringement of the '892 patent, the Court now addresses Bard's non-jurisdictional arguments challenging Gore's right to recover pre-Assignment lost profits damages.[10] (D.I. 567 at 4-7)

### 1.     Waiver

Bard argues that Gore "waived" its argument that it is entitled to recover pre-Assignment lost profits damages by raising it for the first time in response to Bard's original motion to

---

[10]As discussed above, the Court reviews these arguments under Rule 56's summary judgment standard.

dismiss. (D.I. 567 at 4-5; D.I. 574 at 1-2)  However, **Bard** did not raise the issue of waiver in its briefing on its original motion to dismiss. (*See generally* D.I. 471)  The Court instructed that "Defendants' new motion for summary judgment shall be limited to the issues raised in Defendants' earlier Motion." (D.I. 559)  Because Bard did not raise the issue of waiver with respect to its original motion, the Court rejects Bard's waiver arguments.

### 2.    Gore Stands in the Shoes of GEH

Gore admits that it was neither the owner nor exclusive licensee of the '892 patent prior to January 30, 2012. (*See* D.I. 505)  Gore may still potentially sue "for past infringement transpiring before it acquired legal title" because the Assignment expressly grants Gore a right to do so. *Abraxis*, 625 F.3d at 1367.  However, Gore may not sue for lost profits damages that never existed, because Gore stands in the shoes of GEH with respect to damages for pre-Assignment infringement. *Poly-America*, 383 F.3d 1303, 1311 (Fed. Cir. 2004); 6 Am. Jur. 2d *Assignments* § 144 (2002).  Simply put, if GEH did not have a lost profits damages claim to assign to Gore, such a claim was not assigned, and Gore lacks such a claim now.

Because Gore was merely a non-exclusive licensee before the Assignment, Bard argues that Gore is entitled only to seek damages that GEH could have sought prior to January 30, 2012. (D.I. 567 at 5-6)  Bard avers that GEH "sold nothing" during the pertinent time period. (*Id.* at 6-7; *see also Gore Enter. Holdings, Inc. v. Comptroller of Treasury*, 87 A.3d 1263, 1276 (Md. 2014) ("In effect, GEH does not create, invent or make anything . . . ."))  Gore does not dispute the fact that GEH did not practice the '892 patent. (*See generally* D.I. 569, 573)  "[I]f the patentee is not selling a product, by definition there can be no lost profits." *Rite-Hite*, 56 F.3d at 1548.  The Court agrees with Bard that GEH, as a non-practicing entity, was not permitted to

recover lost profits damages during the time that it owned the '892 patent. The Court also agrees with Bard that Gore stands in the shoes of GEH with respect to damages recoverable prior to January 30, 2012 and, therefore, that Gore, too, cannot recover lost profits damages arising for this period. *See Poly-America*, 383 F.3d at 1311-12.

While conceding that GEH was a non-practicing entity at all relevant times, Gore nevertheless argues that it may recover its own lost profits damages for infringement occurring prior to January 30, 2012, citing numerous cases as support. (D.I. 569 at 5-10) (citing, *inter alia*, *Crown Die*, 261 U.S. at 40-41, 43; *Consol. Oil-Well Packer Co. v. Eaton, Cole & Burnham Co.*, 12 F. 865, 870 (C.C.D. Conn. 1882); *Henry v. Francestown Soapstone Stove Co.*, 11 F. Cas. 1180, 1181 (C.C.D.N.H. 1876); *Abraxis*, 625 F.3d at 1367; *Enovsys LLC v. Nextel Communs., Inc.*, 614 F.3d 1333, 1341 n.2 (Fed. Cir. 2010); *Eastman Kodak Co. v. Sun Microsystems, Inc.*, 2004 WL 2026456, at *5 (W.D.N.Y. Sept. 10, 2004); *Minco*, 95 F.3d at 1113, 1116-19; and *Network Appliance, Inc. v. Bluearc Corp.*, 2005 WL 1530222, at *14-15 (N.D. Cal. June 27, 2005), *aff'd*, 205 F. App'x 835 (Fed. Cir. 2006)). The cases cited by Gore do not support its claim for pre-Assignment lost profits damages.

