08:18:28  1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -
      W.L. GORE & ASSOCIATES, INC.,        :    CIVIL ACTION
4                                          :
              Plaintiff,                   :
5      v                                   :
                                           :
6      C.R. BARD, INC. and BARD PERIPHERAL :
      VASCULAR, INC.,                      :
7                                          :    NO. 11-515-LPS
              Defendants.
8                              - - -

9                         Wilmington, Delaware
                       Tuesday, February 28, 2017
10                            *Volume A*

11                             - - -

12     BEFORE:  HONORABLE LEONARD P. STARK, Chief Judge, and a jury

13     APPEARANCES:              - - -

14
                      YOUNG CONAWAY STARGATT & TAYLOR, LLC
15                    BY:  ADAM W. POFF, ESQ., and
                          PILAR G. KRAMAN, ESQ.
16
                          and
17
                      FAEGRE BAKER DANIELS, LLP
18                    BY:  JAMES W. PORADEK, ESQ.,
                          CHAD DROWN, ESQ.,
19                        KEVIN P. WAGNER, ESQ.,
                          ELIZABETH COWAN WRIGHT, ESQ.,
20                        DAVID MERRITT, ESQ.,
                          KATHERINE S. RAZAVI, ESQ.,
21                        LAUREN J. FRANK, ESQ.,
                          TIMOTHY M. SULLIVAN, ESQ., and
22                        PATRICK C. BOTTINI, ESQ.
                          (Minneapolis, Minnesota)
23
                          Counsel for W.L. Gore & Associates, Inc.
24

25                                 Brian P. Gaffigan
                                   Registered Merit Reporter

```
 1    APPEARANCES:   (Continued)

 2
                    MORRIS NICHOLS ARSHT & TUNNELL, LLP
 3                  BY:   JACK B. BLUMENFELD, ESQ., and
                          MICHAEL J. FLYNN, ESQ.
 4
                          and
 5
                    KIRKLAND & ELLIS, LLP
 6                  BY:  STEVEN CHERNY, ESQ., and
                          JEREMY WILSON, ESQ.
 7                        (New York, New York)

 8                        and

 9                  KIRKLAND & ELLIS, LLP
                    BY:  EDWARD C. DONOVAN, ESQ.,
10                        CHARLES C. FERNANDEZ, ESQ.
                          KATHARINE M. BURKE, ESQ.
11                        MICHAEL A. PEARSON, ESQ., and
                          JASON M. WILCOX, ESQ.
12                        (Washington, District of Columbia)

13                        and

14                  KIRKLAND & ELLIS, LLP
                    BY:  AMANDA J. HOLLIS, ESQ., and
15                        DENNIS J. ABDELNOUR, ESQ.
                          (Chicago, Illinois)
16
                          and
17
                    WOLF, GREENFIELD & SACKS, P.C.
18                  BY:  JOHN L. STRAND, ESQ.
                          (Boston, Massachusetts)
19
                              Counsel for C.R. Bard, Inc. and
20                            Bard Peripheral Vascular, Inc.

21

22

23

24

25
```

1                          - oOo -

2                    P R O C E E D I N G S

3                  (REPORTER'S NOTE:  The following jury trial was

08:14:10  4    held in open court, beginning at 8:37 a.m.)

08:16:54  5                  THE COURT:  Good morning, everyone.

08:29:03  6                  (The attorneys respond, "Good morning, Your

08:29:07  7    Honor.")

08:29:07  8                  THE COURT:  Just this first morning, let me

08:37:02  9    start by having you put your appearances on the record for

08:37:04 10    us, please.

08:37:06 11                  MS. KRAMAN:  Good morning, Your Honor.

08:37:09 12                  THE COURT:  Good morning.

08:37:10 13                  MS. KRAMAN:  Pilar Kraman for Gore.  With me at

08:37:13 14    counsel table is Jim Poradek.

08:37:16 15                  MR. PORADEK:  Good morning, Your Honor.

08:37:16 16                  MS. KRAMAN:  Liz Wright.

08:37:16 17                  MS. WRIGHT:  Good morning, Your Honor.

08:37:16 18                  MS. KRAMAN:  From Faegre.

08:37:18 19                  And there is Kevin Wagner.

08:37:19 20                  MR. WAGNER:  Good morning, Your Honor.

08:37:19 21                  MS. KRAMAN:  And in the gallery, the same order

08:37:21 22    here, Jill Schmid, our jury consultant; Chad Drown, Kate

08:37:26 23    Razavi, also from Faegre; and then Allan Wheatcraft and Mike

08:37:32 24    Vonesh in the back from Gore.

08:37:32 25                  THE COURT:  Okay.  Welcome to all of you.  Thank

08:37:35  1    you.

08:37:37  2                    MR. BLUMENFELD:  Good morning, Your Honor.

08:37:38  3                    THE COURT:  Good morning.

08:37:39  4                    MR. BLUMENFELD:  Jack Blumenfeld from Morris

08:37:41  5    nick from Bard.  At counsel table, Steve Cherney and Amanda

08:37:44  6    Hollis from Kirkland & Ellis.  Behind them Jason Wilcox and

08:37:48  7    Ed Donovan also from Kirkland & Ellis; Jackie Dasbit who is

08:37:53  8    in-house at Bard; and in the first row, Carrie Mason who is

08:37:58  9    our jury consultant.

08:37:59 10                    THE COURT:  Okay.  Good morning.  Welcome to all

08:38:01 11    of you.

08:38:01 12                    So we are here for jury selection for the trial

08:38:05 13    that will begin tomorrow.  I have on my agenda for this

08:38:12 14    morning the one issue that we flagged in the order yesterday

08:38:15 15    which is the Factual Stipulation No. 2, and then we will

08:38:19 16    give a chance for you to raise any issues you raise.  We are

08:38:22 17    going to charge you for the time this morning in accordance

08:38:25 18    with what you agreed on as for keeping time in the pretrial

08:38:29 19    order.

08:38:30 20                    So with that, let me hear from the plaintiffs,

08:38:33 21    their position on the stipulation.

08:38:36 22                    MS. WRIGHT:  Yes, Your Honor.  Again, Liz Wright

08:38:42 23    for plaintiff.  Thank you.

08:38:43 24                    THE COURT:  Good morning.

08:38:44 25                    MS. WRIGHT:  With respect to the Teece

08:38:46  1    **stipulation, there are three issues I would like to**

08:38:49  2    **specifically address the request in your order yesterday**

08:38:51  3    **with regard to the support for the fact that Ms. White used**

08:38:55  4    **those criteria, the criteria for selecting the patents that**

08:38:59  5    **go in the proud patent list.**

08:39:00  6            **And I think there is just a little bit of**

08:39:03  7    **confusion, Your Honor.  There were two sets of criteria that**

08:39:05  8    **were used with respect to the proud patent list.  One of**

08:39:08  9    **them is the selection criteria.  That is the valid, likely**

08:39:13 10    **to be infringe and difficult to work around criteria that**

08:39:16 11    **we're proposing to include in paragraph 5.**

08:39:18 12            **Those are identified in paragraph 62 of the**

08:39:20 13    **Teece report and the record is undisputed that those were**

08:39:23 14    **used.  Ms. Wright testified to that effect, Dr. Vonesh**

08:39:26 15    **testified to that effect and defendant's expert Nigel Buller**

08:39:30 16    **understood the documents to reflect that.  So we think the**

08:39:32 17    **evidence is undisputed.**

08:39:33 18            **The other set of criteria that had been**

08:39:36 19    **discussed are those used to rank the patents.  That is a**

08:39:39 20    **separate set of criteria.  Those came from Les Nouvelles,**

08:39:44 21    **and that is included in the stipulation in I think**

08:39:48 22    **paragraph, sorry, that is in paragraph 5.  So the criteria**

08:39:51 23    **we are proposing to add, Your Honor, are in paragraph 3.**

08:39:53 24            **THE COURT:  So you are making an exchange**

08:39:56 25    **between selection and ranking and you see ranking as covered**

08:39:59 1   by paragraph 5.

08:40:00 2           MS. WRIGHT:  Absolutely, Your Honor.  And there

08:40:02 3   is a distinction between selection and ranking, and that is

08:40:04 4   discussed in the Teece report and is supported by all of

08:40:07 5   the evidence in the case.  That is why we believe it is

08:40:09 6   important to include the selection criteria which was

08:40:12 7   undisputedly used in paragraph 3.

08:40:14 8           THE COURT:  Now, there is an argument that were

08:40:16 9   I to do this, you will come out better off than you were

08:40:21 10  than what you originally proposed; and I rejected.  How do

08:40:23 11  you respond to that?

08:40:24 12          MS. WRIGHT:  I think there may have been just a

08:40:26 13  little bit of a misunderstanding with how we were proposing

08:40:28 14  that the first time, Your Honor.  We tried to clarify that

08:40:30 15  with our new proposal to stay with the Teece report,

08:40:33 16  identify those criteria.  You know, we thought that it

08:40:37 17  perhaps wasn't clear that was actually identified with the

08:40:39 18  Teece report, and that all of the evidence in the record was

08:40:41 19  clear to those with the criteria that were used.

08:40:43 20          So we obviously respect the Court's Order very

08:40:46 21  much, but we wanted to put that forth.  And we also think

08:40:49 22  it is important to include the criteria for selection in

08:40:52 23  the stipulation because it doesn't seem reasonable to have

08:40:57 24  criteria for ranking included but not the criteria for

08:40:59 25  selection.  We want to be -- we want the jury to have all of

08:41:03 1    the facts with respect to the way that the proud patent list

08:41:06 2    was created in front of them.

08:41:08 3              THE COURT:  Okay.  And you see two other

08:41:10 4    disputes, right?

08:41:11 5              MS. WRIGHT:  Yes, Your Honor.  Turning on to the

08:41:13 6    question of whether there should be a stipulation of factual

08:41:16 7    stipulation about whether Gore had a financial incentive to

08:41:19 8    maximize the value of the patent.

08:41:20 9              There is just no evidence that actually supports

08:41:23 10   that.  And when you look at the letter that was filed by

08:41:25 11   defendants, you can see there is a lot of attorney argument

08:41:28 12   as to why they think that is the case.  But we can't have a

08:41:31 13   factual stipulation that relates to attorney argument to

08:41:34 14   maximize the financial incentives -- excuse me, attorney

08:41:38 15   argument related to Gore having an incentive to maximize the

08:41:42 16   financial value of the '892 patent.

08:41:44 17             We propose as a compromise that we would

08:41:46 18   say that Gore had a financial incentive to accurately

08:41:50 19   characterize the patent which we think is reasonable; but

08:41:52 20   just to be clear, Your Honor, the royalty rate, that

08:41:55 21   7.5 percent royalty rate discussed in the Teece report was

08:41:59 22   set in 1999.  So there was no attempts to adjust the royalty

08:42:03 23   rate with the Teece report.  They were simply analyzing the

08:42:06 24   patent portfolio.  So we think it would be unreasonable to

08:42:11 25   say there was a financial incentive to maximize the valve

08:42:14 1   and defendants have not identified any evidence that is the

08:42:16 2   case.  So we don't think we should have a stipulation when

08:42:19 3   there is no evidence.

08:42:20 4        THE COURT:  Well, as I understand it, the whole

08:42:21 5   Maryland tax proceeding was about Gore having to justify the

08:42:26 6   payments that it made to GEH in order to justify the taxes

08:42:30 7   that Gore paid; correct?

08:42:32 8        MS. WRIGHT:  That is the case, Your Honor.  You

08:42:35 9   are correct, but the royalty rate itself was already set.

08:42:37 10  And I would point out that the ranking assigned to the '892

08:42:41 11  patent would not have helped justify a higher royalty rate

08:42:46 12  because it actually, according to Les Nouvelles -- we

08:42:49 13  dispute it, but that according to Les Nouvelles would be 7

08:42:53 14  and-a-half so there is a math issue.  There is not an

08:42:57 15  incentive to assign that value.

08:42:57 16       THE COURT:  Let me make it simpler.  If all the

08:43:00 17  patents on the proud patent list were justifiably ranked

08:43:03 18  as revolutionary, wouldn't that more likely support any

08:43:08 19  particular royalty rate than if they all were ranked as

08:43:12 20  minor patents?

08:43:14 21       MS. WRIGHT:  I don't think that squares, Your

08:43:15 22  Honor, with what was actually happening in the real world

08:43:17 23  because the real world was there had been an established

08:43:21 24  rate, established royalty rate of 7 and-a-half percent so

08:43:24 25  Gore was absolutely not trying to increase the rate.  They

08:43:29  1    weren't trying to increase the rate, there was an

08:43:31  2    established rate.  So they would have no reason to rank.

08:43:34  3              THE COURT:  But they were trying to justify a

08:43:36  4    rate they had already paid, weren't they?

08:43:38  5              MS. WRIGHT:  Yes, by balancing out the various,

08:43:40  6    various patents that were ranked.  But, Your Honor, I can

08:43:43  7    see this is something that perhaps, you know, you have

08:43:45  8    concerns about, so we think that the language that we

08:43:48  9    proposed is more accurate because it actually reflects the

08:43:51 10    situation of trying to accurately characterize the patents.

08:43:54 11    But we're not, we don't think it is an accurate actual

08:43:59 12    stipulation, but I understand that the Court has concerns

08:44:00 13    about it.

08:44:01 14              THE COURT:  Okay.  And what is the third dispute

08:44:05 15    that you see here?

08:44:06 16              MS. WRIGHT:  The third dispute relates to the

08:44:08 17    fact that the proposal language that Bard would include as

08:44:13 18    implying that Gore had not had an incentive and also had an

08:44:17 19    opportunity to change the information that it had submitted

08:44:24 20    to the Maryland Tax Court relating to the '892 patent by

08:44:27 21    having a sentence that says:  The proceedings continued

08:44:29 22    until 2014; and then a sentence that says:  Gore did not

08:44:32 23    alter or, you know, did not inform the Maryland Tax Court of

08:44:36 24    the different result at any time.

08:44:37 25              That suggests that Gore had the opportunity to

08:44:38  1    do so and some kind of obligation to do so.

08:44:41  2              Our concern with that was that the record was

08:44:43  3    closed in 2009; and so the idea that there were five years

08:44:47  4    of appeals that proceedings continued with, that Gore, it is

08:44:51  5    somehow being suggested.  Should have altered the royalty

08:44:54  6    rate but didn't is very misleading to the jury.

08:44:58  7              THE COURT:  So can you represent there was no

08:45:00  8    way whatsoever in the course of those appellate proceedings

08:45:04  9    that had Gore decided, hey, wait a minute, this is just a

08:45:07 10    minor patent, it's not anything better -- or it's the

08:45:11 11    opposite really.  Hey, this is a really valuable patent but

08:45:15 12    we have a record on appeal that said this is just minor.  We

08:45:18 13    don't really believe that any more.  Your representation is

08:45:22 14    there was no way to let the Maryland Court know that.

08:45:25 15              MS. WRIGHT:  I think the analogy, Your Honor,

08:45:26 16    would be if there were a case in front of Your Honor, that

08:45:29 17    was the record was then closed, there was a verdict, and

08:45:31 18    then it went up to the appellate court.  I don't think it

08:45:34 19    would be expected or anticipated that someone would come to

08:45:37 20    the trial court or the appellate court after the fact to

08:45:39 21    alter the record.  I'm not sure that that would be permitted

08:45:42 22    in many cases.  Generally, the record is closed.

08:45:44 23              So our concern is that by including that

08:45:46 24    language, they're suggesting there was an opportunity and an

08:45:48 25    obligation that didn't exist.

08:45:50  1                    THE COURT:  Okay.  Is there anything else?

08:45:53  2                    MS. WRIGHT:  No.

08:45:53  3                    THE COURT:  I'll hear from the defendants.

08:45:58  4                    MR. CHERNY:  May I approach, Your Honor?

08:46:00  5                    THE COURT:  Yes.  And good morning.

08:46:01  6                    MR. CHERNY:  Good morning, Your Honor.  I just

08:46:02  7      have a couple of slides.

08:46:03  8                    THE COURT:  Okay.

08:46:13  9                    (Slides passed forward.)

08:46:16 10                    MR. CHERNY:  Okay.  So I will start with the

08:46:21 11      first issue that was raised, Your Honor.

08:46:22 12                    Now, Ms. Wright raised a number of times where

08:46:25 13      she said things were undisputed or indisputable.  I think

08:46:28 14      what you are going to see, there is actually a dispute here.

08:46:30 15                    So here is the Teece report, which obviously we

08:46:33 16      would have preferred to use the entirety, but we understand

08:46:37 17      the Court's issue here and are trying to work with the Court

08:46:40 18      to solve it.

08:46:40 19                    Here is where Dr. Teece talks about assembling

08:46:45 20      the proud list.

08:46:46 21                    Here is where the three criteria he said he

08:46:49 22      applied, and it is important to understand what he is doing

08:46:51 23      here.  He says it is common for the parties to focus on a

08:46:54 24      proud list of key patents.

08:46:55 25                    And, remember, he is talking about the licensor

08:46:58  1    and the licensee.  So what is happening is between Gore and

08:47:02  2    GEH, he is saying, okay, lee my look at three criteria to

08:47:05  3    about the value of the parties.  Remember, as you said, they

08:47:08  4    are trying to justify what Gore as the licensee paid to GEH.

08:47:11  5              And he lists one.  It is very similar in some

08:47:14  6    respects to what have you seen before in terms of maybe a

08:47:17  7    reasonable royalty negotiation.

08:47:18  8              Assume it is valid.

08:47:20  9              Infringed by a significant portion of the

08:47:22 10    prospective licensee's product offerings.

08:47:24 11              Now, the licensee here is Gore.  And the reason

08:47:27 12    I'm noting that is because not because I'm arguing the

08:47:30 13    marking issue but it shows that there was a change that

08:47:33 14    actually has animated their deviation from those three

08:47:38 15    criteria.

08:47:38 16              So what is really happening here is difficult or

08:47:41 17    impossible to work around.

08:47:43 18              So what Dr. Teece is saying, let's assemble a

08:47:46 19    list of patents that the licensee, Gore, they're valid, they

08:47:49 20    use them because that is justified why they're paying the

08:47:54 21    7 and-a-half percent and it would be hard for them to get

08:47:56 22    around.

08:47:56 23              And then he says, well, we're putting the proud

08:47:59 24    patent list.  He asked the people of Gore to identify key

08:48:01 25    patents within the GEH portfolio, especially those that read

08:48:04 1    on the various products that Gore makes.

08:48:06 2             And if you recall, actually for the '892, they

08:48:08 3    listed 100 percent coverage ratio.

08:48:11 4             What happened since there that caused the whole

08:48:14 5    issue that we discussed before where we decided they do not

08:48:17 6    or never practiced the '892, they actually deviated from the

08:48:20 7    criteria here that they want to enter into the stipulation.

08:48:23 8             So as we pointed out, they're actually using

08:48:28 9    different criteria.

08:48:29 10            This is Mr. Vonesh's testimony:

08:48:32 11            What was the activity that you did participate

08:48:34 12   with respect to the proud patent list?

08:48:37 13            I personally provided input and guidance to

08:48:39 14   identifying patent classes in alignment with those four

08:48:42 15   criteria.

08:48:43 16            Now, there is only three criteria.  So right

08:48:45 17   away we know they're applying, or their testimony is that,

08:48:49 18   in this case, that they used four criteria.  What is the

08:48:53 19   four criteria?

08:48:54 20            What happened is because of the inconsistency

08:48:57 21   with what Teece actually said, which was trying to justify

08:49:01 22   that 7 and-a-half percent by looking at patents that Gore

08:49:04 23   was actually using?  Because obviously it would make no

08:49:06 24   sense when Gore is trying to justify why it paid GEH.  It is

08:49:11 25   saying here -- you know, he starts off with give me patents

08:49:13 1    that Gore is using and then we can justify, you know, why

08:49:17 2    you are paying 7 and-a-half percent and then we can rank

08:49:19 3    them as to what their value was.

08:49:21 4         What has happened is that now in this case,

08:49:24 5    because they decided to take a different tact than they did

08:49:27 6    in that earlier case which we showed you at the last

08:49:30 7    pretrial conference and in Maryland, they said there is four

08:49:35 8    criteria, and the criteria they added is not just is it

08:49:39 9    valid, infringed, hard to work around, they added this

08:49:43 10   criteria called defensive value that the patent would impart

08:49:46 11   to Gore from a strategic point of you know I'm not hear

08:49:50 12   argument.  I think this is clearly wrong but I don't see how

08:49:53 13   they can essentially say we want to stipulate that this is

08:49:56 14   what happened in Teece, right now.

08:49:59 15        When -- and this is Vonesh here, their corporate

08:50:03 16   representative.

08:50:05 17        White, who Ms. Wright mentioned, the same thing.

08:50:09 18   She said what were the criteria you used to compile?

08:50:13 19        I don't recall specifically but they appear to

08:50:14 20   be reasonable.

08:50:15 21        And then she goes through and says, and she

08:50:18 22   expects there was also a sort of defensive value.

08:50:21 23        She says maybe that would be considered as part

08:50:23 24   of item 3, difficult and/or costly to work around.

08:50:26 25        But what Teece is talking about there is, he is

08:50:31 1    talking about difficult and costly to work around for the

08:50:33 2    licensee.  So the whole issue here is that if we had the

08:50:37 3    actual Teece report we would be able to cross or show people

08:50:41 4    exactly what he did, but we don't.  And so I understand

08:50:44 5    that.  It seems unfair at this point for them to say we want

08:50:47 6    in here a criteria for selection that their own witnesses

08:50:51 7    have said is different than the one they employed.

08:50:53 8              THE COURT:  All right.  Well, first of all, do

08:50:55 9    you agree that paragraph 3 deals with selection criteria

08:50:59 10   whereas paragraph 5 deals with the value --

08:51:03 11             MS. WRIGHT:  Absolutely.

08:51:04 12             THE COURT:  Let me finish the question.

08:51:06 13             MR. CHERNY:  I'm sorry, Your Honor.

08:51:07 14             THE COURT:  With the valuation and ranking

08:51:09 15   criteria, paragraph 5; correct?

08:51:10 16             MR. CHERNY:  Correct.

08:51:11 17             THE COURT:  So in paragraph 3, would you object

08:51:14 18   to us essentially tracking what you have here and saying,

08:51:18 19   you know, the Teece report identifies the following criteria

08:51:21 20   it is common to use in selecting patents, one, two, and

08:51:25 21   three, and then adding something along the lines of

08:51:28 22   paragraph 88, in this case, the Teece report also indicates

08:51:34 23   defensive value, something to that effect was considered.

08:51:37 24             MR. CHERNY:  We would object because we don't

08:51:39 25   actually agree the Teece report.  What they're saying here,

08:51:42  1    88 doesn't say anything about defensive value.  88 tracks

08:51:45  2    No. 2 which is that the whole point was they were assembling

08:51:49  3    patents that were used by Gore.  They have now taken a

08:51:52  4    different position and their witnesses have now taken a

08:51:55  5    different position so now they tried to add in a further

08:51:57  6    criteria called defensive value.

08:51:59  7         THE COURT:  So what is your position?  Did they

08:52:01  8    use three criteria or four criteria to select?

08:52:05  9         MR. CHERNY:  I think Teece used three criteria,

08:52:08 10    but their witnesses have said four criteria.  So at this

08:52:10 11    point, there seems to be an internal dispute (A) between us

08:52:13 12    and them.  I think that they used the patent.  I think that

08:52:16 13    they had a duty to mark as we discussed.  I think there is

08:52:18 14    evidence to that effect, but they disagree.  They say they

08:52:22 15    didn't use the patent and so, for example, if we're going to

08:52:27 16    say, pursuant to their stipulation and their interrogatory,

08:52:29 17    that they say they didn't use the patent.

08:52:31 18         But this suggests otherwise.  This suggests that

08:52:33 19    this is something that was used as part of what was put in

08:52:36 20    there.  And so we have an internal Gore dispute here which

08:52:40 21    is Teece saying these are the criteria I used and the people

08:52:44 22    he spoke to saying, well, there were four criteria.  So

08:52:48 23    we're having a hard time figuring it out, stipulating to

08:52:51 24    this because although I do believe that that is the

08:52:55 25    criteria, the record is unclear here.

08:52:57 1              THE COURT:  By that, you mean just the three.

08:52:59 2              MR. CHERNY:  Yes.  I mean it's clear that they

08:53:02 3   have taken a position because.

08:53:04 4              And especially, remember, we have the same jury

08:53:06 5   later on for damages as well.  It's clear that they have

08:53:10 6   added on a criteria called defensive value which they view

08:53:13 7   as, well, the patent could be listed on there, even if we

08:53:16 8   didn't practice it, but it could be valued for its defensive

08:53:19 9   value in keeping somebody else out.  When they say defensive

08:53:22 10  value, what they're saying is that there is now a fourth

08:53:25 11  criteria which is for patents that they don't use, but that

08:53:28 12  will keep other people out.

08:53:30 13             So I'm not trying to be difficult here, Your

08:53:32 14  Honor.  I do understand what the Court is trying to do.

08:53:34 15  And, again, it's not that three itself was -- if we had the

08:53:38 16  actually document, if it is in the actual document, it would

08:53:43 17  show what Teece was saying but it would also be clear what

08:53:45 18  he was talking about was he was -- because he was trying to

08:53:49 19  assess the reasonableness of the royalty that Gore was

08:53:53 20  paying to GEH, that he is talking in his mind about patents

08:53:57 21  that he thinks are being practiced.

08:53:59 22             THE COURT:  But it is correct that the Teece

08:54:01 23  report identified the three criteria it is common to use in

08:54:05 24  selecting patents; correct?

08:54:06 25             MR. CHERNY:  That is correct.

08:54:07  1          THE COURT:  And you actually -- it not only says

08:54:09  2    that, you think that is what he did?

08:54:10  3          MR. CHERNY:  I think that is what he did, but I

08:54:12  4    also think that Gore simultaneously in this case is arguing

08:54:15  5    something that is contrary to that.  So I think that they

08:54:18  6    believe, and argued, essentially argued when, I put up the

08:54:23  7    proud patent list up there and, say, look it is minor,

08:54:25  8    they're going to say we don't practice it.  And that shows

08:54:29  9    Your Honor, it's minor.  It is major to you.  They say it is

08:54:32 10    major to you, Bard, but it was minor to us.

08:54:34 11          THE COURT:  All right.  What about the other

08:54:36 12    issues?

08:54:36 13          MR. CHERNY:  Okay.  I think also, it wasn't

08:54:42 14    raised, I think there was an issue in what they put in that

08:54:45 15    there was a time deadline of 2003.  And the only thing we

08:54:48 16    want to point out was even though they keep saying that

08:54:51 17    Teece's report and proud patent list was limited to 2003

08:54:55 18    temporally, there are patents on the list that didn't issue

08:54:57 19    until after 2003.

08:54:59 20          THE COURT:  So you don't agree that the time

08:55:03 21    period relevant to this analysis was 1994 to 2003?

08:55:06 22          MR. CHERNY:  I do agree that was what was

08:55:08 23    relevant to his analysis.  I do not agree that since the

08:55:10 24    proud patent list goes beyond that, obviously there were

08:55:13 25    patents that were being valued on the proud patent list that

08:55:17 1    hadn't issued as of 2003.

08:55:18 2              THE COURT:  Okay.

08:55:19 3              MR. CHERNY:  And so this goes to the question

08:55:23 4    that you raised, and I think you addressed it exactly the

08:55:27 5    way we would address it, which is the reason we wanted to

08:55:30 6    use the Teece report in some respects was to provide -- in

08:55:33 7    great respect was to provide the context for why they're

08:55:36 8    doing this whole exercise, and you are exactly right.

08:55:38 9              What happened was Maryland was challenging Gore

08:55:42 10   and said, look, 7.5 percent is too high and they did have a

08:55:45 11   financial, clear financial incentive because as you said.

08:55:49 12   So it wasn't a matter of 7.5 percent changing, although they

08:55:52 13   did, they're supposed to renegotiate it every year and

08:55:55 14   relook at it.

08:55:56 15             But putting the 7.5 percent aside, Maryland is

08:55:59 16   saying, look, we want to make sure this is a real number for

08:56:02 17   an arm's length transaction for these patents between you

08:56:05 18   two.  And obviously, as you said, you know, the more patents

08:56:09 19   that are more valuable, the more likely it is that Maryland

08:56:13 20   says, okay, you know, that is worth 7 and-a-half percent.

08:56:15 21   And so that was clearly one of the things that we would

08:56:18 22   argue.

08:56:19 23             THE COURT:  And in order to justify the amount

08:56:23 24   of taxes that Gore was paying to Maryland, they needed to

08:56:27 25   justify the 7 and-a-half percent royalty rate.

08:56:29  1          MR. CHERNY:  Correct.  Because that was actually

08:56:31  2   the whole point of the Teece report which was to go through

08:56:33  3   the 7 and-a-half percent and essentially take this group of

08:56:37  4   patents, and that animated both the selection -- that is why

08:56:40  5   the selection criteria included patents that W.L. Gore uses.

08:56:45  6   Because what are you paying for to use?  What is valuable to

08:56:48  7   you as a licensee?  Assuming, for example, that you needed

08:56:51  8   a license from your subsidiary.  And then once you look

08:56:54  9   through the identified patents that you need to use, how

08:56:59 10   much is it worth to you to use those things?  And obviously

08:57:01 11   they said this is revolutionary, this is major.  It more

08:57:06 12   justifies.

08:57:07 13          THE COURT:  Now, if I tell the jury and let you

08:57:09 14   argue to the jury that Gore had a financial incentive to

08:57:14 15   maximize the value of the '892 patent, is it your intent

08:57:19 16   to argue from that that they were being deceptive and

08:57:23 17   manipulative and dishonest with the proceeding?

08:57:27 18          MR. CHERNY:  No.  No.  In fact, what I'm saying,

08:57:30 19   they realized, even though they hadn't -- when they looked

08:57:33 20   at each one of those patents, they were looking at it

08:57:35 21   through the scope of -- (hitting mike) -- I'm sorry.  I want

08:57:38 22   to value this, and I want to give it the best value I can

08:57:41 23   possibly give it, and so I'm not saying they were trying to

08:57:44 24   be deceptive about it.  What I'm saying is when they looked

08:57:47 25   at it, their incentive in each case is to essentially give

08:57:51  1     it the best justifiable value it could have.

08:57:53  2              So if minor -- if major could have been

08:57:56  3     justified, they would have justified it.  They would have

08:57:58  4     made it major, so I'm not saying.

08:58:00  5              THE COURT:  At least they would have had a

08:58:01  6     financial incentive to justify it.

08:58:03  7              MR. CHERNY:  Correct.  I mean that was clearly

08:58:04  8     the whole point of Teece is to go through each of these

08:58:06  9     patents that they allegedly practiced and say, okay, you

08:58:10 10     know, how does this justify the many millions of dollars

08:58:13 11     that you wrote off in Maryland?

08:58:16 12              THE COURT:  And the third issue.

08:58:17 13              MR. CHERNY:  Okay.  The third issue was, I heard

08:58:20 14     the question you asked Ms. Wright which is, it clearly, the

08:58:24 15     proceeding went to 2014.  I don't think there was any

08:58:26 16     guarantee that they couldn't have updated it.  They

08:58:29 17     certainly didn't update it even past 2009.  I mean they

08:58:32 18     certainly -- had they decided that, that there was something

08:58:35 19     that happened in the market that had said, wow, everyone has

08:58:38 20     now adopted, I think they could have gone to both the tax

08:58:42 21     authorities and the court.

08:58:43 22              Remember, they're also dealing with tax

08:58:45 23     authorities on the other side and they could have said,

08:58:47 24     look, this is 2011.  This is widespread adoption where

08:58:52 25     people are using this.  This now justifies, and I do think

08:58:55  1    the tax authority would have listened to it.

08:58:57  2            And I did not hear, when you asked Ms. Wright,

08:59:00  3    can you guarantee or represent that there was no -- and she

08:59:03  4    said, well, I would think it is analogous to your court, but

08:59:06  5    that is not an answer.

08:59:07  6            I mean what they're essentially saying is -- and

08:59:09  7    this is the argument that happened -- cut it off at 2003 and

08:59:12  8    then we're going to essentially say in 2003, given the

08:59:15  9    market conditions in 2003, this was a minor patent, but it

08:59:19 10    became more.

08:59:19 11            Now, of course, she slipped there.  She said up

08:59:22 12    until 2009, it could have changed, because she says the

08:59:25 13    record closed in 2009.

08:59:26 14            But, again, I don't know and I don't think she

08:59:29 15    knows whether she could have gone to the tax authorities or

08:59:33 16    the people actually taxing, not just the court, and said tax

08:59:38 17    authorities, we want to show you, look, this patent, which

08:59:40 18    is licensed, has actually become much more major.

08:59:43 19            THE COURT:  Would you object to us adding to

08:59:45 20    your sentence, "the evidentiary record closed in 2009?"

08:59:51 21            MR. CHERNY:  I would not.

08:59:52 22            THE COURT:  Is there anything else?

08:59:53 23            MR. CHERNY:  No, Your Honor.  Thank you.

08:59:54 24            THE COURT:  All right.  Ms. Wright.

08:59:59 25            MS. WRIGHT:  Very briefly, Your Honor.

09:00:02 1           We think the record that we submitted with our

09:00:04 2   letter makes it clear that Ms. White used the three, used at

09:00:08 3   least the three criteria set forth in the report.  And if

09:00:10 4   you look at the excerpts, the unhighlighted portions that

09:00:13 5   Mr. Cherney just showed up there, the portions that weren't

09:00:16 6   highlighted, they reflected those criteria were used.

09:00:19 7           THE COURT:  Well, okay.  But is there, are you

09:00:21 8   proposing to tell the jury about this fourth criteria as well?

09:00:26 9           MS. WRIGHT:  Your Honor, I think what we are

09:00:27 10  proposing is a stipulation that would say the Teece report

09:00:30 11  identified these three criteria.  And if Bard and Mr. Cherney

09:00:33 12  want to cross-examine our witnesses on whether there was a

09:00:36 13  fourth criteria used, we don't have an objection to that.

09:00:39 14          THE COURT:  Well, they, if I understand

09:00:40 15  correctly, they don't think a fourth criteria was used.

09:00:43 16  They say it is you that thinks a fourth criteria was used.

09:00:47 17          MS. WRIGHT:  In that case, if they want to

09:00:49 18  cross-examine our witnesses about the fact that a fourth

09:00:51 19  criteria was not used, that would be fine, too.

09:00:53 20          We would just like the stipulation to be clear

09:00:55 21  that the Teece report sets forth those criteria, which it

09:00:58 22  does, and to the extent there is cross-examination about how

09:01:01 23  the criteria were used to select the patents for the list,

09:01:05 24  or whether additional criteria were or were not used, that

09:01:08 25  would just come out in the normal course of trial, Your

09:01:10   1    Honor.

09:01:10   2                    THE COURT:   Are you intending to bring out as

09:01:12   3    part of your case -- and by that, I mean even your

09:01:17   4    cross-examination of their case, rebuttal of their case,

09:01:20   5    are you intending to make as part of this case that the

09:01:22   6    selection of the patents for the proud patent list were

09:01:25   7    based at least in part on this fourth criteria of defensive

09:01:29   8    value?

09:01:30   9                    MS. WRIGHT:   I believe that would be part of

09:01:31  10    our case, which is why we would have no objection to them

09:01:35  11    cross-examining our witnesses on it, obviously.

09:01:37  12                    THE COURT:   Hold on.   Their argument --

09:01:38  13                    MS. WRIGHT:   Okay.

09:01:39  14                    THE COURT:   If I tell the jury that it was done

09:01:41  15    based on these three, and yet you are going to take the

09:01:45  16    position it was based on four, then arguably what I'm saying

09:01:49  17    is a little misleading to the jury.

09:01:51  18                    MS. WRIGHT:   I understand your position, Your

09:01:53  19    Honor.   All we are asking for in the stipulation is not

09:01:55  20    that you say those criteria were used but that you, the

09:01:58  21    stipulation say that the Teece report sets forth those

09:02:02  22    three criteria which we view as being parallel to say Les

09:02:07  23    Nouvelles set forth these values in the patents.

09:02:09  24                    So we're not asking the stipulation to say that

09:02:11  25    those criteria were used.   We would be absolutely fine with

09:02:14 1    the stipulation saying the stipulation sets fourth the three

09:02:18 2    criteria, which I think is --

09:02:19 3                THE COURT:  And your proposal remains that I am

09:02:22 4    just silent on this supposed fourth criteria, and then you

09:02:26 5    fight it out in front of the jury on the fourth criteria.

09:02:29 6                MS. WRIGHT:  Or if you wanted to include

09:02:31 7    language, Your Honor, that at least these criteria --

09:02:33 8                (Counsel confer.)

09:02:35 9                MS. WRIGHT:  Right.  Thank you, Mr. Poradek.

09:02:37 10               We would be okay if that language said something

09:02:40 11   like at least these three criteria were used, but I would

09:02:44 12   also point out Ms. White testified that she viewed that

09:02:48 13   fourth criteria that Mr. Cherny was showing you as actually

09:02:51 14   being part of the three criteria.

09:02:53 15               And if I could work the Elmo, I could show that

09:02:56 16   to Your Honor.

09:02:57 17               THE COURT:  I recall that.

09:02:59 18               And so your argument is going to be something to

09:03:02 19   the effect of while the '892 patent is minor to us, Gore,

09:03:06 20   it's major to the defendant.

09:03:08 21               MS. WRIGHT:  We will be making that argument,

09:03:10 22   Your Honor.

09:03:10 23               THE COURT:  Okay.  Is there anything else on

09:03:14 24   this first issue?

09:03:15 25               MS. WRIGHT:  So I think just to reiterate, that

09:03:16  1    is why we're comfortable and would request a stipulation

09:03:19  2    that reflects what the Teece said.  And if the Court wanted

09:03:22  3    to make additional qualifying language to account for the

09:03:25  4    fourth criteria issue, we would be fine with that.

09:03:27  5             Nothing else on the first issue, Your Honor.

09:03:29  6             THE COURT:  Okay.

09:03:30  7             MS. WRIGHT:  On the last issue, I'll just skip

09:03:32  8    over the financial incentive.

09:03:35  9             With respect to the timing, I'll point out the

09:03:37 10    entire exercise of the Teece report was focused on 2003.

09:03:40 11    What I just heard counsel for Bard, Mr. Cherney say is that

09:03:43 12    I don't know whether the record could have been altered

09:03:45 13    after 2009; and I also couldn't say he doesn't know if the

09:03:48 14    record could have been altered; so what that tells me

09:03:51 15    perhaps we shouldn't be putting things in the stipulation

09:03:53 16    that would imply somebody could have altered the record

09:03:56 17    where it is not clear that is the case.

09:03:58 18             We would be okay with what the Court suggested,

09:04:00 19    which is putting in the record closed as of 2009.

09:04:03 20             THE COURT:  Okay.  Is there anything else?

09:04:03 21             MS. WRIGHT:  Thank you, Your Honor.

09:04:05 22             THE COURT:  Mr. Cherney do you want address

09:04:09 23    issue 1?

09:04:10 24             MR. CHERNY:  Yes.  I think what you heard how do

09:04:13 25    you put forth in a non-misleading way a stipulated, a

09:04:17  1    stipulated fact that is clearly -- I mean there is an

09:04:24  2    internal inconsistency.

09:04:30  3              And, again, they said they went back to

09:04:33  4    Ms. White tried to joined it into three.

09:04:34  5              Mr. Vonesh, their corporate representative at

09:04:37  6    this case, said it was four.

09:04:39  7              And when Dr. Criado, who I believe is the one

09:04:45  8    who is going to present on this issue, and he talked about

09:04:48  9    defensive value and the importance of using patents to use

09:04:51 10    keep people out such as Bard or other people, we don't get

09:04:54 11    to cross-examine him with the entire context the Teece

09:04:58 12    report and say wait a second.  That is not what Teece was

09:05:00 13    talking about at all in terms of any of these rankings at all.

09:05:04 14              So what we have is a situation here where they

09:05:07 15    have admitted -- and I mean they have more of the criteria.

09:05:09 16    This is not a stipulation.  So I understand they're getting

09:05:12 17    a benefit by not having the Teece report.  And I understand

09:05:14 18    the Court's reasoning for doing so, but they are clearly

09:05:18 19    changing what he said.

09:05:20 20              Now they said we want to put in that Tease

09:05:22 21    listed it because they want to suggest that that is what --

09:05:25 22    they want to suggest that Teece did apply those criteria in

09:05:29 23    choosing.  And the problem is that it is by no means clear,

09:05:33 24    and they're going to have witnesses who are going to testify

09:05:37 25    I guess more -- as you heard, they're going to say, well,

09:05:40 1    the third criteria is really the fourth criteria.

09:05:43 2              This is not right.  I mean this is not -- at

09:05:46 3    this point, we are moving away from just trying to have

09:05:49 4    facts that we all pretty much agree are in Teece as a

09:05:52 5    bounds, and now they want to essentially get the benefit

09:05:54 6    of what Teece already said and also the benefit of their

09:05:58 7    morphing of Teece without allowing us to control

09:06:01 8    cross-examine with the entirety of the Teece report.

09:06:03 9              THE COURT:  Well, what would you think of the

09:06:05 10   alternative where we say essentially the Teece report

09:06:11 11   identified these criteria and then add to it, you know,

09:06:17 12   something along the lines of the plaintiff's position is

09:06:20 13   that, in addition to that, this fourth criteria was relied

09:06:25 14   on in this case and the defendants disagree, something along

09:06:30 15   those lines?

09:06:32 16             MR. CHERNY:  I think it is confusing.  I don't

09:06:33 17   think it is part of -- I guess at that point of the

09:06:35 18   stipulation, we all disagree.  I think it is coming from the

09:06:39 19   Court at that point.  And so I just don't know what the

09:06:42 20   value is of saying.

09:06:42 21             THE COURT:  I guess the problem is --

09:06:44 22             MR. CHERNY:  And then --

09:06:45 23             THE COURT:  Hold on.  The stipulations are

09:06:48 24   intended to cabin, I say in part, as I explained, cabin the

09:06:54 25   universe of what is the raw material you can use as you

09:06:57 1    fight out whatever relevance fights there are about say the

09:07:00 2    Teece report.  If I haven't addressed selection criteria

09:07:05 3    at all, then I take it your position is there will be no

09:07:10 4    discussion of selection criteria, whether it be one, two,

09:07:13 5    three or four criteria.

09:07:14 6              MR. CHERNY:  But the problem is if you put in

09:07:17 7    what you're proposing, Your Honor, and you say that this was

09:07:20 8    listed they say three, we say four, and we want to say,

09:07:23 9    okay, you're Criado, you are going to say four.  Okay?  But

09:07:28 10   if you look at the entirety of the Teece report, it is

09:07:30 11   pretty clear he didn't view there is a fourth one.  He

09:07:33 12   didn't apply a fourth one.  In fact, everything that he is

09:07:35 13   putting in here is about not about defensive value.  He

09:07:39 14   listed defensive value in a generic discussion of the

09:07:43 15   patents.

09:07:43 16            But when he is talking about the reason he is

09:07:46 17   choosing, he asks Gore to choose patents, he is talking

09:07:49 18   about in terms of valuing what Gore is using.  Everything he

09:07:52 19   says is about give me patents within the GEH portfolio that

09:07:57 20   read on the various products.

09:07:59 21            Now they don't want to accept that, and I

09:08:01 22   understand it, but the thing is that if Criado starts

09:08:04 23   getting up there and starts talking about the fourth

09:08:06 24   criteria that allows for the possibility that one of the

09:08:08 25   things that Teece did was list patents that were purely for

09:08:11 1    defensive value but that were not infringed by Gore, used by

09:08:16 2    Gore, then we're in a serious disadvantage because normally

09:08:20 3    we would say, come on, Dr. Criado.  Take a look at every

09:08:25 4    other page.  They're trying to value this license between

09:08:28 5    Gore and GEH and part of the way they're doing it, much like

09:08:32 6    a reasonable royalty, they're saying, okay, you are using

09:08:34 7    these things.  How much would you pay to continue using it

09:08:37 8    so we can justify the 7 and-a-half percent?

09:08:40 9              So I do think it would be misleading, and I do

09:08:42 10   think it would be unfair.

09:08:43 11             THE COURT:  So at this point, your position I

09:08:45 12   guess is just strike everything that they have proposed in

09:08:48 13   paragraph 3, the bolded portion.  And if I were to do that,

09:08:53 14   what is your view as to what comes in about selection

09:08:56 15   criteria?

09:08:57 16            MR. CHERNY:  I guess it would be neutral at this

09:08:59 17   point.  There is a lot of things in the Teece report that

09:09:01 18   are not coming in.

09:09:02 19            THE COURT:  By neutral, do you mean silent?

09:09:05 20            MR. CHERNY:  Silent.

09:09:05 21            THE COURT:  The jury doesn't hear anything about

09:09:07 22   the selection criteria?

09:09:09 23            MR. CHERNY:  Correct.  Because, I mean if they

09:09:11 24   had stayed consistent, if they had stayed consistent in their

09:09:13 25   position in this case and stayed consistent with Teece, it

09:09:17 1      would be one thing.  But we have this inconsistency which you

09:09:21 2      have drawn out, Your Honor, yourself that they are going to

09:09:23 3      put up their witnesses to say things that are inconsistent

09:09:26 4      with that and that the rest of the Teece report would show is

09:09:30 5      not credible.

09:09:31 6              So, in some respects, they have caused an issue

09:09:35 7      by taking this inconsistency.  I can't cross, I can't bring

09:09:38 8      it out on cross-examination, because the one thing that will

09:09:40 9      show it will be the Teece report.

09:09:42 10             THE COURT:  Okay.

09:09:42 11             MR. CHERNY:  Thank you, Your Honor.

09:09:43 12             THE COURT:  Thank you.  Is there any last word

09:09:44 13     on this issue, Ms. Wright?

09:09:46 14             MS. WRIGHT:  No, Your Honor.  I think we'll just

09:09:49 15     defer to the Court's judgment at the point.  Thank you.

09:09:51 16             THE COURT:  All right.  Well, "defer" is the

09:09:52 17     right word.  I will get back to you on this.

09:09:55 18             That was all I had.  Issues that the plaintiffs

09:09:58 19     want to raise before we bring the jury pool up?

09:10:01 20             MS. WRIGHT:  No, Your Honor.

09:10:01 21             MR. PORADEK:  No, Your Honor.

09:10:02 22             THE COURT:  Okay.  Issues that the defendants

09:10:04 23     want to raise?

09:10:05 24             MR. CHERNY:  May I have a second?

09:10:06 25             THE COURT:  Sure.

09:10:09  1                    (Counsel confer.)

09:10:16  2                    MR. CHERNY:  I'm told no, Your Honor.

09:10:17  3                    THE COURT:  All right.  I believe the jury pool

09:10:18  4      will be available at 9:30.  We will take a recess.  If I

09:10:22  5      need to see you for a few minutes before 9:30, I will come

09:10:25  6      back and see you.  We will be in recess.

09:10:51  7                    (Brief recess taken.)

09:10:51  8                    *      *      *

09:40:37  9                    (Proceedings reconvened after recess.)

09:40:37 10                    THE COURT:  Good morning, everyone.  Welcome,

09:40:42 11      members of our jury pool.  My name is Leonard Stark.  I'm a

09:40:45 12      judge here in the District of Delaware; and I'm the judicial

09:40:49 13      officer who has been selected to preside over a civil trial

09:40:52 14      for which we are selecting a jury this morning.

09:40:55 15                    I want to thank you all for being here and thank

09:40:59 16      you in advance for your patience as we go through this

09:41:01 17      process.  It is possible that the process of selecting a

09:41:05 18      jury today may take most of the day, so, please, I do ask

09:41:10 19      for your patience as we go through this very important process.

09:41:14 20                    In a moment, I will explain to you in more

09:41:17 21      detail what we're going to be doing, but before that, I will

09:41:21 22      ask my courtroom deputy Mr. Neil Looby to administer an oath

09:41:26 23      to the pool.

09:41:26 24                    Mr. Looby.

09:41:28 25                    (Prospective jurors placed under oath.)

09:41:42  1          THE COURT:  I'm now going to read to you a list

09:41:48  2    of questions which I will explain the purpose of in a

09:41:53  3    moment.  These questions are the beginning of the process.

09:41:58  4    The next steps will involve that I will meet with each of

09:42:02  5    you who have an answer that is a "yes" answer to these

09:42:06  6    questions in my juryroom which is right behind me.  And then

09:42:11  7    we'll come back in the courtroom for the last steps of the

09:42:13  8    jury selection process.  And ultimately by the time we're

09:42:16  9    done with this process, we will end up with eight of you who

09:42:19 10    are going to be the jury in our case.

09:42:21 11          With that, let me read this to you.

09:42:24 12          It begins:  Good morning, ladies and gentlemen.

09:42:26 13    I am Judge Stark, and I will be presiding over the trial for

09:42:30 14    which a jury is about to be drawn in the case captioned W.L.

09:42:35 15    Gore and associates, Inc. versus C.R. Bard Inc. and Bard

09:42:43 16    peripheral vascular Inc.

09:42:43 17          This case is an action for patent infringement

09:42:47 18    arising under the patent laws of the United States.  The

09:42:52 19    plaintiff in this case is W.L. Gore and associates Inc. (or

09:42:56 20    simply "Gore").  The defendants are C.R. Bard Inc. and Bard

09:43:03 21    Peripheral Vascular Inc. (or simply "Bard").  For those of

09:43:07 22    you selected to serve as jurors, I will give you more

09:43:09 23    detailed instructions once you are sworn in as jurors and

09:43:13 24    again at the conclusion of the trial.  For now, I will

09:43:16 25    simply tell you that Gore accuses Bard of infringing its

09:43:19  1    patent.  Bard denies that it has infringed the patent, and

09:43:23  2    asserts that the patent is invalid.

09:43:30  3            The trial will begin tomorrow and is expected to

09:43:34  4    take eight days to try, meaning we expect to be completed

09:43:39  5    no later than Friday, March 10.  I will go offer the

09:43:43  6    specific schedule in a few moments.  Our trial days will run

09:43:47  7    from approximately 9:00 a.m. to 4:30 p.m.

09:43:53  8            In light of this brief summary, I will ask you

09:43:57  9    certain questions, the purpose of which is to (1) enable the

09:44:01 10    Court to determine whether or not any prospective juror

09:44:04 11    should be excused for cause; and (2) enable counsel for the

09:44:11 12    parties to exercise their individual judgment with respect

09:44:15 13    to peremptory challenges, that is, challenges for which no

09:44:18 14    reason need be given by counsel.

09:44:20 15            As I read these questions to you, please try to

09:44:23 16    keep in mind whether you answer "yes" to any of them.  There

09:44:32 17    is no need for you to raise your hand or stand or respond in

09:44:35 18    any way at this time to my questions.  Instead, when I have

09:44:40 19    concluded asking all of the questions, I will move to my

09:44:45 20    juryroom, along with the attorneys and the court reporter.

09:44:49 21    Then, for any of you who have answered "yes" to any of my

09:44:54 22    questions, members of my staff will bring you individually

09:44:57 23    into the juryroom, so you can speak to me and the attorneys

09:45:01 24    about any "yes" answers you had.  Don't worry if you can't

09:45:05 25    remember the specific question or question number to which

09:45:09  1    your answer is "yes."

09:45:12  2              With that background, I will now ask you the

09:45:14  3    questions.  It's a total of 23 questions.

09:45:17  4              Question 1.  Have you heard or read anything

09:45:21  5    about this case or about Gore or Bard?

09:45:28  6              Question 2.  I will now ask counsel to introduce

09:45:32  7    themselves.  After they have done so, I will ask you whether

09:45:36  8    you are familiar with any of these attorneys or their law

09:45:39  9    firms.

09:45:41 10              First for Gore.

09:45:42 11              MR. PORADEK:  Thank you, Your Honor.

09:45:43 12              I'm James Poradek from of Faegre Baker Daniels.

09:45:48 13              MS. SCHMID:  Jill Schmid.

09:45:50 14              MS. RAZAVI:  Good morning.  I'm Kate Razavi from

09:45:52 15    Faegre Baker Daniels.

09:45:54 16              MS. KRAMAN:  Pilar Kraman from Young Conaway

09:45:54 17    Stargatt & Taylor.

09:45:56 18              MR. DROWN:  Good morning.  Chad Drown from

09:45:52 19    Faegre Baker Daniels.

09:45:57 20              MR. WAGNER:  Good morning.  Ken Wagner from

09:45:52 21    Faegre Baker Daniels.

09:46:02 22              MR. VONESH:  Mike Vonesh from Gore.

09:46:04 23              MR. WHEATCRAFT:  Al Wheatcraft from Gore.

09:46:08 24              THE COURT:  Thank you.

09:46:09 25              And now for Bard.

```
09:46:11  1              MR. CHERNY:  Thank you, Your Honor.

09:46:15  2              I'm Steve Cherny from Kirkland & Ellis.

09:46:17  3              MR. BLUMENFELD:  I'm Jack Blumenfeld from Morris

09:46:19  4    Nichols Arsht & Tunnell.

09:46:19  5              MS. HOLLIS:  I'm Amanda Hollis from Kirkland

09:46:21  6    Ellis.

09:46:23  7              THE COURT:  Thank you.

09:46:25  8              So ladies and gentlemen, Question 2 is:  Are

09:46:29  9    you related to, or personally acquainted with, any of those

09:46:33 10    attorneys, or have you ever been represented by any of those

09:46:36 11    attorneys or other associates or members of the listed law

09:46:40 12    firms?

09:46:43 13              Question 3.  I will now ask counsel to list for

09:46:47 14    you the potential witnesses who may testify at this trial or

09:46:51 15    from whom you may hear previously recorded testimony during

09:46:54 16    the trial, or whose names you may possibly hear mentioned

09:46:58 17    in testimony from other witnesses during the trial.  After

09:47:04 18    counsel have done so, I will ask you whether you are

09:47:06 19    familiar with any of these individuals.

09:47:13 20              MR. PORADEK:  Dave Myers, James Lewis, Wayne

09:47:19 21    House, Mike Vonesh, John Brinkmann, Dan Browne, Donald

09:47:29 22    Goffena, Paul Goodman, Carol White, Iain Campbell, Ace Baty,

09:47:40 23    Scott Randall, Keith Harris, Brian Doherty, Michelle

09:47:48 24    Bushmire, Alexander Tessmer, Joshua Smale, John Reviere,

09:47:58 25    Michael Barkley, Uta Rosseck, Jonathan Putnam, Peter Lee,
```

09:48:15 1    Christian Vallbracht, Enrique Criado, Robert Gorman, Laura

09:48:26 2    Stamm.

09:48:27 3              I think that is it for us, Your Honor.

09:48:29 4              THE COURT:  Thank you.

09:48:31 5              MR. CHERNY:  Ladies and gentlemen, I'm not going

09:48:33 6    to repeat the names that Mr. Poradek said, but the

09:48:36 7    additional names you may hear people who may be witnesses

09:48:40 8    Benjamin Beckstead, Merrill Birdno, Barbara boys, Nigel

09:48:47 9    Buller, Robert Calcote, Richard Ellis, John Joseph Hewitt,

09:48:57 10   Erin Hutchinson, Gregory Leonard, G. Ray Martin, Jeffrey

09:49:04 11   Steck, David Teece, and Barbara Weiland.

09:49:09 12             THE COURT:  Thank you.

09:49:11 13             So, ladies and gentlemen, Question 3 is:  Do you

09:49:16 14   recognize the names of any of the prospective witnesses or

09:49:19 15   other individuals?

09:49:24 16             Question 4.  Look around at the other potential

09:49:27 17   jury members.  Do you know any of the others or have you had

09:49:30 18   any relationship with any of the other potential jurors

09:49:33 19   before today?

09:49:37 20             Question 5.  Have you, a family member, or a

09:49:44 21   close friend had any dealings with, owned stock in, or

09:49:48 22   relied financially in any way on, either Gore or Bard?

09:49:54 23             Question 6.  Have you, a family member, or a

09:49:58 24   close friend had any experience with the products of either

09:50:01 25   of those companies?

09:50:04  1           Question 7.  Have you, any member of your

09:50:08  2   family, or a close friend of been employed by or had a

09:50:12  3   business relationship with Gore, Bard, or DuPont?

09:50:19  4           Question 8.  Do you, a family member, or a close

09:50:23  5   friend have positive, neutral, or negative opinions toward

09:50:28  6   either Gore, Bard, or DuPont?

09:50:32  7           Question 9.  Have you, any family member, or

09:50:36  8   anyone close to you, had experience with procedures or

09:50:40  9   devices for treating heart or vascular diseases, including

09:50:44 10   stents, vascular grafts, stent grafts, or angioplasty?

09:50:55 11           Question 10.  Have you ever had a negative

09:50:59 12   experience with any medical procedure or medical device, or

09:51:02 13   known others who have had a negative experience with any

09:51:05 14   medical procedure or medical device?

09:51:14 15           Question 11.  Have you, any member of your

09:51:17 16   family, or a close friend ever been employed by a company

09:51:23 17   which was involved in, or had a business relationship with,

09:51:26 18   the medical device industry?

09:51:31 19           Question 12.  Do you, a family member, or a

09:51:37 20   close friend have strong positive or negative opinions

09:51:40 21   regarding medical technology companies?

09:51:48 22           Question 13.  Do you, any family member, or

09:51:50 23   anyone close to you have any education, special training, or

09:51:54 24   work experience in any of the following fields:

09:51:57 25           a.  legal;

09:52:01  1                    b.   intellectual property rights or patents;

09:52:05  2                    c.   the patent application process;

09:52:09  3                    d.   engineer, technical or scientific;

09:52:13  4                    e.   healthcare;

09:52:15  5                    f.   medical devices; or

09:52:18  6                    g.   the Federal Drug and Food Administration?

09:52:23  7                    Question 14.  Do you serve in a leadership

09:52:25  8   position either at work or in a professional or social group

09:52:28  9   of some kind?

09:52:31 10                    Question 15.  Do you have any experience with

09:52:33 11   patents?

09:52:34 12                    Question 16.  Do you now work, or have you ever

09:52:37 13   worked, for a company that has patents?

09:52:43 14                    Question 17.  Do you believe that patents are

09:52:48 15   uniquely bad in the healthcare industry because less

09:52:51 16   competition adversely impacts the consumer?

09:52:55 17                    Question 18.  Do you believe there are too many

09:53:00 18   lawsuits these days?

09:53:02 19                    Question 19.  Have you, a family member, or a

09:53:07 20   close friend been involved in any way in any type of

09:53:11 21   lawsuit?

09:53:12 22                    Question 20.  Do you have any strong feelings

09:53:17 23   regarding the idea of a large corporation filing a lawsuit

09:53:21 24   against another company?

09:53:23 25                    Question 21.  Have you ever served on a jury

before?

                    Question 22.  Let me tell you more about the
length of the trial and the schedule we expect to follow.
On most days, jurors will be expected to be here from 9:00
a.m. through 4:30 p.m.  We take a morning break and an
afternoon break, with each break being about 15 minutes
long.  We also take a break of about a half an hour for
lunch and on most days we will provide you lunch. (We cannot
provide you lunch today.)  We will complete the trial no
later than next Friday, March 10.  Does this schedule
present any substantial hardship for you?  And, finally,

                    Question 23.  Is there any other reason why you
could not sit on this jury and render a fair verdict based
on the evidence presented to you and the law as I will give
it to you in my instructions?

                    So that's the 23 questions.  As I said, in a
few moments, after I get settled in the juryroom behind me,
folks will bring you in one by one to talk to me and the
lawyers.  And so we will be seeing some of you shortly.

                    We will be in recess.

                    (Brief recess taken.)

                    *       *       *

                    (Proceedings reconvened in the juryroom.)

                    THE COURT:  Good morning.  Have a seat, please.

                    A couple things before we start bringing in the

09:59:37 1    jurors in.  I want to give my decision on the disputes that

09:59:41 2    were argued this morning on the Stipulation No. 2 and after

09:59:44 3    that, we'll have Mr. Looby tell us which jurors are not

09:59:48 4    here.  And then unless there is anything else, we will start

09:59:52 5    bringing the jury pool in.

09:59:54 6              So first, excuse me.  With respect to the

09:59:59 7    disputes about Fact Stipulation No. 2, about the Teece

10:00:02 8    report, the first issue was Paragraph No. 3.

10:00:08 9              There we are going to strike the bolded language

10:00:10 10   proposed by Gore.  This paragraph deals with the selection

10:00:15 11   criteria for the patents on the proud patent list.  The

10:00:20 12   report identifies three criteria that are commonly used.

10:00:24 13   There is a fact dispute on whether those three criteria and

10:00:27 14   only those three were used here.  Bard's position is that

10:00:30 15   those three criteria were used here but Gore's position is

10:00:34 16   that those three plus a fourth were used or, alternatively,

10:00:38 17   what is arguably a fourth criteria was embedded somehow in

10:00:42 18   criteria three.

10:00:43 19             I think this leaves me the choices of either

10:00:48 20   letting essentially all of this in and letting you fight it

10:00:53 21   out in front of the jury or keeping all of it, that is, the

10:00:58 22   issue of how the patents were selected for the proud patent

10:01:00 23   list out of the issues that will be presented to the jury.

10:01:05 24             If I were to take the first course, I think

10:01:08 25   consistent with how I'm handling all of the prior litigation

10:01:12  1    evidence in this trial, I would need to set out in the

10:01:14  2    stipulation what are the boundaries and what are the

10:01:18  3    evidentiary bases that each side could use to set forth

10:01:22  4    their position that it is three criteria or four criteria or

10:01:28  5    something else and I would need to explain all that in the

10:01:31  6    stipulation to the jury.

10:01:32  7              I think that the more appropriate course, the

10:01:35  8    one that is fairer to both sides is to instead just strike

10:01:41  9    the proposed Gore language and keep the selection criteria

10:01:45 10    issue out from what the jury will need to deal with.

10:01:50 11              So that is the ruling on paragraph 3.

10:01:52 12              On paragraph 6, I will delete the Gore proposal

10:01:56 13    about the financial incentives at paragraph 6.

10:02:00 14              On paragraph 7, I will adopt the Bard proposal

10:02:04 15    about financial incentives.  What Bard proposes in

10:02:08 16    paragraph 7 is true, indisputably true.  Gore had a

10:02:11 17    financial incentive for all of the patents that were before

10:02:13 18    the Maryland court to have a higher value in order to more

10:02:18 19    likely justify the royalty paid to GEH, in order to more

10:02:22 20    likely have a successful outcome to the tax proceedings.

10:02:27 21    And it is fair for Bard to know this context.

10:02:30 22              Finally, on paragraph 8, the dispute I think was

10:02:34 23    basically resolved by the argument, but to be clear we will

10:02:36 24    include the Bard proposed language and we will add at the

10:02:39 25    end of the sentence:  The evidentiary record in that

10:02:42  1    proceeding closed in 2009.

10:02:45  2              So that is the rulings you all will need to in

10:02:48  3    some timely manner prepare an updated version of the

10:02:51  4    stipulation.

10:02:52  5              All right.  Are there any questions about that?

10:02:55  6              MS. RAZAVI:  No thank you, Your Honor.

10:02:57  7              MR. CHERNY:  No.

10:02:58  8              THE COURT:  All right.  Mr. Looby.

10:03:00  9              THE DEPUTY CLERK:  The following jurors are

10:03:01 10    absent, No. 16, No. 18, 27, 38.

10:03:14 11              MR. CHERNY:  I'm sorry.  Will you go back one?

10:03:18 12              THE DEPUTY CLERK:  16, 18, 27 --

10:03:21 13              MR. CHERNY:  38.

10:03:22 14              THE DEPUTY CLERK:  -- 38 and 42.

10:03:25 15              MR. CHERNY:  Thanks.

10:03:25 16              THE COURT:  Any questions before we start

10:03:26 17    bringing the jurors back?

10:03:29 18              MS. RAZAVI:  No.  Thank you, Your Honor.

10:03:30 19              MR. CHERNY:  No.

10:03:33 20              (Juror enters juryroom.)

10:04:03 21              THE COURT:  Good morning.  Have a seat, please.

10:04:06 22              A JUROR:  Good morning.

10:04:07 23              THE COURT:  Do you know what your juror number

10:04:09 24    is?

10:04:09 25              A JUROR:  The one on the inside of the envelope?

| | | |
|---|---|---|
| 10:04:11 | 1 | THE COURT:  The small number. |
| 10:04:13 | 2 | A JUROR:  5. |
| 10:04:14 | 3 | THE COURT:  Was that inside the envelope? |
| 10:04:16 | 4 | A JUROR:  Yes, stuck to the inside. |
| 10:04:18 | 5 | THE COURT:  So are you Adrienne Bartoline? |
| 10:04:21 | 6 | A JUROR:  Yes. |
| 10:04:21 | 7 | THE COURT:  All right.  My apologies.  Do you |
| 10:04:23 | 8 | remember what you answered "yes" to? |
| 10:04:26 | 9 | A JUROR:  A couple of them. |
| 10:04:26 | 10 | THE COURT:  Okay. |
| 10:04:27 | 11 | A JUROR:  I'm a nurse.  I worked in stroke |
| 10:04:30 | 12 | treatment, and cardiovascular step down, so I'm very |
| 10:04:35 | 13 | familiar with stents. |
| 10:04:36 | 14 | THE COURT:  Okay. |
| 10:04:40 | 15 | A JUROR:  I don't remember all the questions. |
| 10:04:41 | 16 | THE COURT:  No? |
| 10:04:42 | 17 | A JUROR:  On a personal note, the only thing |
| 10:04:43 | 18 | that impacts me is I just took a promotion and they're |
| 10:04:47 | 19 | flying someone in to start training me on the 6th. |
| 10:04:50 | 20 | THE COURT:  The 6th being the middle of next |
| 10:04:52 | 21 | week. |
| 10:04:52 | 22 | A JUROR:  The first. |
| 10:04:54 | 23 | THE COURT:  Okay. |
| 10:04:55 | 24 | A JUROR:  The Monday of next week. |
| 10:04:58 | 25 | THE COURT:  All right.  Congratulations on that. |

10:05:00  1                    A JUROR:  Thanks.

10:05:01  2                    THE COURT:  Do you recall, do you have any other

10:05:02  3      issues?  We're going to talk about each of them.

10:05:05  4                    A JUROR:  I don't think so.  I think it was just

10:05:08  5      mostly the stent.  I know the medical equipment.

10:05:10  6                    THE COURT:  Okay.  So in terms of that, have you

10:05:14  7      heard of Gore before today?

10:05:16  8                    A JUROR:  Yes.  My old neighbor used to work for

10:05:19  9      Gore; but obviously in a medical aspect, I have heard of

10:05:23 10      them, at least briefly.

10:05:25 11                    THE COURT:  Okay.  Do you have any opinions

10:05:27 12      about Gore?

10:05:29 13                    A JUROR:  No.

10:05:29 14                    THE COURT:  No.  Do you think you could be fair

10:05:34 15      to Gore and to the party on the other side, Bard?

10:05:37 16                    A JUROR:  Oh, sure.  Bard is like all Bard

10:05:40 17      medical equipment?  Because that I'm more familiar with --

10:05:45 18                    THE COURT:  I was going to ask you that next.

10:05:46 19                    THE WITNESS:  Okay.

10:05:47 20                    THE COURT:  Why don't you tell us about your

10:05:50 21      familiarity with Bard.

10:05:51 22                    A JUROR:  I think a lot of things that have been

10:05:53 23      implanted in various patients of mine I guess over the

10:05:56 24      years.  I don't have any opinion particularly.

10:05:59 25                    THE COURT:  Okay.

10:06:00  1          A JUROR:  So I guess it would depend if the

10:06:02  2   things I'm thinking of are accurate, like Bard catheters,

10:06:06  3   Bard, just various, like everything down to a Foley

10:06:13  4   catheter?

10:06:14  5          MR. CHERNY:  I'm sorry, I can't answer your

10:06:16  6   questions.

10:06:16  7          THE COURT:  They'll have their chance to speak

10:06:18  8   and ask you questions in a moment.

10:06:21  9          A JUROR:  Okay.  Sorry.

10:06:22 10          THE COURT:  You, depending on the answers to

10:06:24 11   that question, are you concerned about whether you could be

10:06:27 12   fair to Bard in this trial?

10:06:31 13          A JUROR:  No.

10:06:31 14          THE COURT:  No.

10:06:32 15          A JUROR:  As far as I know, everything has

10:06:34 16   always worked either way.

10:06:39 17          THE COURT:  And how long have you been a nurse?

10:06:41 18          A JUROR:  2005.

10:06:43 19          THE COURT:  And always related to strokes?

10:06:45 20          A JUROR:  Stroke and cardiac stepdown, so yes.

10:06:50 21          THE COURT:  In terms of your promotion, if you

10:06:54 22   were here instead of at your workplace on the 6th, what

10:06:59 23   would happen, do you think?

10:07:02 24          A JUROR:  They're just going to have to cancel

10:07:03 25   the flight I guess of the person from the office who would

10:07:06 1    have to fly out for training and move them.

10:07:11 2                    THE COURT:  Do you know whether it would be a

10:07:13 3    problem to reschedule that?

10:07:15 4                    A JUROR:  I have no idea.

10:07:17 5                    THE COURT:  All right.  Let me see if the

10:07:18 6    lawyers have questions for you.  First from Gore.

10:07:23 7                    MS. RAZAVI:  No questions, Your Honor.

10:07:24 8                    THE COURT:  And from Bard.

10:07:26 9                    MR. CHERNY:  No, Your Honor.

10:07:26 10                   THE COURT:  Okay.  Did you think of anything

10:07:28 11   else?

10:07:29 12                   A JUROR:  No.

10:07:29 13                   THE COURT:  All right.  We'll have you go back

10:07:30 14   in the courtroom.  Thank you very much.

10:07:33 15                   (Juror left juryroom.)

10:07:39 16                   THE COURT:  Is there any motion to strike the

10:07:41 17   juror for cause?

10:07:42 18                   MS. RAZAVI:  No, Your Honor.  Thank you.

10:07:43 19                   THE COURT:  How about from Bard?

10:07:45 20                   MR. CHERNY:  No, Your Honor.

10:07:45 21                   THE COURT:  All right.

10:07:50 22                   (Juror enters juryroom.)

10:07:52 23                   THE COURT:  Have a seat, please.  Good morning.

10:07:55 24   Do you recall what your jury number is?

10:07:58 25                   A JUROR:  24.

10:08:00  1                    THE COURT:  24.

10:08:04  2                    A JUROR:  Bhaskar Lakkakula.

10:08:07  3                    THE COURT:  Thank you.  That is what I was going

10:08:08  4    to say.  So do you recall what you answered "yes" to?

10:08:11  5                    A JUROR:  Two questions you asked me.

10:08:13  6                    One, do you have any position?  I work for

10:08:17  7    Capital One.  I'm a senior manager and manage a team.

10:08:24  8                    And do you have any constraints to continue as a

10:08:28  9    juror?  My wife is doing a day college, so I have two kids,

10:08:34 10    so I kind of act as a backup for that.  Probably being

10:08:38 11    sitting here would be constrained.  I kind of juggled my

10:08:43 12    activities day to day, the kids came from school bus or

10:08:45 13    something.  I was not planning for this.

10:08:48 14                    So those are the two questions that I have on

10:08:50 15    this.

10:08:51 16                    THE COURT:  Okay.  Thank you.  Let's talk just a

10:08:53 17    little bit more about those.

10:08:54 18                    You are senior manager at Capital One, correct?

10:08:59 19                    A JUROR:  Yes.

10:09:00 20                    THE COURT:  About how long have you had that

10:09:01 21    role?

10:09:02 22                    A JUROR:  One and-a-half year, two years.  One

10:09:04 23    year, four months.  Yeah, probably.  I was in J.P. Morgan

10:09:09 24    Chase for 14 years.

10:09:09 25                    THE COURT:  And you were in a leadership role

10:09:11  1    there as well?

10:09:12  2                    A JUROR:  Yes.

10:09:13  3                    THE COURT:  And similar to the work you do?

10:09:14  4                    A JUROR:  Similar.

10:09:16  5                    THE COURT:  And in terms of the schedule, your

10:09:18  6    wife is attending college?

10:09:19  7                    A JUROR:  Day college.  She is undergraduate.

10:09:25  8                    THE COURT:  And if you were with us from 9:00

10:09:29  9    o'clock until 4:30 every day, would you be able to make

10:09:33 10    arrangements for your kids?

10:09:35 11                    A JUROR:  I have not.  Because day to day, I

10:09:38 12    juggle every day.

10:09:39 13                    THE COURT:  Every day you juggle?

10:09:41 14                    THE JURORS:  Yes.  Because one kid, middle

10:09:43 15    school, comes around 3:00 o'clock and another kid comes at

10:09:47 16    4:00 o'clock.  She is doing the day college.

10:09:49 17                    THE COURT:  Okay.  All right.

10:09:50 18                    A JUROR:  And apart from that, my calendar is

10:09:54 19    full of commitments so everything is being shuffled.

10:09:59 20                    THE COURT:  Work commitments.

10:10:00 21                    A JUROR:  Yes.  I kind of manage two days, three

10:10:04 22    days work based on the kids activities.

10:10:07 23                    THE COURT:  Okay.  Is there anything else you

10:10:10 24    want to tell us?

10:10:11 25                    A JUROR:  No.

10:10:12   1           THE COURT:  Let me see if the lawyers have any

10:10:14   2   questions.

10:10:14   3           Any question?

10:10:15   4           MS. RAZAVI:  I do have one question.  Can you

10:10:17   5   tell us more about your position at the Capital One?

10:10:19   6           A JUROR:  I'm a senior manager.  And I work on

10:10:21   7   the platform where they are using their Android cellphone.

10:10:31   8           THE COURT:  Anything else?

10:10:32   9           MS. RAZAVI:  Okay.  Thank you very much.

10:10:33  10           THE COURT:  Questions?

10:10:36  11           MR. CHERNY:  How old are your children?

10:10:38  12           A JUROR:  One is 12 years, another is 10 years.

10:10:41  13           MR. CHERNY:  And would it be possible to make

10:10:44  14   temporary arrangements to care for them afterschool?

10:10:48  15           A JUROR:  This is the first time I'm coming to

10:10:51  16   the jury.  I don't know how the whole process works.  I

10:10:53  17   learn some things here about how the process works.

10:10:57  18           There are too many things.  My calendar is

10:10:59  19   filled up all the time, and my other office is Virginia.

10:11:06  20   Everything is lined up so I can make it.  I have to go back

10:11:10  21   and do a lot of things.

10:11:12  22           THE COURT:  And if you were the only one who

10:11:15  23   could pick up or meet the kids, how early would you have to

10:11:20  24   leave this building to do that?

10:11:21  25           A JUROR:  My first kid comes at 3:00 o'clock.

10:11:23  1    Then there is the second kid.

10:11:27  2              THE COURT:  And I don't know how far away you

10:11:30  3    are, but what time would you feel you have to leave here to

10:11:34  4    be there to meet them at 3:00?

10:11:35  5              A JUROR:  It's 20-30 minutes ride from here.

10:11:38  6              THE COURT:  All right.  Is there anything else?

10:11:39  7              MR. CHERNY:  No, Your Honor.

10:11:40  8              THE COURT:  All right.  You can go back in the

10:11:42  9    courtroom behind you.

10:11:46 10              A JUROR:  Thank you.

10:11:48 11              (Juror enters juryroom.)

10:11:48 12              THE COURT:  Any motion?

10:11:49 13              MS. RAZAVI:  No, thank you, Your Honor.

10:11:49 14              THE COURT:  Any motion?

10:11:50 15              MR. CHERNY:  No, Your Honor.

10:11:51 16              THE COURT:  All right.  I'm just going to put a

10:11:53 17    star next to him given the issue with kids.  I'm not saying

10:11:58 18    I will strike him, but we'll see.

10:12:07 19              (Juror enters juryroom.)

10:12:08 20              THE COURT:  Good morning.

10:12:08 21              A JUROR:  Good morning.

10:12:09 22              THE COURT:  What is your juror number, please?

10:12:11 23              A JUROR:  36.

10:12:14 24              THE COURT:  So you are Patrick Robinson?

10:12:15 25              A JUROR:  Correct.

10:12:16 1                    THE COURT:  Do you recall what you answered

10:12:18 2        "yes" to?

10:12:18 3                    A JUROR:  Yes, my wife works for Gore.

10:12:20 4                    THE COURT:  Your wife works for Gore.

10:12:21 5                    A JUROR:  She's works for Gore.

10:12:23 6                    THE COURT:  What does she do?

10:12:23 7                    A JUROR:  She is accounts payable off of Paper

10:12:26 8        Mill Road.

10:12:26 9                    THE COURT:  Okay.  About how long has she worked

10:12:28 10       there?

10:12:29 11                   A JUROR:  Around eight years I believe.  And we

10:12:31 12       do have like a stock retirement system up there.

10:12:38 13                   THE COURT:  Do you have any feelings about Gore?

10:12:39 14                   A JUROR:  Yeah.  I really like Gore.  They

10:12:42 15       employed my wife, and she worked for MBNA before.  So we're

10:12:46 16       both appreciative.  That is half of our income.

10:12:51 17                   THE COURT:  And do you think that would affect

10:12:53 18       how you view a lawsuit brought by Gore?

10:12:56 19                   A JUROR:  I'm afraid it might.  I mean I have no

10:12:59 20       problem serving whatsoever.  But I don't know if I can be

10:13:01 21       partial or not, one way or the other, honestly.

10:13:06 22                   THE COURT:  And is your concern that Gore might

10:13:07 23       start out a little bit ahead in your mind?

10:13:10 24                   A JUROR:  Yes.

10:13:11 25                   THE COURT:  Okay.  Any other concern?

```
10:13:13  1                    A JUROR:  That's it.  Again, I don't mind
10:13:15  2     serving whatsoever.
10:13:15  3                    THE COURT:  Okay.  Let me see if there are any
10:13:18  4     questions.  Any questions?
10:13:19  5                    MS. RAZAVI:  No.  Thank you.
10:13:21  6                    THE COURT:  Any questions.
10:13:21  7                    MR. CHERNY:  No.  Thank you, Your Honor.
10:13:22  8                    THE COURT:  Thank you very much.
10:13:24  9                    THE WITNESS:  Okay.  Thanks also.
10:13:26 10                    (Juror left juryroom.)
10:13:27 11                    THE COURT:  Any motion?
10:13:29 12                    MS. RAZAVI:  No.  Thank you.
10:13:29 13                    THE COURT:  Any motion?
10:13:30 14                    MR. CHERNY:  I think that he should be struck
10:13:32 15     for cause.
10:13:33 16                    THE COURT:  Any objection?
10:13:34 17                    MS. RAZAVI:  No.  Thank you, Your Honor.
10:13:35 18                    THE COURT:  All right.  I will grant the
10:13:38 19     unobjected motion and strike Juror No. 36.
10:13:48 20                    (Juror enters juryroom.)
10:13:49 21                    THE COURT:  Good morning.
10:13:50 22                    A JUROR:  Hello.  Good morning.
10:13:51 23                    THE COURT:  Would you tell us your juror number,
10:13:52 24     please?
10:13:53 25                    A JUROR:  22.
```

10:13:54  1                      THE COURT:  Meghan Hudson.

10:13:58  2                      A JUROR:  Yes.

10:13:58  3                      THE COURT:  Okay.  Do you recall what you

10:14:01  4      answered "yes" to?

10:14:01  5                      A JUROR:  Okay.  There was a question, yes, I

10:14:03  6      work in healthcare.  Yes, I had my mother-in-law worked at

10:14:09  7      DuPont.  They kind of forced her into early retirement.  She

10:14:15  8      is no longer employed there.  So there was a question about

10:14:18  9      that.

10:14:18 10                      There was another question about medical, like

10:14:27 11      corporations.  What I got from that was that, I mean

10:14:33 12      everybody is here to kind of make money.  That is what it is

10:14:36 13      about.  So the patient care.

10:14:38 14                      THE COURT:  Okay.

10:14:39 15                      A JUROR:  So that was my, that is my opinion on

10:14:41 16      that.

10:14:42 17                      I'm trying to think ...  oh.  And I did go to

10:14:47 18      high school with a lot of people that worked at the Gore

10:14:51 19      Center in Elkton, Maryland.

10:14:54 20                      THE COURT:  Okay.

10:14:55 21                      A JUROR:  And I'm trying to think of the other

10:15:01 22      one I answered "yes" to.  I'm sorry.

10:15:03 23                      THE COURT:  That's okay.  No, there were a lot

10:15:05 24      of questions.

10:15:06 25                      A JUROR:  Yes, I was thinking.  Okay.

10:15:08  1                    THE COURT:  Let's talk a little bit about these

10:15:10  2      four areas.  And if you think of the others, let us know.

10:15:13  3                    A JUROR:  Sure.  No problem.

10:15:13  4                    THE COURT:  So you work in healthcare and I see

10:15:16  5      you are wearing a Christiana Care shirt.

10:15:18  6                    A JUROR:  Yes, my fleece.

10:15:19  7                    THE COURT:  Is that where you work?

10:15:21  8                    A JUROR:  Yes, I work here in Wilmington in

10:15:23  9      patient psyche.

10:15:25 10                    THE COURT:  About how long have you been doing

10:15:27 11      that.

10:15:27 12                    A JUROR:  About 11 years.

10:15:28 13                    THE COURT:  Jut generally what do you do there.

10:15:29 14                    A JUROR:  I provide group therapy, 101 therapy,

10:15:32 15      maintain safety.  I'm a licensed associate counselor of

10:15:38 16      mental health at the University of Delaware; and I have a

10:15:40 17      national certification in counselling.

10:15:44 18                    THE COURT:  Okay.  I assume that doesn't involve

10:15:48 19      anything with stents or vascular.

10:15:50 20                    A JUROR:  No.  We have patients with health

10:15:52 21      problems and things like that.  When patients do come in and

10:15:57 22      if I work in the crisis center at the ER, we do have to take

10:16:00 23      the patients up to the vascular center, stroke alert, to get

10:16:07 24      the stent put in.

10:16:08 25                    But I just deal with the family.  I don't do any

10:16:12  1    of the medical treatment.

10:16:13  2            THE COURT:  And based on that experience or

10:16:15  3    anything else, do you have any experience or attitudes about

10:16:21  4    Gore or Bard?

10:16:23  5            A JUROR:  No.  Like I said, corporations,

10:16:28  6    everybody is out to, it's a money business.  That is kind of

10:16:33  7    my thoughts on that.

10:16:33  8            THE COURT:  So let's talk about that.  There was

10:16:36  9    a question basically about do you have any strong feelings

10:16:40 10    about corporations suing other corporations.  Is that

10:16:45 11    something you have a feeling about?

10:16:49 12            A JUROR:  I mean everybody is out to get their

10:16:53 13    money and their capital and nobody wants to have anybody

10:16:56 14    step on anybody's toes, and they want what is right.

10:17:00 15            THE COURT:  So do you think that feeling might

10:17:03 16    affect whether you could be fair and impartial in a trial

10:17:06 17    between Gore and Bard?

10:17:12 18            A JUROR:  I don't believe so.

10:17:13 19            THE COURT:  And your mother-in-law has

10:17:14 20    experience at DuPont.  Do you have a feeling pro or con

10:17:20 21    about DuPont?

10:17:22 22            A JUROR:  Con.  She worked there for 35 years

10:17:25 23    and she was being mistreated from what she was telling me.

10:17:30 24    Of course, I don't know that for a fact but I felt they did

10:17:35 25    her wrong, so a little bit.

10:17:38  1          THE COURT:  So if you hear references to DuPont

10:17:41  2  here, do you think what your mother-in-law's experience was

10:17:46  3  and your attitude is likely to affect how you see that

10:17:49  4  evidence?

10:17:49  5          A JUROR:  Now, that part might cloud my judgment

10:17:52  6  just a little bit.  But I'll be honest.

10:17:57  7          THE COURT:  Okay.  And your experience with

10:17:59  8  folks who went to the Gore Center.  Tell us a little bit

10:18:03  9  more about that.

10:18:05 10          A JUROR:  Well, Cecil County is small.  I

10:18:09 11  graduated from Northeast High School, and most of my friends

10:18:13 12  parents worked there and a couple of my girlfriends.  I only

10:18:16 13  keep in touch with them through Facebook so they're not

10:18:19 14  close friends but they worked there.  I think the one is

10:18:21 15  still there at the Elkton site.

10:18:25 16          THE COURT:  Does that give you any feelings

10:18:27 17  about Gore?

10:18:28 18          A JUROR:  No.

10:18:28 19          THE COURT:  Okay.  Did you think of anything

10:18:31 20  else you wanted to share with us?  That's fine if you

10:18:33 21  didn't.

10:18:34 22          THE JURORS:  I think I answered "yes" to those.

10:18:39 23  Do you work in ... I think that is it.

10:18:41 24          THE COURT:  Let me see if anyone else in the

10:18:43 25  room has questions for you.  Go ahead.

10:18:45 1          A JUROR:  Sure.  No problem.

10:18:46 2          MS. RAZAVI:  I'll ask you a quick question.

10:18:48 3          A JUROR:  Sure.

10:18:48 4          MS. RAZAVI:  So this is a lawsuit where a

10:18:51 5     plaintiff is suing for money damages.  Do you think that

10:18:53 6     might be something that affects your ability to be a juror

10:18:55 7     in this case?

10:18:58 8          A JUROR:  Well, I'm not very educated on patents

10:19:00 9     or anything like that, but I know that, you know, the patent

10:19:04 10    lasts for so long, and then no one can come up with anything

10:19:08 11    until that patent runs out, like medications.  And so ... I

10:19:16 12    don't, I can't really answer I guess.

10:19:18 13         MS. RAZAVI:  Okay.

10:19:20 14         A JUROR:  I'm having a hard time trying to

10:19:23 15    answer that.  I apologize.

10:19:24 16         MS. SCHMID:  May I ask a question?

10:19:25 17         A JUROR:  Sure.

10:19:26 18         MS. SCHMID:  So as somebody that works in

10:19:27 19    healthcare and technology there has patents involving

10:19:28 20    things, do you have any kind of opinion about patents on

10:19:31 21    healthcare products, devices, anything like that?

10:19:37 22         A JUROR:  No, I do understand that things are

10:19:40 23    made to protect certain things.  And I guess I have a

10:19:53 24    problem when someone has a medication that is going to help

10:19:54 25    them the best in which it is like $400 for two pills.  That

10:19:58 1    is where I'm going with that.

10:20:00 2                   MS. SCHMID:  Okay.

10:20:01 3                   A JUROR:  If that helps clear it up.

10:20:02 4                   THE COURT:  Questions?

10:20:03 5                   MR. CHERNY:  Yes.  You mentioned that you had

10:20:05 6    friends who I guess were at Gore or were at the Gore Center.

10:20:11 7                   A JUROR:  Um-hmm.

10:20:12 8                   MR. CHERNY:  Did you ever talk to them about

10:20:14 9    Gore?

10:20:15 10                  A JUROR:  No.  At that time in my life, they

10:20:18 11   just said they got paid very well for being just a high

10:20:21 12   school graduate and didn't have any of their education and

10:20:24 13   that they had good benefits and people were trying to get in

10:20:28 14   there at the time.  But they never talked about how they

10:20:33 15   were, like there was no bad.

10:20:35 16                  MR. CHERNY:  Do you have any questions?

10:20:37 17                  (Ms. Mason shakes her head no.)

10:20:40 18                  MR. PORADEK:  Can I ask one question?

10:20:43 19                  THE COURT:  Go ahead.

10:20:44 20                  MR. PORADEK:  I was thinking of the DuPont

10:20:46 21   issue.  Gore itself, if you were to hear Gore had some

10:20:49 22   connection to DuPont historically, a different company but

10:20:53 23   historically, do you think, given your suggestion you might

10:20:56 24   have some concerns about DuPont, do you think that would

10:20:58 25   cloud your judgment with respect to Gore just having some

10:21:01  1    historical connection?

10:21:04  2                A JUROR:  I don't think so, no.  Historical is

10:21:11  3    not indirectly related to my mother-in-law.  Do you know

10:21:14  4    what I mean?

10:21:15  5                MR. PORADEK:  Understood.

10:21:16  6                THE COURT:  Anything else?

10:21:17  7                MR. CHERNY:  No, Your Honor.

10:21:17  8                THE COURT:  All right.  You can go back to the

10:21:19  9    courtroom.  Thank you.

10:21:21 10                A JUROR:  Thank you.

10:21:22 11                (Juror left juryroom.)

10:21:24 12                THE COURT:  Any motion?

10:21:38 13                MR. PORADEK:  I'm thinking there just seems to

10:21:41 14    be a number of issues that she was expressing, you know,

10:21:45 15    concern about just being in it for the money, and then I am

10:21:48 16    concerned about the connection.

10:21:50 17                I didn't want to overtalk about it but there is

10:21:52 18    a pretty significant connection between DuPont and Gore in

10:21:55 19    terms of the development of ePTFE.  As you probably know,

10:22:00 20    Teflon was at DuPont and then they ended up stretching the

10:22:04 21    Teflon, the DuPont Teflon, so almost, because you are

10:22:07 22    talking about Teflon very much and because that is such an

10:22:10 23    iconic product here in Delaware, I would be worried about

10:22:14 24    the prejudice.  So I think given the kind of combination of

10:22:18 25    things, we would move to strike.

10:22:19 1          THE COURT:  All right.  What is your position?

10:22:21 2          MR. CHERNY:  I didn't -- I mean I understand Mr.

10:22:25 3  Poradek's concerns.  I didn't hear anything that was acute

10:22:27 4  enough given I don't know how many jurors we're going to end

10:22:30 5  up having issues with.

10:22:31 6          From my perspective, I would oppose striking her

10:22:33 7  at this moment because I didn't hear anything that indicated

10:22:36 8  she couldn't be fair unlike the fellow whose wife works for

10:22:41 9  Gore.  So, you know, to my mind, I noted everything she said

10:22:47 10 but I didn't think she said anything that indicated she

10:22:49 11 couldn't be fair to Gore.  It seems like she had a balance

10:22:52 12 of things between the Gore Center and DuPont.

10:22:55 13         THE COURT:  Yes.  I'm going to deny the motion.

10:22:58 14 I understand why Gore has the concerns it does and evidently

10:23:03 15 there will be reference to DuPont in the trial but her, I

10:23:09 16 thought the strongest issue would be her feelings about

10:23:13 17 DuPont today, but it seemed to be a distinct between what

10:23:17 18 happened recently to her mother-in-law and she didn't seem

10:23:20 19 to have any negative feelings with them historically, and

10:23:24 20 she did say some nice things about Gore as well, and part of

10:23:27 21 what she gave in her responses, so overall, I don't see a

10:23:31 22 basis to strike her.  So I will deny the motion.

10:23:36 23         (Juror enters juryroom.)

10:23:39 24         THE COURT:  Good morning.  Have a seat, please.

10:23:41 25         Do you recall what your juror number is?

10:23:44 1                    A JUROR:  6.

10:23:45 2                    THE COURT:  So you are Jean Bowers.

10:23:48 3                    A JUROR:  That's right.

10:23:48 4                    THE COURT:  Okay.  Do you recall anything that

10:23:49 5      you answered "yes" to?

10:23:51 6                    A JUROR:  Well, No. 13 I believe it was,

10:23:56 7      knowledge of the legal process.

10:23:57 8                    THE COURT:  Okay.

10:23:58 9                    A JUROR:  For ten years, I was a member of a

10:24:01 10     congressional research service and the law and the judiciary

10:24:04 11     and the courts and prisons were one of my many areas of

10:24:08 12     expertise.

10:24:10 13                   My husband is a lawyer.  Criminal law is not his

10:24:18 14     thing.  He was an administrative lawyer, administration and

10:24:22 15     regulation.

10:24:23 16                   And also I was a manager of libraries and a

10:24:28 17     library information organization for ten years.

10:24:32 18                   THE COURT:  Okay.  That's it?

10:24:34 19                   A JUROR:  That's it.

10:24:34 20                   THE COURT:  Not that it's not enough.  Let's

10:24:37 21     talk a little bit about that.  So do you have any training

10:24:40 22     in the legal area?

10:24:41 23                   A JUROR:  Not per se, no.

10:24:44 24                   THE COURT:  Okay.  And in the issues you dealt

10:24:47 25     with the congressional research service, were patents or

10:24:51 1    intellectual property ever a subject?

10:24:53 2                 A JUROR:  No, no.  Although I worked for the

10:24:55 3    national technical information service for awhile, and one

10:24:59 4    of the organizations that brought together scientific and

10:25:03 5    technical library was called SINDI (phonetic) and the PTO

10:25:10 6    was part of that, but patents were never my thing.

10:25:14 7                 THE COURT:  Do you have any general things about

10:25:16 8    litigation or the Court system?

10:25:18 9                 A JUROR:  No, not at all.

10:25:19 10                THE COURT:  Okay.  And your husband, did he

10:25:21 11   practice law here in Delaware?

10:25:23 12                A JUROR:  No, he was a Federal Government

10:25:25 13   lawyer.

10:25:25 14                THE COURT:  Okay.  Not here in Delaware.

10:25:27 15                A JUROR:  Not here.

10:25:28 16                THE COURT:  Okay.  And are you familiar with the

10:25:30 17   law firms or any of the lawyers?

10:25:32 18                A JUROR:  No.

10:25:33 19                THE COURT:  All right.  And then you had some

10:25:36 20   management role in the libraries.

10:25:38 21                A JUROR:  Yes.

10:25:38 22                THE COURT:  Is that here in Delaware?

10:25:40 23                A JUROR:  No, it was the federal government in

10:25:42 24   Washington.

10:25:43 25                THE COURT:  All right.  Let me see if the others

10:25:45  1    have questions for you.  Any questions?

10:25:47  2           MS. RAZAVI:  No questions.  Thank you.

10:25:48  3           THE COURT:  Any questions?

10:25:49  4           MR. CHERNY:  Yes.  Do you have any thoughts at

10:25:51  5    all -- or I know you said patents aren't your things.

10:25:54  6           A JUROR:  Right.

10:25:55  7           MR. CHERNY:  Do you have any thoughts at all

10:25:56  8    about patents?

10:25:57  9           A JUROR:  No, I think patents are a great thing.

10:25:59 10    I think when you are creative and come up with a process or

10:26:03 11    an object that you should have entitlement to make money

10:26:09 12    from it.

10:26:10 13           MR. CHERNY:  And would you say that you feel

10:26:12 14    positively towards people who get patents then?

10:26:16 15           A JUROR:  I'm an artist now, in my retirement

10:26:19 16    years, and I feel a little bit stepped on when somebody

10:26:22 17    copies my work.  It's kind of the same thing.

10:26:26 18           MR. CHERNY:  Okay.

10:26:28 19           A JUROR:  So I do have feelings that, yes,

10:26:37 20    regarding copyright infringement.  If it can be proven, you

10:26:40 21    know, and I think that is what you are here to do.

10:26:42 22           MR. CHERNY:  And do you sympathize because of I

10:26:44 23    guess your feelings about copyright?  Do you sympathize with

10:26:48 24    patent owners?

10:26:49 25           A JUROR:  Yes.  Yes.

| | | |
|---|---|---|
| 10:26:50 | 1 | MR. CHERNY:  Okay. |
| 10:26:53 | 2 | A JUROR:  But it was also said there was a |
| 10:26:55 | 3 | discrepancy as to whether or not the patent was actually |
| 10:26:59 | 4 | functional or accurate.  So you would argue that, I'm sure, |
| 10:27:05 | 5 | right? |
| 10:27:09 | 6 | THE COURT:  He can't answer any questions. |
| 10:27:11 | 7 | A JUROR:  No, no. |
| 10:27:12 | 8 | THE COURT:  If someone is alleged to have copied |
| 10:27:16 | 9 | or infringed somebody else's intellectual property, would |
| 10:27:20 | 10 | you assume based on that allegation that it's true? |
| 10:27:25 | 11 | A JUROR:  I don't think I could assume it |
| 10:27:26 | 12 | without hearing the argument. |
| 10:27:28 | 13 | THE COURT:  Okay.  Any other questions? |
| 10:27:30 | 14 | MS. RAZAVI:  No.  Thank you, Your Honor. |
| 10:27:31 | 15 | THE COURT:  Any other questions? |
| 10:27:32 | 16 | MR. CHERNY:  No, Your Honor. |
| 10:27:33 | 17 | THE COURT:  Okay.  You can go back into the |
| 10:27:38 | 18 | courtroom.  Thank you. |
| 10:27:40 | 19 | A JUROR:  Thank you. |
| 10:27:41 | 20 | (Juror left juryroom.) |
| 10:27:41 | 21 | THE COURT:  Any motion? |
| 10:27:42 | 22 | MS. RAZAVI:  No.  Thank you, Your Honor. |
| 10:27:42 | 23 | THE COURT:  Any motion? |
| 10:27:43 | 24 | MR. CHERNY:  I'm going to move to strike her. |
| 10:27:45 | 25 | I'm worried about what she just said in terms of her |

10:27:47 1    likening, she said she starts off with being sympathetic to

10:27:53 2    patent owner and likening herself to a patent owner.  I

10:27:56 3    understand she said she would have to hear the evidence but

10:27:59 4    she clearly said she has a sympathy starting off with the

10:28:02 5    patent owners.

10:28:03 6            THE COURT:  Any response?

10:28:03 7            MR. PORADEK:  I didn't hear that, Your Honor.  I

10:28:05 8    thought she was very self-policing.  I thought she answered

10:28:08 9    what would have been your followup questions and she said I

10:28:11 10   am going to, I need to hear evidence and I understand there

10:28:14 11   is an allegation of invalidity.  So I saw herself regulating

10:28:18 12   all those things in her answers.  So I saw a very careful

10:28:23 13   deliberative juror, and I think that is what we should have

10:28:29 14   on this panel.

10:28:32 15           THE COURT:  Any thoughts?

10:28:32 16           MR. CHERNY:  She said she starts off with a

10:28:34 17   predisposition and that she identifies with patent owners

10:28:37 18   and she obviously has strong feelings about her artwork that

10:28:42 19   she has identified.  So I don't have any doubts she would

10:28:45 20   try, but we're starting off with someone who is not neutral.

10:28:47 21           THE COURT:  All right.  I'm going to deny the

10:28:49 22   motion.  I don't think all of that is a basis to strike her.

10:28:53 23   She said she would be fair and impartial.  I believe she can

10:28:56 24   be fair and impartial.  She volunteered there is an

10:28:59 25   invalidity argument.  She clearly was listening closely to

10:29:03  1    what I have already begun to instruct and I just don't see a

10:29:07  2    basis to strike her.

10:29:08  3                    MR. CHERNY:  Thank you, Your Honor.

10:29:14  4                    THE DEPUTY CLERK:  Yes.

10:29:15  5                    (Juror enters juryroom.)

10:29:16  6                    THE COURT:  Good morning.

10:29:16  7                    A JUROR:  Good morning.

10:29:17  8                    THE COURT:  Have a seat please what is your

10:29:18  9    number?

10:29:19 10                    A JUROR:  37.

10:29:21 11                    THE COURT:  That should make you Denise Sabato.

10:29:24 12                    A JUROR:  Sabato.

10:29:25 13                    THE COURT:  Sabato.  Sorry.

10:29:27 14                    A JUROR:  Close enough.

10:29:30 15                    THE COURT:  Do you recall what you answered

10:29:31 16    "yes" to?

10:29:31 17                    A JUROR:  Yes.  I'm actually on vacation, 3/9 to

10:29:35 18    3/21.

10:29:36 19                    THE COURT:  That's the middle of next week I

10:29:38 20    think.

10:29:38 21                    A JUROR:  Yes.

10:29:38 22                    THE COURT:  Have you already paid for that

10:29:40 23    vacation?

10:29:41 24                    A JUROR:  Yes, and it is not refundable.  It is

10:29:44 25    spring break with my family to visit my father.

| | | |
|---|---|---|
| 10:29:47 | 1 | THE COURT:  All right.  Other issues? |
| 10:29:49 | 2 | THE JURORS:  Just I know another juror out |
| 10:29:52 | 3 | there.  He is my neighbor.  We serve on the Highland West |
| 10:29:56 | 4 | Civic Association together. |
| 10:29:57 | 5 | THE COURT:  Okay. |
| 10:29:58 | 6 | A JUROR:  I'm in a leadership position at Chase. |
| 10:30:00 | 7 | I work at JP Morgan chase. |
| 10:30:02 | 8 | My father worked for DuPont, not that that |
| 10:30:05 | 9 | matters.  He is retired from there. |
| 10:30:06 | 10 | I think my biggest concern is my trip. |
| 10:30:08 | 11 | THE COURT:  Sure.  All right. |
| 10:30:11 | 12 | Any questions? |
| 10:30:12 | 13 | MS. RAZAVI:  No.  Thank you. |
| 10:30:13 | 14 | THE COURT:  Any questions? |
| 10:30:15 | 15 | MR. CHERNY:  No, Your Honor. |
| 10:30:15 | 16 | THE COURT:  Okay.  You can go back in the |
| 10:30:18 | 17 | courtroom.  Thank you. |
| 10:30:19 | 18 | A JUROR:  Thank you. |
| 10:30:21 | 19 | (Juror left juryroom.) |
| 10:30:24 | 20 | THE COURT:  All right.  I will usually strike |
| 10:30:28 | 21 | for a prepaid vacation.  Is there any objection to that? |
| 10:30:30 | 22 | MS. RAZAVI:  No objection. |
| 10:30:30 | 23 | THE COURT:  Any objection? |
| 10:30:31 | 24 | MR. CHERNY:  No objection. |
| 10:30:31 | 25 | THE COURT:  All right.  So we will strike 37. |

10:30:34  1                      (Juror enters juryroom.)

10:30:39  2                 THE COURT:  Good morning.

10:30:40  3                 A JUROR:  Good morning.

10:30:40  4                 THE COURT:  What is your juror number, please?

10:30:43  5                 A JUROR:  31, I think.

10:30:45  6                 THE COURT:  Let's see.  I can check here.

10:30:49  7      Cathleen Petrucci.

10:30:51  8                 A JUROR:  Yes.

10:30:52  9                 THE COURT:  That is what we have as 31.  Do you

10:30:54 10      recall what you answered "yes" to.

10:30:55 11                 A JUROR:  I have four yeses.

10:30:57 12                 THE COURT:  Okay.

10:30:57 13                 A JUROR:  The first is last Saturday night, I

10:31:02 14      had a urinary tract infection and I was in a lot of pain and

10:31:05 15      up all night and I'm on Cipro.  And even right now, I don't

10:31:10 16      think I'm drinking enough and voiding because I'm concerned

10:31:12 17      about keeping a schedule here.

10:31:13 18                 I'm on -- I didn't bring anything with me to

10:31:17 19      show you but I could get it.

10:31:20 20                 THE COURT:  I accept what you are saying.

10:31:22 21                 A JUROR:  I work in a hospital.  I have not

10:31:23 22      used -- I'm sure I used Bard products but I never worked in

10:31:27 23      critical cardiac.  The closest I got to the cath lab was

10:31:31 24      just doing staff education on patient safety.

10:31:34 25                 I work for Crozer Chester Medical Center.  We're

10:31:38  1    part of the system.  They announced a strike March 5th, and

10:31:42  2    I might be required -- I'm not in the union.  I might be

10:31:44  3    required to provide some care starting then.  It will be a

10:31:48  4    five day outage.

10:31:50  5             I have had jury experience.  You asked that

10:31:53  6    question.

10:31:55  7             And I also have a high regard for the Gore

10:31:59  8    community, and I have four friends that work for Gore.

10:32:03  9             THE COURT:  Let's just talk briefly about those.

10:32:06 10             Sorry about your health situation.  I'm sorry

10:32:08 11    that you had to share that with us.

10:32:11 12             You heard the schedule that I outlined.  I do

10:32:14 13    allow additional breaks as well really basically as

10:32:18 14    frequently as a juror needs to break.  You just kind of have

10:32:22 15    to raise your hand and we let you go out and do whatever you

10:32:25 16    might have to do.

10:32:27 17             Do you have concerns that if you could take

10:32:31 18    breaks as often as you need to drink or do anything else,

10:32:36 19    would that alleviate your concerns or would you still have

10:32:38 20    your concerns?

10:32:39 21             A JUROR:  I would still have concerns because,

10:32:42 22    you know, I am kind of nervous at all for being here.

10:32:45 23             THE COURT:  Sure.

10:32:46 24             A JUROR:  Much less to worry about keeping that

10:32:49 25    under control.

| | |
|---|---|
| 10:32:49 | 1 |

THE COURT:  Okay.

10:32:50  2          A JUROR:  Attended to.

10:32:51  3          THE COURT:  That's fine.  And Bard products are

10:32:55  4  used in your hospital?

10:32:56  5          A JUROR:  I'm sure they are.

10:32:57  6          THE COURT:  Okay.

10:32:58  7          A JUROR:  I have seen the boxes with the name.

10:33:00  8          THE COURT:  But you didn't say you had any

10:33:02  9  feelings, positive or negative, toward Bard, correct?

10:33:05 10          A JUROR:  No.

10:33:06 11          THE COURT:  So there might be a strike next week

10:33:09 12  and that would possibly create additional responsibilities

10:33:12 13  at work for you?

10:33:13 14          A JUROR:  Right.  They haven't told me yet but

10:33:16 15  they typically use nurses that are nonunion to help out in

10:33:20 16  some roles.

10:33:21 17          THE COURT:  And you fall into that category;

10:33:23 18  right?

10:33:24 19          A JUROR:  (Nodding yes.)

10:33:25 20          THE COURT:  When did you serve on a jury before,

10:33:27 21  roughly?

10:33:28 22          A JUROR:  About, it's been awhile.  Probably

10:33:30 23  eight or ten years ago.

10:33:32 24          THE COURT:  And was that here in Delaware?

10:33:33 25          A JUROR:  Here in Delaware.

10:33:34 1                    THE COURT:  Federal or state court, if you

10:33:36 2    recall?

10:33:36 3                    A JUROR:  State, I think.

10:33:37 4                    THE COURT:  And do you remember anything about

10:33:38 5    what kind of case it was?

10:33:40 6                    A JUROR:  Yes, I do.  It was sexual assault of a

10:33:44 7    minor.  I served and I got a weird call back months later to

10:33:51 8    come and meet with the judge.

10:33:55 9                    I took a call at work, I'm hanging chemo and I'm

10:33:58 10   like why?  They said they couldn't tell me why, gave me a

10:34:02 11   date.  I showed up and I was locked into a courtroom.  And I

10:34:04 12   had to be questioned in front of the defendant who we all

10:34:09 13   found guilty about the fact if I told the truth about

10:34:14 14   speaking to someone outside the courtroom.

10:34:15 15                   Apparently, there is one person on the jury that

10:34:18 16   wanted to change his mind, and they came up with a few

10:34:20 17   issues that were potential problems.

10:34:21 18                   And I was exonerated but it was like shocking

10:34:25 19   and confusing to be face-to-face and have to say my name in

10:34:29 20   front of this defendant that we all found guilty.

10:34:32 21                   So that was my one and only jury experience.

10:34:36 22                   THE COURT:  Okay.  And then you said you have

10:34:38 23   high regard for Gore; correct?

10:34:41 24                   A JUROR:  (Nodding yes.)

10:34:42 25                   THE COURT:  That is based on your friend's

10:34:44  1    experience?

10:34:44  2               A JUROR:  Well, I think they were founded on

10:34:46  3    good values.  And I live in Newark, Delaware.  They're

10:34:51  4    nearby.  They're well known in the community.  I have

10:34:54  5    friends that are very happy there.

10:34:56  6               THE COURT:  Do you think Gore would start out in

10:34:59  7    your mind ahead in this trial?

10:35:00  8               A JUROR:  I honestly don't think they would

10:35:04  9    pursue this if they didn't feel strongly that they had a

10:35:10 10    justified reason.

10:35:11 11               THE COURT:  Okay.  Let me see if there are other

10:35:13 12    questions for you.

10:35:15 13               Any questions?

10:35:16 14               MS. RAZAVI:  No.  Thank you.

10:35:16 15               THE COURT:  Any questions?

10:35:17 16               MR. CHERNY:  No, Your Honor.

10:35:18 17               THE COURT:  All right.  Go back in the

10:35:19 18    courtroom.

10:35:19 19               A JUROR:  Thank you.

10:35:21 20               THE COURT:  If they haven't told you, you should

10:35:23 21    feel free to come and go as you need from the courtroom.

10:35:29 22               (Juror left juryroom.)

10:35:29 23               THE COURT:  I think I should strike 31.  Do you

10:35:32 24    oppose?

10:35:34 25               MS. RAZAVI:  No objection.

| | | |
|---|---|---|
| 10:35:35 | 1 | THE COURT:  Do you oppose? |
| 10:35:37 | 2 | MR. CHERNY:  No objection. |
| 10:35:37 | 3 | THE COURT:  All right.  Strike juror 31. |
| 10:35:42 | 4 | (Juror enters juryroom.) |
| 10:35:42 | 5 | THE COURT:  Good morning. |
| 10:35:48 | 6 | A JUROR:  Good morning. |
| 10:35:49 | 7 | THE COURT:  Could you tell us your juror number |
| 10:35:50 | 8 | please. |
| 10:35:51 | 9 | A JUROR:  48. |
| 10:35:53 | 10 | THE COURT:  Ryan, how do you pronounce the last |
| 10:35:59 | 11 | name. |
| 10:35:59 | 12 | A JUROR:  Web/bles (phonetic). |
| 10:36:00 | 13 | THE COURT:  Wuebbels.  Sorry about that. |
| 10:36:02 | 14 | A JUROR:  That's all right. |
| 10:36:03 | 15 | THE COURT:  Do you recall what you answered |
| 10:36:04 | 16 | "yes" to? |
| 10:36:04 | 17 | THE JURORS:  Well, I guess the first one was |
| 10:36:08 | 18 | Gore product. |
| 10:36:09 | 19 | THE COURT:  Okay. |
| 10:36:11 | 20 | A JUROR:  I play guitar and they put a coating |
| 10:36:13 | 21 | on some strings. |
| 10:36:14 | 22 | THE COURT:  Okay. |
| 10:36:18 | 23 | A JUROR:  So that's -- |
| 10:36:19 | 24 | THE COURT:  You are familiar. |
| 10:36:20 | 25 | A JUROR:  I'm familiar with that.  I think you |

10:36:22   1    asked something about copyright patent law.

10:36:24   2                  THE COURT:  Yes.

10:36:25   3                  A JUROR:  I went to a class on it in college.  I

10:36:28   4    don't know if that is relevant.

10:36:29   5                  THE COURT:  Okay.  Other issues?

10:36:34   6                  A JUROR:  No.

10:36:34   7                  THE COURT:  No.  So given your familiarity with

10:36:37   8    Gore's product, do you have any strong feelings about Gore

10:36:40   9    as a company?

10:36:41  10                  A JUROR:  No.

10:36:41  11                  THE COURT:  No.  And about how long ago did you

10:36:45  12    take a class on patent or copyright?

10:36:47  13                  A JUROR:  That was back in '99.

10:36:49  14                  THE COURT:  1999.

10:36:51  15                  A JUROR:  Yes.

10:36:51  16                  THE COURT:  Have you had any training or

10:36:53  17    experience with patents or copyrights since then?

10:36:55  18                  A JUROR:  No.

10:36:56  19                  THE COURT:  Do you have any opinions?

10:36:58  20                  A JUROR:  Not that I can think of.

10:37:00  21                  THE COURT:  Do you have any opinions about

10:37:02  22    patents or copyrights?

10:37:03  23                  A JUROR:  I'm a musician so, an artist, so I

10:37:07  24    guess it has some relevance.  I don't know.

10:37:13  25                  THE COURT:  Okay.

10:37:15  1                        A JUROR:  Strong opinion on it?  I guess kind of

10:37:18  2     favor it, since, you know.

10:37:21  3                        THE COURT:  Since you are a musician.

10:37:23  4                        A JUROR:  Right.  Yes.  Intellectual property.

10:37:25  5     Yes.

10:37:26  6                        THE COURT:  All right.  Other things you want to

10:37:29  7     share with us?

10:37:31  8                        A JUROR:  (Shaking head no.)

10:37:31  9                        THE COURT:  No?

10:37:32 10                        A JUROR:  No.

10:37:32 11                        THE COURT:  Any other questions?

10:37:34 12                        MS. RAZAVI:  Not from us.

10:37:35 13                        THE COURT:  Any questions?

10:37:36 14                        MR. CHERNY:  Sure.  Why did you take a class in

10:37:38 15     patent and copyright law?

10:37:40 16                        A JUROR:  Because I was studying music, I

10:37:43 17     thought that was part of, you know, good for the business of

10:37:45 18     getting into music, you know, if you achieve success with

10:37:50 19     it, so...

10:37:51 20                        MR. CHERNY:  Did you end up in any way other

10:37:53 21     than that using copyrights or patents?  I mean did you file

10:37:56 22     for a -- maybe I'm not being clear.

10:37:59 23                        A JUROR:  I guess I have.  I have property that

10:38:01 24     is, you know, copyrighted, so ...

10:38:05 25                        MR. CHERNY:  And have you ever thought that

10:38:07  1   anyone took your music or was there any concerns there?

10:38:10  2            A JUROR:  No, I never had any problem with it.

10:38:14  3            MR. CHERNY:  And do you think in any way you

10:38:16  4   start off with a bias towards people who own copyrights or

10:38:21  5   patents?

10:38:24  6            A JUROR:  I don't know how -- you have bias for

10:38:29  7   somebody who has it?  I don't know.  I guess I'm in favor of

10:38:33  8   there being copyrights and patents, you know.

10:38:37  9            MR. CHERNY:  But you don't have a bias.  You

10:38:39 10   think someone who has a patent or has a copyright is somehow

10:38:44 11   sympathetic figure for you because they have obtained a

10:38:47 12   patent or copyright?

10:38:50 13            A JUROR:  No.  I mean, I don't know.  If they

10:38:53 14   created a good product and it is unique, I could see some --

10:39:00 15   you know, they should have some, I don't know, reward for

10:39:03 16   it, I guess, so ... I mean I don't know if that is a ...

10:39:09 17            MR. CHERNY:  Do you have any other questions?

10:39:13 18            MS. MASON:  You said you have copyrights of your

10:39:15 19   own?

10:39:16 20            A JUROR:  Yes.

10:39:17 21            MS. MASON:  Can you tell us on songs?

10:39:21 22            A JUROR:  I mean obviously when I created it, at

10:39:24 23   least back when I studied it.  I mean I haven't -- and I

10:39:30 24   have, you know, I'm an artist, so, also a visual artist, so

10:39:35 25   take pictures and try to make sure I, you know --

10:39:38  1                    MS. MASON:  So --

10:39:39  2                    A JUROR:  -- my name is associated with the work

10:39:41  3       at least.

10:39:41  4                    MS. MASON:  In music, other people will sample

10:39:45  5       existing songs and use them to create new songs.  Do you

10:39:49  6       have strong feelings about that?

10:39:52  7                    A JUROR:  I mean I don't know, I guess

10:39:57  8       there's -- I don't know.  I haven't studied that aspect of

10:40:00  9       the law, and that is a pretty interesting part of it, I

10:40:03 10       guess.  But I'm -- I don't know.  I think some sampling

10:40:08 11       could be used on small scales but, yes, if it really formed

10:40:13 12       the basis of the work, then I feel like that artist should

10:40:18 13       be credited.

10:40:21 14                    MR. CHERNY:  Can I answer ask one more question?

10:40:24 15                    THE COURT:  Sure.

10:40:25 16                    A JUROR:  Sure.

10:40:25 17                    MR. CHERNY:  Actually, it will be two.

10:40:27 18                    Where did you study patent law or copyright law?

10:40:29 19                    A JUROR:  It was just the one class but it was

10:40:31 20       at University of Delaware.

10:40:33 21                    MR. CHERNY:  And do you remember who taught it?

10:40:39 22                    A JUROR:  I forget his name.  No, I can't recall

10:40:47 23       it right now.

10:40:48 24                    MR. CHERNY:  And one final question.  Do you

10:40:50 25       recall -- I know it was 18 years ago.  Do you recall any of

10:40:56 1    the subject matter that you learned in that class about

10:40:58 2    patent law?

10:41:00 3              A JUROR:  Well, I mean that was one thing right

10:41:03 4    there about how once you create it, it's copyrighted.  That

10:41:07 5    is a little bit different than patent, but ...

10:41:09 6              MR. CHERNY:  What do you mean by that?

10:41:10 7              A JUROR:  I mean maybe that is the same thing

10:41:12 8    but, yeah, I don't know too much about patent law but I feel

10:41:15 9    like there are some parallels.

10:41:19 10             MR. CHERNY:  Any more questions?

10:41:20 11             MS. MASON:  (Shaking head no.)

10:41:21 12             THE COURT:  Okay.  You can go back into the

10:41:22 13   courtroom.

10:41:23 14             A JUROR:  You're welcome.

10:41:25 15             (Juror left juryroom.)

10:41:26 16             THE COURT:  Any motion?

10:41:29 17             MS. RAZAVI:  No motion.  Thank you.

10:41:30 18             THE COURT:  Any motion?

10:41:34 19             MR. CHERNY:  Why don't you voice the motion.

10:41:37 20             MR. BLUMENFELD:  Yes, we do move to strike.  It

10:41:39 21   does sound like he -- he said he favors intellectual

10:41:42 22   property patents and copyrights, that intellectual property

10:41:47 23   owners should be rewarded.  I think he does, he did evidence

10:41:52 24   a bias toward intellectual property owners.

10:41:55 25             THE COURT:  Okay.

10:41:57  1          MS. RAZAVI:  From what I heard, Your Honor, he

10:41:58  2  was expressing a belief that the intellectual property

10:42:02  3  system is a good thing.  And I think most of us here would

10:42:04  4  probably agree with that.  I didn't hear a single thing from

10:42:07  5  him that would reflect bias.  In fact, I think he was

10:42:10  6  unequivocal in terms of what he understood in patent law.

10:42:16  7  It was about copyright law.

10:42:18  8          THE COURT:  Any response?

10:42:19  9          MR. BLUMENFELD:  No, Your Honor.

10:42:20 10          THE COURT:  All right.  I'm going to deny the

10:42:21 11  motion.  I agree with what Gore has said.  I don't think it

10:42:26 12  makes you strikeable for cause just that you have positive

10:42:31 13  feelings towards the existence of intellectual property

10:42:34 14  rights.  I didn't hear anything that suggested he would make

10:42:37 15  a decision not based on the evidence.  And my general sense

10:42:40 16  of him was these were not issues he has given a great deal

10:42:45 17  of thought to.  He was talking about them off the top of his

10:42:48 18  head as we were asking him about them.

10:42:49 19          Now, before we bring in the next person, with

10:42:53 20  apologies, are the two women here, are you jury consultants?

10:42:59 21          MS. MASON:  Yes.

10:43:00 22          THE COURT:  Are you attorneys?

10:43:02 23          MS. MASON:  No.

10:43:02 24          THE COURT:  I take at this time you have no

10:43:04 25  objection?

10:43:04  1              MR. PORADEK:  Sorry about that.  We did notice

10:43:06  2      that was happening, but we certainly don't have an

10:43:08  3      objection.

10:43:08  4              THE COURT:  And I take it you don't object?

10:43:11  5              MR. CHERNY:  Once you did, I figured it was fair

10:43:14  6      game.

10:43:14  7              MR. PORADEK:  It's okay with you.

10:43:15  8              THE COURT:  As long as the overall questioning

10:43:17  9      doesn't get out of hand, I'll allow it.

10:43:21 10              Okay.

10:43:23 11              (Juror enters juryroom.)

10:43:23 12              THE COURT:  Good morning.

10:43:27 13              A JUROR:  Good morning.

10:43:27 14              THE COURT:  Could you tell us your juror number,

10:43:29 15      please.

10:43:30 16              A JUROR:  20.

10:43:32 17              THE COURT:  Laura Hammond.

10:43:35 18              A JUROR:  Yes.

10:43:36 19              THE COURT:  Do you recall what you answered

10:43:38 20      "yes" to?

10:43:39 21              A JUROR:  Quite a few of the medical ones.

10:43:40 22              THE COURT:  Okay.

10:43:41 23              A JUROR:  I'm a nurse.  Background in surgery,

10:43:45 24      trauma, critical care, research.  So I have dealt with Bard

10:43:48 25      products in that instance.

10:43:51  1                    I feel I have a concern about the schedule.

10:43:56  2                    THE COURT:  Okay.

10:43:57  3                    A JUROR:  I have a lecture that I'm supposed to

10:44:00  4      give both Tuesday and Thursday next week.  So I'm on the

10:44:04  5      schedule for that.

10:44:06  6                    THE COURT:  Okay.

10:44:07  7                    A JUROR:  And I don't remember all the other

10:44:09  8      questions.

10:44:10  9                    THE COURT:  Okay.  If it comes back to you, let

10:44:12 10      me know.

10:44:12 11                    A JUROR:  Okay.

10:44:13 12                    THE COURT:  Let's talk a little bit about the

10:44:14 13      things you did recall.

10:44:15 14                    You are a practicing nurse now.

10:44:19 15                    A JUROR:  Um-hmm.

10:44:20 16                    THE COURT:  Just for his benefit, yes or no.

10:44:22 17                    A JUROR:  Yes.

10:44:22 18                    THE COURT:  And about how long have you

10:44:24 19      practiced as a nurse?

10:44:26 20                    A JUROR:  35 years.

10:44:26 21                    THE COURT:  Okay.  And where are you currently

10:44:29 22      employed.

10:44:29 23                    A JUROR:  I'm with an organization that is part

10:44:32 24      of United Healthcare.  It's called Optimum but my background

10:44:36 25      was at Crozer Chester Medical Center was when I was at

10:44:40  1    clinical.

10:44:41  2                    THE COURT:  Have you dealt directly with Bard

10:44:43  3    products?

10:44:43  4                    A JUROR:  Yes.  I mean we used them is what I

10:44:45  5    can tell you.

10:44:46  6                    THE COURT:  Do you have any feelings about those

10:44:47  7    products or about Bard?

10:44:49  8                    A JUROR:  No.  No, not in particular.  No.

10:44:51  9                    THE COURT:  Okay.  Not positive or negative.

10:44:53 10                    A JUROR:  No, it was just one of the devices or

10:44:56 11    equipment we used.

10:44:57 12                    THE COURT:  Okay.  Now, the lectures that you

10:45:00 13    are scheduled to give Tuesday and Thursday, is that through

10:45:05 14    your employment?

10:45:05 15                    A JUROR:  No, it is actually through a Bible

10:45:07 16    conference, and I repeat.  I give it Tuesday and then repeat

10:45:11 17    it to a different group on Thursday.

10:45:13 18                    THE COURT:  Okay.  And about what time is that

10:45:16 19    scheduled to be?

10:45:17 20                    A JUROR:  It's 9:30 to about 11:00.

10:45:20 21                    THE COURT:  In the morning?

10:45:20 22                    A JUROR:  Yes.

10:45:21 23                    THE COURT:  Okay.  And is it, if you were to

10:45:24 24    give those lectures those two mornings and then come to us,

10:45:27 25    about what time do you think you would be available to us?

84

| 10:45:30 | 1 | A JUROR:  Probably by 11:30. |

10:45:30   1          A JUROR:  Probably by 11:30.

10:45:34   2          THE COURT:  You would be here at 11:30?

10:45:37   3          A JUROR:  Yes.

10:45:37   4          THE COURT:  And if you were alternatively

10:45:40   5   required to be here at 9:00 o'clock Tuesday and Thursday

10:45:43   6   morning, obviously you couldn't given the lecture then.

10:45:46   7          THE JURORS:  Right.

10:45:46   8          THE COURT:  What would happen?  Could it be

10:45:48   9   rescheduled?  What would happen?

10:45:50  10          A JUROR:  It can't be rescheduled because it's

10:45:52  11   in a sequence.  I think they would just not have it.

10:45:56  12          THE COURT:  All right.  Did you think of

10:46:00  13   anything else you wanted to share with us?

10:46:02  14          A JUROR:  The only other thing, I have a

10:46:03  15   daughter who is currently looking for employment in the

10:46:06  16   medical device field actively, biomedical engineering.  So

10:46:11  17   we've been actively looking at all sorts of medical device

10:46:14  18   companies.

10:46:15  19          THE COURT:  Okay.  And do those include any of

10:46:17  20   the companies whose names I mentioned?

10:46:18  21          A JUROR:  Not at this time.

10:46:20  22          THE COURT:  All right.  Any questions?

10:46:23  23          MR. PORADEK:  I had a question.

10:46:24  24          Because of your experience in the healthcare

10:46:26  25   industry, do you think that patents, it was a question, that

10:46:30  1    patents are uniquely bad in the healthcare industry because

10:46:36  2    less competition would adversely impact the consumer?

10:46:38  3             A JUROR:  No, I don't think so.  To me, we used

10:46:41  4    all different types of equipment.  And I had nothing to do

10:46:44  5    with the supply or why we chose one versus another.  And so

10:46:50  6    to me, they were all equally different companies.

10:46:53  7             MR. PORADEK:  So the idea that patent case might

10:46:55  8    in some way affect potentially a little bit of what is in

10:46:58  9    the market, would that concern you?

10:47:00 10             A JUROR:  No.

10:47:01 11             MR. PORADEK:  You would be unbiased in that way?

10:47:04 12             A JUROR:  Yes.

10:47:05 13             THE COURT:  Any questions?

10:47:07 14             MR. CHERNY:  No questions, Your Honor.

10:47:08 15             THE COURT:  All right.  You can go back.  Thank

10:47:09 16    you.

10:47:10 17             A JUROR:  Thank you.

10:47:11 18             (Juror left juryroom.)

10:47:15 19             THE COURT:  Any motion?

10:47:15 20             MS. RAZAVI:  No motion, thank you.

10:47:16 21             THE COURT:  Any motion?

10:47:18 22             MR. CHERNY:  No, Your Honor.

10:47:18 23             THE COURT:  I am going to put a star next to her

10:47:22 24    just given the lecture commitment.  We may come back to her

10:47:25 25    given her schedule.

10:47:32  1                    (Juror enters juryroom.)

10:47:33  2                    THE COURT:  Good morning.

10:47:34  3                    A JUROR:  Good morning.

10:47:35  4                    THE COURT:  Would you tell us your jury number,

10:47:37  5     please.

10:47:38  6                    A JUROR:  21.

10:47:39  7                    THE COURT:  Amanda Hicks.

10:47:41  8                    A JUROR:  Yes.

10:47:42  9                    THE COURT:  Do you recall what you answered

10:47:43 10     "yes" to?

10:47:43 11                    A JUROR:  Well, for one, too many lawsuits

10:47:46 12     obviously.  I think there is a lot.

10:47:49 13                    And not that I personally know of them but some

10:47:53 14     of the law firms you guys brought up, I actually work in

10:47:57 15     child care and a lot of our clientele's parents work in some

10:48:05 16     of them.  So hearing those names kind of triggered hearing,

10:48:09 17     you know, them work for them and they come in and kind of

10:48:12 18     talk amongst each other when they run into each other.  So

10:48:15 19     that was a biggy when I heard those.

10:48:18 20                    THE COURT:  Is there anything else?

10:48:19 21                    A JUROR:  Then I do, as far as doing the trial

10:48:24 22     for a certain amount of days as far as being I have a

10:48:28 23     13 year old son that I'm responsible for, getting off the

10:48:31 24     bus every day or he has aftercare, afterschool programs, he

10:48:34 25     has to be picked up from by like 4:00 everyday and things

10:48:37  1    like that, so that was a little ...

10:48:41  2                    THE COURT:  All right.  Let's talk about those.

10:48:43  3                    A JUROR:  Um-hmm.

10:48:44  4                    THE COURT:  In terms of you say obviously there

10:48:46  5    is too many lawsuits.

10:48:47  6                    A JUROR:  Um-hmm.

10:48:47  7                    THE COURT:  Tell us just a little bit more about

10:48:50  8    your thoughts on that.

10:48:51  9                    A JUROR:  I mean I just feel like obviously

10:48:54 10    people can sue for anything.  I guess, you know, but I feel

10:48:57 11    like sometimes certain things, it's just like obsessive

10:49:00 12    like, you know, I'm going to sue for this or I'm going to do

10:49:03 13    this.  You know what I mean?  So I feel like it's a lot.

10:49:06 14    And I know it can be a lot, but ...

10:49:08 15                    THE COURT:  Do you think that that feeling would

10:49:12 16    affect how you might see this trial, which obviously is a

10:49:16 17    lawsuit?

10:49:17 18                    A JUROR:  No, not really.  It was a "yes" answer

10:49:19 19    when the question was brought up, so ...

10:49:21 20                    THE COURT:  Okay.  And we mentioned some law

10:49:25 21    firm names.

10:49:26 22                    A JUROR:  Um-hmm.

10:49:27 23                    THE COURT:  You had heard those names before.

10:49:28 24                    A JUROR:  Um-hmm.

10:49:29 25                    THE COURT:  I'm sorry.  For the court reporter,

10:49:31  1    that is a "yes," right?

10:49:32  2              A JUROR:  Yes.

10:49:32  3              THE COURT:  Do you have any feelings positive or

10:49:34  4    negative about any of the firms you heard?

10:49:36  5              A JUROR:  Not necessarily.  I just don't want,

10:49:40  6    you know, for some of them to come in and start chatting and

10:49:42  7    then I hear something, you know, that might be brought up

10:49:45  8    about this case or anything.  I don't know but I know they

10:49:48  9    do come in and chitchat and things like that, and I'm a head

10:49:51 10    teacher in one of the rooms so a lot of them know each other

10:49:55 11    from being in this field and things like that.

10:49:57 12              THE COURT:  But it sounds like there is nothing

10:49:58 13    you heard as of today?

10:49:59 14              A JUROR:  Not as of today, no.

10:50:01 15              THE COURT:  All right.

10:50:02 16              A JUROR:  Yeah.

10:50:03 17              THE COURT:  Now, the schedule, you would

10:50:05 18    typically need to be with your 13 year old as early as 3:00

10:50:10 19    p.m.?

10:50:10 20              A JUROR:  Right.  Exactly.

10:50:11 21              THE COURT:  So what time do you typically leave

10:50:14 22    your work?

10:50:14 23              A JUROR:  I work, yes, I work 7:00 to 3:00 and

10:50:18 24    literally I leave work and pick him up straight from a bus,

10:50:21 25    or if he has his aftercare -- not aftercare, his afterschool

10:50:25  1    program, I leave from work and go there.

10:50:28  2                THE COURT:  So if you were able to leave here at

10:50:30  3    3:00 p.m. every day, would you be able to meet your

10:50:33  4    commitment?

10:50:34  5                A JUROR:  Yeah.  As long as I, like I said, as

10:50:37  6    long as I can leave by 3:00, but I know that can be a little

10:50:41  7    longer.

10:50:41  8                THE COURT:  And if you were required to be here

10:50:45  9    until 4:30, is there any other backup or anything you can do

10:50:49 10    to cover him or her?

10:50:51 11                A JUROR:  It would be a little difficult because

10:50:53 12    may husband works until 5:00 everyday so I'm the one,

10:50:57 13    because of my work schedule, I'm the one that usually is the

10:51:00 14    one able to do that kind of stuff.

10:51:02 15                THE COURT:  Any else you thought of you wanted

10:51:05 16    to share with us?

10:51:06 17                A JUROR:  No.

10:51:06 18                THE COURT:  Any questions?

10:51:07 19                MS. RAZAVI:  No, thank you.

10:51:07 20                THE COURT:  Questions?

10:51:08 21                MR. CHERNY:  No, Your Honor.

10:51:09 22                THE COURT:  All right.  Thank you.

10:51:10 23                A JUROR:  Thank you.

10:51:12 24                (Juror left juryroom.)

10:51:15 25                THE COURT:  Any motion?

10:51:16  1                    MS. RAZAVI:  No motion.  Thank you, Your Honor.

10:51:19  2                    THE COURT:  Any motion?

10:51:19  3                    MR. CHERNY:  No, Your Honor.

10:51:20  4                    THE COURT:  Okay.  I know we are scheduled in by

10:51:24  5       3:00 p.m. on some days.  I'll put a star next to her given

10:51:28  6       her concerns.

10:51:31  7                         (Juror enters juryroom.)

10:51:39  8                    THE COURT:  Good morning.

10:51:39  9                    A JUROR:  Good morning.

10:51:40 10                    THE COURT:  What is your juror number, please?

10:51:43 11                    A JUROR:  The one in the envelope?

10:51:46 12                    THE COURT:  Yes.

10:51:47 13                    A JUROR:  35.

10:51:47 14                    THE COURT:  Kaitlynn Ritchie.

10:51:49 15                    A JUROR:  Yes.

10:51:49 16                    THE COURT:  Do you recall what you answered

10:51:51 17       "yes" to?

10:51:51 18                    A JUROR:  Schedule conflict.

10:51:53 19                    THE COURT:  Tell us about that.

10:51:54 20                    A JUROR:  So I'm a grad student at the

10:51:56 21       University of Delaware so I have classes on Mondays and

10:51:58 22       Wednesdays, so being a part of their jury would make me miss

10:52:03 23       three days of classes which is pretty significant, so I feel

10:52:06 24       like it would negatively impact my grade.

10:52:09 25                    THE COURT:  I'm sorry to have to be so detailed

10:52:12  1    about this, but what time are your classes on Monday?

10:52:14  2                    A JUROR:  Sure.  On Mondays, it's from 8:40 to

10:52:17  3    9:55.

10:52:18  4                    THE COURT:  Okay.

10:52:19  5                    A JUROR:  And then the same for Wednesday

10:52:20  6    morning.

10:52:21  7                    And then on Wednesday, I also have an afternoon

10:52:23  8    class which is 1:25 to 4:25.

10:52:28  9                    THE COURT:  All right.  Any other concerns?

10:52:31 10                    A JUROR:  No.

10:52:32 11                    THE COURT:  No.  Okay.  Any questions?

10:52:34 12                    MS. RAZAVI:  No questions.  Thank you.

10:52:35 13                    THE COURT:  Any questions?

10:52:38 14                    MR. CHERNY:  No questions, Your Honor.

10:52:39 15                    THE COURT:  Okay.  You can go back in the

10:52:41 16    courtroom.

10:52:43 17                    A JUROR:  Thank you.

10:52:44 18                    (Juror left juryroom.)

10:52:46 19                    THE COURT:  Any motion?

10:52:48 20                    MS. RAZAVI:  No motion.  Thank you.

10:52:49 21                    THE COURT:  Any motion?

10:52:50 22                    MR. CHERNY:  (Shaking head no.)

10:52:52 23                    THE COURT:  I'm going to put a star next to her.

10:52:54 24                    MR. CHERNY:  There are a lot of stars.

10:52:55 25                    THE COURT:  We're up to four stars, I believe.

10:53:01  1                    (Juror enters juryroom.)

10:53:02  2                    THE COURT:  Good morning.  Have a seat, please.

10:53:04  3                    A JUROR:  Good morning.

10:53:05  4                    THE COURT:  What is your juror number?

10:53:06  5                    A JUROR:  It's 49, I believe.  Let me double

10:53:09  6    check.

10:53:10  7                    THE COURT:  I can check for you.  James Young.

10:53:11  8                    A JUROR:  Yes.

10:53:13  9                    THE COURT:  Do you recall what you answered

10:53:15 10    "yes" to?

10:53:15 11                    A JUROR:  I say three quarters of the questions.

10:53:18 12                    THE COURT:  Okay.  Give us some idea of what

10:53:21 13    your concerns are.

10:53:21 14                    A JUROR:  Let's see.  I'm not a DuPont fan.

10:53:24 15    Apologize, but it is what it is.

10:53:28 16         I do work with a lot of law firms.  I of work in

10:53:30 17    corporate trusts.  I'm in sales relationship manager.  I

10:53:33 18    used to work in Wilmington many years ago.  I know both,

10:53:37 19    heard of both firms.  They're great firms.  Not a big fan of

10:53:41 20    them.  Too high fees, you know, $300-$400 an hour and

10:53:46 21    climbing.

10:53:47 22         Again, I work with a lot of firms in

10:53:49 23    Philadelphia, so a lot of the names stick out.

10:53:52 24         I am in sales.  I do have to make a living.  And

10:53:58 25    to do March 10th is just impossible, you know, to stay on

10:54:01  1    that.  I understand it's a civic duty.  I know it is very

10:54:05  2    important, but I do have a son to pick up, you know, but

10:54:08  3    that is really the least of it.

10:54:10  4              I guess my son knows friends and parents who

10:54:14  5    work for Gore I believe with that.

10:54:20  6              So if I could go over the questions with you,

10:54:22  7    but I'd say three quarters was a "yes."

10:54:24  8              THE COURT:  Let's just start with those you

10:54:27  9    listed.

10:54:27 10              A JUROR:  Yes.

10:54:27 11              THE COURT:  You are not a fan of DuPont.

10:54:30 12              If you heard they had some role historically

10:54:35 13    related to some issues in this case, would your not being a

10:54:41 14    fan of them affect --

10:54:43 15              A JUROR:  I am.  I'm biased.  There is no doubt.

10:54:46 16    And, you know, it's funny.  You mentioned a book on patents.

10:54:49 17    I'm reading a book on the Wright Brothers which is clearly

10:54:53 18    talking about patents.

10:54:54 19              THE COURT:  I see that.

10:54:55 20              A JUROR:  To me, when you have a patent, that is

10:54:57 21    what it is.  You got a patent for that reason.  You know,

10:55:01 22    anyone who infringes on that.  And that is where it opens up

10:55:04 23    everything.  A patent is a patent.  That is what you applied

10:55:07 24    for.  You know, if you infringed on that in any shape or

10:55:10 25    form, you know, that's just the way it is.

| | | |
|---|---|---|
| 10:55:14 | 1 | THE COURT:  If one side turned out to be |
| 10:55:16 | 2 | affiliated with DuPont, you would hold it against that side? |
| 10:55:21 | 3 | A JUROR:  I probably would. |
| 10:55:22 | 4 | THE COURT:  Okay.  Now, the lawyers that you |
| 10:55:25 | 5 | heard, you say these firms are great but too expensive in |
| 10:55:29 | 6 | your experience.  You are not a fan. |
| 10:55:31 | 7 | Would that end up having you dislike everybody |
| 10:55:35 | 8 | the same or might it help one side or the other? |
| 10:55:37 | 9 | A JUROR:  It probably would help one side or the |
| 10:55:41 | 10 | other.  Probably help one side, not the other side. |
| 10:55:43 | 11 | THE COURT:  Do you know which side? |
| 10:55:45 | 12 | A JUROR:  No, not yet. |
| 10:55:46 | 13 | THE COURT:  And in terms of your work, would it |
| 10:55:52 | 14 | affect your income if you were with us through March 10th? |
| 10:55:56 | 15 | A JUROR:  Yes, it would. |
| 10:55:56 | 16 | THE COURT:  Okay.  And your son is how old? |
| 10:56:03 | 17 | A JUROR:  He is a freshman in high school. |
| 10:56:03 | 18 | THE COURT:  All right.  Any questions? |
| 10:56:05 | 19 | MS. RAZAVI:  No questions.  Thank you. |
| 10:56:06 | 20 | THE COURT:  Any questions? |
| 10:56:07 | 21 | MR. CHERNY:  You said a patent is a patent.  I |
| 10:56:10 | 22 | want to understand that.  What do you mean by that? |
| 10:56:13 | 23 | A JUROR:  Well, in my opinion, of course, I'm |
| 10:56:15 | 24 | not an attorney, but when you get a patent, like, for |
| 10:56:20 | 25 | example, with the Wright Brothers, again, I haven't finished |

10:56:23  1    the book, I'm halfway through it, I'm glad I brought it up

10:56:27  2    because I know I'm going to finish it now.

10:56:31  3              But, you know, when they just applied for the

10:56:33  4    patent, that is where I'm at.  Anyone who infringes on any

10:56:37  5    part of that in any way, shape or form.  And to me, it's

10:56:41  6    wrong, you know.

10:56:43  7              And obviously I'm not a fan of lawsuits.

10:56:47  8    Sometimes they're required.  A lot of times I think they're

10:56:49  9    not.  I'm surprised this hasn't been settled yet at all.  I

10:56:53 10    mean to take it this far with 10 attorneys, I'm going to

10:56:57 11    guess.  Like, wow, this must have been in the works I'm just

10:57:02 12    going to guess for a year, you know, to some extent, but,

10:57:06 13    you know, it's just lawsuits are just, it's too bad.  It

10:57:11 14    really is.

10:57:12 15              THE COURT:  Is there anything else?

10:57:14 16              MR. CHERNY:  I don't have any more questions.

10:57:15 17              THE COURT:  You can go back in the courtroom and

10:57:20 18    enjoy the book.

10:57:21 19              A JUROR:  All right.  Thanks.

10:57:22 20              (Juror left juryroom.)

10:57:23 21              THE COURT:  Any motion?

10:57:29 22              MR. PORADEK:  Yes, I think.

10:57:30 23              THE COURT:  There is a motion to strike that is

10:57:33 24    not opposed.

10:57:34 25              MR. CHERNY:  It's joint.

10:57:35  1                      THE COURT:  It's joint.

10:57:38  2                      MS. RAZAVI:  Wow.

10:57:40  3                      THE COURT:  Joint motion.  It's granted.

10:57:42  4                      MR. PORADEK:  Is that a first?

10:57:43  5                      MR. CHERNY:  I actually don't know whose side he

10:57:46  6      was better for.

10:57:46  7                      THE COURT:  Just try this case to him.

10:57:51  8                      MR. PORADEK:  Right.

10:57:51  9                      MR. CHERNY:  What happens when he gets to the

10:57:54 10      end of the book?

10:57:55 11                      THE COURT:  All right.  We're striking 49.

10:58:03 12                      (Juror enters juryroom.)

10:58:05 13                      THE COURT:  Good morning.  You can have a seat,

10:58:07 14      please.

10:58:08 15                      A JUROR:  Which one of you is Bull?

10:58:10 16                      MR. CHERNY:  Oh, from Night Court?

10:58:13 17                      A JUROR:  No, no, not Night Court.

10:58:17 18                      MS. HOLLIS:  No, the new Bull.

10:58:19 19                      MR. CHERNY:  I'm old Bull.

10:58:22 20                      THE COURT:  Could you tell us your juror number,

10:58:25 21      please?

10:58:25 22                      A JUROR:  13.

10:58:26 23                      THE COURT:  So that would make you Keith

10:58:27 24      Cornett.

10:58:28 25                      A JUROR:  It would.

10:58:29  1          THE COURT:  What did you answer "yes" to, if you

10:58:31  2  recall?

10:58:33  3          A JUROR:  If I understand the question correctly,

10:58:34  4  I answered just because I was a telecommunications engineer

10:58:37  5  for 30 years.

10:58:39  6          THE COURT:  All right.  You were that.  About

10:58:43  7  how long did you stop doing that?

10:58:45  8          A JUROR:  I retired last September.

10:58:47  9          THE COURT:  Congratulations.

10:58:50 10          A JUROR:  Thank you.

10:58:51 11          THE COURT:  Where were you a telecommunications

10:58:52 12  engineer?

10:58:53 13          A JUROR:  In Wilmington and in Philadelphia.

10:58:55 14          THE COURT:  And I assume you had some formal

10:58:57 15  education or training in that area?

10:59:00 16          A JUROR:  Yes.  I'm a Cisco certified network

10:59:02 17  associate.

10:59:03 18          THE COURT:  And did you ever deal with patents

10:59:05 19  in that work?

10:59:06 20          A JUROR:  No, not creating -- or I mean the

10:59:11 21  equipment I installed was patented, of course.

10:59:14 22          THE COURT:  But applying for patents or arguing

10:59:17 23  over them was not part of your work?

10:59:19 24          A JUROR:  No, sir.  No, sir.

10:59:20 25          THE COURT:  Did you have other things you

10:59:22  1     answered "yes" to?

10:59:22  2                      A JUROR:  No, that was it.

10:59:23  3                      THE COURT:  Any questions?

10:59:25  4                      MS. RAZAVI:  No questions.  Thank you.

10:59:26  5                      THE COURT:  Any question?

10:59:27  6                      MR. CHERNY:  Just one.

10:59:28  7                      I understand you are a Cisco certified engineer.

10:59:30  8                      A JUROR:  Um-hmm.

10:59:31  9                      MR. CHERNY:  Did you work for a telecom company

10:59:34 10     or installer?

10:59:35 11                      A JUROR:  No, I got certified at Marshall

10:59:38 12     University in Huntington, West Virginia.  And I worked for a

10:59:41 13     telecom companies in Huntington, West Virginia and in

10:59:45 14     Wilmington and Philadelphia.  I kept getting transferred.

10:59:48 15                      MR. CHERNY:  Can you identify which companies it

10:59:52 16     was?

10:59:52 17                      A JUROR:  Access Group, Applied Card Systems,

10:59:54 18     and Ashland Coal Incorporated.

10:59:57 19                      MR. CHERNY:  Okay.  And I take it you are

10:59:58 20     retired?

10:59:59 21                      A JUROR:  I am retired.  Yes, sir.

11:00:00 22                      MR. CHERNY:  I have no more questions.

11:00:02 23                      THE COURT:  All right.  You can go back into the

11:00:03 24     courtroom.  Thank you.

11:00:05 25                      (Juror left juryroom.)

| | | |
|---|---|---|
| 11:00:05 | 1 | THE COURT:  Any motion? |
| 11:00:10 | 2 | MS. RAZAVI:  No motion. |
| 11:00:10 | 3 | THE COURT:  Any motion. |
| 11:00:11 | 4 | MR. CHERNY:  (Shaking head no.) |
| 11:00:12 | 5 | THE COURT:  Okay. |
| 11:00:14 | 6 | (Juror enters juryroom.) |
| 11:00:16 | 7 | THE COURT:  Good morning. |
| 11:00:17 | 8 | A JUROR:  How are you doing? |
| 11:00:18 | 9 | THE COURT:  Good.  What is your juror number, |
| 11:00:20 | 10 | please? |
| 11:00:21 | 11 | A JUROR:  It is 100 -- |
| 11:00:27 | 12 | THE COURT:  No, it would be the smaller one. |
| 11:00:31 | 13 | A JUROR:  I'm 45. |
| 11:00:32 | 14 | THE COURT:  45.  They give you a lot of numbers. |
| 11:00:35 | 15 | 45.  So Eric Valentine? |
| 11:00:37 | 16 | A JUROR:  Um-hmm. |
| 11:00:38 | 17 | THE COURT:  Just for the court reporter, that |
| 11:00:39 | 18 | was a "yes," right? |
| 11:00:40 | 19 | A JUROR:  Yep. |
| 11:00:41 | 20 | THE COURT:  Do you recall what you answered |
| 11:00:42 | 21 | "yes" to? |
| 11:00:43 | 22 | A JUROR:  I answered "yes" to a few of them. |
| 11:00:46 | 23 | THE COURT:  Okay.  Why don't I tell us what you |
| 11:00:48 | 24 | remember. |
| 11:00:48 | 25 | A JUROR:  One of them was I think there are too |

11:00:50  1    many lawsuits.

11:00:51  2              THE COURT:  Okay.  We'll come back to that.  Do

11:00:56  3    you remember what the others were?

11:00:57  4              A JUROR:  The other one was, I don't think it

11:01:04  5    should be -- it was the one about medical --

11:01:10  6              THE COURT:  Okay.

11:01:12  7              A JUROR:  -- stuff.  And I think it is crazy to

11:01:16  8    have.

11:01:16  9              THE COURT:  Whether patents are bad in the

11:01:17 10    healthcare field.

11:01:18 11              A JUROR:  Yeah, something like that.

11:01:20 12              THE COURT:  Okay.

11:01:21 13              A JUROR:  I think.

11:01:21 14              THE COURT:  All right.  Is there anything else?

11:01:23 15              A JUROR:  Uh-uh.

11:01:25 16              THE COURT:  That's a "no;" right?

11:01:27 17              A JUROR:  No, right.

11:01:28 18              THE COURT:  Let's talk about that.  You say

11:01:30 19    there are too many lawsuits.  Tell us more about that.

11:01:33 20              A JUROR:  I think it's crazy.

11:01:35 21              THE COURT:  Crazy to have so many lawsuits?

11:01:37 22              A JUROR:  Right.  It's ridiculous.

11:01:39 23              THE COURT:  And you have an idea why it is

11:01:41 24    ridiculous?

11:01:42 25              A JUROR:  Several reasons.  I mean this is

```
11:01:44  1    different from what I'm pretty much talking about but to say

11:01:50  2    somebody slips and falls on the restaurant and they sued the

11:01:53  3    company.  I feel like that could be on purpose, could be

11:01:55  4    anything.  I don't know, but ...

11:01:59  5              THE COURT:  Okay.  So but your sense from what I

11:02:03  6    told you about this case involving patents and infringement

11:02:06  7    and invalidity of a patent, this isn't the kind of case that

11:02:09  8    you would think is crazy?

11:02:13  9              A JUROR:  I don't know.  I think it's weird that

11:02:15 10    we have two companies that are, I mean it's cardiovascular

11:02:18 11    equipment or something; right?  Patents.  I man it should be

11:02:22 12    about healing people and not really about money and patents

11:02:25 13    and all that crap.

11:02:26 14              THE COURT:  All right.  So that goes to your

11:02:27 15    second --

11:02:29 16              A JUROR:  Yes.

11:02:29 17              THE COURT:  -- issue.

11:02:30 18              A JUROR:  Um-hmm.

11:02:31 19              THE COURT:  Patents are bad in the healthcare

11:02:33 20    industry.

11:02:34 21              A JUROR:  Um-hmm.

11:02:34 22              THE COURT:  That's a "yes?"

11:02:36 23              A JUROR:  Yes.

11:02:36 24              THE COURT:  It's hard for him to type that.

11:02:38 25              A JUROR:  Sorry about that.
```

11:02:39  1               THE COURT:  So tell us a little bit more about

11:02:41  2      why you feel that way.

11:02:42  3               A JUROR:  I feel like it shouldn't be about

11:02:44  4      money.  It should be about healing people and, I don't know,

11:02:48  5      not about patents.  Like this company is infringing on my

11:02:51  6      product.  It should be about healing people and helping

11:02:55  7      people.  That's how I feel about it.

11:02:58  8               THE COURT:  So if you were on this jury and I

11:02:59  9      instructed you to put aside any personal feelings that you

11:03:03 10      might have like that and instructed you this is what you

11:03:08 11      have to do by weighing the evidence and determining if a

11:03:11 12      patent is infringed or invalid, for example, do you think

11:03:15 13      you could follow those instructions?

11:03:17 14               A JUROR:  Um-hmm.

11:03:18 15               THE COURT:  Is that a "yes?"

11:03:20 16               A JUROR:  Yes.  Yes, I could.  Sorry about that.

11:03:22 17               THE COURT:  Are there other issues you want to

11:03:24 18      share with us?

11:03:24 19               A JUROR:  No.

11:03:25 20               THE COURT:  Let's see if anyone has any

11:03:27 21      follow-up questions for you.

11:03:29 22               Any questions?

11:03:31 23               (Counsel confer.)

11:03:34 24               MS. SCHMID:  So in this case, though, we do have

11:03:36 25      a company that is in like making medical devices, patents

11:03:40  1    related to medical device products that is suing another

11:03:43  2    company and there are damages or money then.  You made a

11:03:46  3    statement about it should be about the money -- shouldn't be

11:03:50  4    about money, it should be about healing.

11:03:51  5                   A JUROR:  Um-hmm.

11:03:52  6                   MS. SCHMID:  Would you think the company that is

11:03:54  7    bringing the lawsuit, would they have kind of to start a

11:03:57  8    step behind, that they would have to do more to prove to you

11:04:00  9    that it's not about the money?

11:04:02 10                   A JUROR:  Probably.

11:04:03 11                   MS. SCHMID:  You would be biased against them at

11:04:05 12    the beginning?

11:04:06 13                   A JUROR:  Probably.

11:04:07 14                   THE COURT:  Is there anything else?

11:04:09 15                   MS. RAZAVI:  No.

11:04:10 16                   THE COURT:  Questions?

11:04:15 17                   MR. CHERNY:  I mean, I guess the only question I

11:04:19 18    have is the Judge asked you, you could listen to both sides

11:04:24 19    and be fair; is that correct?

11:04:25 20                   A JUROR:  I could.

11:04:27 21                   MR. CHERNY:  Okay.  Any further questions?

11:04:29 22                   MS. MASON:  Right.  So in light of, you just

11:04:32 23    said that you probably would maybe be against a company that

11:04:37 24    is bringing a lawsuit but, again, the Judge is going to tell

11:04:40 25    you that you need to wait to hear from everybody before you

11:04:43  1    make an opinion.  Would you be able to do that?

11:04:46  2                 THE JURORS:  Yes, I would be able to do that.

11:04:48  3                 MS. MASON:  And put aside any bias you have?

11:04:50  4                 A JUROR:  Yes.

11:04:52  5                 MR. CHERNY:  Okay.

11:04:53  6                 THE COURT:  And I had asked you, for example,

11:04:55  7    instructions on infringement or invalidity of a patent.  If

11:04:58  8    you were to hear instructions about damages and whether one

11:05:02  9    company was entitled to obtain money, is that something you

11:05:08 10    think you could listen to, despite your feelings that you

11:05:11 11    expressed with us?

11:05:12 12                 A JUROR:  I suppose.

11:05:12 13                 THE COURT:  Listen to and follow, I should say?

11:05:15 14                 A JUROR:  Yes.  Yes.

11:05:15 15                 THE COURT:  Do you think you could?

11:05:17 16                 A JUROR:  Um-hmm.  Yes.

11:05:18 17                 THE COURT:  All right.  Is there anything else?

11:05:20 18                 MR. PORADEK:  Just, I'm sensing some hesitancy

11:05:25 19    when you are asked if you could be unbiased.  Would you

11:05:28 20    say --

11:05:28 21                 A JUROR:  I could put it aside.

11:05:29 22                 MR. PORADEK:  Would you say, though, you are

11:05:31 23    starting with some predisposition?

11:05:33 24                 A JUROR:  Yes.

11:05:34 25                 MR. PORADEK:  And that is something that we, as

11:05:35  1    the plaintiff in this case, would have to overcome for you?

11:05:39  2                    A JUROR:  Yes.

11:05:39  3                    MR. PORADEK:  Thank you very much.

11:05:40  4                    THE COURT:  Is there anything else?

11:05:41  5                    MR. CHERNY:  No, Your Honor.

11:05:41  6                    THE COURT:  All right.  You can step out.  Thank

11:05:44  7    you very much.

11:05:44  8                    A JUROR:  Thank you.

11:05:47  9                    (Juror left juryroom.)

11:05:49 10                    THE COURT:  Any motion?

11:05:50 11                    MR. PORADEK:  Yes, I think we'll bring a motion.

11:05:52 12    I was struck both by his answers and we would be a step

11:05:55 13    behind, but also some of the word he was using, you know,

11:05:58 14    just voluntarily, "crazy," "all that crap," you know, those

11:06:02 15    kind of inflammatory words that I think betray a bias.

11:06:09 16                    MS. KRAMAN:  I will add he seemed, under

11:06:12 17    pressure he seemed to say he could be impartial but then

11:06:17 18    didn't seem convincing.

11:06:18 19                    THE COURT:  Okay.  What is your position?

11:06:20 20                    MR. CHERNY:  He seems similar to the people with

11:06:23 21    general feelings where a patentee would start a step ahead,

11:06:27 22    but he said I mean he seemed to, he didn't seem to be the

11:06:30 23    kind of person that would be pressured.  That part, I didn't

11:06:34 24    seem to get the part.  He seemed to be honest.  That was his

11:06:40 25    initial disposition of lawsuits in general, but I also think

11:06:43 1    he could be honest and fair.

11:06:45 2              THE COURT:  Any response?

11:06:46 3              MS. SCHMID:  When people are asked can you be

11:06:48 4    fair especially by a judge and attorneys, they tend to

11:06:51 5    actually say "yes, I can" because they feel pressure to do

11:06:54 6    so.  But on his own, he admits and says things, it is

11:06:56 7    ridiculous, it's crazy, it's crap.  I guess I am prejudiced.

11:07:00 8              You have to go kind of I think with his initial

11:07:02 9    feelings as opposed to those when he is pressured to say,

11:07:05 10   yes, I can be fair because we all want to be fair.

11:07:08 11             THE COURT:  Okay.  Give me a moment.

11:07:11 12             (Court and law clerk confer.)

11:07:30 13             THE COURT:  Thank you, Mr. Looby.

11:07:33 14             All right.  I'm going to grant the motion and

11:07:36 15   strike the juror.  I think it's -- I think he probably could

11:07:45 16   follow my instructions, but I'm not confident enough given

11:07:50 17   some the words that he used and some of the hesitancy I

11:07:53 18   perceived from him.  So 45 is stricken.

11:08:01 19             (Juror enters juryroom.)

11:08:03 20             THE COURT:  Good morning.

11:08:04 21             A JUROR:  Good morning.

11:08:05 22             THE COURT:  If you could have a seat and tell us

11:08:07 23   your juror number if you recall.

11:08:08 24             A JUROR:  17.

11:08:09 25             THE COURT:  Randall Elser.

11:08:14  1                     A JUROR:  Yes.

11:08:14  2                     THE COURT:  Do you recall what you answered

11:08:16  3      "yes" to?

11:08:16  4                     A JUROR:  There were several of them.  I would

11:08:19  5      have to hear some of the questions again.

11:08:21  6                     THE COURT:  I could do that, but do you remember

11:08:23  7      any of the general areas?

11:08:26  8                     A JUROR:  Let's see.

11:08:27  9                     THE COURT:  The schedule.

11:08:28 10                     A JUROR:  I know somebody.  I know a friend that

11:08:31 11      works at Gore.  Not a great friend but I do know somebody

11:08:34 12      that works at Gore.

11:08:35 13                     THE COURT:  Do you have any feelings about Gore

11:08:38 14      as a result of that?

11:08:40 15                     A JUROR:  No.

11:08:41 16                     THE COURT:  Do you think Gore would start out

11:08:43 17      ahead or behind in this trial in your mind?

11:08:45 18                     A JUROR:  That is another thing, too.  I've

11:08:47 19      gotten free Gore products before, too.  I don't know.

11:08:51 20                     THE COURT:  Okay.  What kind of products?

11:08:54 21                     A JUROR:  Guitar strings.

11:08:57 22                     THE COURT:  Does that mean Gore would start out

11:08:59 23      ahead or behind in your mind?

11:09:03 24                     A JUROR:  No, probably not.  I did like the

11:09:06 25      product.  I mean to be honest.

11:09:08  1                    THE COURT:  Okay.  Was there any serious concern

11:09:13  2     about the schedule here?

11:09:15  3                    A JUROR:  Oh, yeah.  That is another thing, too.

11:09:17  4     I'm like an independent contractor, and I work based on what

11:09:21  5     I complete and what I sell, so I'm not making any money if

11:09:26  6     I'm here.  I have never tried to get out of jury duty

11:09:28  7     before.  I actually sat on a jury, too --

11:09:30  8                    THE COURT:  That is another one.

11:09:32  9                    A JUROR:  -- for four or five days.  And, you

11:09:35 10     know, I was working at the time.  I was working at Verizon

11:09:38 11     so they were paying me to be here.  Now I'm actually, I'm

11:09:41 12     not getting work completed I'm not making any money.  So

11:09:45 13     that was one of my issues.

11:09:46 14                    THE COURT:  Okay.

11:09:47 15                    A JUROR:  And something about patent stuff.  I

11:09:50 16     have actually gone through the research, the patent process,

11:09:54 17     although I had some, I have some opinions on the patent

11:09:57 18     process.

11:09:59 19                    I think it favors the big guy in a sense.  It is

11:10:04 20     an expensive process.  I work with guitars.  I invent things

11:10:08 21     all the time, little things here, but I would love to patent

11:10:11 22     them but I can't because it is too expensive for me to do.

11:10:15 23                    And, you know, I think the process is kind of

11:10:17 24     flawed in the sense somebody can take, like in my mind,

11:10:20 25     maybe this is wrong, but somebody can take one product and,

11:10:24   1    you know, shift this or that and turn it into it a

11:10:27   2    completely different product.  Like a guitar pickup, for

11:10:29   3    example, you take one guitar pickup, if you take two of

11:10:32   4    them, turn one of them around, it becomes a humbucker.  Did

11:10:35   5    you just make a new product or did you take two of something

11:10:38   6    and turn it into something else?  Like whose product is it

11:10:41   7    in the first place?

11:10:43   8              So that is my thoughts on the patent process.

11:10:45   9              THE COURT:  Thank you.

11:10:47  10              A JUROR:  I don't remember.  Like I said, there

11:10:49  11    was a few other things.

11:10:50  12              THE COURT:  Do you have any technical training

11:10:52  13    or experience in any technical fields?

11:10:56  14              A JUROR:  I did work for an anesthesia company,

11:10:59  15    selling anesthesia products.  You mentioned medical

11:11:03  16    supplies.

11:11:03  17              THE COURT:  Okay.  Had you, did you deal with

11:11:06  18    any Bard or Gore products in those sales or otherwise?

11:11:12  19              A JUROR:  I don't think so.

11:11:13  20              THE COURT:  All right.  In terms of your work

11:11:16  21    and what you get paid to do, if you are with us from 9:00 to

11:11:21  22    4:30 through the 10th, is your work of a nature you could do

11:11:27  23    some of it at other hours?

11:11:29  24              A JUROR:  Yes.

11:11:30  25              THE COURT:  So how -- I'm not asking for a

11:11:35  1    dollar figure, but how much more difficult or how much

11:11:37  2    generally would you be hurt if you were with us during the

11:11:40  3    daytime?

11:11:42  4              A JUROR:  I work on like 30 percent commission,

11:11:45  5    what comes in after it is completed.  So if there is only

11:11:48  6    two of us that work there and the other guy, he has been

11:11:51  7    kind of under the weather a little bit lately; and if we're

11:11:55  8    not getting anything done, we're not making any money.

11:11:57  9    So ...

11:11:58 10              THE COURT:  And what kind of work is it that you

11:11:59 11    do?

11:12:00 12              A JUROR:  Build guitars.

11:12:01 13              THE COURT:  Build guitars.

11:12:03 14              A JUROR:  Um-hmm.

11:12:04 15              THE COURT:  And your prior jury service, about

11:12:07 16    how long ago was that?

11:12:09 17              A JUROR:  I apologize.  I don't know, three or

11:12:10 18    four years ago maybe.

11:12:11 19              THE COURT:  At least three or four years.

11:12:13 20              A JUROR:  Yes.

11:12:13 21              THE COURT:  Was that here in Delaware?

11:12:14 22              A JUROR:  Yes.

11:12:15 23              THE COURT:  Was it here in this federal court?

11:12:17 24              A JUROR:  It's not in this building, I don't

11:12:20 25    think.  It was on the King Street building.  Was it this

11:12:22  1    building?

11:12:23  2         THE COURT:  No, the state court courthouse is on

11:12:25  3    the same road.

11:12:26  4         A JUROR:  It's probably that one.  It's not

11:12:28  5    where I came in.  Yes, it's a different building.

11:12:31  6         THE COURT:  Do you remember what kind of trial

11:12:32  7    it was?

11:12:33  8         A JUROR:  Yeah.  It was a guy had been, worked

11:12:35  9    in an apartment complex or lived there and a piece of

11:12:39 10    something fell off the complex and hit him on the neck and

11:12:42 11    he was suing for damages.  And we awarded him damages in a

11:12:46 12    large sum of money, if I remember right.

11:12:48 13         THE COURT:  Okay.  Do you think anything about

11:12:49 14    that experience would impact how you would see this case?

11:12:52 15         A JUROR:  No, I mean there is nothing to the

11:12:59 16    process.  I sat on a jury before.  I did nod off a couple of

11:13:03 17    times in the jury box.  I'm not good at sitting all the

11:13:07 18    time; and it actually was kind of embarrassing.  The second

11:13:10 19    time, I made eye contact with the judge.  I felt like a

11:13:15 20    jerk.  But lesson learned.

11:13:16 21         THE COURT:  Thank you.  Thank you.  Let me see

11:13:21 22    if anyone else has questions for you.  Any questions?

11:13:24 23         MR. PORADEK:  I guess I'm wondering you talked

11:13:25 24    about the patent system and some impressions you had.

11:13:29 25         A JUROR:  Yes.

11:13:29  1          THE COURT:  It sounds like you feel the patent

11:13:31  2    system may not be fair to the smaller inventor.  Is that

11:13:34  3    your concern?

11:13:35  4          A JUROR:  Yes, that is exactly what I believe.

11:13:37  5    Yes.  Someone like me who has, I got a lot of days and I

11:13:41  6    come up with a lot of cool things in my mind and I

11:13:44  7    researched putting stuff through.  And I know it's, and

11:13:47  8    again I could be wrong, but it's like 8,000 bucks just to

11:13:50  9    try to patent something.  So how can I do that?  Gore could

11:13:53 10    do that.  I can't do that.

11:13:55 11          MR. PORADEK:  So would you hold it?  I'm just

11:13:57 12    wondering how that view of the patent system impacts your

11:14:00 13    feeling about Gore having been able to do that.

11:14:03 14          A JUROR:  It's -- it's frustrating for me.  Like

11:14:07 15    I said, I would like to patent things.  I cannot.  They can

11:14:09 16    or anybody, any big company can.

11:14:12 17          MR. PORADEK:  Right.

11:14:13 18          A JUROR:  Big company.  I mean a large company

11:14:16 19    can, Randy can't.

11:14:17 20          MR. PORADEK:  I guess the bottom line is would

11:14:19 21    that impact your view of us as patent owners and plaintiffs

11:14:22 22    in this case because obviously --

11:14:24 23          A JUROR:  Honestly, yes, this is something.  Yes

11:14:26 24    probably.  I would like to say no, but at the end of the day

11:14:30 25    it's in the back of my mind.  I'm being completely honest.

11:14:34  1              MR. PORADEK:  Appreciate it.  Thank you.

11:14:35  2              THE COURT:  Okay.  Questions?

11:14:36  3              MR. CHERNY:  If both companies were

11:14:39  4      quote-unquote "big companies" with patents, would that tend

11:14:41  5      to even it out, whatever disposition you have?

11:14:46  6              A JUROR:  I'm kind of just down on the whole

11:14:48  7      patent system in itself.  It's a good fair question.  I

11:14:52  8      don't even know if I can answer that.

11:14:57  9              I don't know.  I don't know.  Probably not, you

11:15:01 10      know.

11:15:02 11              MR. CHERNY:  I'm sorry?

11:15:06 12              A JUROR:  Probably.  I mean in my mind, you guys

11:15:08 13      can get patents, I can't get patents.  And that is just the

11:15:12 14      way I look at it.  It's I'm kind of down on it.  I think it

11:15:14 15      is a flawed system and I don't like -- like I said, you

11:15:18 16      could change things and, you know, for myself, I could spend

11:15:23 17      the $8,000 to put all this money into it and then have

11:15:26 18      somebody take my product and move this and that around and

11:15:29 19      create a whole new product.  And I don't know that I could

11:15:31 20      even fight.  You know, I just think the whole system is

11:15:35 21      flawed.  And probably not.  I don't like it.

11:15:40 22              MR. CHERNY:  I understand about your views about

11:15:41 23      the entire system.

11:15:43 24              A JUROR:  Yeah.

11:15:44 25              MR. CHERNY:  But in a situation where you had

11:15:45  1    two companies, same in the medical field.

11:15:48  2              A JUROR:  It's large companies.

11:15:50  3              MR. CHERNY:  Right.  Do you think you could

11:15:52  4    specifically and fairly listen to the evidence, you know?

11:15:58  5              A JUROR:  I don't.  I don't think so, no.  One

11:16:01  6    company is going to be larger than the other company.  I

11:16:03  7    don't know.  Yeah, I suppose so.

11:16:06  8              THE COURT:  So if you are on the jury and I

11:16:09  9    instructed you, first of all, that you have to follow my

11:16:12 10    instructions and then further that you need to put aside any

11:16:16 11    bias or sympathy or prejudice you may have and focus just on

11:16:20 12    the evidence in front of you, do you think you could follow

11:16:24 13    that instruction or are you concerned that you might not?

11:16:27 14              A JUROR:  I'm concerned that I might not.  You

11:16:29 15    gave me the instruction, do the best.  I hate to -- you

11:16:34 16    know, hate -- I wouldn't want to go against what you say

11:16:37 17    obviously.  I would do my duty, but I don't know that I

11:16:40 18    could.

11:16:40 19              THE COURT:  All right.  Is there anything else?

11:16:44 20              MR. PORADEK:  (Shaking head no.)

11:16:45 21              THE COURT:  Is there anything else?

11:16:45 22              MR. CHERNY:  (Shaking head no.)

11:16:46 23              THE COURT:  All right.  Go back into the

11:16:47 24    courtroom.

11:16:48 25              A JUROR:  Thank you.

11:16:50  1                    (Juror left juryroom.)

11:16:50  2            MR. PORADEK:  Your Honor, one thing, I just, and

11:16:54  3    this may impact your follow questioning.  He talked about

11:16:57  4    getting free guitar strings from Gore.

11:16:59  5            THE COURT:  I think he did say that.

11:17:01  6            MR. PORADEK:  I believe our inventor may have

11:17:02  7    been involved with guitar strings at Gore.  There may be

11:17:07  8    other inventions, but that could be something that comes up,

11:17:09  9    and I wanted to make sure you were aware of that fact as you

11:17:12 10    are going --

11:17:13 11            THE COURT:  I was not aware of that fact, so

11:17:14 12    thank you.

11:17:15 13            MR. PORADEK:  Yes.

11:17:15 14            THE COURT:  Do you have a motion?

11:17:16 15            MR. PORADEK:  We have no motion.

11:17:17 16            THE COURT:  Okay.  What about the defendants?

11:17:21 17            MR. CHERNY:  No, I don't think so.

11:17:23 18            THE COURT:  Okay.  And do you have any concerns

11:17:26 19    that he may hear, and I don't know --

11:17:30 20            MR. PORADEK:  Do we have a motion?  I may have

11:17:32 21    misunderstood.  I apologize.

11:17:33 22            THE COURT:  If he were -- if they were to, if

11:17:35 23    the jury were to hear that this inventor may have created

11:17:39 24    the invention, that he actually got free benefits from?

11:17:45 25            MR. CHERNY:  I'm not sure this has come up in

11:17:46  1   the case yet.  There hasn't been much guitar issues.

11:17:49  2              THE COURT:  I wouldn't have thought.

11:17:50  3              MR. PORADEK:  I screwed up.  With my colleagues,

11:17:52  4   we do have a motion.  I think, I think given his statements,

11:17:59  5   and I know it's going both ways a little bit, but the

11:18:02  6   primary thing about being not appreciating the patent

11:18:06  7   system, and then when I asked him very correctly if he could

11:18:09  8   be fair to us, he did indicate he didn't think he could.

11:18:14  9              I think, I understand there was other stuff that

11:18:16 10   he said, but I'm concerned that just an overall disdain for

11:18:21 11   the patent system and a personal feeling against it would be

11:18:23 12   prejudicial to Gore.

11:18:26 13              MS. KRAMAN:  And not being able to commit to

11:18:28 14   follow the Court's instructions, that is probably a problem.

11:18:34 15              THE COURT:  In light of their revised position,

11:18:35 16   what is the defendant's view?

11:18:36 17              MR. CHERNY:  Can I get, the first part which is

11:18:39 18   who is the guitar string part?

11:18:41 19              THE COURT:  Right.  Do you think the guitar

11:18:42 20   evidence is going to come in?

11:18:44 21              MR. PORADEK:  I think Dave Myers, it's one of

11:18:47 22   his inventions.  I believe he was involved in guitar

11:18:49 23   strings.  That may come in.

11:18:51 24              MR. CHERNY:  Is this really something you guys

11:18:53 25   are going to elicit at trial?

11:18:55  1                    MR. PORADEK:  It can come up because he works in

11:18:58  2      ePTFE and this is something that may come up.

11:19:05  3                    MS. KRAMAN:  It's his background.

11:19:06  4                    MR. CHERNY:  I'm still not sure.  Yes, it seemed

11:19:08  5      like he was all over the map.  I didn't hear anything.  I

11:19:11  6      think he will try to be fair.  He didn't seem as focused, as

11:19:15  7      negative some of the other people.  So I think that I oppose

11:19:20  8      the motion, as I said before.

11:19:21  9                    THE COURT:  Any response?

11:19:21 10                    MR. PORADEK:  (Shaking head no.)

11:19:24 11                    THE COURT:  All right.  I'm going to deny the

11:19:25 12      motion.  I have maybe more confidence than he verbally

11:19:29 13      expressed that he can follow my instructions.  He seemed to

11:19:32 14      be genuinely struggling but in a way that actually gives me

11:19:37 15      confidence that he do his best as anyone can to follow my

11:19:40 16      instructions and put aside his general views about the

11:19:43 17      patent system, and my sense of those general views is that

11:19:47 18      they really don't cut for or against either side here and

11:19:50 19      that that is probably what he will realize if he consciously

11:19:53 20      struggles with it in following my instructions.

11:19:57 21                    It seems to me while not making an evidentiary

11:20:01 22      decision just yet, I think it is one thing to say you have

11:20:04 23      multiple patents and it's another thing to say they're

11:20:08 24      specifically on guitars or guitar strings.

11:20:10 25                    I'm not sure that the latter is really

11:20:12  1      necessary, but I'll leave it to you all to evaluate that.

11:20:15  2      If you have a dispute, let me know.

11:20:17  3              MR. PORADEK:  We're not going to be talking

11:20:19  4      about patents in terms of guitar string patents.  It's more

11:20:22  5      he did work, some of the work he did was in the area of

11:20:26  6      developing guitar strings.

11:20:27  7              THE COURT:  Again, I'm not sure he needs to be

11:20:30  8      that detailed about every aspect of his background, but we

11:20:32  9      will deal with it as it comes up, if it does.

11:20:39 10              (Juror enters juryroom.)

11:20:40 11              THE COURT:  Good morning.

11:20:41 12              A JUROR:  Good morning.

11:20:42 13              THE COURT:  Have a seat, please.

11:20:44 14      Do you recall what your juror number is?

11:20:46 15              A JUROR:  29.

11:20:48 16              THE COURT:  So you must be Maureen McCollom.

11:20:52 17              A JUROR:  I am.

11:20:53 18              THE COURT:  Do you recall what you answered

11:20:54 19      "yes" to.

11:20:58 20              A JUROR:  Well, I was advised I should disclose

11:21:00 21      to you that my future daughter-in-law is Nar Crawford.

11:21:00 22              THE COURT:  Oh.

11:21:05 23              A JUROR:  So I don't know if that makes any

11:21:06 24      difference, but I was told I should let you know that.

11:21:09 25              THE COURT:  Right.

11:21:10  1              A JUROR:  And she clerked at Young Conaway for

11:21:12  2    two summers.

11:21:13  3              THE COURT:  She is in my incoming law clerk.

11:21:15  4              A JUROR:  Yes.

11:21:15  5              THE COURT:  So currently about to graduate from

11:21:19  6    Penn Law School I believe.

11:21:20  7              A JUROR:  Yes.

11:21:21  8              THE COURT:  So congratulations.

11:21:23  9              A JUROR:  Yes, we're very lucky to have her in

11:21:25 10    our family.

11:21:26 11              THE COURT:  Thank you for disclosing that.  Of

11:21:27 12    course, she doesn't work here now.

11:21:31 13              A JUROR:  Right.

11:21:31 14              THE COURT:  Do you think knowing your future

11:21:33 15    daughter-in-law is going to work for me will impact how you

11:21:35 16    view this case?

11:21:36 17              A JUROR:  No, absolutely not.

11:21:37 18              THE COURT:  Okay.

11:21:38 19              A JUROR:  I do have sort of an issue with Young

11:21:40 20    Conaway.

11:21:40 21              THE COURT:  Okay.

11:21:41 22              A JUROR:  And I don't think it would affect this

11:21:43 23    but I also want to disclose that.

11:21:46 24              My husband's former partner, Vince Thomas, is

11:21:50 25    now a partner at Young Conaway.

```
11:21:52   1                    THE COURT:  Okay.  So do you think that or your

11:21:57   2       future daughter-in-law's experience with Young Conaway would

11:22:00   3       impact how you see this case?

11:22:01   4                    A JUROR:  I really don't.

11:22:02   5                    THE COURT:  Okay.

11:22:03   6                    A JUROR:  But I just wanted to let you know.

11:22:04   7                    THE COURT:  Do you think the side that they're

11:22:06   8       on might start out a little bit ahead in your mind?

11:22:09   9                    A JUROR:  No.

11:22:10  10                    THE COURT:  No.

11:22:11  11                    A JUROR:  It would actually go towards the other

11:22:12  12       side.

11:22:13  13                    THE COURT:  Okay.  Do you think they might start

11:22:14  14       out a little behind?

11:22:17  15                    A JUROR:  They might.

11:22:17  16                    THE COURT:  They might.

11:22:18  17                    A JUROR:  I don't know.  I would hope no.  You

11:22:21  18       know, I would hope I would be.

11:22:23  19                    THE COURT:  You would try not to.

11:22:24  20                    A JUROR:  I would try not to.  Absolutely.

11:22:27  21                    THE COURT:  And the specific attorneys whose

11:22:31  22       names you heard or who you may see here.

11:22:34  23                    A JUROR:  I don't know anyone in this room, no.

11:22:36  24                    THE COURT:  And the ones that were mentioned in

11:22:38  25       addition?
```

11:22:38 1                    A JUROR:  No, I did not know anyone else.

11:22:41 2                    THE COURT:  Okay.  Is there anything else you

11:22:43 3    wanted to share with us?

11:22:44 4                    A JUROR:  No, that's it.

11:22:45 5                    THE COURT:  All right.  Any questions?

11:22:49 6                    MS. RAZAVI:  No.

11:22:50 7                    THE COURT:  Any questions?

11:22:51 8                    MR. CHERNY:  No, Your Honor.

11:22:51 9                    THE COURT:  All right.  You can go back into the

11:22:53 10   courtroom.

11:22:53 11                   A JUROR:  Thank you.

11:22:55 12                   (Juror left juryroom.)

11:23:01 13                   MR. PORADEK:  I have to remember to speak

11:23:03 14   audibly.  I was shaking my head.

11:23:04 15                   THE COURT:  Any motion?

11:23:05 16                   MR. PORADEK:  No motion.

11:23:05 17                   THE COURT:  No motion?

11:23:06 18                   MR. CHERNY:  No motion.

11:23:10 19                   (Juror enters juryroom.)

11:23:14 20                   A JUROR:  Hello.

11:23:15 21                   THE COURT:  Good morning.  Have a seat, please.

11:23:18 22                   A JUROR:  Hot seat.

11:23:18 23                   THE COURT:  Yes.  Do you know what your juror

11:23:20 24   number is?

11:23:21 25                   A JUROR:  33.

| | | |
|---|---|---|
| 11:23:22 | 1 | THE COURT:  33.  Deborah Pragg. |
| 11:23:26 | 2 | A JUROR:  Correct. |
| 11:23:26 | 3 | THE COURT:  Do you recall what you answered |
| 11:23:27 | 4 | "yes" to? |
| 11:23:28 | 5 | A JUROR:  One was I did serve on a jury before. |
| 11:23:30 | 6 | THE COURT:  Okay. |
| 11:23:31 | 7 | A JUROR:  Down at the other courthouse. |
| 11:23:33 | 8 | THE COURT:  Okay. |
| 11:23:35 | 9 | A JUROR:  And the second one was I have a |
| 11:23:39 | 10 | nephew-in-law that works for Gore. |
| 11:23:43 | 11 | THE COURT:  Okay. |
| 11:23:44 | 12 | A JUROR:  But I don't know what he does. |
| 11:23:46 | 13 | THE COURT:  Okay. |
| 11:23:46 | 14 | A JUROR:  So, other than that, that's it. |
| 11:23:48 | 15 | THE COURT:  That's it.  So the jury service was |
| 11:23:50 | 16 | in the other building so probably state court. |
| 11:23:53 | 17 | A JUROR:  Yes. |
| 11:23:53 | 18 | THE COURT:  About how long ago was that? |
| 11:23:55 | 19 | A JUROR:  Probably three or four years ago. |
| 11:23:57 | 20 | THE COURT:  Do you remember anything about the |
| 11:23:58 | 21 | case? |
| 11:23:58 | 22 | A JUROR:  It was a father was supposed to have |
| 11:24:00 | 23 | molested his daughter, and we, he was found not guilty, so |
| 11:24:05 | 24 | ... |
| 11:24:05 | 25 | THE COURT:  Okay. |

11:24:05  1          A JUROR:  Other than that, I don't remember

11:24:07  2   nothing else.

11:24:07  3          THE COURT:  Do you think anything about that

11:24:10  4   experience would affect your service here?

11:24:12  5          A JUROR:  No, uh-uh.

11:24:13  6          THE COURT:  And the nephew-in-law, don't know

11:24:15  7   what he does at Gore?

11:24:16  8          A JUROR:  No, I know he travels for them.

11:24:18  9   That's all I know.

11:24:19 10          THE COURT:  Has he talked to you about his

11:24:21 11   feelings about Gore?

11:24:22 12          A JUROR:  No, I see him once a year.

11:24:24 13          THE COURT:  Do you have any feelings about Gore?

11:24:25 14          A JUROR:  Not one way or the other.

11:24:26 15          THE COURT:  All right.  Any questions?

11:24:31 16          MR. PORADEK:  I don't think so, Your Honor.

11:24:32 17          MS. RAZAVI:  No.

11:24:32 18          THE COURT:  Any questions?

11:24:33 19          MR. CHERNY:  No.

11:24:33 20          THE COURT:  You can go back into the courtroom.

11:24:41 21          A JUROR:  Thank you.

11:24:42 22          (Juror left juryroom.)

11:24:43 23          THE COURT:  Any motion?

11:24:45 24          MS. KRAMAN:  Your Honor, she didn't mention this

11:24:47 25   but Young Conaway sued her husband for wrongful death and he

11:24:51 1    subsequently, as a result of the lawsuit, had a mental

11:24:54 2    breakdown and died suddenly.  This was all within the last

11:24:58 3    few years.  So that causes us some concern especially since

11:25:02 4    she didn't raise it.

11:25:03 5                    THE COURT:  Young Conaway represented someone

11:25:05 6    who sued?

11:25:06 7                    MS. KRAMAN:  We represented the victim who her

11:25:08 8    husband killed.

11:25:08 9                    THE COURT:  And you have no doubt that's it's

11:25:11 10   the same person?

11:25:13 11                   MS. KRAMAN:  Yes, we know it's the same person.

11:25:15 12   Yes.

11:25:15 13                   THE COURT:  Okay.  So are you moving to strike

11:25:17 14   her?

11:25:18 15                   MS. KRAMAN:  Yeah.  I mean it does cause me some

11:25:20 16   concern, too, that she didn't raise the fact that she was

11:25:24 17   familiar with Young Conaway, too.

11:25:29 18                   THE COURT:  What is your position?

11:25:30 19                   MR. CHERNY:  I guess I have to oppose because I

11:25:33 20   mean obviously she seemed like a prototypical fair juror,

11:25:36 21   and not that I doubt Ms. Kraman but I didn't hear anything

11:25:42 22   from her, so I don't know that you can strike the juror

11:25:44 23   based on, I guess, you know, the statement that she would

11:25:48 24   have a bias based on what Ms. Kraman knows.

11:25:53 25                   THE COURT:  Well, it seems to me, I'm not going

11:26:02  1    to strike her just based on that representation which I

11:26:06  2    completely accept, I'm sure it's true.  But I have no basis

11:26:12  3    to think that she is biased, although it is logical to think

11:26:15  4    that she would be.  So I think, if I were to strike her, I

11:26:19  5    would, I would first want to talk to her, but in order to do

11:26:22  6    that, I'd have to bring up what undoubtedly, from what you

11:26:26  7    are saying, would be a very difficult situation for her and

11:26:29  8    one for whatever reason she didn't mention to us.

11:26:32  9              MR. PORADEK:  Would you consider talking to her

11:26:34 10    outside our presence, Your Honor?

11:26:35 11              THE COURT:  I would consider that.  Would that

11:26:37 12    be your request?

11:26:38 13              MR. PORADEK:  That would be my request.

11:26:41 14              THE COURT:  What do you feel about that?

11:26:42 15              MR. CHERNY:  We obviously want to get to a fair

11:26:44 16    result, but I want to suggest, as you said, she may have no

11:26:47 17    memory of who the law firm was, so I wouldn't want to prompt

11:26:51 18    her.  She seems pretty together and so the suggestion either

11:26:56 19    is that she is deliberately not identifying or what seems

11:27:00 20    like she may very well not remember that Young Conaway was

11:27:03 21    involved.

11:27:04 22              THE COURT:  So what would you propose I do at

11:27:07 23    this point?

11:27:07 24              MR. CHERNY:  I think maybe a foundational

11:27:10 25    question.  Not just Young Conaway, go through some of the

11:27:14  1    names of the law firms again and just, yes, no pun intended,

11:27:19  2    if there is any reason to see.  Because if she doesn't have

11:27:22  3    any reason to associate the other side with whatever

11:27:25  4    happened to other husband, I guess there is no reason to

11:27:28  5    strike her.

11:27:30  6              THE COURT:  Any further thoughts?

11:27:31  7              MR. PORADEK:  Your Honor, I would trust you to

11:27:33  8    handle it delicately, and we would at that point defer to

11:27:37  9    your judgment.

11:27:38 10              MS. KRAMAN:  However you want to question her.

11:27:40 11              MR. CHERNY:  Yes, that's fair.

11:27:41 12              THE COURT:  I think it's about time for a short

11:27:43 13    recess anyway.  So there are rest rooms here, if you need

11:27:46 14    them.  We'll take a recess and then I will figure out what

11:27:49 15    to do.

11:37:14 16              (Brief recess taken.)

11:37:14 17                   *       *       *

11:38:01 18              (Proceedings reconvened after recess.)

11:38:01 19              THE COURT:  So we left off with Juror 33.  What

11:38:40 20    I'm going to do is bring her back and remind her of the

11:38:44 21    names of the law firms that are involved and just ask her if

11:38:47 22    she has any familiarity with those firms and then we'll see

11:38:50 23    what she says and I'll decide how to follow-up from there.

11:38:55 24              MS. KRAMAN:  All right.

11:38:56 25              THE COURT:  All right.  Bring her in.

| | | |
|---|---|---|
| 11:39:03 | 1 | (Juror enters juryroom.) |
| 11:39:04 | 2 | A JUROR:  Twice. |
| 11:39:06 | 3 | THE COURT:  It's not so hot of a seat. |
| 11:39:08 | 4 | So we're back with Juror 33; correct? |
| 11:39:10 | 5 | A JUROR:  Um-hmm. |
| 11:39:11 | 6 | THE COURT:  So I just wanted to remind you of |
| 11:39:13 | 7 | the names of the law firms that are involved in this case. |
| 11:39:16 | 8 | A JUROR:  Okay. |
| 11:39:16 | 9 | THE COURT:  And just ask you if you are familiar |
| 11:39:18 | 10 | with any of those firms.  Okay? |
| 11:39:20 | 11 | You probably already heard this this morning, |
| 11:39:22 | 12 | but the firms that are involved are Young Conaway Stargatt & |
| 11:39:26 | 13 | Taylor, Morris Nichols, Faegre Baker Daniels, and Kirkland & |
| 11:39:31 | 14 | Ellis. |
| 11:39:32 | 15 | Are you familiar with any of those? |
| 11:39:33 | 16 | A JUROR:  None rings a bell. |
| 11:39:35 | 17 | THE COURT:  All right.  Well, thank you.  That's |
| 11:39:36 | 18 | all I wanted to ask. |
| 11:39:39 | 19 | A JUROR:  Okay. |
| 11:39:40 | 20 | (Juror left juryroom.) |
| 11:39:41 | 21 | THE COURT:  Are you standing by your motion? |
| 11:39:47 | 22 | MR. PORADEK:  I think just given what we know, |
| 11:39:48 | 23 | we will stand by your our motion. |
| 11:39:50 | 24 | THE COURT:  I assume you still oppose. |
| 11:39:52 | 25 | MR. CHERNY:  Yes, Your Honor. |

11:39:53 1        THE COURT:  All right.  I'm going to deny the

11:39:56 2   motion.  It seems to me the only risk here is that she may,

11:40:04 3   some time during the trial, realize she has an issue, if she

11:40:06 4   even does, with Young Conaway.  And I'm going to trust that

11:40:11 5   if those things are to occur that she will bring it to my

11:40:14 6   attention and I can deal with it at that time.

11:40:16 7        But at this point, having directly asked her,

11:40:20 8   she seems to have no knowledge or memory of what I accept as

11:40:23 9   the truth; and I don't think it would be appropriate for me

11:40:27 10  to try to bring that memory back up.  So again I'm denying

11:40:32 11  the motion.

11:40:35 12        (Juror enters juryroom.)

11:40:40 13        A JUROR:  How are you doing.

11:40:40 14        THE COURT:  Good morning.

11:40:41 15        A JUROR:  Good morning.

11:40:41 16        THE COURT:  Have a seat.  What is your juror

11:40:43 17  number, please?

11:40:44 18        A JUROR:  39.

11:40:45 19        THE COURT:  That would make you James Schwartz.

11:40:49 20        A JUROR:  Yes.

11:40:49 21        THE COURT:  Okay.  Do you recall what you

11:40:51 22  answered "yes" to?

11:40:52 23        A JUROR:  I most certainly do.  The witness for

11:40:54 24  W.L. Gore, on your list was there a Dawn Goodman?

11:40:59 25        MR. PORADEK:  It was a Paul Goodman.

11:41:01 1                    A JUROR:  Paul Goodman.

11:41:02 2                    MR. PORADEK:  Yes, Arizona.

11:41:04 3                    A JUROR:  I thought you say Dawn.

11:41:05 4                    MR. PORADEK:  That was probably my fault.

11:41:07 5                    A JUROR:  Okay.

11:41:08 6                    MR. PORADEK:  Paul Goodman based in Arizona.

11:41:10 7                    A JUROR:  And you mentioned about employment at

11:41:12 8      any of the companies.  I had a co-worker that worked at

11:41:15 9      Gore.

11:41:15 10                    THE COURT:  Okay.

11:41:16 11                    A JUROR:  I applied at Gore many years ago.  I

11:41:19 12     don't know if that has any influence on the case or not but

11:41:23 13     that's --

11:41:24 14                    THE COURT:  As a result of your co-worker or

11:41:28 15     your own --

11:41:28 16                    A JUROR:  No, he is actually on disability now

11:41:30 17     so he no longer works there.

11:41:31 18                    THE COURT:  Did he ever express any feelings

11:41:33 19     about Gore to you?

11:41:36 20                    A JUROR:  No, not at all.

11:41:37 21                    THE COURT:  And the fact that you applied and

11:41:39 22     ended up working there, does that give you any feelings

11:41:42 23     about Gore?

11:41:43 24                    A JUROR:  Not at all.

11:41:43 25                    THE COURT:  All right.  Other issues?

```
11:41:46  1                    A JUROR:  No, that was it.  I just misheard you.
11:41:50  2      That's all.
11:41:51  3                    THE COURT:  No, no problem at all.
11:41:53  4                    Any questions?
11:41:54  5                    MR. PORADEK:  No, Your Honor.
11:41:55  6                    MS. RAZAVI:  No, Your Honor.
11:41:55  7                    THE COURT:  Any questions.
11:41:56  8                    MR. CHERNY:  No, Your Honor.
11:41:56  9                    THE COURT:  All right.  You can go back into the
11:41:58 10      courtroom.  Thank you.
11:42:00 11                    A JUROR:  All right.
11:42:01 12                    (Juror left juryroom.)
11:42:03 13                    THE COURT:  Any motion?
11:42:05 14                    MR. PORADEK:  (Shaking head no.)
11:42:06 15                    MS. RAZAVI:  No motion.
11:42:07 16                    MR. CHERNY:  No, Your Honor.
11:42:09 17                    (Juror enters juryroom.)
11:42:13 18                    THE COURT:  Good morning.
11:42:15 19                    A JUROR:  Good morning.
11:42:16 20                    THE COURT:  Have a seat, please.
11:42:17 21                    A JUROR:  Thank you.
11:42:17 22                    THE COURT:  Can you tell us your juror number?
11:42:19 23                    A JUROR:  41.
11:42:20 24                    THE COURT:  Howard Tar/peen (phonetic)?
11:42:23 25                    A JUROR:  Tar/pine (phonetic).
```

11:42:25  1          THE COURT:  Tarpine.  Sorry about that.

11:42:26  2          A JUROR:  Close.

11:42:27  3          THE COURT:  Do you have any questions?

11:42:29  4          A JUROR:  A few actually I was a DuPont employee

11:42:31  5     for a number of years.  I'm currently an employee there

11:42:35  6     through a contract agency.  Earlier in my DuPont career, I

11:42:39  7     did some work with Teflon.

11:42:41  8          One of the other jurors is a neighbor.

11:42:45  9          I don't know any lawyers here.

11:42:47 10          THE COURT:  Okay.  Had you heard of the law

11:42:51 11     firms I mentioned?

11:42:52 12          A JUROR:  I have not.

11:42:52 13          THE COURT:  Okay.

11:42:53 14          A JUROR:  No.  I'm also an hourly worker, so

11:42:56 15     spending that much time away could be considered a financial

11:42:59 16     hardship.

11:43:00 17          THE COURT:  Okay.

11:43:01 18          A JUROR:  And my partner is scheduled to get a

11:43:06 19     port installed Thursday for chemo therapy.

11:43:10 20          THE COURT:  Sorry.  Is that this Thursday?

11:43:13 21          A JUROR:  This Thursday, yes.

11:43:14 22          THE COURT:  And you were planning to be there?

11:43:16 23          A JUROR:  Yes.

11:43:16 24          THE COURT:  Okay.

11:43:19 25          A JUROR:  Up to Mackinac hospital and provide

11:43:24  1    transportation.

11:43:24  2                     THE COURT:  Okay.

11:43:26  3                     A JUROR:  And she starts chemo next week.

11:43:28  4                     THE COURT:  Is there anything else?

11:43:29  5                     A JUROR:  Not that I recall.

11:43:30  6                     THE COURT:  Okay.  Let's talk just a little bit

11:43:33  7    about those issues.

11:43:34  8                     A JUROR:  Okay.

11:43:36  9                     THE COURT:  You're a former DuPont employee and

11:43:37 10    currently work with them.

11:43:39 11                     A JUROR:  Um-hmm.

11:43:41 12                     THE COURT:  And I assume you have positive

11:43:42 13    feelings towards DuPont?

11:43:44 14                     A JUROR:  For the most part, yes.

11:43:47 15                     THE COURT:  Okay.

11:43:48 16                     A JUROR:  It was a forced retirement, so not

11:43:50 17    totally.

11:43:50 18                     THE COURT:  And are you familiar with Gore?

11:43:52 19                     A JUROR:  Somewhat, yes.

11:43:55 20                     THE COURT:  Okay.

11:43:56 21                     A JUROR:  Never having worked for Gore.  Oh, one

11:43:58 22    other thing.  My partner also had surgery to replace a knee

11:44:02 23    and it wasn't totally successful.  She has had pain since

11:44:05 24    then.

11:44:06 25                     THE COURT:  Okay.

11:44:07  1          A JUROR:  But I have known some Gore employees,

11:44:10  2   and I don't have strong feelings either way about the

11:44:15  3   company.

11:44:15  4          THE COURT:  Okay.

11:44:15  5          A JUROR:  I know that Bill Gore was a former

11:44:19  6   DuPont employee and that he took Teflon into the medical

11:44:22  7   field and garments.

11:44:25  8          THE COURT:  And you say you worked on Teflon at

11:44:27  9   some point?

11:44:28 10          A JUROR:  I did.  I used to have an electrical

11:44:31 11   properties testing lab and part of what I did was to qualify

11:44:34 12   Teflon for sale.

11:44:36 13          THE COURT:  If you heard some of the products

11:44:37 14   involved here may involve Teflon, would that impact you in

11:44:43 15   any way?

11:44:44 16          A JUROR:  No.

11:44:45 17          THE COURT:  All right.  But your work with

11:44:49 18   DuPont now, I take it you are paid by the hour?

11:44:53 19          A JUROR:  Yes.

11:44:54 20          THE COURT:  And if you weren't with us between

11:44:55 21   now and next Friday, roughly how many hours might you work?

11:45:00 22          A JUROR:  I work full-time, 40 hours a week.

11:45:03 23          THE COURT:  Okay.  And if you are with us, would

11:45:05 24   you not be getting paid at all from them for that work?

11:45:08 25          A JUROR:  That's right.  I'm working through a

11:45:10  1    contract agency and because of that, I have no benefits.

11:45:13  2                  THE COURT:  And I take it, it is not work you

11:45:16  3    could do after 4:30 in the day?

11:45:18  4                  A JUROR:  No.  Actually, my workday is typically

11:45:21  5    6:00 to 2:30 but I'm often there until 4:30.

11:45:26  6                  THE COURT:  All right.  And for your partner, if

11:45:30  7    you were not able to be there on Thursday, is there someone

11:45:34  8    else that could help her?

11:45:35  9                  A JUROR:  I'm sure that could be arranged, yes.

11:45:37 10    She has a good support group.

11:45:39 11                  THE COURT:  All right.  Any questions?

11:45:45 12                  MS. RAZAVI:  No.  No questions.

11:45:48 13                  MS. MASON:  So you're retired technically from

11:45:51 14    DuPont and you currently, you still work for 40 hours a week

11:45:55 15    but hourly, but because you are retired from DuPont, do you

11:45:57 16    receive some sort of pension?

11:46:01 17                  A JUROR:  Yes, I qualified for a pension.

11:46:03 18                  MS. MASON:  So if you didn't work hourly, you

11:46:05 19    would still have some income upon which you could live?

11:46:09 20                  A JUROR:  I do.  And I also get Social Security.

11:46:12 21    I started that this year -- or last year.

11:46:15 22                  MS. MASON:  Would it be a real hardship if you

11:46:17 23    didn't receive your hourly.

11:46:20 24                  A JUROR:  My hourly?  That's not an overwhelming

11:46:24 25    hardship, no.

```
11:46:25  1                    MS. MASON:  Thank you.

11:46:26  2                    A JUROR:  I look forward to the paycheck.

11:46:29  3                    MS. MASON:  That's understandable.

11:46:31  4                    THE COURT:  Thank you.  You can go back into the

11:46:34  5       courtroom.

11:46:35  6                    A JUROR:  Thank you.

11:46:37  7                      (Juror left juryroom.)

11:46:39  8                    THE COURT:  Any motion?

11:46:42  9                    MR. PORADEK:  No motion, Your Honor.

11:46:43 10                    MR. CHERNY:  No motion.

11:46:43 11                    THE COURT:  Okay.

11:46:44 12                      (Juror enters juryroom.)

11:46:45 13                    THE COURT:  Good morning.

11:46:51 14                    A JUROR:  Hello.

11:46:51 15                    THE COURT:  Have a seat.  Tell us your juror

11:46:53 16       number, please.

11:46:55 17                    A JUROR:  15.

11:46:57 18                    THE COURT:  Gregory Davis.

11:46:59 19                    A JUROR:  Yes.

11:46:59 20                    THE COURT:  Do you recall what you answered

11:47:00 21       "yes" to?

11:47:01 22                    A JUROR:  I believe it was 7 and 14.

11:47:03 23                    THE COURT:  Okay.  Do you recall what they were?

11:47:05 24                    A JUROR:  I believe 7 had something to do with

11:47:08 25       employment with the companies or DuPont.  I was previously a
```

11:47:11  1    DuPont employee.

11:47:12  2                    THE COURT:  Okay.  What did you do at DuPont?

11:47:14  3                    A JUROR:  For the first couple of years, I was

11:47:16  4    in accounting, and then the remaining years I was in IT

11:47:21  5    system support.

11:47:22  6                    THE COURT:  Okay.  When did you stop working

11:47:24  7    with DuPont?

11:47:25  8                    A JUROR:  I was employed from '88 until 1996.

11:47:29  9    And then was outsourced and there was a consultant until

11:47:33 10    2008.

11:47:33 11                    THE COURT:  Okay.  Do you have any feelings

11:47:35 12    positive or negative about DuPont?

11:47:37 13                    A JUROR:  No.

11:47:37 14                    THE COURT:  No.  Okay.  And No. 14, what was

11:47:42 15    that?  Do you recall?

11:47:43 16                    A JUROR:  I believe it was leadership position.

11:47:45 17                    THE COURT:  Okay.  Tell us that.

11:47:46 18                    A JUROR:  Current company.  I'm IT director in

11:47:48 19    our digital services organization at a company called VWR

11:47:54 20    International.

11:47:55 21                    THE COURT:  Have you been there since March of

11:47:58 22    '08?

11:47:58 23                    A JUROR:  March of '09.

11:48:00 24                    THE COURT:  Is there anything else you wanted to

11:48:01 25    share with us?

11:48:02  1                        A JUROR:  No.

11:48:02  2                        THE COURT:  Any questions?

11:48:03  3                        MS. RAZAVI:  No questions.

11:48:04  4                        THE COURT:  Any questions?

11:48:05  5                        MR. CHERNY:  No questions, Your Honor.

11:48:06  6                        THE COURT:  All right.  Thank you very much.

11:48:08  7                        (Juror left juryroom.)

11:48:08  8                        THE COURT:  Any motion?

11:48:11  9                        MS. RAZAVI:  No motion.

11:48:11 10                        MR. CHERNY:  No motion, Your Honor.

11:48:17 11                        (Juror enters juryroom.)

11:48:17 12                        THE COURT:  Good morning.

11:48:18 13                        A JUROR:  Good morning.

11:48:18 14                        THE COURT:  Would you tell us your juror number,

11:48:20 15     please?

11:48:21 16                        A JUROR:  19.

11:48:22 17                        THE COURT:  Mary Haley?

11:48:24 18                        A JUROR:  Yes.

11:48:24 19                        THE COURT:  What did you answer "yes" to, if you

11:48:27 20     recall?

11:48:28 21                        A JUROR:  Two questions I mentally answered

11:48:30 22     "yes" to.  One is I'm an active DuPont employee and the

11:48:33 23     second one is I have concerns about my work schedule related

11:48:39 24     to the duration of the trial.

11:48:40 25                        THE COURT:  Okay.  Let's talk about those.

11:48:43  1          A JUROR:  Okay.

11:48:44  2          THE COURT:  You currently work at DuPont,

11:48:45  3   correct?

11:48:46  4          A JUROR:  Yes.

11:48:46  5          THE COURT:  Tell us just generally what you do.

11:48:48  6          A JUROR:  I'm a customer service specialist in

11:48:51  7   the corporate customer care group supporting the material

11:48:55  8   sciences business, performance products.

11:48:59  9          THE COURT:  Do you have feelings, strongly,

11:49:03 10   positive or negative, about DuPont?

11:49:05 11          A JUROR:  No, I don't.  I'm grateful to be

11:49:09 12   employed there.

11:49:09 13          THE COURT:  If you hear DuPont's name and their

11:49:13 14   possible affiliation with one side or the other, would that

11:49:16 15   affect how you might see the evidence here?

11:49:19 16          A JUROR:  I don't believe so.

11:49:21 17          THE COURT:  Okay.  And about how long have you

11:49:24 18   been at DuPont?

11:49:25 19          A JUROR:  35 years.

11:49:26 20          THE COURT:  Now, the schedule.  Tell us about

11:49:28 21   your concerns there.

11:49:30 22          A JUROR:  We're resourced very tightly in

11:49:34 23   customer service.  My team has, we don't have the backup

11:49:39 24   capability from my desk at this time.  My customer base is

11:49:45 25   all Canadian because we centered that group into Wilmington,

11:49:48 1    Delaware.  I have one backup for my entire customer base who

11:49:53 2    is on vacation Friday.

11:49:56 3            The other aspect is we are doing a completely

11:50:00 4    cubicle shift, moving of cubicles to stages for the

11:50:04 5    impending merger with Dow and setting up the segments of the

11:50:11 6    groups.  So that's this week also.

11:50:13 7            There is the entire floor cubicle move, the

11:50:19 8    resourcing hardship with me being away for that length of

11:50:23 9    time.

11:50:23 10            THE COURT:  Now, if you were with us through

11:50:26 11    next Friday, the 10th, could they delay that move or would

11:50:32 12    it go on without you?

11:50:34 13            A JUROR:  It would go on.  I would have to burn

11:50:38 14    the midnight oil.

11:50:39 15            THE COURT:  So you would definitely have to go

11:50:41 16    to the office at 4:30 with us?

11:50:44 17            A JUROR:  I would have to do double time.  There

11:50:47 18    are other aspects of my job I would have to do also.

11:50:50 19            THE COURT:  Do you think you could give us your

11:50:52 20    attention between 9:00 and 4:30?

11:50:54 21            A JUROR:  That is my concern, the distraction of

11:50:56 22    knowing what is waiting or what the struggles might be with

11:50:59 23    the backup situation.

11:51:01 24            THE COURT:  Okay.  Is there anything else you

11:51:03 25    want to share with us?

11:51:04  1                        A JUROR:  No.

11:51:05  2                        THE COURT:  Okay.  Are there any questions?

11:51:08  3                        MR. PORADEK:  You mentioned you are working with

11:51:12  4        materials.  You are in the sales area, but there are

11:51:14  5        materials you are involved in selling?

11:51:16  6                        A JUROR:  Yes.

11:51:16  7                        MR. PORADEK:  Could you tell us what those

11:51:18  8        materials are?

11:51:19  9                        A JUROR:  They are resins that are injection

11:51:25 10        molded, and some of our products are polymers.  You know,

11:51:32 11        polymer resins that are manufactured in West Virginia.

11:51:35 12                        MR. PORADEK:  Okay.  Is Teflon something that is

11:51:37 13        part of your area?

11:51:38 14                        A JUROR:  No, not Teflon.

11:51:41 15                        MR. PORADEK:  Okay.

11:51:42 16                        THE COURT:  Any questions?

11:51:43 17                        MR. CHERNY:  No.  No questions, Your Honor.

11:51:44 18                        THE COURT:  Okay.  You can go back into the

11:51:47 19        courtroom.  Thank you, Your Honor.

11:51:49 20                        A JUROR:  Thank you.

11:51:53 21                        (Juror left juryroom.)

11:51:53 22                        THE COURT:  Any motion?

11:51:55 23                        MS. RAZAVI:  No motion for Gore.

11:51:57 24                        MR. CHERNY:  No, Your Honor.

11:51:58 25                        MR. PORADEK:  I would just say she sounds like

| | |
|---|---|
| 11:52:01 | 1 |

**hardship issue.  We would throw that out there, and I guess**

**I would be worried about it.**

               **THE COURT:  I will put a star next to her.**

               **MR. CHERNY:  I leave the hardships to you, Your**

**Honor.**

               **THE COURT:  Right.  Thank you.**

               **(Juror enters juryroom.)**

               **THE COURT:  Good morning.**

               **A JUROR:  Hello.**

               **THE COURT:  Have a seat.  Could you tell us your**

**juror number.**

               **A JUROR:  1.**

               **THE COURT:  1.  Congratulations.  You are**

**Courtney Anderson?**

               **A JUROR:  Um-hmm.**

               **THE COURT:  Do you recall what you answered**

**"yes" to?**

               **A JUROR:  Just that I served on a jury before.**

               **THE COURT:  Was that here in federal court?**

               **A JUROR:  No.**

               **THE COURT:  Was it here in Delaware?**

               **A JUROR:  Yes, it was in Kent County.**

               **THE COURT:  About how long ago was it?**

               **A JUROR:  It was December, well, in 2015.**

               **THE COURT:  Do you recall anything about what**

11:52:44  1     that trial was about?

11:52:45  2                     A JUROR:  Um-hmm.

11:52:46  3                     THE COURT:  Can you tell us just a little bit

11:52:48  4     about it?

11:52:48  5                     A JUROR:  It was about a family member who

11:52:51  6     passed away and the family friend took care of two children

11:52:58  7     after the family member passed away.  When they grew up,

11:53:01  8     there was some issues about the people who were taking care

11:53:05  9     of them not wanting to give them the money that was in the

11:53:08 10     accounts that were for the children.  They were trying to

11:53:10 11     keep it for themselves.  Since they had raised them, they

11:53:13 12     felt they deserved to keep the money.  They were sued for

11:53:18 13     the money.

11:53:19 14                     THE COURT:  And did the jury reach a verdict?

11:53:21 15                     A JUROR:  Um-hmm.  And we obviously decided that

11:53:23 16     they deserved the money that was given to them by their

11:53:25 17     parents.

11:53:26 18                     THE COURT:  All right.  And anything else you

11:53:29 19     want to share with us?

11:53:30 20                     A JUROR:  Uh-uh.

11:53:31 21                     THE COURT:  That is a no?

11:53:32 22                     A JUROR:  Yes.  No.

11:53:33 23                     THE COURT:  Any questions?

11:53:34 24                     MR. PORADEK:  No questions, Your Honor.

11:53:35 25                     MS. RAZAVI:  No questions.

| | | |
|---|---|---|
| 11:53:36 | 1 | THE COURT:  Any questions? |
| 11:53:37 | 2 | MR. CHERNY:  No, Your Honor. |
| 11:53:37 | 3 | THE COURT:  Okay.  You can go back into the |
| 11:53:39 | 4 | courtroom.  Thank you. |
| 11:53:40 | 5 | A JUROR:  Thank you. |
| 11:53:42 | 6 | (Juror left juryroom.) |
| 11:53:42 | 7 | THE COURT:  Any motion? |
| 11:53:45 | 8 | MR. PORADEK:  No, Your Honor. |
| 11:53:49 | 9 | MR. CHERNY:  No, Your Honor. |
| 11:53:50 | 10 | MS. RAZAVI:  No motion. |
| 11:53:51 | 11 | (Juror enters juryroom.) |
| 11:53:52 | 12 | THE COURT:  Good morning. |
| 11:53:53 | 13 | A JUROR:  Good morning. |
| 11:53:54 | 14 | THE COURT:  Tell us what juror number is, |
| 11:53:56 | 15 | please. |
| 11:53:56 | 16 | A JUROR:  28. |
| 11:54:00 | 17 | THE COURT:  I will check it for you.  Richard |
| 11:54:03 | 18 | Marcus. |
| 11:54:03 | 19 | A JUROR:  Yes, sir. |
| 11:54:04 | 20 | THE COURT:  Do you recall what you answered |
| 11:54:05 | 21 | "yes" to? |
| 11:54:05 | 22 | A JUROR:  Three items.  One, you asked about |
| 11:54:07 | 23 | leadership role. |
| 11:54:08 | 24 | THE COURT:  Right. |
| 11:54:09 | 25 | A JUROR:  I'm a broker owner of my real estate |

11:54:11 1    company.  And so I have a leadership role.

11:54:17 2              THE COURT:  Right.

11:54:18 3              A JUROR:  Two, you asked about lawsuits.  Over

11:54:22 4    the last I'd say 15 years, I've been involved in two

11:54:24 5    lawsuits.  One was a seller thought that I didn't do a

11:54:30 6    proper job for him so he sued me.  He didn't prevail.  And,

11:54:39 7    second, my brother and another man were in a partnership

11:54:42 8    with me and there was like a takeover and they threw me out

11:54:49 9    and I sued them.  So that would be the two lawsuits.  And

11:54:53 10   then,

11:54:53 11             Third, currently what I do in my job is my

11:54:58 12   clients are FANNIE MAE, HUD, Veterans Administration, so I

11:55:03 13   do daily inspections of dated photos.  So if I was not doing

11:55:10 14   those for eight days, it would definitely put me behind.

11:55:15 15             THE COURT:  Okay.  Let's talk about those

11:55:19 16   issues.

11:55:20 17             The lawsuits, the second one where you were I

11:55:24 18   guess the plaintiff, did that, has that been resolved?

11:55:29 19             A JUROR:  It settled.

11:55:30 20             THE COURT:  It settled.  And based on either of

11:55:33 21   your experiences with lawsuits, do you think any of that

11:55:36 22   would affect how you might view this case?

11:55:38 23             A JUROR:  No.

11:55:39 24             THE COURT:  Do you think having been a defendant

11:55:42 25   and a plaintiff, would you start out favoring one side or

11:55:45  1    the other?

11:55:46  2              A JUROR:  Probably not.

11:55:48  3              THE COURT:  Okay.  And in terms of the work you

11:55:51  4    do reviewing these photos --

11:55:54  5              A JUROR:  I actually drive in my car and

11:55:56  6    physically take the photos.

11:55:58  7              THE COURT:  Okay.  Well, that helps me better

11:56:01  8    understand.  So that is work you typically do in the

11:56:04  9    daytime, I assume?

11:56:06 10              A JUROR:  And then at night I upload the photos

11:56:08 11    for reports.  So it's a daily activity.  I have 57

11:56:13 12    properties right now that I'm responsible for, so it's

11:56:18 13    steady.

11:56:19 14              THE COURT:  So if you weren't with us between

11:56:20 15    now and a week from Friday, how many properties?  Is it

11:56:25 16    every day you would be going and visiting some of those?

11:56:28 17              A JUROR:  Yes, I do it every day.  I'm going to

11:56:32 18    do it when I leave here, if it's still light.

11:56:35 19              THE COURT:  We hope it is.

11:56:37 20              And if you are not able to do that work between

11:56:39 21    now and March 10th, is there someone else that would do it

11:56:43 22    or what would happen?

11:56:44 23              A JUROR:  No, I would have to try to find

11:56:46 24    someone to try to do it.  I don't actually have agents that

11:56:50 25    work in my office.  It's a very small office.  My wife and

11:56:53  1    I.   And we have one full-time and a couple of part-time

11:56:57  2    agents.   So it would be trying to find somebody to do the

11:57:02  3    photos for you.

11:57:03  4              THE COURT:   And is there a financial impact to

11:57:04  5    you if you are not able to do it?

11:57:06  6              A JUROR:   Well, I don't want to think that they

11:57:09  7    would fire me from those listings if I wasn't keeping

11:57:14  8    current, but I would try and do it on the weekends or, you

11:57:19  9    know, in some fashion.

11:57:20 10              THE COURT:   All right.   Any questions?

11:57:23 11              MR. PORADEK:   No questions.

11:57:24 12              MS. RAZAVI:   No questions, Your Honor.

11:57:26 13              MR. CHERNY:   No questions, Your Honor.

11:57:27 14              THE COURT:   All right.   You can go back into the

11:57:29 15    courtroom.   Thank you.

11:57:31 16              (Juror left juryroom.)

11:57:31 17              THE COURT:   Any motion?

11:57:33 18              MR. PORADEK:   No motion.

11:57:33 19              MS. RAZAVI:   No motion, Your Honor.

11:57:34 20              MR. CHERNY:   No motion, Your Honor.

11:57:36 21              THE DEPUTY CLERK:   Let me just see.

11:57:56 22              (Juror enters juryroom.)

11:57:57 23              THE COURT:   Have a seat, please.   That one there

11:58:00 24    is for you.

11:58:01 25              Do you know what your juror number is?

11:58:03 1                    A JUROR:  Two.

11:58:04 2                    THE COURT:  Melinda Babb.

11:58:05 3                    A JUROR:  Yes.

11:58:06 4                    THE COURT:  Do you recall what you answered

11:58:07 5      "yes" to?

11:58:07 6                    A JUROR:  Yes.  I actually have a "yes" and a

11:58:10 7      maybe.

11:58:10 8                    THE COURT:  Okay.  What is the "yes?"

11:58:13 9                    A JUROR:  "Yes" referred to I guess your term

11:58:14 10     leadership.  I have two direct reports at work, so ...

11:58:19 11                   THE COURT:  Okay.

11:58:20 12                   A JUROR:  And then maybe I think you asked like

11:58:24 13     if your employer could have been affiliated with any of the

11:58:27 14     two entities, and I work in the financial services, so I

11:58:30 15     suppose it is possible --

11:58:31 16                   THE COURT:  Okay.

11:58:32 17                   A JUROR:  -- in that line of business.

11:58:33 18                   THE COURT:  You have no knowledge as to whether

11:58:35 19     your employer, which is J.P. Morgan Chase --

11:58:38 20                   A JUROR:  Right.

11:58:38 21                   THE COURT:  -- whether they worked with --

11:58:39 22                   A JUROR:  Anyone here.

11:58:42 23                   THE COURT:  Okay.  In your work as a project

11:58:45 24     manager there, you have not dealt with Gore?

11:58:46 25                   A JUROR:  No, no.  I work in micro-efficiencies

11:58:50  1    and technology challenges.

11:58:51  2                  THE COURT:  Is there anything else?

11:58:52  3                  A JUROR:  No.

11:58:52  4                  THE COURT:  No.  Any questions?

11:58:54  5                  MS. RAZAVI:  No questions, Your Honor.

11:58:55  6                  MR. CHERNY:  No questions, Your Honor.

11:59:00  7                  THE WITNESS:  Thanks.

11:59:01  8                  (Juror left juryroom.)

11:59:01  9                  THE COURT:  Any motion?

11:59:02 10                  MR. PORADEK:  No motion, Your Honor.

11:59:03 11                  MR. CHERNY:  No motion, Your Honor.

11:59:07 12                  (Juror enters juryroom.)

11:59:08 13                  THE COURT:  Good morning.

11:59:09 14                  A JUROR:  Hi.  Good morning.

11:59:10 15                  THE COURT:  Do you know what your juror number

11:59:11 16    is?

11:59:12 17                  A JUROR:  10.

11:59:14 18                  THE COURT:  Erin Challburg.

11:59:17 19                  A JUROR:  Yes.

11:59:17 20                  THE COURT:  Do you recall what you answered

11:59:18 21    "yes" to?

11:59:20 22                  A JUROR:  I do know Gore.  Just our neighbors,

11:59:23 23    growing up, Joe Morrow worked for Gore at the Newark

11:59:27 24    location.

11:59:27 25                  And then my other concern or my other "yes"

11:59:30 1    answer was leadership position.  I'm a schoolteacher.  Being

11:59:34 2    out for eight days would be an extensive amount of time out

11:59:38 3    of the classroom, especially being difficult to find

11:59:41 4    substitutes these days.

11:59:42 5           It also includes parent-teacher conferences.  So

11:59:46 6    inconveniencing my students, 165, and we already have about

11:59:50 7    85 parent-teacher conferences scheduled for next week as

11:59:54 8    well.

11:59:54 9           When the original paperwork came out for the

11:59:57 10   17th, I don't know if that was this case or a different

12:00:00 11   case.  It happened to be over several professional

12:00:03 12   development days, so I wasn't as concerned with time out of

12:00:08 13   the classroom as well as eight days away from students.

12:00:11 14          THE COURT:  Okay.  In terms of your knowledge of

12:00:13 15   Gore, do you have any feelings, positive or negative, about

12:00:16 16   Gore?

12:00:16 17          A JUROR:  I know that my parents, any time we

12:00:20 18   were doing camping items, they would suggest those products,

12:00:26 19   but not in terms of medical.

12:00:28 20          THE COURT:  Do you think Gore would start out a

12:00:30 21   little bit ahead in your mind as a result?

12:00:33 22          A JUROR:  Based on what I know of the company

12:00:35 23   and just being in Newark, I think it's a company that has

12:00:39 24   provided job opportunities to people in the families that I

12:00:44 25   teach as well.

12:00:45  1                    THE COURT:  Okay.  And then you teach what age

12:00:48  2      students?

12:00:49  3                    A JUROR:  Middle school, science.

12:00:51  4                    THE COURT:  And I guess you have multiple

12:00:53  5      classes throughout the day.

12:00:54  6                    A JUROR:  Yes, I do.

12:00:55  7                    THE COURT:  So any students --

12:00:56  8                    A JUROR:  Yes.

12:00:56  9                    THE COURT:  -- and conferences are scheduled for

12:00:58 10      next week?

12:00:59 11                    A JUROR:  The 8th and the 9th.  Yes, we have 85

12:01:03 12      parents scheduled.

12:01:03 13                    THE COURT:  Any chance they're scheduled after

12:01:06 14      4:30 in the day?

12:01:06 15                    A JUROR:  It's all day.  It's 7:00 a.m. to 7:00

12:01:09 16      p.m.

12:01:10 17                    THE COURT:  Okay.

12:01:10 18                    A JUROR:  Both days.

12:01:11 19                    THE COURT:  All right.  Any questions?

12:01:13 20                    MR. PORADEK:  Just you said you have known some

12:01:16 21      Gore folks.

12:01:18 22                    A JUROR:  Yes, neighbors.

12:01:19 23                    MR. PORADEK:  Any reason you wouldn't be neutral

12:01:22 24      and unbiased in this case?

12:01:27 25                    A JUROR:  I mean I think just knowing the

12:01:30  1   company might -- I just know of the company.

12:01:32  2             MR. PORADEK:  Right.

12:01:33  3             A JUROR:  Is that what you are looking for?

12:01:37  4             MR. PORADEK:  My overall question is, could you

12:01:37  5   listen to the evidence and you use that to decide the case

12:01:41  6   other than the fact you know something about Gore?

12:01:44  7             A JUROR:  I have no knowledge of the case or of

12:01:45  8   the details.

12:01:46  9             MR. PORADEK:  Right.

12:01:47 10             THE COURT:  Any questions?

12:01:47 11             MR. CHERNY:  And I think you said that you have

12:01:49 12   a positive disposition towards Gore from their presence at

12:01:55 13   work.

12:01:56 14             A JUROR:  Overall, yes.  Just from my input from

12:01:58 15   my parents and just our good friends, the Marrows.

12:02:04 16             MR. CHERNY:  When you say your "parents," you

12:02:06 17   mean the school parents?

12:02:08 18             A JUROR:  Correct.

12:02:09 19             MR. CHERNY:  So your parents had a positive view

12:02:11 20   of Gore?

12:02:12 21             A JUROR:  Yes.

12:02:13 22             MR. CHERNY:  Thank you.

12:02:14 23             A JUROR:  Thank you.

12:02:14 24             THE COURT:  Okay.  You can go back into the

12:02:17 25   courtroom.

12:02:18  1                    (Juror left juryroom.)

12:02:18  2              THE COURT:  Any motion?

12:02:19  3              MR. PORADEK:  No motion, Your Honor.

12:02:20  4              THE COURT:  Any motion?

12:02:21  5              MR. CHERNY:  Yes.  Besides the fact she has

12:02:23  6    hardships for the job I leave to you.  I think she has a

12:02:26  7    clear disposition.  Even when Mr. Poradek tried to get her

12:02:30  8    to say she would be fair, she never got there, that she got

12:02:34  9    a positive inclination.

12:02:36 10              THE COURT:  I would about inclined to strike her

12:02:38 11    on the hardship.  Would you oppose that?

12:02:40 12              MR. PORADEK:  No, I think that is right.

12:02:41 13              THE COURT:  I'm not going to take her away from

12:02:43 14    the classroom and away from 85 parent-teacher conferences.

12:02:47 15    So I'm striking Juror No. 10.

12:02:54 16                    (Juror enters juryroom.)

12:02:55 17              THE COURT:  Good afternoon.

12:02:56 18              A JUROR:  Hello.

12:02:56 19              THE COURT:  Have a seat, please.  Do you recall

12:02:58 20    your juror number?

12:03:00 21              A JUROR:  14.

12:03:01 22              THE COURT:  That makes you David Cutler;

12:03:03 23    correct?

12:03:03 24              A JUROR:  Yup.  Uh-huh.

12:03:06 25              THE COURT:  Tell us what you recall you answered

12:03:09   1    "yes" to.

12:03:09   2              A JUROR:  I'm a lawyer.  So I have been inside

12:03:12   3    rooms like this before.

12:03:13   4              THE COURT:  Right.

12:03:14   5              A JUROR:  Aside from that, I have a couple of

12:03:16   6    depositions that are a little hard to schedule.  You know, I

12:03:20   7    mean if push comes to shove, I can serve, but those are my

12:03:24   8    only two.

12:03:26   9              THE COURT:  I assume you are familiar with the

12:03:27  10    law firms that I mentioned.

12:03:29  11              A JUROR:  Yeah, but not, I don't really know

12:03:32  12    anyone.  I don't know anyone that does patent work, so ...

12:03:35  13              THE COURT:  Do you have any positive or negative

12:03:38  14    feelings about any of the firms that are involved in this

12:03:41  15    case?

12:03:41  16              A JUROR:  No.

12:03:42  17              THE COURT:  Have you ever served on a jury

12:03:44  18    before?

12:03:44  19              A JUROR:  Once before law school, in DC.

12:03:48  20              THE COURT:  Okay.  Do you have any feelings

12:03:50  21    about patent litigation?

12:03:51  22              A JUROR:  No, nothing.  Not one way or the other

12:03:55  23    so ...

12:03:56  24              THE COURT:  Okay.  And the depositions, while

12:03:59  25    I'm sure it would cause some inconvenience, they could be

12:04:02 1     rescheduled?

12:04:04 2            A JUROR:  Yeah.

12:04:05 3            THE COURT:  Okay.  Any other concerns?

12:04:07 4            A JUROR:  No, that's it.

12:04:08 5            THE COURT:  Okay.  Any questions?

12:04:09 6            MR. PORADEK:  No questions.

12:04:10 7            THE COURT:  Any questions.

12:04:12 8            MR. CHERNY:  What kind of lawyer are you?

12:04:13 9            A JUROR:  I guess personal injury but mostly

12:04:16 10     asbestos litigation.

12:04:18 11            MR. CHERNY:  Would that make you a plaintiffs

12:04:20 12     lawyer, by and large?

12:04:22 13            A JUROR:  Yes.

12:04:23 14            MR. CHERNY:  Do you have a disposition that

12:04:24 15     would cause you to have a plaintiff's kind of bias?

12:04:26 16            A JUROR:  No.

12:04:27 17            MR. CHERNY:  Have you ever represented

12:04:30 18     defendants?

12:04:32 19            A JUROR:  No.

12:04:33 20            MR. CHERNY:  So your job is obviously dependent

12:04:36 21     upon plaintiffs getting paid?

12:04:38 22            A JUROR:  Yeah.  Yeah, that's true.  I do a

12:04:40 23     little bit of contract work but it is all mostly kind of

12:04:43 24     plaintiffs.

12:04:43 25            MR. CHERNY:  Contingency fee.

12:04:45 1          A JUROR:  Yeah.

12:04:49 2          MS. MASON:  Would your future clients, would you

12:04:51 3  hesitate for your clients, current or future, to learn that

12:04:56 4  you were on a jury that found in favor of the defendant?

12:05:01 5          A JUROR:  No.  I mean I try and be unbiased as I

12:05:05 6  can.  I mean if a potential client came in and found out

12:05:09 7  that I had been on a jury, well, you know, I try and give an

12:05:12 8  honest analysis of the law.  If a possible client comes in

12:05:16 9  on their chance of the case, the risks involved.  I, mean if

12:05:20 10  a possible client wasn't happy about that, well, there is

12:05:23 11  other lawyers out there, so ...

12:05:25 12          MR. CHERNY:  And do you have an understanding of

12:05:28 13  the procedures in court, like, for example, when there is

12:05:32 14  objections and would you --

12:05:34 15          A JUROR:  I hope so.  Not to be, but yeah.

12:05:38 16          MR. CHERNY:  Would you be coming to your own

12:05:41 17  conclusions based on it?

12:05:44 18          A JUROR:  No, no.  I understand generally

12:05:46 19  obviously why I think things are objective, but I

12:05:49 20  understand, you know, the instructions judges make to say to

12:05:54 21  make an assessment based on why something may be admitted or

12:05:57 22  not admitted, you know.  You only have to look at the facts

12:06:00 23  presented, so I can understand that.

12:06:04 24          MR. CHERNY:  Anything else?

12:06:05 25          MS. MASON:  (Shaking head no.)

| | | |
|---|---|---|
| 12:06:06 | 1 | MR. CHERNY:  No, Your Honor. |
| 12:06:07 | 2 | THE COURT:  All right.  Go back to the |
| 12:06:08 | 3 | courtroom.  Thank you. |
| 12:06:08 | 4 | A JUROR:  Thank you. |
| 12:06:10 | 5 | (Juror left juryroom.) |
| 12:06:11 | 6 | THE COURT:  Any motion? |
| 12:06:13 | 7 | MR. PORADEK:  No motion, Your Honor. |
| 12:06:14 | 8 | MR. CHERNY:  What do you think, Jack? |
| 12:06:19 | 9 | No motion. |
| 12:06:21 | 10 | (Juror enters juryroom.) |
| 12:06:21 | 11 | THE COURT:  Good afternoon. |
| 12:06:24 | 12 | A JUROR:  Good afternoon. |
| 12:06:24 | 13 | THE COURT:  Would you tell us what your juror |
| 12:06:26 | 14 | number is, please? |
| 12:06:28 | 15 | A JUROR:  12. |
| 12:06:29 | 16 | THE COURT:  La/shane (phonetic) Cooper. |
| 12:06:31 | 17 | A JUROR:  La/Shawn (phonetic). |
| 12:06:33 | 18 | THE COURT:  Lashaun.  Sorry about that.  Do you |
| 12:06:36 | 19 | recall what you answered "yes" to? |
| 12:06:37 | 20 | A JUROR:  Yes.  I work at DuPont, and work in |
| 12:06:41 | 21 | the FDA field, pharmaceutical.  I served on a jury before. |
| 12:06:46 | 22 | Yes. |
| 12:06:46 | 23 | THE COURT:  Those are the issues. |
| 12:06:48 | 24 | A JUROR:  Um-hmm. |
| 12:06:49 | 25 | THE COURT:  When did you work at DuPont? |

12:06:51 1          A JUROR:  What, a year ago.  The Edgemoor plant.

12:06:55 2          THE COURT:  What kind of work did you do there?

12:06:58 3          A JUROR:  Chemical operator.

12:07:00 4          THE COURT:  Do you have any feelings about

12:07:03 5    DuPont?

12:07:03 6          A JUROR:  That they laid me off.

12:07:04 7          THE COURT:  So they did lay you off?

12:07:06 8          A JUROR:  Um-hmm.

12:07:06 9          THE COURT:  That's a "yes" for the court

12:07:08 10   reporter's benefit?

12:07:09 11         A JUROR:  Yeah.

12:07:09 12         THE COURT:  Does that give you a negative

12:07:10 13   feeling towards DuPont?

12:07:12 14         A JUROR:  Not necessarily.

12:07:13 15         THE COURT:  And you got another job, I see;

12:07:15 16   right.

12:07:15 17         A JUROR:  Yeah.

12:07:16 18         THE COURT:  FDA related work.  When was that in

12:07:21 19   your career?

12:07:21 20         A JUROR:  2013 on Noramco Pharmaceuticals.

12:07:26 21         THE COURT:  What kind of interaction did you

12:07:28 22   have with the FDA?

12:07:29 23         A JUROR:  A little bit as far as I was operator

12:07:33 24   there.  As far as they had to look at your paperwork to see

12:07:36 25   if there was discrepancies or anything like that.

12:07:38   1                 THE COURT:  And about when did you serve on a

12:07:40   2   jury?

12:07:41   3                 A JUROR:  It was in Brooklyn.

12:07:44   4                 THE COURT:  Okay.

12:07:46   5                 A JUROR:  It was like 2010.

12:07:49   6                 THE COURT:  Okay.  Do you remember anything

12:07:51   7   about what kind of case it was?

12:07:52   8                 A JUROR:  It was a criminal.  It was, what was

12:07:55   9   it, aggravated assault and robbery.

12:07:58 10                 THE COURT:  And did the jury reach a verdict?

12:07:59 11                 A JUROR:  Yes.

12:08:00 12                 THE COURT:  Do you recall what it was?

12:08:01 13                 A JUROR:  Guilty.

12:08:02 14                 THE COURT:  Did you have any feeling about that

12:08:04 15   process?

12:08:04 16                 A JUROR:  No.

12:08:05 17                 THE COURT:  Okay.  Any questions?

12:08:10 18                 MS. SCHMID:  What do you do as a chemical

12:08:12 19   operator or what your duties are?

12:08:13 20                 A JUROR:  Right now they're finishing and just

12:08:16 21   basically blending the packaging and pigments.  I worked at

12:08:20 22   BASF.  Before I was in the raw material side, making

12:08:24 23   titanium dioxide.  And then at Noramco, I make the

12:08:29 24   intermediates for pharmaceuticals.

12:08:31 25                 THE COURT:  Any questions?

| | | |
|---|---|---|
| 12:08:33 | 1 | MR. CHERNY:  When you said you were making |
| 12:08:34 | 2 | titanium dioxide, was that at DuPont? |
| 12:08:39 | 3 | A JUROR:  Yes. |
| 12:08:39 | 4 | MR. CHERNY:  Any work with Teflon? |
| 12:08:41 | 5 | A JUROR:  No. |
| 12:08:42 | 6 | MR. CHERNY:  I don't have any other questions. |
| 12:08:43 | 7 | THE COURT:  All right.  You can go back into the |
| 12:08:45 | 8 | courtroom.  Thank you. |
| 12:08:47 | 9 | A JUROR:  Thank you. |
| 12:08:48 | 10 | (Juror left juryroom.) |
| 12:08:48 | 11 | THE COURT:  Any motion? |
| 12:08:50 | 12 | MR. PORADEK:  No motion. |
| 12:08:51 | 13 | THE COURT:  Any motion? |
| 12:08:51 | 14 | MR. CHERNY:  No motion. |
| 12:08:52 | 15 | (Juror enters juryroom.) |
| 12:08:56 | 16 | THE COURT:  Good afternoon.  Have a seat, |
| 12:08:57 | 17 | please. |
| 12:08:58 | 18 | Can you tell us your juror number? |
| 12:09:00 | 19 | A JUROR:  44. |
| 12:09:01 | 20 | THE COURT:  44.  Joanne Thompson. |
| 12:09:05 | 21 | A JUROR:  Yes. |
| 12:09:06 | 22 | THE COURT:  Do you recall what you answered |
| 12:09:07 | 23 | "yes" to? |
| 12:09:08 | 24 | A JUROR:  Yes.  My husband worked for DuPont. |
| 12:09:11 | 25 | THE COURT:  Okay. |

12:09:13  1                    A JUROR:  He was let go due to downsizing.

12:09:18  2                    I am a lead worker, you asked about?

12:09:20  3                    THE COURT:  Leadership.

12:09:21  4                    A JUROR:  At Christiana High School, Cafeteria.

12:09:25  5      I'm training a girl right now.

12:09:28  6                    What was the third thing?  Yes, I do think

12:09:30  7      people sue too much but I understand with big companies they

12:09:33  8      have to, but that's my three answers that I said "yes" to.

12:09:36  9                    THE COURT:  Okay.  Let's talk a little bit more

12:09:38 10      about them.

12:09:39 11                    A JUROR:  Okay.

12:09:39 12                    THE COURT:  Let's start where you ended up.

12:09:41 13      Since I asked, you shared that you do think people sue too

12:09:45 14      much.  Do you think that would impact your ability to sit in

12:09:49 15      this case?

12:09:49 16                    A JUROR:  No.

12:09:50 17                    THE COURT:  No.

12:09:50 18                    A JUROR:  No.

12:09:51 19                    THE COURT:  At the high school, you supervise at

12:09:55 20      least one other employee?

12:09:58 21                    A JUROR:  I have ten girls under me.

12:10:01 22                    THE COURT:  Ten, and you have one you are

12:10:03 23      training?

12:10:04 24                    A JUROR:  Yes, a new employee I'm training

12:10:06 25      there.

12:10:06 1                    THE COURT:  About how long have you worked

12:10:08 2      there?

12:10:08 3                    A JUROR:  19 years.

12:10:09 4                    THE COURT:  Your husband used to work at DuPont?

12:10:11 5                    A JUROR:  Yes, he works at SDIX now, which is

12:10:15 6      another pharmaceutical company.

12:10:21 7                    THE COURT:  As a result of his experience at

12:10:23 8      DuPont, do you have any feelings about DuPont?

12:10:25 9                    A JUROR:  I'm not crazy about them to begin

12:10:28 10     with.  But it's no bad or ill, you know.

12:10:30 11                   THE COURT:  And the downsizing?

12:10:32 12                   A JUROR:  Yeah, that hurt us financially for

12:10:35 13     quite awhile until he was able to get another job, but he is

12:10:40 14     okay now, I guess.

12:10:41 15                   THE COURT:  And somewhere you heard the DuPont

12:10:43 16     name or was affiliated with one side or the other.  Would

12:10:47 17     that affect your view of the evidence?

12:10:49 18                   A JUROR:  Probably not.  No.

12:10:50 19                   THE COURT:  Any questions?

12:10:52 20                   MR. PORADEK:  I guess you talked about how your

12:10:54 21     first reaction is maybe there is too many lawsuits.

12:10:57 22                   A JUROR:  Yes, people getting rich.  That's what

12:10:59 23     I'm thinking about.

12:11:02 24                   MR. PORADEK:  So kind of serial litigants?

12:11:04 25                   A JUROR:  Yes.

12:11:05  1                    MR. PORADEK:  Do you have a view of the patent

12:11:06  2      system as you sit here?

12:11:08  3                    A JUROR:  No.

12:11:08  4                    MR. PORADEK:  Okay.  Thank you.

12:11:09  5                    A JUROR:  You're welcome.

12:11:10  6                    THE COURT:  Questions?

12:11:11  7                    MR. CHERNY:  I have no questions.

12:11:11  8                    THE COURT:  Okay.  You can go back into the

12:11:13  9      courtroom.

12:11:14 10                    A JUROR:  Thank you.

12:11:14 11                    THE COURT:  Thank you.

12:11:16 12                    (Juror left juryroom.)

12:11:16 13                    THE COURT:  Any motion?

12:11:20 14                    MR. PORADEK:  No motion, Your Honor.

12:11:21 15                    THE COURT:  Any motion.

12:11:22 16                    MR. CHERNY:  No motion.

12:11:23 17                    (Juror enters juryroom.)

12:11:23 18                    THE COURT:  Good afternoon.  Have a seat,

12:11:29 19      please.

12:11:29 20                    A JUROR:  Good afternoon, everyone.

12:11:31 21                    THE COURT:  Could you tell us your juror number?

12:11:33 22                    A JUROR:  34.

12:11:35 23                    THE COURT:  Brandon Reim.

12:11:37 24                    A JUROR:  Yes, sir.

12:11:37 25                    THE COURT:  What did you answer "yes" to?

12:11:39 1          A JUROR:  There was the question, and correct me

12:11:41 2   if I'm wrong, regarding the number of lawsuits.  There is

12:11:45 3   too many.  You know, in my opinion that I believe at some

12:11:49 4   points there are based on sometimes there are frivolous

12:11:53 5   lawsuits out.  There, I'm sure we can all understand that in

12:11:57 6   the past, I'm not saying all of them are frivolous.  There

12:12:01 7   are a lot that are serious, and I do take those seriously as

12:12:05 8   well.  I'm not saying it won't make me impartial.  I will

12:12:07 9   give my honest and best integrity if I am selected to be a

12:12:12 10  juror.

12:12:13 11         And there is another item I wanted to bring to

12:12:18 12  the attention is tomorrow, March 1st being I'm Catholic, I

12:12:22 13  take my religion very seriously and I won't be able to

12:12:25 14  attend any of the Ash Wednesday masses, and that is a very

12:12:28 15  serious part of my religion that I don't want to miss.

12:12:32 16         I do come from Seaford, Delaware.  It is about

12:12:34 17  an hour and 45 minutes.

12:12:35 18         I do have a work obligation that my boss wants

12:12:38 19  me to attend in Ocean City, Maryland for an opiate awareness

12:12:42 20  event.  I'm working with the police department at this time

12:12:44 21  with that.

12:12:45 22         THE COURT:  And is that event tomorrow also?

12:12:49 23         A JUROR:  It's at 6:00 p.m. in Ocean City,

12:12:52 24  Maryland.  That is why I won't be able to attend the evening

12:12:55 25  mass for the Ash Wednesday services.

12:12:57 1              THE COURT:  Right.  So if we were going to break

12:12:59 2     at around 3:00 o'clock tomorrow, it sounds like you might be

12:13:04 3     able to get back to Ocean City.  Is there no mass

12:13:09 4     opportunity that you would be able to make?

12:13:11 5              A JUROR:  The masses do occur anywhere from

12:13:13 6     6:00 to 7:00, and that is when, right in the middle work

12:13:17 7     obligation I need to fulfill.  I could see if I could work

12:13:20 8     something out with my boss on that.  It is something I have

12:13:23 9     committed to do a month ago, although I don't know if last

12:13:26 10    minute is going to sit well with my boss.

12:13:29 11             THE COURT:  Okay.  And in terms of your, you on

12:13:32 12    lawsuits, do you think that that is going to affect how you

12:13:36 13    view this case if you were on this jury?

12:13:37 14             A JUROR:  No.

12:13:38 15             THE COURT:  Okay.  Is there anything else?

12:13:40 16             A JUROR:  No.  And if you wish to, if there is a

12:13:43 17    letter that could be written to my employer that may exempt

12:13:46 18    me from having to attend the event tomorrow night, I may be

12:13:50 19    able to make accommodations for the Ash Wednesday services.

12:13:52 20    I could attend.  So I'm willing to work with you guys

12:13:55 21    however I can be here.

12:13:57 22             THE COURT:  And given the length of your drive

12:14:01 23    in the morning, is there a mass opportunity in the morning

12:14:05 24    if we started court a little bit late?

12:14:08 25             A JUROR:  Seaford, Delaware starts at 6:30, it

12:14:11  1    goes to 7:30.

12:14:13  2                    THE COURT:  6:30 in the morning.

12:14:15  3                    A JUROR:  Yes, in the morning, so it would be

12:14:16  4    over 7:30.  So an hour and 45 minutes would put me

12:14:21  5    50 minutes late beyond the 9:00 a.m. time.

12:14:23  6                    THE COURT:  All right.

12:14:23  7                    A JUROR:  That is if traffic is okay.

12:14:25  8                    THE COURT:  Sure.

12:14:26  9                    A JUROR:  Which we all know.

12:14:27 10                    THE COURT:  You don't control.

12:14:29 11                    A JUROR:  (Nodding yes.)

12:14:29 12                    THE COURT:  All right.  Any questions?

12:14:31 13                    MR. PORADEK:  No questions, Your Honor.

12:14:31 14                    THE COURT:  Any questions?

12:14:32 15                    MR. CHERNY:  No questions, Your Honor.

12:14:33 16                    THE COURT:  All right.  You can go back into the

12:14:35 17    courtroom.

12:14:38 18                    A JUROR:  Thank you, sir.

12:14:40 19                    (Juror left juryroom.)

12:14:40 20                    THE COURT:  Any motion?

12:14:41 21                    MR. PORADEK:  No motion.

12:14:43 22                    MS. RAZAVI:  No motion.

12:14:44 23                    MR. CHERNY:  No motion, Your Honor.

12:14:45 24                    THE COURT:  Okay.

12:14:46 25                    (Juror enters juryroom.)

12:14:51   1           THE COURT:  Good afternoon.  Have a seat there,

12:14:54   2   please.

12:14:54   3           A JUROR:  Hello.

12:14:55   4           THE COURT:  Do you recall your juror number?

12:14:58   5           A JUROR:  43.

12:15:00   6           THE COURT:  43.  Natalie Terranova.

12:15:05   7           A JUROR:  Yes.

12:15:05   8           THE COURT:  Do you recall what you answered

12:15:07   9   "yes" to?

12:15:07 10           A JUROR:  Kind of the first one.  Because I, it

12:15:10 11   was like a couple years ago maybe when it first started.  I

12:15:14 12   didn't read the whole article but I knew they were getting

12:15:16 13   sued for something but I didn't really pay much attention to

12:15:19 14   it.

12:15:19 15           THE COURT:  So you had heard something about

12:15:22 16   Gore and Bard.

12:15:23 17           A JUROR:  Yeah.  Just because I know they were

12:15:27 18   being sued.  I didn't even finish reading the article.

12:15:29 19           THE COURT:  And it was years ago you are saying?

12:15:32 20           A JUROR:  A couple years or so, I forget.

12:15:34 21           THE COURT:  Okay.

12:15:35 22           A JUROR:  It's been awhile.

12:15:35 23           THE COURT:  Do you think whatever you read would

12:15:38 24   affect how you would see the evidence in this case?

12:15:41 25           A JUROR:  I don't think so.

12:15:42 1                    THE COURT:  No.

12:15:43 2                    A JUROR:  I don't even remember what it was.

12:15:45 3                    THE COURT:  Okay.  Is there anything else you

12:15:46 4    wanted to share with us?

12:15:47 5                    A JUROR:  There was one about being on a --

12:15:53 6    being sued or something.

12:15:54 7                    THE COURT:  Right, being involved in lawsuits in

12:15:56 8    any way.

12:15:56 9                    A JUROR:  I don't know if that would pertain to

12:15:58 10   me but I was in a car accident about three years ago.

12:16:01 11                   THE COURT:  Sorry.

12:16:01 12                   A JUROR:  You never went to court or anything.

12:16:04 13   It was settled and all that.  I don't know if that counted

12:16:06 14   or not.

12:16:06 15                   THE COURT:  Sure.  Okay.  And that is all

12:16:08 16   resolved.

12:16:09 17                   A JUROR:  That's it.  Yes.

12:16:09 18                   THE COURT:  That's it?  All right.  Any

12:16:13 19   questions?

12:16:13 20                   MS. RAZAVI:  (Shaking head no.)

12:16:15 21                   THE COURT:  Any questions?

12:16:16 22                   MR. CHERNY:  No questions.

12:16:17 23                   THE COURT:  Thank you.

12:16:20 24                   A JUROR:  Thanks.

12:16:21 25                   (Juror left juryroom.)

| | | |
|---|---|---|
| 12:16:21 | 1 | THE COURT:  Any motion? |
| 12:16:23 | 2 | MR. PORADEK:  No motion, Your Honor. |
| 12:16:25 | 3 | MS. RAZAVI:  No motion, Your Honor. |
| 12:16:25 | 4 | MR. CHERNY:  No motion, Your Honor. |
| 12:16:27 | 5 | (Juror enters juryroom.) |
| 12:16:28 | 6 | THE COURT:  Good afternoon. |
| 12:16:28 | 7 | A JUROR:  Hello. |
| 12:16:29 | 8 | THE COURT:  Have a seat.  Can I tell us your |
| 12:16:32 | 9 | juror number please? |
| 12:16:33 | 10 | A JUROR:  No. 8. |
| 12:16:35 | 11 | THE COURT:  Gary Buchanon. |
| 12:16:37 | 12 | A JUROR:  Yes, sir. |
| 12:16:37 | 13 | THE COURT:  And do you recall what you answered |
| 12:16:39 | 14 | "yes" to? |
| 12:16:41 | 15 | A JUROR:  I work at Hotel DuPont. |
| 12:16:44 | 16 | THE COURT:  Right. |
| 12:16:45 | 17 | A JUROR:  So I see lawyers and so forth coming |
| 12:16:50 | 18 | through there. |
| 12:16:51 | 19 | THE COURT:  Okay. |
| 12:16:51 | 20 | A JUROR:  Another thing.  If I don't work, I |
| 12:16:54 | 21 | don't get paid so that is hard for me to like, you know. |
| 12:17:03 | 22 | And what else was there?  I guess that's it for |
| 12:17:10 | 23 | now. |
| 12:17:10 | 24 | THE COURT:  Okay.  So you see a lot of lawyers, |
| 12:17:13 | 25 | I'm sure. |

12:17:14  1          A JUROR:  Yes.

12:17:14  2          THE COURT:  At the Hotel DuPont.  Do you

12:17:16  3  recognize any of the lawyers you see today?

12:17:19  4          A JUROR:  Yes, a few.

12:17:20  5          THE COURT:  Okay.  And you happened to be

12:17:23  6  looking in the plaintiff's direction.  Do you have any -- do

12:17:28  7  you think the side of the lawyers who you recognize might

12:17:32  8  start out ahead or behind in your mind in this case?

12:17:37  9          A JUROR:  This is my first time doing this.

12:17:43 10  Maybe, maybe not.

12:17:44 11          THE COURT:  But maybe.

12:17:46 12          A JUROR:  Maybe.

12:17:49 13          THE COURT:  And what is your schedule roughly

12:17:51 14  between now and next Friday?  Do you work during the day?

12:17:56 15          A JUROR:  It's crazy.  I was supposed to work

12:17:58 16  tomorrow, Thursday, and Saturday.

12:18:04 17          THE COURT:  But if you were with us from 9:00 to

12:18:07 18  4:30 during weekdays, would you be able to make up those

12:18:11 19  hours some other time or would you be losing money?

12:18:18 20          A JUROR:  I wouldn't be able to make up because

12:18:20 21  when I'm scheduled is when I work.  So if I don't work, I

12:18:26 22  don't get paid.

12:18:26 23          THE COURT:  It's not like they would give you an

12:18:28 24  option of different hours, say, on Sunday or at night for

12:18:32 25  instance.

12:18:32  1                      A JUROR:  No, because it's not that busy right

12:18:35  2      this minute.

12:18:35  3                      THE COURT:  All right.  Is there anything else?

12:18:37  4                      A JUROR:  My wife works for Christiana.  I don't

12:18:42  5      know if that ...

12:18:45  6                      THE COURT:  Okay.  What kind of work does she

12:18:48  7      do?

12:18:48  8                      A JUROR:  She is a nurse.

12:18:49  9                      THE COURT:  At the hospital?

12:18:50 10                      A JUROR:  Yes.

12:18:51 11                      THE COURT:  Do you know what kind of nursing she

12:18:53 12      does?

12:18:53 13                      A JUROR:  LPN.

12:18:56 14                      THE COURT:  She is an LPN?

12:18:58 15                      A JUROR:  Yes.

12:18:58 16                      THE COURT:  All right.  Anything else?

12:19:02 17                      A JUROR:  No.

12:19:03 18                      THE COURT:  Okay.  Are there any questions?

12:19:06 19                      MR. PORADEK:  No questions.

12:19:07 20                      THE COURT:  Any questions?

12:19:08 21                      MR. CHERNY:  Yes.

12:19:09 22                      So you work at the Hotel DuPont you said?

12:19:12 23                      A JUROR:  Yes.

12:19:12 24                      MR. CHERNY:  You said you work on Saturdays?

12:19:15 25                      A JUROR:  Yes, mostly.

12:19:16  1          MR. CHERNY:  What type of work do you do?

12:19:18  2          A JUROR:  I'm in the banquets.

12:19:19  3          MR. CHERNY:  So you walk about the hotel?

12:19:21  4          A JUROR:  Yes.

12:19:21  5          MR. CHERNY:  And I guess you see some people.

12:19:26  6          A JUROR:  Yes, and cater to everyone.

12:19:28  7          MR. CHERNY:  When you say you cater?

12:19:30  8          A JUROR:  I cater.  I mean the servers, food

12:19:33  9   service.  And we have conferences.  Our meetings, our lunch,

12:19:38 10   our dinner, or whatever it is.  I cater to the guests.

12:19:43 11          MR. CHERNY:  Do you arrange sometimes with law

12:19:45 12   firms or lawyers that?

12:19:48 13          A JUROR:  Yes, we do have law firms weekly right

12:19:51 14   through.  We cater the law firms also.

12:19:59 15          MR. CHERNY:  Is there anything else?

12:20:01 16          MS. MASON:  No.

12:20:01 17          MR. CHERNY:  I don't have any other questions.

12:20:03 18          THE COURT:  Thank you.  You can go back into the

12:20:06 19   courtroom.

12:20:06 20          A JUROR:  Thank you.  Have a great day everyone.

12:20:10 21          (Juror left juryroom.)

12:20:11 22          THE COURT:  Any motion?

12:20:12 23          MR. PORADEK:  I think, I guess there is a

12:20:14 24   combination of things.  I'm not sure he seemed to recognize

12:20:17 25   some folks here and I actually don't recognize him, but it

12:20:19 1    may be, I hope he had a positive experience, but either way,

12:20:24 2    he does seems to have some hardship stuff on top of that.

12:20:28 3    So I think combined, I would move to strike.

12:20:33 4              THE COURT:  Do you oppose?

12:20:33 5              MR. CHERNY:  We can join that one.

12:20:36 6              THE COURT:  Then I will grant that and strike

12:20:38 7    Juror 8, I believe it was.

12:20:43 8              (Juror enters juryroom.)

12:20:43 9              THE COURT:  Good afternoon.  Have a seat,

12:20:49 10   please.

12:20:49 11             A JUROR:  Hello.

12:20:50 12             THE COURT:  Have a seat, please.  Tell us your

12:20:52 13   juror number.

12:20:52 14             A JUROR:  4.

12:20:53 15             THE COURT:  Christopher Barnhard.

12:20:56 16             A JUROR:  Yes.

12:20:56 17             THE COURT:  Do you recall what you answered

12:20:57 18   "yes" to?

12:20:58 19             A JUROR:  Many things, I think.

12:21:00 20             THE COURT:  What.

12:21:01 21             A JUROR:  I'll start with the last one which

12:21:04 22   was, I have a court date at 8:00 o'clock in the morning on

12:21:09 23   the 9th in Rehoboth for a cellphone while driving violation.

12:21:14 24             THE COURT:  So you are currently scheduled to be

12:21:18 25   down there?

12:21:18  1                    A JUROR:  Um-hmm.

12:21:19  2                    THE COURT:  Okay.  And --

12:21:20  3                    A JUROR:  I haven't asked for any postponement

12:21:23  4       or anything, but ...

12:21:24  5                    THE COURT:  Okay.

12:21:25  6                    A JUROR:  But I did answer "yes" to many others.

12:21:28  7                    THE COURT:  Why don't you tell me about some of

12:21:31  8       the others.

12:21:31  9                    A JUROR:  I'm a clinical engineer.  I work on

12:21:33 10       medical equipment.  I supervise a group of folks that do

12:21:37 11       that.  And I have done it for years.

12:21:38 12                    THE COURT:  What kind of medical equipment

12:21:40 13       generally?

12:21:40 14                    A JUROR:  From x-ray all the way to infusion

12:21:43 15       pumps.  The whole gamut.

12:21:45 16                    THE COURT:  And you have been doing that kind of

12:21:48 17       work for about how long?

12:21:49 18                    A JUROR:  Ten years.

12:21:50 19                    THE COURT:  All right.  Other issues?

12:21:54 20                    A JUROR:  I mean you asked if I had heard of

12:21:56 21       Bard?  Yes, I have.  I heard of Gore.  Yes, I heard of.

12:22:01 22                    THE COURT:  Do you have feelings about Gore or

12:22:03 23       Bard?

12:22:03 24                    A JUROR:  I like Gore-Tex.  I mean I have some

12:22:08 25       of their material.  I could tell Bard how they could

12:22:11 1    redesign some of their medical equipment.

12:22:13 2                  THE COURT:  You could tell them?

12:22:15 3                  A JUROR:  Yes, to save us some money in the

12:22:17 4    hospital.

12:22:17 5                  THE COURT:  You deal with Bard's products then

12:22:21 6    in your work?

12:22:21 7                  A JUROR:  Um-hmm.

12:22:22 8                  THE COURT:  That's a "yes," right, for the court

12:22:24 9    reporter?

12:22:25 10                 A JUROR:  Yes.  Sorry.  Yes.

12:22:26 11                 THE COURT:  Do you deal with Gore at all in

12:22:28 12   work?

12:22:28 13                 A JUROR:  No, we don't.  At least not to my

12:22:32 14   knowledge.  I don't.  I don't know if we have any of their

12:22:35 15   surgical supplies or anything.

12:22:36 16                 THE COURT:  Okay.  Other issues?

12:22:40 17                 A JUROR:  I don't think so.  I think that covers

12:22:45 18   most of the yeses that mattered.

12:22:48 19                 THE COURT:  Okay.

12:22:49 20                 A JUROR:  I couldn't remember the others.

12:22:50 21                 THE COURT:  Any questions?

12:22:51 22                 MR. PORADEK:  Your job is clinical engineer.

12:22:53 23                 A JUROR:  Yes.

12:22:54 24                 MR. PORADEK:  Could you really quickly describe

12:22:56 25   what you do?

12:22:58 1          A JUROR:  We're tasked with maintenance and

12:23:02 2     keeping up on the equipment repairs.

12:23:04 3          MR. PORADEK:  Got it.  Thank you.

12:23:05 4          A JUROR:  Yep.

12:23:06 5          THE COURT:  Questions?

12:23:08 6          MR. CHERNY:  You said you could help Bard.

12:23:10 7          A JUROR:  Yes.  Your site, right?  It's not

12:23:13 8     related to surgical, though, is it?

12:23:16 9          MR. CHERNY:  No, I get to ask the questions.

12:23:20 10    Anyway, I want to make sure the fact you have thoughts about

12:23:24 11    Bard products.  Does that in any way affect your ability to

12:23:27 12    deal with this case?  I can't tell if you have a negative

12:23:30 13    view.  It seems like you have.

12:23:31 14         A JUROR:  I just think there is an opportunity

12:23:33 15    for improvement on the particular device you have.

12:23:37 16         MR. CHERNY:  Would that affect your ability to

12:23:39 17    have --

12:23:40 18         A JUROR:  No, every company that makes medical

12:23:42 19    devices has possibilities for improvement.  I could make

12:23:45 20    that claim for any vendor, any manufacturer.

12:23:49 21         MR. CHERNY:  And you say you have some of their,

12:23:51 22    Gore's material, like maybe Gore-Tex.

12:23:55 23         A JUROR:  Yes, I have a Bass Pro Outlet jumper

12:23:58 24    for fishing, outdoor.

12:23:59 25         MR. CHERNY:  Thank you.  I thought you just said

12:24:01  1    material.  Thank you.

12:24:02  2                   A JUROR:  No.

12:24:03  3                   THE COURT:  Do you have any views about the

12:24:05  4    patent system?

12:24:06  5                   A JUROR:  I don't.  I could definitely learn

12:24:09  6    more about it.

12:24:10  7                   THE COURT:  Does your work involve patents at

12:24:12  8    all?

12:24:13  9                   A JUROR:  Well, I work for a hospital.  I mean

12:24:15 10    we make use of things that are patented all around, but we

12:24:18 11    don't hold any patent or pursue any as far as, we're not a

12:24:23 12    university hospital or anything like that.

12:24:26 13                   THE COURT:  All right.  Do you think of anything

12:24:29 14    else you want to share with us?  No?  Okay.

12:24:32 15                   All right.  Well, thank you very much.

12:24:35 16                   A JUROR:  Thank you.

12:24:37 17                   (Juror left juryroom.)

12:24:37 18                   THE COURT:  Any motion?

12:24:41 19                   MR. PORADEK:  No motion, Your Honor.

12:24:42 20                   MR. CHERNY:  No motion, Your Honor.

12:24:44 21                   (Juror enters juryroom.)

12:24:57 22                   THE COURT:  Good afternoon.  Hi.  Come on in.

12:24:59 23                   A JUROR:  Thank you.

12:25:00 24                   THE COURT:  Have a seat, please.

12:25:01 25                   A JUROR:  Okay.

12:25:01 1                      THE COURT:  And do you recall your juror number?

12:25:05 2                      A JUROR:  Three.

12:25:06 3                      THE COURT:  Three.

12:25:07 4                      A JUROR:  Um-hmm.

12:25:08 5                      THE COURT:  Pauline Barnes.

12:25:09 6                      A JUROR:  Yes.

12:25:09 7                      THE COURT:  Do you recall anything you answered

12:25:12 8      "yes" to?

12:25:13 9                      A JUROR:  Well, I did sit on a jury one time.

12:25:16 10     And I was a juror.

12:25:17 11                     THE COURT:  And was that here in Delaware?

12:25:18 12                     A JUROR:  No, it was in Maryland.

12:25:21 13                     THE COURT:  About how long ago?

12:25:22 14                     A JUROR:  It was probably eight years ago.  I

12:25:25 15     was still working at the time.  I'm retired now.

12:25:28 16                     THE COURT:  Congratulations.

12:25:29 17                     A JUROR:  Thanks.  Thank you.

12:25:30 18                     THE COURT:  Do you recall anything about what

12:25:31 19     the case was about?

12:25:33 20                     A JUROR:  It was a civil rights case.

12:25:36 21                     THE COURT:  And did the jury reach a verdict?

12:25:40 22                     A JUROR:  Yes, they did.  They said not guilty.

12:25:42 23     There wasn't enough evidence to convict the sheriff.  It was

12:25:47 24     about a sheriff and a towns-person.

12:25:52 25                     THE COURT:  All right.  Were there other things

12:25:54  1    you answered "yes" to?

12:25:55  2                    A JUROR:  No.

12:25:56  3                    THE COURT:  No.

12:25:56  4                    A JUROR:  No, that was it.

12:25:57  5                    THE COURT:  Any questions?

12:26:01  6                    MR. PORADEK:  Any questions?  No.  No thank you.

12:26:04  7                    MR. CHERNY:  I have no questions.

12:26:06  8                    THE COURT:  All right.  You can go back into the

12:26:07  9    courtroom.  Thank you.

12:26:09 10                    A JUROR:  Thank you.  See you.

12:26:11 11                    (Juror left juryroom.)

12:26:11 12                    THE COURT:  Any motion?

12:26:13 13                    MR. PORADEK:  No motion, Your Honor.

12:26:14 14                    MR. CHERNY:  No motion.

12:26:17 15                    (Juror enters juryroom.)

12:26:20 16                    THE COURT:  Good afternoon.  Have a seat,

12:26:21 17    please.

12:26:21 18                    A JUROR:  Hi.

12:26:22 19                    THE COURT:  Can you tell us your juror number?

12:26:25 20                    A JUROR:  40.

12:26:28 21                    THE COURT:  Jonathan Stephens.

12:26:30 22                    A JUROR:  Yes.

12:26:30 23                    THE COURT:  Do you recall what you answered

12:26:32 24    "yes" to?

12:26:32 25                    A JUROR:  Your question about engineering.  I'm

12:26:36 1    a structural engineer, primarily with infrastructure,

12:26:41 2    bridges, roadways, stuff like that.

12:26:44 3            My wife is a pediatric nurse with A.I. duPont.

12:26:48 4    I don't know if that really falls into any of the categories

12:26:52 5    you asked, but I wanted to be open about that.

12:26:56 6            THE COURT:  Right.

12:26:57 7            A JUROR:  You know, my personal views in terms

12:27:00 8    of lawsuits.  Sure, there is too many, but I mean I'm not

12:27:06 9    going to hold that to anybody.  I can hear the case.  That's

12:27:12 10   pretty much it.

12:27:13 11           THE COURT:  That's it?

12:27:14 12           A JUROR:  Yes.

12:27:14 13           THE COURT:  You have training as a structural

12:27:17 14   engineer, I assume.

12:27:18 15           A JUROR:  Um-hmm.

12:27:18 16           THE COURT:  "Yes," right?

12:27:19 17           A JUROR:  Yes, graduated from Delaware with

12:27:22 18   undergraduate, master's degree and have a professional

12:27:25 19   engineer's license.

12:27:26 20           THE COURT:  And have you at any point in your

12:27:29 21   career dealt with medical product design?

12:27:30 22           A JUROR:  No, uh-uh.

12:27:32 23           THE COURT:  And your wife I think you said is a

12:27:35 24   pediatric nurse?

12:27:37 25           A JUROR:  Yeah.

12:27:37  1               THE COURT:  Do you know has she dealt with

12:27:40  2    stents or vascular grafts or that sort of thing?

12:27:45  3               A JUROR:  No, nothing like that.

12:27:47  4               THE COURT:  And you don't -- have you ever heard

12:27:49  5    her talk about Gore or Bard and their products?

12:27:52  6               A JUROR:  No.

12:27:53  7               THE COURT:  No.

12:27:53  8               Any questions?

12:27:56  9               MR. PORADEK:  Do you have any experience with

12:27:57 10    the patent system in your engineering work?

12:27:59 11               A JUROR:  No, I do not.

12:28:00 12               MR. PORADEK:  Any view of the patent system

12:28:02 13    generally, one way or the other?

12:28:04 14               A JUROR:  Not really, no.  I did, my research

12:28:10 15    for my graduate degree is composites.  So there is a little

12:28:16 16    bit, nothing I directly worked with was patented.  But there

12:28:21 17    were patents that came out of that building where I worked,

12:28:26 18    but nothing directly with me.

12:28:30 19               THE COURT:  Any questions?

12:28:31 20               MR. CHERNY:  No questions.

12:28:31 21               THE COURT:  Okay.  You can go back into the

12:28:34 22    courtroom.

12:28:34 23               A JUROR:  Great.  Thanks.

12:28:38 24               (Juror left juryroom.)

12:28:38 25               MR. PORADEK:  No motion, Your Honor.

| | | |
|---|---|---|
| 12:28:39 | 1 | MR. CHERNY:  No motion. |
| 12:28:40 | 2 | THE COURT:  Okay. |
| 12:28:41 | 3 | (Juror enters juryroom.) |
| 12:28:46 | 4 | THE COURT:  Good afternoon. |
| 12:28:48 | 5 | A JUROR:  Good afternoon, Your Honor. |
| 12:28:49 | 6 | THE COURT:  Have a seat. |
| 12:28:51 | 7 | A JUROR:  How are you? |
| 12:28:52 | 8 | THE COURT:  Good.  And your juror number? |
| 12:28:55 | 9 | A JUROR:  25. |
| 12:28:56 | 10 | THE COURT:  Kennett Lambie. |
| 12:28:58 | 11 | A JUROR:  Yes. |
| 12:28:59 | 12 | THE COURT:  Do you recall what you answered |
| 12:29:00 | 13 | "yes" to? |
| 12:29:00 | 14 | A JUROR:  I work at the Thomas Jefferson |
| 12:29:03 | 15 | University Hospital.  And I work in the, it's the Life |
| 12:29:10 | 16 | Science Building.  It's all research.  I'm a utility |
| 12:29:13 | 17 | mechanic for plant operations and engineering.  Like |
| 12:29:21 | 18 | 43 years, I've been there. |
| 12:29:22 | 19 | THE COURT:  In your work, I assume you are not |
| 12:29:23 | 20 | dealing with medical products? |
| 12:29:25 | 21 | A JUROR:  Well, I see them but I don't know what |
| 12:29:27 | 22 | they are. |
| 12:29:27 | 23 | THE COURT:  Okay. |
| 12:29:28 | 24 | A JUROR:  I really don't. |
| 12:29:29 | 25 | THE COURT:  You are not involved in. |

| | | |
|---|---|---|
| 12:29:30 | 1 | A JUROR:  I hear things but that's about it. |
| 12:29:32 | 2 | THE COURT:  You hear things? |
| 12:29:34 | 3 | A JUROR:  Um-hmm. |
| 12:29:35 | 4 | THE COURT:  That's a yes, right? |
| 12:29:36 | 5 | A JUROR:  Yes. |
| 12:29:36 | 6 | THE COURT:  And have you ever heard folks talk |

about Gore or Bard products?

| | | |
|---|---|---|
| 12:29:42 | 8 | A JUROR:  Never. |
| 12:29:42 | 9 | THE COURT:  Okay.  Other issues? |
| 12:29:44 | 10 | A JUROR:  I was on a jury. |
| 12:29:47 | 11 | THE COURT:  Okay. |
| 12:29:48 | 12 | A JUROR:  It was about 30 years ago, in Delaware |

County.  And I do remember it was, it had to do with

somebody hit, crashed into a utility thing that belonged to

the government.  So it was about two weeks about on that

trial.

| | | |
|---|---|---|
| 12:30:06 | 17 | THE COURT:  Okay. |
| 12:30:07 | 18 | A JUROR:  I do remember something about it, not |

a whole lot.

| | | |
|---|---|---|
| 12:30:10 | 20 | THE COURT:  Was there a verdict, if you recall? |

Which side prevailed?

| | | |
|---|---|---|
| 12:30:14 | 22 | A JUROR:  Yes, they favored the guy that was |

driving the truck.  They claimed that when they built it

that the curb was sticking out too far into the road.

| | | |
|---|---|---|
| 12:30:24 | 25 | THE COURT:  Okay. |

12:30:25  1                 A JUROR:  That's about it.

12:30:26  2                 THE COURT:  Is there anything else you wanted to

12:30:28  3       share with us?

12:30:28  4                 A JUROR:  Well, the only other thing I have is I

12:30:31  5       do miss a couple days of work every month because my wife is

12:30:35  6       disabled.  And then when she is real ill, I have to take my,

12:30:38  7       I have a little daughter nine years old and I have to take

12:30:41  8       her to school and then pick her up, things like that.

12:30:45  9       Sometimes it's only once a month or twice.  That's it,

12:30:48 10       though.

12:30:49 11                 THE COURT:  I take it, it is unpredictable?

12:30:52 12                 THE JURORS:  Yes, she has nerve damage from

12:30:53 13       cancer, so it's hard to say when the days are going to be.

12:30:57 14       But that's the only thing I had to add.

12:30:59 15                 THE COURT:  Okay.  All right.  Thank you.  Any

12:31:01 16       questions?

12:31:02 17                 MR. PORADEK:  No questions, Your Honor.

12:31:03 18                 THE COURT:  Questions?

12:31:04 19                 MR. CHERNY:  No questions.

12:31:05 20                 THE COURT:  Okay.  Now you can go.  Thank you

12:31:08 21       very much.

12:31:08 22                 A JUROR:  Thank you, Your Honor.

12:31:09 23                 (Juror left juryroom.)

12:31:10 24                 THE COURT:  Any motion?

12:31:12 25                 MR. PORADEK:  No motion.

12:31:13  1                    MR. CHERNY:  No motion, Your Honor.

12:31:14  2                    THE COURT:  Okay.

12:31:15  3                    (Juror enters juryroom.)

12:31:18  4                    THE COURT:  Good afternoon.

12:31:19  5                    A JUROR:  Good afternoon.

12:31:20  6                    THE COURT:  What is your juror number, please?

12:31:22  7                    A JUROR:  47.

12:31:25  8                    THE COURT:  I can check that for you.

12:31:26  9                    Stephanie Winchester.

12:31:29 10                    A JUROR:  Yes.

12:31:29 11                    THE COURT:  That is 47.  Do you recall what you

12:31:32 12      answered "yes" to?

12:31:32 13                    A JUROR:  Yes.  I was on a jury 10 years ago,

12:31:35 14      2007.

12:31:35 15                    THE COURT:  Here in Delaware?

12:31:36 16                    A JUROR:  Yes.

12:31:37 17                    THE COURT:  In this building or another

12:31:39 18      building?

12:31:40 19                    A JUROR:  Down the street.

12:31:41 20                    THE COURT:  Do you recall anything about the

12:31:42 21      case?

12:31:42 22                    A JUROR:  It was a murder trial.

12:31:43 23                    THE COURT:  A murder trial.  Did you have a

12:31:45 24      verdict?

12:31:46 25                    A JUROR:  It was a hung jury.  It was her third

12:31:48  1    trial.  You don't want me to say more?

12:31:53  2            THE COURT:  That is enough.  Is there anything

12:31:56  3    else you wanted to say you answered "yes" to?

12:31:59  4            A JUROR:  What else?  I have heard of Gore

12:32:02  5    before from school.  I just heard they made clothing.  I

12:32:05  6    didn't know anything.

12:32:06  7            In 2012, when I bought my house, I think the

12:32:08  8    closing attorney was from Kirkland Ellis.  I'm not

12:32:11  9    100 percent sure, though.  They were with the realtor.

12:32:15 10    And I think that's it

12:32:17 11            THE COURT:  Okay.  And Gore, you have heard a

12:32:20 12    little bit about them.  Do you have any feelings, positive

12:32:22 13    or negative?

12:32:23 14            A JUROR:  No.  I just thought they made clothes

12:32:26 15    from Columbia from what I learned in school.

12:32:28 16            THE COURT:  All right.  Are there any questions?

12:32:30 17            MR. PORADEK:  No questions here.

12:32:31 18            THE COURT:  Any questions?

12:32:33 19            MR. CHERNY:  No questions.

12:32:34 20            THE COURT:  All right.  You can go back into the

12:32:36 21    courtroom.

12:32:38 22            A JUROR:  Thank you.

12:32:40 23            (Juror left juryroom.)

12:32:42 24            THE COURT:  I see you guys weren't the clothing

12:32:45 25    guys.

12:32:45 1                    MR. CHERNY:  No.

12:32:45 2                    THE COURT:  Any motion?

12:32:47 3                    MR. PORADEK:  No motion.

12:32:48 4                    MR. CHERNY:  No motion.

12:32:51 5                    (Juror enters juryroom.)

12:32:56 6                    THE COURT:  Good afternoon.  You can have a

12:32:58 7     seat.  And tell us your juror number, please.

12:33:02 8                    A JUROR:  32.

12:33:03 9                    THE COURT:  Mark Potter.

12:33:04 10                   A JUROR:  Correct.

12:33:05 11                   THE COURT:  Okay.  Do you recall what you

12:33:06 12    answered "yes" to?

12:33:07 13                   A JUROR:  I was trying to keep track of the

12:33:09 14    numbers but I lost track.

12:33:11 15                   THE COURT:  That's okay.

12:33:11 16                   A JUROR:  I'm not sure.  There are multiple ones

12:33:13 17    but I'm not saying there may be one or two in there that

12:33:16 18    might affect my decision for the most part now, I think.

12:33:20 19                   My biggest problem with what is going on here

12:33:22 20    is the amount of time this is going to take.  I'm

12:33:26 21    self-employed.  I'm a small contractor.  It's just three

12:33:29 22    guys.  I'm a third of the production.

12:33:33 23                   We have a very ambitious plan for the rest of

12:33:35 24    the week.  Some things have to be done that is going to

12:33:38 25    affect someone's settlement next week.

12:33:41  1          THE COURT:  You are in construction, correct?

12:33:43  2          A JUROR:  Yes, I'm a contractor.

12:33:44  3          THE COURT:  If you are not there, can those

12:33:46  4  deadlines be met?

12:33:47  5          A JUROR:  I can, I can be done this week, but

12:33:49  6  that will keep the people that have to go to settlement next

12:33:53  7  week happy.  We've got some very serious problems to fix

12:33:58  8  this week.

12:33:59  9          Unless I take my guys out at 6:00 o'clock at

12:34:02 10  night and shows them what needs to be done for the next two

12:34:07 11  weeks.  And the following week, we have a project that will

12:34:11 12  take a week with me there, so it will take a little bit

12:34:13 13  longer.

12:34:14 14          THE COURT:  Is there a time that is better for

12:34:16 15  you to do in your business?

12:34:18 16          A JUROR:  Actually February is supposed to be

12:34:19 17  the perfect time.

12:34:20 18          THE COURT:  You are busy.

12:34:22 19          A JUROR:  The weather is cooperating and we have

12:34:24 20  a lot to do, so ...

12:34:26 21          THE COURT:  Okay.

12:34:27 22          A JUROR:  Normally, wintertime is better for us.

12:34:29 23  We're outside guys, roofing, windows, and doors.

12:34:33 24          THE COURT:  Do you remember any of the other

12:34:35 25  issues?

12:34:37  1              A JUROR:  There are too many lawsuits.

12:34:39  2     Frivolous lawsuits.  I'm not saying this is frivolous.  I

12:34:44  3     have been sued before.  It turns out I have to sue someone

12:34:49  4     now because the insurance company is forcing me to.  The

12:34:54  5     whole thing is a workman's comp dispute.

12:34:57  6              THE COURT:  Okay.

12:34:58  7              A JUROR:  My broker.  One of the guys because he

12:35:00  8     is an officer of the company, myself and my son.  The broker

12:35:05  9     set it up that way.  It's been that way ten years.  We

12:35:08 10     changed companies, he didn't set it up right.  So the

12:35:11 11     auditor comes to find out I owe him $17,000.  Well, since he

12:35:15 12     did it wrong, I have to sue him.  They won't listen to me.

12:35:19 13     This is what happened.  This is the way it's been for ten

12:35:22 14     years.  This is the way it has always been.  This is a

12:35:24 15     mistake.

12:35:25 16              What are we going to do?  Well, are you going to

12:35:28 17     pay us $17,000?  Now I'm being forced to sue that man

12:35:32 18     because he set it up wrong.  It's very clear what he is

12:35:35 19     supposed to do.  He just did it wrong.  Of course, I signed

12:35:38 20     off on it.  I've got to sit down with him:  Hey, Mark.  How

12:35:42 21     are you doing, Kevin?  Here you go.  Sign here, here, here.

12:35:46 22     Have a nice day.  This, the whole due diligence going on,

12:35:50 23     you signed it.

12:35:52 24              THE COURT:  All right.  I can hear your

12:35:55 25     frustration.

12:35:56  1          A JUROR:  So it's affecting --  did I hear the

12:35:59  2     DuPont company?

12:36:00  3          THE COURT:  Yes, you have.

12:36:01  4          A JUROR:  I have disdain.

12:36:02  5          THE COURT:  You have disdain for DuPont.

12:36:05  6          A JUROR:  Their hypocrisy is outrageous.

12:36:08  7          THE COURT:  So you heard their name.  Would you

12:36:11  8     be able to fairly evaluate the evidence?

12:36:14  9          A JUROR:  That's, the lawsuit thing and me being

12:36:17 10     sued, there was a whole thing.  That stuff I think I can get

12:36:23 11     past and still be fair about.  But the DuPont company, I

12:36:25 12     worked for DuPont for 18 years, firsthand knowledge of their

12:36:29 13     foolishness and they're actually kind of trumpish.  I hate

12:36:36 14     to bring politics into this.

12:36:39 15          THE COURT:  So you have trouble putting that

12:36:40 16     aside.

12:36:41 17          A JUROR:  Well, I may.  I may.

12:36:42 18          THE COURT:  All right.  Are there other issues?

12:36:45 19          A JUROR:  No.

12:36:45 20          THE COURT:  Okay.  Any questions?

12:36:49 21          MR. PORADEK:  No.  No, Your Honor.

12:36:51 22          THE COURT:  Any questions?

12:36:52 23          MR. CHERNY:  Your feelings about DuPont, would

12:36:54 24     they transfer to another company that, you know, may have

12:36:59 25     been historically affiliated to DuPont?  A separate company.

12:37:06  1          A JUROR:  I don't know.

12:37:07  2          MR. CHERNY:  Do you know anything about either

12:37:10  3   of the companies here, Gore or Bard?

12:37:13  4          A JUROR:  Gore, I have actually done work at

12:37:15  5   Gore, you know.  I don't know anybody.  I don't know their

12:37:18  6   policies.  I don't know a lot about their business.  But I

12:37:21  7   have heard of Gore.

12:37:23  8          MR. CHERNY:  Do you have any feelings negative

12:37:24  9   or positive about them?

12:37:26 10          A JUROR:  No.

12:37:27 11          MR. CHERNY:  If you found out they were

12:37:28 12   affiliated with DuPont in the past, would that affect your

12:37:31 13   ability to be fair?

12:37:32 14          A JUROR:  I'm afraid I might not be as impartial

12:37:39 15   as a judge might be.  You know, I understand.  Maybe the

12:37:44 16   folks in this room can separate that maybe better than some

12:37:48 17   people, that being your line of work.

12:37:52 18          THE COURT:  Is there anything else?

12:37:53 19          MR. CHERNY:  No, Your Honor.

12:37:53 20          THE COURT:  Okay.  You can go back into the

12:37:55 21   courtroom.  Thank you.

12:37:57 22          A JUROR:  Thank you.

12:37:58 23          (Juror left juryroom.)

12:38:02 24          THE COURT:  Any motion?

12:38:04 25          MR. PORADEK:  Yes, we would move to strike for

12:38:05  1    cause.

12:38:06  2              THE COURT:  Do you oppose that?

12:38:07  3              MR. CHERNY:  I oppose it.  I don't know what to

12:38:10  4    make of what he just said.  He obviously has strong feelings

12:38:13  5    about DuPont.  He doesn't know Gore.  So I don't --

12:38:16  6              MR. PORADEK:  I think there is going to be --

12:38:17  7    I'm sorry to interrupt you, Steve.

12:38:19  8              MR. CHERNY:  I don't, I don't, I can't figure

12:38:21  9    out if there is enough of a connection there to strike him.

12:38:24 10              THE COURT:  Okay.  I'm concerned that there is

12:38:25 11    enough of a connection, and he also has the hardship which

12:38:30 12    factors in, and just the way the information was coming out,

12:38:35 13    that he worked at DuPont, that he did work at Gore.  I just

12:38:40 14    have enough concern that I think it best I strike him.  So I

12:38:45 15    grant the motion to strike 32.

12:38:47 16              Any more?

12:38:50 17              THE DEPUTY CLERK:  Yes.

12:38:50 18              THE COURT:  Okay.

12:38:52 19              THE DEPUTY CLERK:  The person you wanted to talk

12:38:55 20    about should be coming soon, but there are these two.

12:39:00 21              THE COURT:  Okay.

12:39:00 22              (Juror entered courtroom.)

12:39:00 23              Hi.  Good afternoon.  Have a seat, please.

12:39:04 24              (Juror enters juryroom.)

12:39:04 25              THE COURT:  Do you recall your juror number?

12:39:06  1                    A JUROR:  No. 9.

12:39:07  2                    THE COURT:  Jacqueline Burgos-Cousin.

12:39:10  3                    A JUROR:  Yes.

12:39:11  4                    THE COURT:  And do you recall what you answered

12:39:12  5        "yes" to?

12:39:13  6                    A JUROR:  Actually four.

12:39:14  7                    THE COURT:  Okay.  Great.  Do you recall?

12:39:18  8                    A JUROR:  One.  My husband was a DuPont

12:39:20  9        employee.  It is going to be 29 years in June.

12:39:23 10                    THE COURT:  Okay.

12:39:26 11                    A JUROR:  You asked about if I was a leader of

12:39:28 12        an organization.  I'm the executive director for a Contact

12:39:31 13        Lifeline, which is a 24 hours crisis service, including rape

12:39:36 14        crisis services in Kent County, that includes court

12:39:40 15        appearances, police and hospitals.

12:39:43 16                    THE COURT:  Okay.

12:39:45 17                    A JUROR:  So now the third one was would this be

12:39:48 18        difficulty for you to have a lengthy trial?  As an executive

12:39:51 19        director, I have many grants that have deadlines and I'm the

12:39:55 20        only one that does the grant applications.

12:39:57 21                    THE COURT:  Okay.

12:39:58 22                    A JUROR:  And the last one was something about

12:40:01 23        anyone in your household or anybody did a patent.  I think

12:40:04 24        my husband submitted a patent about five years or so.  There

12:40:07 25        was no results on that.

12:40:08  1                THE COURT:  All right.  Let me just ask you

12:40:11  2   quickly about, is hour husband still at DuPont?

12:40:15  3                A JUROR:  Yes, it will be 29 years in June.

12:40:17  4                THE COURT:  Do you have positive or negative

12:40:19  5   feelings about DuPont?

12:40:19  6                A JUROR:  My husband has been working at DuPont

12:40:23  7   for 29 years.  We have two kids in college.  I'm sorry.

12:40:27  8   Back to you again.

12:40:30  9                THE COURT:  If you hear reference to DuPont or

12:40:32 10   find out that they're affiliated with one side or the other,

12:40:35 11   would your positive feelings impact how you view the

12:40:39 12   evidence in this case?

12:40:40 13                A JUROR:  I will definitely stand firm on the

12:40:43 14   issues and set forth accordingly.

12:40:47 15                THE COURT:  Meaning could you put aside your

12:40:49 16   positive feelings?

12:40:50 17                A JUROR:  Yes, I can.

12:40:51 18                THE COURT:  Okay.

12:40:51 19                A JUROR:  I have positive personal feelings

12:40:53 20   about DuPont, not business.

12:40:56 21                THE COURT:  All right.  Now in terms of your

12:40:58 22   schedule.

12:41:01 23                A JUROR:  Yes.

12:41:01 24                THE COURT:  If you were with us from 9:00 to

12:41:04 25   4:30 until the end of next week, how would that affect the

12:41:08  1    operations of the helpline?

12:41:10  2              A JUROR:  Well, we do have a coordinator that

12:41:13  3    handles the hotline.  As the executive director, I have to

12:41:15  4    make sure of my roles and responsibility of writing grants,

12:41:18  5    getting funding for the organization, because this is

12:41:21  6    nonprofit.  So that is where I will have to do a lot of

12:41:25  7    scheduling, bringing work home, doing work afterhours.

12:41:33  8              THE COURT:  Okay.  And you believe your husband

12:41:36  9    applied for a patent?

12:41:37 10              A JUROR:  I believe he did, yes.

12:41:38 11              THE COURT:  And you don't think he ever got it?

12:41:40 12              A JUROR:  Oh, no.  I guarantee you he didn't.

12:41:43 13              THE COURT:  Do you have any feelings about the

12:41:44 14    patent system?

12:41:45 15              A JUROR:  Not at all.  No negative emotions.

12:41:48 16              THE COURT:  All right.  Any questions?

12:41:50 17              MR. PORADEK:  No questions.

12:41:51 18              THE COURT:  Hold on.  One more question.  Any

12:41:54 19    questions?

12:41:57 20              A JUROR:  Sure.

12:41:58 21              MR. CHERNY:  I think my colleague might have a

12:41:59 22    question.

12:41:59 23              A JUROR:  Sure.  I'm here.

12:42:01 24              MS. MASON:  I'm trying to formulate one here.

12:42:03 25              So you have obviously very positive feelings of

12:42:06  1    gratitude toward DuPont for supporting your family allowing

12:42:10  2    you to put your children in college.  And you say you can

12:42:14  3    put them aside.

12:42:15  4              A JUROR:  Yes.  Because I'm also a

12:42:17  5    businessperson myself, so I, there is nothing -- I mean my

12:42:21  6    husband working for DuPont, I have gratitude, thank you very

12:42:25  7    much for that.  That is just that part.  Anything outside

12:42:29  8    of, that of course I'm here to is serve and do what needs to

12:42:32  9    be done.  So I would have to put any personal feelings

12:42:35 10    aside, of course.

12:42:36 11              MS. MASON:  Can you tell us a little bit about

12:42:37 12    your husband's patent application?  He applied for a patent.

12:42:44 13              A JUROR:  Five to seven years ago.  That is why

12:42:48 14    I brought it up.

12:42:49 15              THE COURT:  Sure.

12:42:49 16              MS. MASON:  Do you remember what happened?

12:42:50 17              A JUROR:  Nothing came out of it.  My husband

12:42:53 18    didn't follow it up any further.  He put it aside and didn't

12:42:56 19    go any further.

12:42:57 20              MS. MASON:  He put it in himself?

12:42:58 21              A JUROR:  Yes.

12:42:59 22              MS. MASON:  Do you remember if the Patent Office

12:43:02 23    got back to him or told him anything?

12:43:05 24              A JUROR:  Actually, no.  No, I don't think

12:43:07 25    anybody got back to him or anything.  I only brought it up

12:43:12   1    because it want one of the questions.

12:43:13   2                    THE COURT:  Right.

12:43:14   3                    A JUROR:  It was "ah."  But outside of that ...

12:43:18   4                    THE COURT:  Any other questions?

12:43:19   5                    MR. CHERNY:  No questions.

12:43:20   6                    THE COURT:  All right.  You can go back into the

12:43:22   7    courtroom.

12:43:22   8                    A JUROR:  Thank you.

12:43:24   9                    (Juror left juryroom.)

12:43:25  10                    THE COURT:  Any motion?

12:43:26  11                    MR. PORADEK:  No motion.

12:43:27  12                    MR. CHERNY:  No motion.

12:43:29  13                    (Juror enters juryroom.)

12:43:35  14                    THE COURT:  Good afternoon.  Have a seat.

12:43:36  15                    Do you know your juror number?

12:43:38  16                    A JUROR:  Seven.

12:43:39  17                    THE COURT:  Seven.  Ashlee Brown.

12:43:42  18                    A JUROR:  Yes.

12:43:42  19                    THE COURT:  Do you recall what you answered

12:43:44  20    "yes" to?

12:43:44  21                    A JUROR:  Yes.  I have served jury duty.  Well,

12:43:50  22    my mom and sister and aunt are all in the medical field.

12:43:54  23    And then the hardship one, taking off work.

12:43:59  24                    THE COURT:  Okay.  Let's talk about that first.

12:44:02  25                    A JUROR:  Okay.

12:44:03  1          THE COURT:  If you were with us from 9:00 to

12:44:05  2   4:30 through the end of next week, how would that affect

12:44:09  3   you?

12:44:09  4          A JUROR:  I'm a server so I'm a tipped employee,

12:44:11  5   so if I'm not there, I make nothing.  They don't compensate

12:44:16  6   or anything like that.

12:44:17  7          I also do, I am responsible for next week with

12:44:20  8   my mom out of town for my niece three days a week to get off

12:44:23  9   the school bus.

12:44:24 10          THE COURT:  Okay.  And you would not be able to

12:44:28 11   make up the hours some other time?

12:44:31 12          A JUROR:  Right.  Yeah.  Like I would, they

12:44:33 13   would have to give me off, including today, and then the

12:44:36 14   rest of this week and next week.  It is almost two weeks

12:44:38 15   off, and I don't have, yeah, like there is any other time to

12:44:41 16   make it up for it.

12:44:43 17          I live at Lewes down at the beach.  That is not

12:44:46 18   like even if I get out of here, I could make it to a night

12:44:48 19   shift or anything like that.

12:44:49 20          THE COURT:  All right.  And you have family that

12:44:54 21   works in the medical field?

12:44:55 22          A JUROR:  Um-hmm.  Yes.

12:44:56 23          THE COURT:  Do any of them deal with medical

12:44:58 24   devices?

12:44:59 25          A JUROR:  They're nurses, so they don't

12:45:01  1    necessarily do it like directly.  They do like after

12:45:06  2    surgery, they're on the medical surgery floor.  So I guess

12:45:09  3    if they have a patient has a device maybe, but not always.

12:45:12  4               THE COURT:  And your prior jury service, was

12:45:15  5    that here in Delaware?

12:45:17  6               A JUROR:  Yes, in Sussex County.

12:45:19  7               THE COURT:  About how long ago?

12:45:20  8               A JUROR:  It was, I would say, maybe four or

12:45:23  9    five years ago.

12:45:24 10               THE COURT:  Do you remember what kind of case it

12:45:25 11    was?

12:45:25 12               A JUROR:  It was just a one-day trial.  It was a

12:45:29 13    drug sale or something.  They were just trying to get the

12:45:31 14    other guy.

12:45:34 15               THE COURT:  Did the jury reach a verdict?

12:45:36 16               A JUROR:  Yes.

12:45:36 17               THE COURT:  Do you recall what that was?

12:45:37 18               A JUROR:  Yes, he was guilty of selling.

12:45:40 19               THE COURT:  All right.  Anything else?

12:45:41 20               A JUROR:  I don't think so.

12:45:42 21               THE COURT:  Any questions?

12:45:43 22               MR. PORADEK:  No questions.

12:45:44 23               MR. CHERNY:  No questions, Your Honor.

12:45:46 24               THE COURT:  All right.  You can go back into the

12:45:48 25    courtroom.  Thank you.

12:45:49  1                      A JUROR:  Thank you.

12:45:50  2                          (Juror left juryroom.)

12:45:51  3                      THE COURT:  Any motion?

12:45:53  4                      MR. PORADEK:  No motion, Your Honor.

12:45:54  5                      MR. CHERNY:  No motion, Your Honor.

12:45:55  6                      THE COURT:  All right.  Put a star next to her

12:45:58  7      for the hardship.

12:46:09  8                          (Juror enters juryroom.)

12:46:10  9                      THE COURT:  Good afternoon.  Have a seat,

12:46:11 10      please.

12:46:11 11                      Do you remember what your number is?

12:46:13 12                      A JUROR:  23.

12:46:14 13                      THE COURT:  23.

12:46:14 14                      A JUROR:  Yes.

12:46:16 15                      THE COURT:  Are you Gregory Kane then?

12:46:18 16                      A JUROR:  I am.

12:46:19 17                      THE COURT:  And do you recall what you answered

12:46:20 18      "yes" to?

12:46:21 19                      A JUROR:  It was the last question on whether I

12:46:24 20      was on a jury before.

12:46:25 21                      THE COURT:  Okay.  You have been on a jury

12:46:27 22      before.

12:46:27 23                      A JUROR:  Um-hmm.

12:46:28 24                      THE COURT:  Sorry.  For the court reporter's

12:46:30 25      benefit, that would be "yes?"

12:46:31  1                    A JUROR:  Yes.

12:46:32  2                    THE COURT:  About how long ago was that?

12:46:35  3                    A JUROR:  Four years ago.

12:46:36  4                    THE COURT:  Okay.  And was that in this building

12:46:39  5       or another one?

12:46:40  6                    A JUROR:  It was in the building down the

12:46:42  7       street.

12:46:42  8                    THE COURT:  The state court.  Do you recall

12:46:44  9       anything about what kind of trial it was?

12:46:45 10                    A JUROR:  It was for DUI.

12:46:47 11                    THE COURT:  Okay.  And did the jury reach a

12:46:49 12       verdict?

12:46:50 13                    A JUROR:  They did.

12:46:50 14                    THE COURT:  And what was it?

12:46:51 15                    A JUROR:  It was not guilty.

12:46:52 16                    THE COURT:  And did you have any feelings about

12:46:54 17       that process?

12:46:56 18                    A JUROR:  I agreed with it, you know.

12:46:59 19                    THE COURT:  Do you think that experience serving

12:47:01 20       on that jury would affect your ability to serve on this

12:47:04 21       jury?

12:47:05 22                    A JUROR:  Probably.

12:47:06 23                    THE COURT:  How so?

12:47:07 24                    A JUROR:  I had never experienced being on a

12:47:11 25       jury before, so I didn't realize -- I agreed with the person

12:47:20 1    that was in trouble, put it that way.  And on the opposite

12:47:25 2    side, I believe the police were doing something.  They were

12:47:29 3    trying to exaggerate what got the young man there.

12:47:37 4              So if I saw that this time, you know, for

12:47:40 5    whatever reason, I feel like I would lean towards the person

12:47:44 6    that, you know, like if it was a man or a woman, whoever was

12:47:50 7    the one, I would probably favor them for some reason.

12:47:54 8              THE COURT:  So this case is not a criminal case.

12:47:57 9              A JUROR:  Right.

12:47:57 10             THE COURT:  As you probably heard.  There is an

12:47:59 11   allegation of patent infringement.  Are you saying you might

12:48:02 12   start out leaning towards the party that was accused of

12:48:08 13   infringing?

12:48:09 14             A JUROR:  Probably.

12:48:10 15             THE COURT:  Based on that prior experience?

12:48:12 16             A JUROR:  Um-hmm.

12:48:13 17             THE COURT:  That is a "yes?"

12:48:14 18             A JUROR:  That's a "yes."  Sorry.

12:48:15 19             THE COURT:  That's all right.  Is there anything

12:48:17 20   else.

12:48:17 21             A JUROR:  That's it.

12:48:18 22             THE COURT:  Any questions?

12:48:19 23             MR. PORADEK:  We're representing the plaintiff

12:48:20 24   in this case.  I just wanted to follow-up.

12:48:23 25             Do you think there is too many lawsuits

12:48:25  1      generally?

12:48:29  2              A JUROR:  I couldn't say yes or no.

12:48:30  3              MR. PORADEK:  Okay.  So you had an experience

12:48:33  4      where you thought the plaintiff in that particular case was

12:48:36  5      not, was not --

12:48:42  6              A JUROR:  Yes, I don't think he should have been

12:48:44  7      arrested in that one particular case.

12:48:47  8              MR. PORADEK:  Got it.  Okay.  You think you kind

12:48:49  9      of looked neutrally at the facts.

12:48:51 10              A JUROR:  Certainly.

12:48:53 11              MR. PORADEK:  Okay.

12:48:53 12              A JUROR:  Because this would be completely

12:48:55 13      different, obviously.

12:48:56 14              MR. PORADEK:  Thank you.

12:48:57 15              MR. CHERNY:  No questions, Your Honor.

12:48:59 16              THE COURT:  Thank you very much.

12:49:02 17              (Juror left juryroom.)

12:49:02 18              THE COURT:  Any motion?

12:49:06 19              MR. PORADEK:  I'm concerned I don't think he

12:49:11 20      said enough though to support a motion to strike, so no.

12:49:15 21              THE COURT:  Any motion?

12:49:16 22              MR. CHERNY:  No motion.

12:49:16 23              THE COURT:  So I guess there were folks in the

12:49:24 24      courtroom that had some concern about this juror and maybe

12:49:29 25      some of his behavior?

| | |
|---|---|
| 12:49:31 1 | THE DEPUTY CLERK:  Yes, I think the CSOs. |
| 12:49:33 2 | THE COURT:  Some of the CSOs witnessed some |
| 12:49:36 3 | things about him that they were concerned about just how he |
| 12:49:39 4 | was behaving in the courtroom. |
| 12:49:42 5 | So knowing that and having interacted just a |
| 12:49:46 6 | little bit with him, I guess I have a little bit of concern. |
| 12:49:49 7 | Would there be any objection to me striking him based on |
| 12:49:51 8 | that? |
| 12:49:52 9 | MR. PORADEK:  No objection. |
| 12:49:53 10 | MR. CHERNY:  Would be possible to know which |
| 12:49:55 11 | one, which somewhere juror it is? |
| 12:49:57 12 | THE COURT:  No, this juror we just had. |
| 12:49:59 13 | MR. CHERNY:  I'm sorry. |
| 12:50:00 14 | THE COURT:  Yes, No. 23. |
| 12:50:01 15 | MR. CHERNY:  I thought we were talking about |
| 12:50:02 16 | someone. |
| 12:50:03 17 | THE COURT:  Sorry.  I was not clear. |
| 12:50:06 18 | MS. KRAMAN:  I was, too. |
| 12:50:07 19 | THE COURT:  No, No. 23. |
| 12:50:08 20 | MR. PORADEK:  Given that -- |
| 12:50:10 21 | MS. KRAMAN:  Yes. |
| 12:50:10 22 | MR. PORADEK:  -- we would not. |
| 12:50:11 23 | THE COURT:  You would not oppose striking 23. |
| 12:50:14 24 | MR. PORADEK:  (Nodding yes.) |
| 12:50:16 25 | MR. CHERNY:  I guess since I don't know what he |

12:50:17 1    did, I defer to Your Honor.

12:50:19 2            THE COURT:  I'm going to strike 23.  I had a

12:50:25 3    little bit of concern talking to him, including him saying

12:50:30 4    he would start out in favor of the defendant and given that

12:50:33 5    plus the concerns the CSOs raised, I'm going to strike him.

12:50:38 6    No. 23 is stricken.

12:50:42 7            THE DEPUTY CLERK:  These are our last three.

12:51:04 8            (Juror enters juryroom.)

12:51:08 9            THE COURT:  Hi.  Have a seat.  Tell us your

12:51:10 10   juror number, please.

12:51:11 11           A JUROR:  11.

12:51:12 12           THE COURT:  Carlos.

12:51:15 13           A JUROR:  Charriez.

12:51:15 14           THE COURT:  Charriez.  Do you recall what you

12:51:18 15   answered "yes" to?

12:51:19 16           A JUROR:  One of the last questions about the

12:51:21 17   financial.

12:51:21 18           THE COURT:  It might be a hardship to serve?

12:51:23 19           A JUROR:  Yeah.

12:51:23 20           THE COURT:  Tell me.

12:51:24 21           A JUROR:  I'm losing out on about a little over

12:51:28 22   $200 right now.  I work for Signature Furniture.  I build

12:51:32 23   stuff like this.

12:51:33 24           THE COURT:  Okay.

12:51:33 25           A JUROR:  That we have been doing ten hour days

12:51:37  1     up in Bethlehem, and like I just said, I just lost a lot of

12:51:41  2     money being here today, not, not that I don't want to

12:51:44  3     participate because I'm more than willing to but I just

12:51:47  4     wanted to bring it to the Court's attention.

12:51:49  5              THE COURT:  Every day that you would be here,

12:51:51  6     you would lose money.

12:51:52  7              A JUROR:  Yeah, I'm losing ten hours on my

12:51:55  8     paycheck and they don't pay for me to be here.  $40 the

12:51:58  9     Court that gives me, that is nothing.  That is a gas tank.

12:52:01 10              THE COURT:  Okay.  Other issues?

12:52:04 11              A JUROR:  No, sir.

12:52:05 12              THE COURT:  Any questions?

12:52:06 13              MR. PORADEK:  No questions.

12:52:07 14              MR. CHERNY:  No questions.

12:52:08 15              THE COURT:  All right.  You can go back to the

12:52:10 16     courtroom.

12:52:10 17              A JUROR:  Thank you.

12:52:12 18              (Juror left juryroom.)

12:52:13 19              THE COURT:  I propose to strike 11 for hardship.

12:52:16 20     Any objection?

12:52:16 21              MR. PORADEK:  No objection.

12:52:17 22              MR. CHERNY:  No objection.

12:52:18 23              THE COURT:  11 is stricken.

12:52:22 24              (Juror enters juryroom.)

12:52:27 25              THE COURT:  Good afternoon.  Have a seat.

12:52:28 1                    A JUROR:  Good afternoon.

12:52:29 2                    THE COURT:  Tell us what your juror number is.

12:52:31 3                    A JUROR:  30.

12:52:32 4                    THE COURT:  Shana Moon.

12:52:34 5                    A JUROR:  Yes, that is me.

12:52:35 6                    THE COURT:  Do you recall what you answered

12:52:36 7      "yes" to?

12:52:36 8                    A JUROR:  Question 22.

12:52:38 9                    THE COURT:  Okay.

12:52:39 10                   A JUROR:  I'm a teacher, so those eight days,

12:52:43 11     there will be a lot on me.  I have to prepare lesson plans

12:52:47 12     for the classroom for the substitute, and also I have some

12:52:50 13     meetings over the next week and-a-half.

12:52:52 14                   THE COURT:  What age of grade do you work with?

12:52:55 15                   A JUROR:  I'm third grade.

12:52:55 16                   THE COURT:  Third grade.  Okay.  Is there

12:53:00 17     anything else?

12:53:00 18                   A JUROR:  That's it.

12:53:01 19                   THE COURT:  No.

12:53:02 20                   MR. PORADEK:  No questions, Your Honor.

12:53:02 21                   MR. CHERNY:  No questions.

12:53:03 22                   THE COURT:  Okay.  You can go back into the

12:53:05 23     courtroom.

12:53:06 24                   A JUROR:  Thank you so much.

12:53:10 25                   (Juror left juryroom.)

12:53:10  1          THE COURT:  I think consistent with the other

12:53:12  2  teacher, I propose to strike, Juror No.  30 for hardship.

12:53:15  3  Any objection?

12:53:16  4          MR. PORADEK:  No objection.

12:53:17  5          MR. CHERNY:  No objection.

12:53:18  6          THE COURT:  30 is stricken.

12:53:20  7          (Juror enters juryroom.)

12:53:25  8          THE COURT:  Good afternoon.  Have a seat,

12:53:26  9  please.

12:53:28 10          A JUROR:  Okay.

12:53:28 11          THE COURT:  Sorry to keep you moving around.

12:53:32 12          A JUROR:  That's all right.

12:53:33 13          THE COURT:  Do you recall your juror number?

12:53:35 14          A JUROR:  Yes.

12:53:36 15          THE COURT:  It is?

12:53:37 16          A JUROR:  46.

12:53:38 17          THE COURT:  Stephen Wilson.

12:53:40 18          A JUROR:  Um-hmm.

12:53:41 19          THE COURT:  And do you recall what you answered

12:53:42 20  "yes" to?

12:53:42 21          A JUROR:  About having hardships.

12:53:46 22          THE COURT:  Tell me about that.

12:53:47 23          A JUROR:  I just had a new hip.

12:53:48 24          THE COURT:  Okay.

12:53:49 25          A JUROR:  It's difficult to sit out there for so

12:53:51  1    long.

12:53:52  2                    THE COURT:  Okay.

12:53:52  3                    A JUROR:  I tried calling into this place but,

12:53:55  4    you know, you don't get nowhere.

12:53:57  5                    THE COURT:  Sorry about that.

12:53:58  6                    A JUROR:  And I didn't know what to do.  And I

12:54:01  7    just had it done last month.

12:54:02  8                    THE COURT:  Okay.  So there would be a better

12:54:04  9    time for you to have to sit at length here in the

12:54:07 10    courthouse?

12:54:07 11                    A JUROR:  Definitely.

12:54:08 12                    THE COURT:  All right.  Is there anything else

12:54:11 13    you wanted to share with us?

12:54:11 14                    A JUROR:  No, not really.

12:54:13 15                    THE COURT:  Okay.  All right.  Any question?

12:54:16 16                    MR. PORADEK:  No questions, Your Honor.

12:54:17 17                    MR. CHERNY:  No questions, Your Honor.

12:54:18 18                    THE COURT:  All right.  You can go back into the

12:54:22 19    courtroom.  Thank you.

12:54:23 20                    A JUROR:  Um-hmm.

12:54:29 21                    (Juror left juryroom.)

12:54:30 22                    THE COURT:  Any objection to striking 46?

12:54:31 23                    MR. PORADEK:  No objection.

12:54:32 24                    MR. CHERNY:  No objection.

12:54:32 25                    THE COURT:  Okay.  46 is stricken.

12:54:36  1              Is that it?

12:54:39  2              THE DEPUTY CLERK:  Let me just check to make

12:54:43  3      sure.

12:54:52  4              (Pause.)

12:55:13  5              THE DEPUTY CLERK:  That's it.

12:55:14  6              THE COURT:  That's everybody?

12:55:15  7              THE DEPUTY CLERK:  Yes.

12:55:16  8              THE COURT:  How about you tell us who is still

12:55:18  9      in the pool.

12:55:20  10             THE DEPUTY CLERK:  Okay.  Still in would be No.

12:55:34  11     1, 2, 3, 4, 5, 6, and 7, No. 9, 12, 13, 14, 15, 17, 19, 20,

12:55:51  12     21, 22, 24, 25, 26, 28, 29, 33, 34, 35, 39, 40, 41, 43, 44,

12:56:16  13     47, 48.

12:56:18  14             THE COURT:  Thank you.

12:56:20  15             And I have put stars due to hardship issues next

12:56:25  16     to No. 24, No. 20, No. 21, No. 35, No. 19, and No. 7.

12:56:45  17             In light of the numbers we have left, I would

12:56:48  18     propose to strike all of them due to concerns about their

12:56:51  19     schedule.

12:56:51  20             Is there any objection to that?

12:56:52  21             MR. PORADEK:  No objection, Your Honor.

12:56:54  22             THE COURT:  Any objection to that?

12:56:55  23             MR. CHERNY:  No, Your Honor.

12:56:56  24             THE COURT:  Did you catch those numbers.

12:56:57  25             THE DEPUTY CLERK:  Yes, I have them.

12:56:59  1          THE COURT:  So we'll strike them.

12:57:01  2          Any questions before we complete the jury

12:57:02  3  selection process?

12:57:04  4          MR. PORADEK:  None here.

12:57:04  5          MR. CHERNY:  No, Your Honor.

12:57:05  6          THE COURT:  We'll see you in the courtroom.

12:59:11  7          (Brief recess taken.)

12:59:11  8          *     *     *

01:03:35  9          (Proceedings reconvened after recess.)

01:03:35 10          THE COURT:  All right.  Ladies and gentlemen,

01:03:36 11  thank you very much for your patience.  I know it has been a

01:03:40 12  long process and believe or not we're in the home stretch

01:03:42 13  now.

01:03:43 14          What is going to happen is that Mr. Looby will

01:03:45 15  randomly select juror numbers for 14 of you.  If he calls

01:03:50 16  your number, please follow the directions about where to sit

01:03:53 17  in our jury box to my right.

01:03:56 18          Once we have 14 of you seated there, each side

01:03:59 19  is entitled to three peremptory challenges.  They will

01:04:04 20  exercise those challenges by silently passing a clipboard

01:04:08 21  back and forth.

01:04:09 22          Once they have done that, we'll end up with

01:04:11 23  eight of you who will be our jury.  And then you will all be

01:04:15 24  free to go.  But please bear with us particularly as we're

01:04:18 25  passing the clipboard back and forth, that will take a

01:04:22  1   little bit of time and we'll sort of have silence during

01:04:25  2   that time frame.

01:04:25  3                    All right.  Mr. Looby, if you could proceed.

01:04:31  4                    THE DEPUTY CLERK:  Juror No. 12, first seat in

01:04:43  5   the first row, please.

01:05:07  6                    Juror No. 39, second seat in the first row.

01:06:05  7                    Juror No. 48, third seat in the first row.

01:06:40  8                    THE COURT:  Is there room behind you at

01:06:43  9   plaintiff's table that the jurors can walk through to the

01:06:47 10   juror box?  Is there space?

01:06:50 11                    MS. KRAMAN:  Yes, we'll make it.

01:06:52 12                    THE COURT:  Thank you.

01:07:16 13                    THE DEPUTY CLERK:  Juror No. 40.

01:07:47 14                    Juror No. 33.

01:08:12 15                    Juror No. 41.

01:08:31 16                    Juror No. 3.

01:09:36 17                    Juror No. 29, first seat in the second row,

01:09:44 18   please.

01:09:49 19                    Juror No. 25.

01:10:46 20                    Juror No. 13.

01:10:49 21                    Juror No. 43.

01:11:56 22                    Juror No. 1.

01:12:32 23                    Juror No. 22.

01:13:03 24                    Juror No. 14.

01:13:25 25                    THE COURT:  We'll begin the peremptory striking

01:13:28  1    process.

01:13:41  2                    (Pause while clipboard is passed back and forth

01:13:55  3    between plaintiff's counsel and defendant's counsel.)

01:21:35  4                    THE COURT:  Is there any objection to the

01:21:36  5    striking process from plaintiff?

01:21:38  6                    MR. PORADEK:  No, Your Honor.

01:21:38  7                    THE COURT:  And from defendant?

01:21:39  8                    MR. CHERNY:  No, Your Honor.

01:21:39  9                    THE COURT:  Okay.

01:21:42 10                    THE DEPUTY CLERK:  Will the following jurors

01:21:44 11    return to the back of the courtroom.

01:21:44 12                    Juror No. 12.

01:21:49 13                    Juror No. 48.

01:21:52 14                    Juror No. 33.

01:22:01 15                    Juror No. 41.

01:22:10 16                    Juror No. 22.  And,

01:22:26 17                    Juror No. 14.

01:22:30 18                    (Remaining selected jurors reassembled into the

01:22:40 19    jury box.)

01:22:52 20                    THE COURT:  Thank you, Mr. Looby.

01:22:53 21                    All right.  Ladies and gentlemen of the jury, if

01:22:56 22    you could sit tight for just a few minutes more.  The rest

01:22:58 23    of you who are not in the jury box, you are excused with my

01:23:02 24    thanks for your patience and your willingness to do the

01:23:04 25    important service of serving on a jury, but you have now

01:23:08  1    completed your duty and you are free to go.

01:23:13  2                    (Unselected jurors left courtroom.)

01:23:37  3                    THE COURT:  All right.  So the eight of you who

01:23:38  4    are in the box, we just need you for a few more minutes

01:23:42  5    today before I give you some instructions about what is

01:23:44  6    going to.

01:23:45  7                    The first thing we have is another oath for you

01:23:48  8    to take.

01:23:49  9                    So, Mr. Looby, if you would administer the oath.

01:23:53 10                    (Selected jurors placed under oath.)

01:24:15 11                    THE COURT:  Thank you.

01:24:19 12                    All right.  Ladies and gentlemen, so as you

01:24:23 13    may have heard me say earlier, the trial begins tomorrow

01:24:27 14    morning.  We will begin at 9:00 o'clock tomorrow morning, so

01:24:32 15    in just a few minutes we'll let you go for today.

01:24:36 16                    All that remains for today is for you basically

01:24:39 17    to follow Mr. Looby in a moment through the doors back to

01:24:42 18    the juryroom.  I saw most or all of you in the juryroom

01:24:46 19    earlier today but he will show you how to get there and

01:24:50 20    talk to you about how to get back in and out of chambers

01:24:54 21    tomorrow.

01:24:55 22                    But the main thing is to plan to be back here

01:24:59 23    tomorrow a little bit before 9:00 because we're able to

01:25:03 24    order lunch for you each day of trial so you will need to

01:25:07 25    leave yourself a few minutes to review the menus we have for

01:25:11  1    you so you can place your order and then we can begin at

01:25:14  2    9:00 o'clock.

01:25:15  3          We will go until 3:00 o'clock tomorrow.  I'll

01:25:19  4    go over the full schedule with you tomorrow during my

01:25:22  5    instruction to you but most days we'll be here from 9:00

01:25:26  6    until 4:30.  Other than when you deliberate, we won't be

01:25:30  7    here later than 4:30.  And we won't be here later than 4:30

01:25:35  8    even when you deliberate unless you decide you want to stay

01:25:37  9    later than 4:30.  Some days we will end earlier than 4:30

01:25:42 10    and I will tell you my schedule again tomorrow but the main

01:25:45 11    thing is tomorrow, you are here from 9:00 until 3:00

01:25:48 12    o'clock.

01:25:48 13          You are not to do, during the course of your

01:25:52 14    service, any research about this case or the parties or the

01:25:55 15    lawyers involved in it.  If there happens to be any

01:26:00 16    newspaper stories or other media coverage of the case, you

01:26:03 17    are not to read it or listen to it.  And I'll have more to

01:26:07 18    say about it tomorrow.

01:26:08 19          The last thing or two last things, sorry, for

01:26:12 20    tonight.  You all have these juror stickers.  You will be

01:26:15 21    given those stickers or possibly a lanyard with something

01:26:18 22    that says "juror" on it everyday.  It's important that you

01:26:23 23    do wear those when you are in and around the courthouse so

01:26:25 24    we all can know who are jurors on the case because we are

01:26:30 25    not to talk to you about anything.  Okay?  And this helps

01:26:33 1    you know who you are.

01:26:34 2                And the last thing, with my apologies, is I am

01:26:38 3    not in charge of temperature control in this room and

01:26:42 4    sometimes as you may have experienced already today, I don't

01:26:45 5    know, it can be too hot and too cold over the course of the

01:26:48 6    day.  The only strategy I can suggest is to have layers and

01:26:53 7    you should feel free at all times to add or remove layers as

01:26:57 8    necessary.

01:26:59 9                So with that, we will excuse you to the juryroom

01:27:03 10   for just a few minutes.

01:27:04 11               Mr. Looby will go over some further details with

01:27:07 12   you.  We'll see you all here tomorrow a little bit before

01:27:09 13   9:00 o'clock.  Thank you very much.  And have a good night.

01:27:12 14               (Jury left courtroom.)

01:27:35 15               THE COURT:  All right.  Have a seat just for a

01:27:37 16   moment.

01:27:37 17               So you all should be here at 8:30 tomorrow, and

01:27:40 18   we'll take up any issues that we need to take up.  I plan to

01:27:45 19   start with the jury with the preliminary instructions and

01:27:48 20   the video, and then obviously we will move to the openings,

01:27:51 21   and I'm here until 3:00 tomorrow.

01:27:54 22               I know I have the deposition issue still to

01:27:57 23   resolve for you.  I'll do that by the time we get started

01:28:01 24   tomorrow morning.  Do you anticipate having more deposition

01:28:06 25   issues today or other things coming in before I see you

01:28:11 1 tomorrow?  Do you know?

01:28:14 2     MR. PORADEK:  You might, Ms. Kraman?

01:28:19 3     MS. KRAMAN:  We're working out some things.  I

01:28:21 4 don't know if there are letters that will be filed today.  I

01:28:23 5 don't know if we'll have anything for tomorrow.  I'm not

01:28:24 6 sure.

01:28:25 7     THE COURT:  All right.  Anything that you

01:28:26 8 anticipate from defendant's side coming in.

01:28:29 9     MS. HOLLIS:  Our understanding is the same.

01:28:30 10 There may be some issues but we need to see.

01:28:34 11     THE COURT:  Okay.  Thank you.  Is there anything

01:28:36 12 else before we break for the day?

01:28:43 13     MR. CHERNY:  I just raised with Mr. Poradek that

01:28:44 14 I guess our exchange deadline for opening slides is 4:00

01:28:48 15 o'clock, and I assume we could work it out between us some

01:28:52 16 time, given the time we spent picking the jury.  And I

01:28:56 17 assume that would be okay with the Court.

01:28:58 18     THE COURT:  If you can agree with something,

01:29:00 19 that would be okay with me.  It seems like something you

01:29:02 20 could agree on.

01:29:03 21     MR. PORADEK:  Yes.

01:29:03 22     MR. CHERNY:  Yes.

01:29:04 23     MR. PORADEK:  I'm sure we will.  We wanted to

01:29:06 24 make sure it was okay with Your Honor.

01:29:08 25     THE COURT:  That's fine.  Is there anything

01:29:09 1    else?

01:29:09 2                MR. CHERNY:  We are implementing your order

01:29:11 3    before about the stipulation.

01:29:12 4                THE COURT:  Right.

01:29:12 5                MR. CHERNY:  I will try to get it over to you,

01:29:15 6    get it to the other side, so it can be entered before the

01:29:17 7    opening.

01:29:18 8                THE COURT:  Right.  And I think you can submit

01:29:20 9    something that looks like what you did with the other ones

01:29:24 10   for me to sign and enter.

01:29:25 11               MR. CHERNY:  Correct.

01:29:25 12               THE COURT:  In terms of what we're actually

01:29:27 13   going to give the jury, I guess we haven't really talked

01:29:32 14   about at what point you may want me to read those and what

01:29:36 15   the jury will actually see in the juryroom.  There might be,

01:29:41 16   I don't know, there might be language such as, you know,

01:29:44 17   the header and the signature block that maybe you don't want

01:29:47 18   in what the jury sees, but work on that and I guess come

01:29:51 19   prepared tomorrow morning to tell me what you propose I do.

01:29:54 20   But in the meantime, I will sign what you submit as long as

01:29:57 21   it is consistent with what I ordered.

01:30:01 22               Is there anything else?

01:30:01 23               MR. PORADEK:  Nothing else, Your Honor.

01:30:02 24               MR. CHERNY:  Nothing else, Your Honor.

01:30:03 25               THE COURT:  All right.  We will see you tomorrow

01:30:05  1     morning.

01:30:18  2                    (Proceedings adjourn at 1:30 p.m.)

01:30:39  3

01:30:39  4         I hereby certify the foregoing is a true and accurate
         transcript from my stenographic notes in the proceeding.

         5

         6                         /s/ Brian P. Gaffigan
                                  Official Court Reporter
         7                         U.S. District Court

         8

         9

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25