Gore cites *Crown Die*, *Consolidated Oil-Well Packer*, *Henry*, *Abraxis*, *Enovsys*, and *Eastman Kodak* for the proposition that assignees are permitted to recover "all available forms of pre-assignment damages *without limitation*." (D.I. 569 at 6) (emphasis in original) Bard responds that these cases merely stand for the proposition that assignees are generally permitted to recover pre-assignment damages "'where an assignment of a patent is coupled with an assignment of a right of action for past infringements'" and that there is no dispute between the parties on this point. (D.I. 574 at 2) (quoting *Crown Die*, 261 U.S. at 40-41) The Court agrees

20

with Bard that these cases permit assignees to recover pre-assignment damages *as a general matter*, but the cases are not relevant to the specific issue of whether Gore can recover *its own* purported pre-Assignment lost profits damages, apart from any damages that were assignable (and assigned) by GEH.

Gore cites *Minco* as an example of the Federal Circuit approving an award of pre-assignment lost profits damages to an assignee based on the "economic harm" caused by the infringer, without "pars[ing] the type of pre-assignment damages that Minco was entitled to recover." (D.I. 569 at 7) (internal quotation marks omitted)  In *Minco*, 95 F.3d at 1119, the Federal Circuit reviewed a district court's award of Minco, Inc.'s ("Minco") lost profits damages arising before Minco was assigned rights to the asserted patent.  Before Minco was assigned the asserted patent, Minco's co-founders owned and practiced the asserted patent.  *See id.* at 1113. The Federal Circuit affirmed the district court's award of Minco's pre-assignment lost profits damages, ruling that "[t]he record . . . supports the district court's finding that Minco would have been able to make . . . additional sales" but for the infringement.

The *Minco* case is distinguishable on its facts.  In *Minco*, the pre-assignment owners of the patent-in-suit were Minco's founders, who *directly* benefitted from Minco's sale of products embodying the patented technology.  *See id.* at 1113, 1119.  The prior patent owners – i.e., Minco's founders – suffered quantifiable economic loss as the result of infringement by a competitor of Minco, because the founders' economic interests were conjoined to Minco's.  *See id.* at 1114, 1118-19.  Therefore, the Federal Circuit held that the right to sue for recovery of past damages included a right to recover lost profits.  *See id.* at 1117.

In contrast, GEH described itself to a Maryland court as an *independent* subsidiary of

Gore engaged in transactions with its parent "at fair market value rates." *See* Brief for Petitioner Gore Enter. Holdings, Inc., 2013 WL 4397802, at *3, *Gore Enter. Holdings, Inc. v. Comptroller of Treasury*, 87 A.3d 1263, 1267 (Md. 2014). GEH's expert opined in the Maryland tax proceedings that "the business arrangements between Gore, Inc. and GEH were arm's-length and that the 7.5% royalty rate provided for in the license agreement between Gore, Inc. and GEH [for a portfolio of patents that included the '892 patent (*see* D.I. 567 at 2) (citing D.I. 568-1 Ex. 7 (Expert Report of Laura B. Stamm) ¶ 237)] was consistent with an arms-length rate." *Id.* at *9. GEH received "significant third-party income and expenses" that were ***not*** directly connected with sales of Gore's products embodying technology covered by GEH's patents. *Id.* at *3. In addition, GEH characterized Gore's sales as ***not*** being "use" of the patents. *Id.* at *4-5.

As a non-practicing, independent subsidiary of Gore, GEH had no legal basis to recover lost profits damages arising from ***Gore's*** lost sales. Therefore, GEH could not have assigned to Gore any right to recover such lost profits damages when it assigned GEH's rights in the '892 patent to Gore. While GEH was free to assign all damages claims it had, it could only assign damages claims it ***did*** have. Because Gore must stand in GEH's shoes, Gore may only recover what GEH could have recovered. Therefore, Gore is not entitled to recover pre-Assignment lost profits damages.

### 3.    Foreseeability of Gore's Pre-Assignment Lost Profits Damages

The Federal Circuit in *Rite-Hite* invoked requirements of "proximate cause" and "foreseeability" in considering awarding lost profits damages. 56 F.3d at 1546; *see also Minco*, 95 F.3d at 1118 ("[T]he patent holder may recover for an injury caused by the infringement if it was or should have been reasonably foreseeable by an infringing competitor in the relevant

market, broadly defined.") (internal quotation marks omitted).  Gore's pre-Assignment lost

profits are not recoverable for the additional reason that these "damages" could not have been

reasonably foreseen by Bard, given GEH's public statements regarding the nature of the

relationship between GEH and Gore.

The Northern District of California observed the following with respect the Federal

Circuit's holding in *Minco*:

> [W]hat was dispositive in *Minco* was not the formal
> assignment of the patent (or the lack thereof), but rather the fact
> that ***the defendant could have reasonably foreseen that a***
> ***competitor practicing the invention would be injured by its***
> ***infringing sales***.  Indeed, it would hardly be reasonable to
> conclude otherwise, given that ***Minco was practicing a patent***
> ***owned by the company's founders and shareholders***.  In light of
> these circumstances, the Federal Circuit correctly looked to the
> substance of the relationship between the company's founders and
> the plaintiff and upheld the district court's award of damages
> arising from acts of infringement that predated the formal
> assignment of the patent.

*Network Appliance*, 2005 WL 1530222, at *14 (emphasis added; internal citation omitted).

Here, as in *Network Appliance*, the "particular injury" suffered by Gore was not sufficiently

"reasonably foreseeable" to be included in a lost profits damages award.

Specifically, Bard could not have reasonably foreseen that its infringement would be the

proximate cause of Gore's pre-Assignment lost profits damages.[9]  As noted in Bard's briefing,

Gore repeatedly asserted that "Gore and GEH had an 'arms-length' relationship," unlike the

apparent unity of interest between Minco and its founders.  (D.I. 574 at 4) (citing D.I. 421-1 Ex.

24 at 16; D.I. 416-6 Ex. 12 at 27)  Indeed, "the business arrangements between Gore, Inc. and

---

[9]Bard's Motion does not challenge Gore's right to recover pre-Assignment damages in
the form of a reasonable royalty.

23

GEH were arm's-length." Brief for Petitioner Gore Enter. Holdings, Inc., 2013 WL 4397802, at *9, *Gore Enter. Holdings, Inc. v. Comptroller of Treasury*, 87 A.3d 1263, 1267 (Md. 2014). In light of these unequivocal statements, potential infringers (like Bard) could not have reasonably foreseen that Gore would seek or could recover ***its own*** pre-Assignment lost profits damages as a non-exclusive licensee to the '892 patent. Gore may not recover lost profits damages that were not reasonably foreseeable. *See Rite-Hite*, 56 F.3d at 1546.

For the foregoing reasons, Bard has shown that Gore cannot recover pre-Assignment lost profits damages. Gore has failed to rebut Bard's showing. Therefore, the Court will grant Bard's Motion with respect to Bard's non-jurisdictional challenge and enter summary judgment for Bard on Gore's claim for pre-Assignment lost profits damages.

## IV.   GORE'S MOTION (D.I. 509)

Gore accuses Bard and Bard's attorneys of engaging in "a pattern of unethical conduct that ultimately achieved its intended goal of disrupting a long-scheduled jury trial." (D.I. 510 at 12) Gore argues that Bard was aware of the Teece Report and state tax litigation referenced in Bard's original motion to dismiss "since at least August 14, 2009" when Bard's attorneys, including John Strand and Steven Cherny, "affirmatively used" the Teece Report in litigation between Gore and Bard in Arizona District Court. (*See id.* at 1-2, 5-8) Messrs. Strand and Cherny represent Bard in the instant case.[10] Bard's ultimate goal, Gore argues, was to hide its knowledge of the Teece Report and the tax litigation until springing it on the first day of trial, despite knowing about it for years. (*See id.* at 10-11)

Gore also moves for sanctions based on Bard's attorneys' alleged violation of a Maryland

---

[10]Gore levies no specific accusations of misconduct against Mr. Strand.

state court's protective order. (*See id.* at 8-10) Gore alleges that Bard's attorneys surreptitiously gained access to sealed documents held at the Cecil County Circuit Court in Maryland and instructed a third-party vendor to make copies of the documents, which were marked "confidential" and "subject to protective order." (*See id.* at 9-10) The documents included a copy of the Teece Report which was filed under seal. (*See id.* at 11) In addition, Gore argues that "Bard has never alerted the Cecil County Court that it copied Gore documents in violation of the Maryland protective orders." (*Id.*)

Gore identifies three categories of alleged misconduct by Bard and/or Bard's attorneys: (1) breach of attorneys' duty of candor (citing Model Rules 3.3(a) and 8.4(c)),[11] (2) violations under the protective order of a Maryland state court (citing Model Rule 4.4), and (3) breach of attorneys' duty not to engage in conduct intended to disrupt a judicial proceeding (citing Model Rules 3.5(d) and 8.4(d)). (*See id.* at 13-17) The Court will address the first and third of these categories together as they both relate to Bard's alleged litigation strategy of hiding knowledge of the Teece Report and tax proceedings until the first day of trial. The Court will then address the second category, regarding alleged violations of the Maryland court's protective order.

### A.    Duties of Candor and to Not Intentionally Disrupt Judicial Proceedings

Gore cites Model Rules 3.3(a)(1) and 8.4(c) in arguing that Bard's attorneys – specifically, Mr. Cherny – breached their duty of candor by making false statements to the Court, which they have failed to correct. (*See* D.I. 510 at 13) Gore does not argue that counsel's

---

[11]"Models Rules" refer to the "Model Rules of Professional Conduct of the American Bar Association . . . , as amended from time to time," which this Court applies to "all attorneys admitted or authorized to practice before this Court," including those who are admitted *pro hac vice*. (*See* D. Del. LR 83.6(d), (i))

conduct warrants formal disciplinary investigation pursuant to Local Rule 83.6(e).

Bard insists that Mr. Cherny simply did not recall the Teece Report or tax litigation because these were small parts of the massive, complex prior litigation between the parties some years ago in Arizona District Court. (*See, e.g.*, D.I. 516 at 10-14) Bard points out that the Arizona District Court characterized its case involving Bard and Gore, during which the Teece Report was produced, as "the most complicated case [that Court] ha[d] presided over." (*Id.* at 11) Moreover, Bard argues that the Teece Report arose in an entirely different context during the Arizona litigation. (*Id.* at 11-12)

The Court is persuaded that Mr. Cherny did not remember the Teece Report from the prior litigation. Mr. Cherny submitted a declaration in which he states that he did not recall the Teece Report or tax proceedings before preparing for trial in this case. (*See generally* D.I. 517) The Court credits Mr. Cherny's statements. Mr. Cherny states that he "had no recollection of the Teece Report before it was uncovered by Bard in October 2015" and that he "*still* has no recollection" of using the Teece Report during the Arizona litigation. (*See id.* at 4) (emphasis added) Mr. Cherny states that his co-counsel was "primarily responsible for drafting the . . . brief that cites the Teece Report." (*Id.* at 3) This statement is corroborated by a declaration from Mr. Cherny's former co-counsel in the Arizona litigation, Mr. Maximillian Grant. (*See* D.I. 521 at 1) ("The Teece Report was attached to a brief submitted by Bard in the [Arizona] litigation in 2009. That brief was prepared in part by Latham & Watkins attorneys working under my supervision.")

Bard raised the Teece Report in a significantly different context during the Arizona case, namely, to highlight Dr. Teece's arguments about what makes a patent relatively ***more*** valuable than other patents. (*See* D.I. 511 Ex. 2 Part 1 at 9) In this litigation, Bard cites the Teece Report

to show that personnel at Gore thought the '892 patent was a "minor" improvement over the

prior art, and *less* valuable than other patents.  In addition, Dr. Teece is not serving as an expert

in the instant litigation like he was in the Arizona litigation.  Gore has cited no evidence that the

Teece Report or tax litigation were central aspects of prior litigation with which Bard or Bard's

current counsel were involved.

Gore accuses Mr. Cherny of failing to exercise "reasonable diligence" to search for and

find the Teece Report before October 2015.  (*See* D.I. 51 at 14)  Bard responds that its attorneys

searched Gore's production and did not find the Teece Report.  (*See* D.I. 516 at 14)  Moreover,

the brief from the Arizona litigation that mentioned the Teece Report was filed under seal (along

with the Teece Report itself), and therefore was not publicly available.  (*See id.* at 15)  As Bard

emphasizes, the Teece Report was a *Gore* document which *Gore* failed to locate and produce in

this litigation, despite being responsive to Bard's discovery requests asking for documents related

to the '892 patent.  (*See id.* at 15)  It is unreasonable for Gore to hold Bard to a higher standard

for remembering and finding a Gore document from the Arizona litigation when Gore itself did

not (in the relevant time) find and produce the pertinent document.  In sum, the Court finds that

Mr. Cherny was reasonably diligent.

Gore also attacks the credibility of Jack Blumenfeld, who represents Bard in the instant

case, arguing that he lied to the Court when he said that Bard "didn't know about" the state tax

proceedings during discovery in the litigation here.  (*See* D.I. 510 at 13)  The Court credits Mr.

Blumenfeld's testimony submitted via declaration.  (*See generally* D.I. 518)  Mr. Blumenfeld

states that "Bard's counsel began investigating the exclusive license standing issue in 2015" and

subsequently discovered documents from the state tax litigation.  (*See id.* at 5)  This is entirely

27

plausible.

Gore's contrary suggestion, on the other hand, is entirely implausible. In Gore's telling, Bard's attorneys were consciously aware of a likely successful defense for their client to an approximately $100 million lost profits damages claim by Gore, yet those attorneys deliberately withheld raising that defense until essentially the eve of trial. Such a strategy would be risky in the extreme. It would entail a high likelihood of a court excluding the defense as untimely. And if counsel's "lies" were discovered, it would risk counsel's reputations and potentially their careers. Far more plausible is that Bard's experienced counsel, with their busy practices, and with their reasonable reliance on *Gore* to produce *Gore* documents that are responsive to Bard's requests, simply did not remember or otherwise discover on their own the Teece Report until they were preparing for the pretrial conference, just as they have represented to the Court.

For the foregoing reasons, the Court will deny Gore's Motion with respect to Gore's argument that Bard and/or Bard's attorneys made intentional misrepresentations to the Court to hide knowledge of the Teece Report and tax proceedings until the first day of trial with the intention of disrupting trial.

**B.    Alleged Violation of Maryland State Court's Protective Order**

Gore argues that Bard breached its duty to honor the protective order of the Maryland court "by improperly obtaining the Teece Report and other confidential Gore documents from the Cecil County clerk's office in violation of the Maryland court's protective orders" and failing to subsequently inform the Maryland court of the violation. (*See* D.I. 510 at 15-16) Bard responds that its attorney, Mr. Charles Wineland III, who was sent to locate and make copies of the documents at the Maryland courthouse, "did not access any sealed documents." (*See* D.I. 516 at

18) "To the contrary," according to Bard, "he **avoided** reviewing materials marked as sealed."

(*Id.*) (emphasis in original)  Mr. Wineland submitted a declaration in which he states the

following regarding his visit to the Cecil County courthouse, where he located and marked

certain documents for copying by a third-party vendor:

> In one of the boxes were certain binders of documents with
> covers indicating they were under seal.  I did not open those
> binders and I did not identify those binders or the documents in
> them for copying.
>
> . . .
>
> I reviewed the other documents in the boxes and tagged
> ones to be copied with post-it notes. . . .  I did not read them
> closely at that time but did identify them as containing potentially
> relevant information.  They were not in a sealed binder or sealed
> container, nor were there any cover labels or slip sheets with the
> documents indicating they were filed under seal.  Rather, they were
> among the loose documents in the boxes available for review.

(D.I. 519 at 3)  Mr. Wineland testifies that court personnel facilitated his location and

identification of relevant documents for copying.  (*See id.* at 2) ("The clerk told me the records

were in boxes available for me to review in a room in the basement of the courthouse.  She

explained I could copy the documents there using the copier available to the public.")

As an initial matter, the Court's view is that it is generally preferable to approach the

court whose order has allegedly been violated with the evidence of the violation and allow that

court to assess what to do about any misconduct that can be proven.  Here that would entail Gore

presenting its arguments and evidence to the Maryland state court (in addition to or in lieu of

presenting them here).  In any event, the evidence Gore has presented in this Court does not

demonstrate any sanctionable conduct by Mr. Wineland (or anyone else).  From the record it

29

appears that at all times Mr. Wineland proceeded in compliance with the instructions and representations he received from Maryland court personnel, and he was permitted to rely on such statements.  Moreover, Mr. Wineland proceeded cautiously, intentionally not reviewing certain binders of documents with covers indicating they were under seal.

Gore points out that the Teece Report itself was marked "confidential" and "subject to protective order."  (D.I. 510 at 2)  This marking does not prove misconduct.  Documents that may at one time be marked "confidential" are frequently "de-designated," including when they are needed for presentation in Court, and such de-designations are not always accompanied by removal of an outdated "confidential" marking.  Moreover, the non-confidential nature of the Teece Report seems evident from Gore's lack of efforts to move to seal the courtroom when it was being discussed in this Court and failure to try to require the Teece Report be treated as confidential here.

The Court is not persuaded there was a violation of the state court's protective order.  Therefore, the Court will deny Gore's Motion.

### C.    Bard's Request for Fees

Bard requests that it be awarded the attorneys' fees it incurred in having to respond to Gore's Motion.  (D.I. 516 at 3)  This may well be a request that should be granted.  Gore's Motion leveled serious accusations of misconduct against highly-experienced attorneys and, as the discussion above demonstrates, the record does not support these allegations.

The parties have not provided briefing or argument directed to Bard's fee request.  Accordingly, the Court will order that the parties submit letter briefs addressing whether it should grant Bard's request to recover attorneys' fees.

V.     **CONCLUSION**

For the foregoing reasons, the Court will grant in part and deny in part Bard's Motion and will deny Gore's Motion.  An appropriate Order follows.