```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -
     W.L. GORE & ASSOCIATES, INC.,          :    CIVIL ACTION
 4                                          :
               Plaintiff,                   :
 5   v                                      :
                                            :
 6   C.R. BARD, INC. and BARD PERIPHERAL    :
     VASCULAR, INC.,                        :
 7                                          :    NO. 11-515-LPS
               Defendants.
 8                              - - -

 9                       Wilmington, Delaware
                       Wednesday, March 1, 2017
10                            Volume B

11                              - - -

12   BEFORE:  HONORABLE LEONARD P. STARK, Chief Judge, and a jury

13   APPEARANCES:              - - -

14
                 YOUNG CONAWAY STARGATT & TAYLOR, LLC
15               BY:  ADAM W. POFF, ESQ., and
                      PILAR G. KRAMAN, ESQ.
16
                      and
17
                 FAEGRE BAKER DANIELS, LLP
18               BY:  JAMES W. PORADEK, ESQ.,
                      CHAD DROWN, ESQ.,
19                    KEVIN P. WAGNER, ESQ.,
                      ELIZABETH COWAN WRIGHT, ESQ.,
20                    DAVID MERRITT, ESQ.,
                      KATHERINE S. RAZAVI, ESQ.,
21                    LAUREN J. FRANK, ESQ.,
                      TIMOTHY M. SULLIVAN, ESQ., and
22                    PATRICK C. BOTTINI, ESQ.
                      (Minneapolis, Minnesota)
23
                         Counsel for W.L. Gore & Associates, Inc.
24

25   Kevin Maurer                     Brian P. Gaffigan
     Official Court Reporter          Registered Merit Reporter
```

1    APPEARANCES:   (Continued)

2

3               MORRIS NICHOLS ARSHT & TUNNELL, LLP
               BY:   JACK B. BLUMENFELD, ESQ., and
                    MICHAEL J. FLYNN, ESQ.

4

5                    and

6               KIRKLAND & ELLIS, LLP
               BY:   STEVEN CHERNY, ESQ., and
                    JEREMY WILSON, ESQ.

7                    (New York, New York)

8                    and

9               KIRKLAND & ELLIS, LLP
               BY:   EDWARD C. DONOVAN, ESQ.,
10                  CHARLES C. FERNANDEZ, ESQ.
                  KATHARINE M. BURKE, ESQ.
11                  MICHAEL A. PEARSON, ESQ., and
                  JASON M. WILCOX, ESQ.
12                  (Washington, District of Columbia)

13                  and

14              KIRKLAND & ELLIS, LLP
              BY:   AMANDA J. HOLLIS, ESQ., and
15                 DENNIS J. ABDELNOUR, ESQ.
                 (Chicago, Illinois)
16

17                 and

18          WOLF, GREENFIELD & SACKS, P.C.
             BY:   JOHN L. STRAND, ESQ.
                (Boston, Massachusetts)
19

20                 Counsel for C.R. Bard, Inc. and
                 Bard Peripheral Vascular, Inc.

21

22

23

24

25

1                          - oOo -

2                    P R O C E E D I N G S

3              (REPORTER'S NOTE:  The following trial was held

08:14:31  4    in open court, beginning at 8:34 a.m.)

08:14:39  5              THE COURT:  Good morning, everyone.

08:34:57  6              (The attorneys respond, "good morning, Your

08:34:58  7    Honor.")

08:34:58  8              THE COURT:  I have a few issues this morning

08:35:01  9    and I'll have Mr. Looby start the clock and split the time

08:35:04 10    equally for the things I have to say which are principally

08:35:07 11    rulings on your deposition issues, but if you have

08:35:10 12    housekeeping matters as well.

08:35:14 13              I had Mr. Looby hand you a couple copies of the

08:35:17 14    trial schedule.  I realize that I had not included that in

08:35:21 15    the preliminary instructions and the jury will be very

08:35:23 16    interested in that, so when I hand them and read the

08:35:27 17    preliminary instructions this morning, I will also hand them

08:35:31 18    this trial schedule.

08:35:34 19              All right.  In terms of the rulings, first, we

08:35:40 20    have the letter of February 27th.  Witness Bushmire.  There

08:35:48 21    are Bard's objections to Gore designations.

08:35:52 22              Bard's objections are sustained since the

08:35:56 23    spreadsheet included in the Exhibit PTX-21 was not used in

08:36:02 24    the deposition.  Therefore, the document was not shown to a

08:36:05 25    witness as is required for admission under the pretrial

08:36:08  1   order.

08:36:09  2                    With respect to witness Rosseck, it's Bard's

08:36:13  3   objection.

08:36:17  4                    Bard's objection is overruled since the

08:36:19  5   testimony has some relevance and is appropriate for

08:36:22  6   completeness.

08:36:23  7                    Then we received two letters yesterday, February

08:36:25  8   28th.

08:36:27  9                    First, we have Ms. Kramer's letter first and

08:36:31  10  that relates to witness Doherty.  There are Bard objections

08:36:37  11  to Gore's designations.

08:36:39  12                   Bard's objections are overruled since the

08:36:41  13  testimony is relevant at least to the second area of

08:36:45  14  consideration of nonobviousness of copying.  So it is

08:36:48  15  appropriate for Gore's rebuttal case in Phase I of the

08:36:51  16  trial.

08:36:52  17                   Then we have Mr. Blumenfeld's letter of

08:36:54  18  yesterday, February 28th with respect to witness House.

08:37:00  19  There are Bard objections to Gore counterdesignations.

08:37:05  20                   Bard's objections are overruled.  The

08:37:08  21  counterdesignations are meant to counter the testimony

08:37:10  22  designated by Bard regarding claim of novelty and are not

08:37:16  23  otherwise inappropriate.

08:37:18  24                   With respect to witness Lewis, there is first

08:37:21  25  Bard objections to Gore counterdesignations.

08:37:25  1          Bard's objections are overruled.  The

08:37:27  2    testimony about thickness of less than a 10th of a

08:37:31  3    millimeter being a characteristic of an ideal stent graft

08:37:35  4    comes about in the discussion of Myer's lab notebook,

08:37:38  5    listed this as a characteristic being one of the seven

08:37:43  6    characteristics of an ideal stent graft.  It is appropriate

08:37:46  7    as a counterdesignation and is not in any other respect

08:37:49  8    inappropriate.  And then,

08:37:51  9          Finally, with respect to the same witness,

08:37:53 10    Lewis, there are Gore objections to Bard's designations.

08:37:58 11          Gore's objections are overruled.  The 402 and

08:38:02 12    403 objections are not explained, and I cannot myself

08:38:05 13    discern the merit of them.  And the hearsay objection lacks

08:38:09 14    merit as no out-of-court statement being offered for the

08:38:12 15    truth.  Instead, Lewis is testifying about his knowledge

08:38:16 16    that these conversations occurred.

08:38:18 17          So that is my ruling with respect to I believe

08:38:20 18    all of the deposition issues that are in front of me.

08:38:24 19          A couple of other things.

08:38:26 20          The glossary is included in the preliminary

08:38:30 21    instructions.  Did you all intend for me to read the

08:38:32 22    glossary to the jury?  Do plaintiffs have a view on that?

08:38:37 23          MS. KRAMAN:  I think the intention was it was

08:38:39 24    just going to be in the juror notebooks.

08:38:41 25          THE COURT:  Okay.

08:38:41  1                    MR. BLUMENFELD:  And we agree with that, Your

08:38:43  2      Honor.  They have it.  You don't need to read it to them.

08:38:46  3                    THE COURT:  I think they have it in the

08:38:47  4      preliminary instructions as well as in the notebook but I

08:38:49  5      will not read it.

08:38:51  6                    The stipulations, have you all talked about when

08:38:56  7      you want to either yourself read them or have me read them

08:38:59  8      or how would you like to proceed with that?

08:39:02  9                    MS. KRAMAN:  It's Gore's view that counsel will

08:39:05 10      read them when they want to admit them into evidence.  And

08:39:09 11      we were discussing, I think we discussed how to, how to, you

08:39:17 12      know, present them to the jury like an exhibit.  It would be

08:39:20 13      presented.  I think we're still working that out.  I don't

08:39:23 14      know, I don't imagine there will be a dispute about it, but

08:39:26 15      I think the intention was that we would read in when we want

08:39:28 16      to admit our stipulation.

08:39:30 17                    THE COURT:  Mr. Cherney.

08:39:31 18                    MR. CHERNY:  That's fine, Your Honor.

08:39:33 19                    THE COURT:  All right.  I trust you will work

08:39:34 20      that out.

08:39:35 21                    MR. CHERNY:  We will.

08:39:35 22                    THE COURT:  If you need me to help you, let me

08:39:37 23      know.

08:39:39 24                    All right.  That was all of my issues.  Any

08:39:42 25      issues from the plaintiffs at this point?

08:39:45  1                    MR. WAGNER:  We do have issues with respect to

08:39:47  2        two slides in Bard's opening.  Is now the time you would

08:39:50  3        like to hear them?

08:39:52  4                    THE COURT:  Now would be the time.

08:39:56  5                    MR. WAGNER:  So with respect to Bard's slides 60

08:40:01  6        and 61, Your Honor, what we see that they're doing here is

08:40:05  7        referring to plaintiff's supplemental infringement

08:40:08  8        contentions.  And there is a couple of issues with that.

08:40:15  9                    One is that this is from the Nomadix case.

08:40:21 10                    The contentions, however, are not themselves

08:40:24 11        evidence.  They're written by attorneys, and not based on

08:40:27 12        personal knowledge or signed under penalty of perjury.

08:40:30 13        These are documents from this litigation from before the

08:40:32 14        claim construction, during the claim construction process,

08:40:35 15        where the parties were working out claim construction

08:40:38 16        issues.

08:40:41 17                    So these are statements by lawyers, not

08:40:42 18        evidence, and it appears that Bard is trying to use this

08:40:45 19        sort of in litigation back and forth which Your Honor said

08:40:50 20        is not appropriate for trial to argue against the testing of

08:40:54 21        our expert rather than get into the merits of testing.

08:40:58 22                    So that is problematic because these things are

08:41:01 23        generally not evidence.  Also problematic, it puts a big red

08:41:05 24        flag on the claim construction issue which we highlighted to

08:41:08 25        Your Honor in our Motion in Limine No. 6 which relates to

08:41:12  1      the final constructions.

08:41:13  2              And just to put a finer point on it.  This is

08:41:15  3      from Bard's response brief on claim construction where they

08:41:19  4      specifically argued that the claims are not limited to a

08:41:21  5      measurement by a snap gauge.  So now they have these slides

08:41:25  6      where they're relying on pre-claim construction contentions.

08:41:28  7      They actually have about 25 slides on snap gauge in general

08:41:32  8      which just puts a big red flag on this issue for us, Your

08:41:36  9      Honor.  It appears that rather than trying to actually deal

08:41:38 10      with the merits of the testing, they're going to be arguing

08:41:41 11      throughout this case and presumably this morning that our

08:41:46 12      expert Dr. Gorman needed to use snap gauge; and, you know,

08:41:50 13      as we said in our motion in limine, we think at some point

08:41:53 14      that might be the issue where we need some sort of specific

08:41:57 15      claim construction if the claims are not limited to snap

08:42:00 16      gauge, but at minimum it raises the issue of how do we deal

08:42:02 17      with this where we have this back and forth process where

08:42:05 18      this is Bard's position in this case.

08:42:07 19              The parties ultimately agreed to this, and then

08:42:09 20      Your Honor made claim construction rulings holding that the

08:42:11 21      claims are not limited to snap gauge.  So we don't think it

08:42:13 22      is appropriate for them to go back to pre-construction

08:42:17 23      infringement contentions and contend that our expert needed

08:42:20 24      to use the snap gauge because we think that is problematic

08:42:24 25      for those reasons.

08:42:25  1            THE COURT:  What do you mean that Motion in

08:42:27  2   Limine No. 6 is still pending?

08:42:28  3            MR. WAGNER:  I think you said at the end of the

08:42:30  4   motion that with respect to what the specific instructions

08:42:33  5   would be that we deal with that in jury instructions.

08:42:35  6            THE COURT:  Okay.  That doesn't mean the motion

08:42:38  7   is pending, that means we haven't decided jury instructions.

08:42:40  8            MR. WAGNER:  Fair enough.

08:42:41  9            THE COURT:  Okay.  Is there anything else?

08:42:43 10            MR. WAGNER:  That's it.

08:42:43 11            THE COURT:  Okay.

08:43:10 12            MR. CHERNY:  Your Honor, may I?

08:43:12 13            THE COURT:  Yes.

08:43:13 14            MR. CHERNY:  Okay.  First of all, my

08:43:18 15   understanding was I think there was a ruling where I believe

08:43:20 16   you had ruled that there was no ambiguity with regard to

08:43:24 17   claim construction, I believe, during the pretrial

08:43:26 18   conference.  I don't think this is really an outstanding

08:43:28 19   issue.  We are not arguing that the claims require snap

08:43:32 20   gauge.  You heard that over and over.

08:43:34 21            That doesn't change the fact that we are arguing

08:43:37 22   that when it comes to methodologies -- and this actually

08:43:39 23   came up in the Daubert process, we believe that Dr. Gorman

08:43:43 24   used a, at best, a not credible methodology of measuring.

08:43:51 25            The patent sets out the snap gauge as a method.

08:43:53 1  Our expert used a snap gauge and microscope to measure the

08:43:58 2  thickness.  We are not arguing that the claim requires snap

08:44:02 3  gauge.  We are perfectly happy to leave the claim

08:44:04 4  construction as requiring a combined average thickness and

08:44:08 5  the experts can both testify as to how they did it and the

08:44:11 6  jury can weigh whether doing it Dr. Gorman's way or the way

08:44:14 7  our expert did is more credible.

08:44:17 8          As for this, it is not just their -- this was

08:44:23 9  their sworn interrogatory response from December 2013, which

08:44:36 10 incorporates their infringement contention by reference.  It

08:44:38 11 is a sworn statement of Gore.  In there they say that, Gore

08:44:43 12 contends that when measured by snap gauge the combined

08:44:47 13 thickness of the first and second tubular coverings is less

08:44:51 14 than .1.  Then ended up deciding not to do that.

08:44:54 15         This has nothing to do with claim construction

08:44:57 16 and what they were required to do.  Obviously, there is an

08:44:59 17 inference there, it turns out they made that contention, we

08:45:03 18 believe that is not true.  Essentially, our guy is going to

08:45:07 19 testify that when measured by snap gauge it doesn't come out

08:45:07 20 there.

08:45:09 21         But Gore actually affirmatively said, not as a

08:45:09 22 claim construction issue but as a factual issue, that is a

08:45:12 23 factual issue, there is nothing legal about a contention

08:45:15 24 that when measured by snap gauge the combined thickness of

08:45:18 25 the first and second tubular coverings is less than .1.  We

08:45:23  1    disagree with that.  We think the fact that when they made

08:45:25  2    the contention and chose not to use the snap gauge --

08:45:28  3    actually, when you use the snap gauge, which is the

08:45:30  4    methodology of the patent, you get above .1.

08:45:32  5            THE COURT:  You intend to use it simply to

08:45:35  6    undermine the credibility of any contention on their part or

08:45:38  7    their expert that you don't need to use snap gauge or it's

08:45:43  8    inappropriate or it's not the best way to measure, for

08:45:46  9    instance?

08:45:46 10            MR. CHERNY:  Correct.  On the other hand, that

08:45:48 11    the methodology that was chosen -- by the way, Dr. Gorman,

08:45:51 12    who may very well testify today, Dr. Gorman actually had a

08:45:54 13    snap gauge and made a choice not to use the snap gauge.

08:45:56 14            From our perspective -- and he made that choice

08:45:58 15    a few months after this statement -- from our perspective

08:46:02 16    that is powerful evidence for the jury to consider, that

08:46:05 17    when using the methodology disclosed in the patent, they may

08:46:07 18    very well have determined that it wasn't favorable for them

08:46:10 19    and they chose the methodology that was untested.

08:46:13 20            This has nothing to do with claim construction.

08:46:14 21            THE COURT:  So this is in their contentions,

08:46:19 22    which are then adopted in an interrogatory response?

08:46:22 23            MR. CHERNY:  Correct.  There is the

08:46:24 24    incorporation (indicating).

08:46:25 25            THE COURT:  Do we need to even get into

08:46:27  1    contentions as opposed to interrogatory response?  Couldn't

08:46:30  2    you simply just show the jury their interrogatory response?

08:46:34  3         MR. CHERNY:  They didn't actually use the words

08:46:37  4    in the interrogatory response.  All they did was said

08:46:40  5    incorporates by reference plaintiff's supplemental

08:46:43  6    interrogatory.  We have no way to do it other than that

08:46:46  7    because they have that one line only.

08:46:48  8         THE COURT:  The words are the contention that

08:46:49  9    are being adopted by reference here.

08:46:51 10         MR. CHERNY:  Correct.  I mean, I have no choice

08:46:55 11    other than, this is the language they used when they said

08:46:58 12    Gore incorporates by reference, I assume -- plaintiff's

08:47:02 13    supplemental infringement contentions served December 6,

08:47:05 14    2013 together with all supplements thereto.  That is why we

08:47:10 15    actually used the interrogatory response, because this is

08:47:13 16    Gore's sworn statement.

08:47:15 17         As long as I get to say Gore adopted that

08:47:17 18    position -- I am not trying to make this about -- I am just

08:47:21 19    constrained by the way the documents were created.

08:47:24 20         THE COURT:  Okay.  Anything else?

08:47:26 21         MR. CHERNY:  No, thank you.

08:47:28 22         THE COURT:  Any response?

08:47:29 23         MR. WAGNER:  Nothing in addition, Your Honor.

08:47:31 24         THE COURT:  Okay.

08:47:34 25         I am going to overrule the objection.  I think

08:47:38  1    the uses that the defendants indicate they want to use this

08:47:42  2    for are not inconsistent with claim construction and are

08:47:46  3    appropriate.  They are really not trying to put contentions

08:47:52  4    in front of the jury.  They are trying to put an

08:47:55  5    interrogatory response in front of the jury, which I think

08:47:57  6    is appropriate under the circumstances.

08:47:59  7            It just so happens the only way to do that,

08:48:02  8    given the nature of the documents, is to make reference to

08:48:05  9    the contentions.

08:48:07 10            So I will overrule the objection.

08:48:09 11            Any other issues from plaintiffs?

08:48:18 12            MR. DROWN:  Good morning, Your Honor.  Chad

08:48:19 13    Drown.

08:48:19 14            Two quick issues.  We are going to be playing

08:48:24 15    deposition video clips today during trial.  Two kind of

08:48:28 16    housekeeping issues that we wanted to bring to your

08:48:31 17    attention and ask your permission to do.

08:48:34 18            We thought it would be appropriate to, actually,

08:48:36 19    when the depositions are going, to have a board, if you

08:48:40 20    will, to cross-reference the witnesses, the witnesses will

08:48:44 21    sometimes talk about a deposition exhibit number, and just

08:48:46 22    show what trial exhibit number that is shown.  It would just

08:48:51 23    be very simple, something along the lines of this, Your

08:48:55 24    Honor, for example --

08:48:58 25            THE COURT:  Where do you propose to display

08:49:01 1 that?  Not on the screen?

08:49:04 2     MR. DROWN:  No.  We could put it here.  We could

08:49:07 3 put it in front of the witness box.  Wherever Your Honor

08:49:11 4 thinks it would be appropriate.  Just to help the

08:49:12 5 cross-reference.

08:49:13 6     THE COURT:  Is this a joint request?

08:49:16 7     MR. DROWN:  We have proposed it to them.  They

08:49:19 8 may be amenable to it.  But they indicated they may have

08:49:22 9 potential issues with it.  Right now it is my understanding,

08:49:25 10 given Your Honor's rulings that all the exhibits now kind of

08:49:28 11 are decided, so we know what exhibits would be coming in

08:49:33 12 with each deponent, that shouldn't be an issue anymore, it

08:49:37 13 would be a basic thing to help the jury.

08:49:40 14     THE COURT:  Is there any answer to that?

08:49:43 15     MR. BLUMENFELD:  Your Honor, I think we will

08:49:45 16 agree to this.  For example, the Bushmire exhibit that Your

08:49:49 17 Honor excluded we will have to take up.  If it is accurate,

08:49:52 18 I don't think we have a problem helping the jury trying to

08:49:54 19 collate exhibits.

08:49:56 20     THE COURT:  Okay.  Then assuming it's accurate,

08:49:59 21 which I am sure it tends to be, you can do it.  I guess

08:50:05 22 during a break you will have to figure out where it looks

08:50:08 23 like it's best to place it.

08:50:10 24     MR. DROWN:  Thank you, Your Honor.

08:50:12 25     The second thing is, when the witness is called

08:50:18  1    by deposition, with Your Honor's permission, the practice

08:50:23  2    would be to introduce them by name and title, and not

08:50:30  3    provide any further commentary, but just, This is a video

08:50:33  4    clip of this person and this is their title, then off they

08:50:39  5    go.

08:50:39  6              THE COURT:  I assume there is no objection to

08:50:41  7    that.

08:50:41  8              MR. BLUMENFELD:  That is fine, Your Honor.

08:50:45  9              MR. DROWN:  Thank you, Your Honor.

08:50:46 10              THE COURT:  Plaintiffs, anything else?

08:50:48 11              MR. WAGNER:  One additional, Your Honor.

08:50:51 12              It relates to the inventorship case, David

08:50:53 13    Myers.  He will be a witness in this case.  He recently tore

08:50:56 14    his rotator cuff in his shoulder.  He is in some pain right

08:50:59 15    now.  He is here right now willing to testify, not under

08:51:02 16    pain medication where he can't.  But he is scheduled to have

08:51:04 17    surgery on Monday.  We expect him to testify likely

08:51:08 18    tomorrow.  And we would ask Bard's accommodation to allow

08:51:10 19    him to complete his testimony when he is on the stand.

08:51:13 20              I think there is two issues that are related to

08:51:15 21    that that are unresolved.  One relates to the allegation

08:51:18 22    from Bard that he used some concepts from these other

08:51:23 23    doctors, Dr. Lee and Dr. Vallbracht, in his invention.

08:51:26 24              We want him to be able to say when he is up on

08:51:29 25    the stand that he doesn't think that he did that, that is

08:51:32  1    not something that he would have done.

08:51:35  2          It is roughly five minutes of testimony.  It

08:51:37  3    would be right at the point of our case in the transition

08:51:40  4    from infringement to validity in Bard's case.

08:51:43  5          The second issue relates to the lab notebook of

08:51:46  6    Dr. G. Ray Martin, that is a document in the case, it is an

08:51:49  7    exhibit.  It contains prototypes that Mr. Myers created.

08:51:53  8    And we would like to be able to show that to the witness and

08:51:57  9    have him look at those prototypes and identify them as his.

08:52:01 10          Bard has objected to that.  I am not sure if

08:52:03 11    that objection is just a general objection or they are

08:52:07 12    objecting to doing that in this space.

08:52:10 13          Regardless, given Mr. Myers's condition, we

08:52:12 14    would like to make him comfortable, if he is required to, we

08:52:15 15    would like to do his testimony all at once the first time

08:52:17 16    rather than waiting for him next week to come back for a few

08:52:21 17    minutes.

08:52:21 18          THE COURT:  The second set of testimony you

08:52:24 19    estimate being also just a few minutes.

08:52:27 20          MR. WAGNER:  Yes, Your Honor.

08:52:29 21          THE COURT:  Let me hear your response.

08:52:30 22          MR. BLUMENFELD:  Thank you, Your Honor.  We

08:52:33 23    certainly want to be accommodating to Mr. Myers and

08:52:36 24    understand the physical issue and don't want to make him

08:52:38 25    come back a second time for a few minutes of testimony.

08:52:41  1           The way I understand this is going to happen is,

08:52:44  2   from the exhibits they designated, he is going to get on the

08:52:49  3   stand, talk about his patent, talk about his lab notebook.

08:52:52  4   Then they have designated Dr. Martin's lab notebook.

08:52:55  5           That is kind of a hot issue for us.  He and Dr.

08:52:59  6   Martin didn't work together.  They both worked for Gore.

08:53:04  7   They worked at separate facilities.  I don't know how he can

08:53:07  8   identify Dr. Martin's notebook.  If what they want to do is

08:53:11  9   take prototypes that are in Dr. Martin's notebook out and

08:53:16 10   show them to Mr. Myers and say, are these your prototypes,

08:53:21 11   do you recognize them, are these what you made, for a few

08:53:24 12   minutes, I don't think we want to make him come back to do

08:53:28 13   that.

08:53:28 14           Our concern is -- we have never seen those

08:53:31 15   prototypes, by the way, Your Honor.  I would ask Mr. Wagner

08:53:35 16   to make them available for us to inspect.

08:53:38 17           But the way they want to do it, apparently, is

08:53:42 18   by having him get on the stand with Dr. Martin's lab

08:53:48 19   notebook in their case-in-chief on infringement and say,

08:53:52 20   these prototypes were in Dr. Martin's lab notebook.

08:53:56 21           That goes to, in our view, the copying issue.  I

08:53:59 22   don't think he ought to be able to do that.  I don't think

08:54:01 23   he has a foundation to do that.  But we can work this out so

08:54:05 24   that he just gets on the stand and is shown the prototypes

08:54:08 25   and says, These are the prototypes I made in the early

08:54:11 1    1990s, I recognize them, they are mine.  That is fine.

08:54:16 2           It is the, "Here's Dr. Martin's notebooks and my

08:54:20 3    prototypes are in his notebook," we object to that.  We

08:54:23 4    object to them doing that in their case-in-chief on

08:54:27 5    infringement.

08:54:27 6           We will object to them doing that even in

08:54:30 7    rebuttal, because we think he doesn't have any foundation to

08:54:33 8    do that.

08:54:34 9           He said the last time he saw the prototypes was

08:54:37 10   when they were in his notebook many, many years ago.

08:54:42 11          THE COURT:  Is there any chance we are getting

08:54:46 12   to their case on copying before the end of the day Friday?

08:54:52 13          MR. BLUMENFELD:  I don't really see that

08:54:54 14   happening, because it looks like they are going to be in

08:54:58 15   their case-in-chief, it looks like through Thursday.  We

08:55:05 16   won't start putting our case on until Friday.

08:55:08 17          THE COURT:  All right.  Thank you.

08:55:09 18          Any response, Mr. Wagner?

08:55:13 19          MR. WAGNER:  Just with respect to the

08:55:14 20   prototypes, Your Honor, we don't think it is appropriate to

08:55:16 21   alter the document.  This lab notebook is a document that

08:55:18 22   has the prototype statements into it.  We think we can't

08:55:21 23   alter the documents.

08:55:23 24          THE COURT:  Is this the only witness that you

08:55:25 25   can do this through?

08:55:25  1          MR. WAGNER:  They are his prototypes, so I think

08:55:28  2     it is appropriate for him to look at them and testify

08:55:30  3     whether he recognizes them as his work product.

08:55:35  4          Dr. Vonesh is another witness who is a person

08:55:37  5     familiar with the lab notebook and will also testify about

08:55:40  6     it.

08:55:41  7          THE COURT:  All right.  Well, I don't have a

08:55:44  8     definitive answer for you.  You are going to have to work on

08:55:47  9     this and see if you can work it out.  I certainly don't want

08:55:49 10     to make him come back or make him move his surgery.  But I

08:55:55 11     don't think that the burden of all that should fall on all

08:55:57 12     the careful lines we have drawn about the Martin issue.

08:56:03 13          If he is not available next week, it may be that

08:56:07 14     you are going to have to sacrifice some of the evidence that

08:56:11 15     you otherwise might be able to get in.  Maybe there is

08:56:14 16     another way to do it.  I don't know at this point.

08:56:16 17          MR. WAGNER:  To be clear, we do view these

08:56:18 18     prototypes as part of the invention story.  Your Honor ruled

08:56:20 19     last week that there is clearly overlap with this Dr. Martin

08:56:24 20     issue between infringement and validity.  Clearly every

08:56:28 21     infringement case, nearly every case, the inventor testifies

08:56:31 22     about the invention.

08:56:32 23          THE COURT:  You are going to have to meet and

08:56:34 24     confer on this.  If I understand it correctly, he is not

08:56:37 25     testifying today.

08:56:38  1          MR. WAGNER:  That's right.  It would be

08:56:39  2  tomorrow.

08:56:39  3          THE COURT:  We will have another chance to

08:56:41  4  discuss it to the extent you remain in dispute about it.

08:56:46  5          MR. WAGNER:  Thank you, Your Honor.

08:56:47  6          THE COURT:  Anything else from plaintiffs that

08:56:48  7  pertains to today?

08:56:49  8          MR. WAGNER:  Nothing, Your Honor.

08:56:50  9          THE COURT:  From defendants, anything that

08:56:52 10  pertains to today?

08:56:54 11          MR. CHERNY:  Apparently, the answer was

08:56:58 12  premature.  Apparently we have objections to Dr. Gorman's

08:57:03 13  exhibits.  Mr. Wilcox is going to argue this.  I apparently

08:57:08 14  don't know what I am talking about.

08:56:43 15          THE COURT:  All right.

08:56:44 16          MR. WILCOX:  Good morning, Your Honor.  Jason

08:56:45 17  Wilcox on behalf of Bard.  So we just have two exhibits that

08:56:49 18  Gore, two Exhibits that Gore intends to use during the

08:56:52 19  testimony of Dr. Gorman and Mr. Randall.  It's PTX-530 and

08:56:58 20  PTX-540.  These are physical samples of the Flair and

08:57:03 21  Fluency Plus products that are accused in this case.  We

08:57:06 22  provided these samples to Gore in their product packaging

08:57:10 23  as they're given to people who order the product.  And in

08:57:13 24  the packaging, they come on a long catheter tube and they're

08:57:18 25  compressed down, and our understanding is that Gore now

08:57:22 1    wants to use the expanded versions of the stent that is

08:57:25 2    actually on the end of the catheter that has been expanded

08:57:28 3    by Dr. Gorman, and that they're then intending to put that

08:57:32 4    on rather than the sample that they actually gave them.  We

08:57:35 5    think we can work through some of this through visual

08:57:37 6    inspection, but our concern is that as you expand the device

08:57:41 7    and actually stretch it out, if you stretch it out too far,

08:57:44 8    it can change the thickness of the device and that is really

08:57:47 9    hard to ascertain just through visual inspection.

08:57:50 10           With Dr. Gorman in particular, our primary

08:57:53 11   concern is that he may also not just show these physical

08:57:57 12   exhibits to the jury but may actually want to talk about

08:58:00 13   them in detail and blow them up on the Elmo or do things to

08:58:03 14   try and argue that these samples that he is prepared show

08:58:08 15   either the thickness limitation is met or the fixing

08:58:11 16   limitation is met.

08:58:13 17           And we're concerned since these aren't the

08:58:15 18   samples he actually used during his testing and those

08:58:17 19   samples have actual been thrown away, it would be completely

08:58:21 20   inappropriate for Gore to use these samples that Dr. Gorman

08:58:24 21   prepared outside the presence of the courtroom with the jury

08:58:27 22   to try and essentially offer new opinion evidence in support

08:58:31 23   of their infringement case.

08:58:33 24           THE COURT:  Okay.  Thank you.

08:58:35 25           MR. WAGNER:  Your Honor, there is no new opinion

08:58:41 1     evidence here.  These are devices that Dr. Gorman inspected

08:58:45 2     and provided opinions on in his report.  As counsel said,

08:58:49 3     Bard provided these samples expressly for use at trial.

08:58:51 4     This was before case was scheduled last year.

08:58:54 5               Dr. Gorman, himself expanded these prototypes

08:58:58 6     or, I'm sorry, these samples from the devices.  They will

08:59:02 7     testify on the stand about how he did that.  If he lays a

08:59:05 8     foundation for this, we don't see how it is at all an issue.

08:59:08 9     These are the accused products.  The jury should be entitled

08:59:10 10    to see the accused products.  Dr. Gorman offered opinions

08:59:14 11    about the accused products.  These are their products.  They

08:59:16 12    can inspect them.  They know what they are.

08:59:18 13              And we just think it's quite odd that Bard

08:59:21 14    really doesn't want the jury to see the products that are

08:59:24 15    accused of infringement if the witness can lay the

08:59:26 16    foundation for this on the stand.  We don't see how there is

08:59:29 17    any issue.

08:59:29 18              THE COURT:  Do you anticipate the jury is going

08:59:32 19    to -- is going to be provided evidence that makes it clear

08:59:38 20    that these are not the actual ones that he used when he did

08:59:41 21    his testing?

08:59:42 22              MR. WAGNER:  We can do that, Your Honor.

08:59:43 23              THE COURT:  Okay.  Is there anything else?

08:59:45 24              MR. WAGNER:  No.

08:59:45 25              THE COURT:  Any reply?

08:59:47 1     MR. WILCOX:  Yes.  So, Your Honor, if Gore is

09:00:00 2 willing to make clear that he didn't do his testing on these

09:00:04 3 samples, that would go a long way towards addressing those

09:00:07 4 concerns, although we still have concerns if he attempts to

09:00:11 5 do any testing or offer any opinion about what these actual

09:00:13 6 samples show because they're not the samples that he used

09:00:17 7 when he did his actual testing for his infringement opinions

09:00:20 8 and, you know, Gore could have kept those samples around if

09:00:23 9 they wanted to use them at trial.  Instead, they chose to

09:00:26 10 discard those samples during the expert discovery process.

09:00:29 11     THE COURT:  All right.  Thank you.

09:00:30 12     I'm overruling the objections.  I will direct

09:00:34 13 that Gore make clear through the testimony what I think is

09:00:38 14 uncontested that these are not the same exact physical

09:00:43 15 samples that he used when he did the testing, but if he can

09:00:47 16 lay a foundation along the lines of I have every reason to

09:00:50 17 think when I opened the package this is essentially the

09:00:53 18 same product as what I did use and is the same as what is

09:00:57 19 accused, then I think that is fair game and not a new

09:01:01 20 opinion and I'm confident that cross-examination can clean

09:01:05 21 up any problems in that regard.

09:01:07 22     Is there anything else from defendants?

09:01:10 23     MR. CHERNY:  No, Your Honor.

09:01:10 24     THE COURT:  Okay.  We will take a recess until

09:01:12 25 the jury is ready for us.

09:01:14  1                    (Brief recess taken.)

09:01:14  2                    *      *      *

09:10:53  3                    (Proceedings reconvened after recess.)

09:10:53  4                    THE COURT:  The jury is all here.  Do we have

09:10:55  5       copies of the juror notebooks for the jurors?

09:11:02  6                    MS. KRAMAN:  Yes.

09:11:31  7                    (Binders passed forward.)

09:11:45  8                    THE COURT:  All right.  We'll bring the jury in.

09:11:51  9                    (Jury returned.)

09:14:10 10                    THE COURT:  Good morning, ladies and gentlemen

09:14:11 11       of the jury.  Nice to see you all again.  Welcome back.

09:14:14 12                    Mr. Looby, don't get too comfortable.  We're

09:14:16 13       going to begin bypassing out some materials to you.  I'll

09:14:20 14       explain what these are.

09:14:25 15                    You will each be given three things.

09:14:28 16                    The first is called a juror notebook.  It

09:14:32 17       contains some information in it that we'll be talking about

09:14:35 18       this morning.

09:14:37 19                    The next is a single page which shows you the

09:14:41 20       trial schedule which I will go over with you of.

09:14:44 21                    And then this third one are the preliminary

09:14:47 22       instructions which I'm going to read to you.

09:14:50 23                    These documents you will have with you

09:14:53 24       throughout the trial, but what we're going to do is I will

09:14:58 25       first read to you the preliminary jury instructions.  Part

09:15:02  1   of the preliminary instructions is a video about patent

09:15:10  2   cases, so I will interrupt at some point to play video for

09:15:14  3   you.   Then when I complete all of my instructions, I'll move

09:15:18  4   to opening statements by counsel.

09:15:19  5            So with that, I'll direct your attention to the

09:15:22  6   preliminary jury instructions.  Feel free to read along on

09:15:24  7   your copy, if you wish.  That's entirely up to you.

09:15:39  8            Members of the jury:  Now that you have been

09:15:40  9   sworn in, I have the preliminary instructions for guidance

09:15:43 10   on your role as jurors in this case.  These instructions are

09:15:47 11   intended to introduce you to the case and the law that you

09:15:51 12   will apply to the evidence that you will hear.  I will give

09:15:56 13   you more detailed instructions on the law at the end of the

09:15:58 14   trial.  Also, because this is a patent trial which will

09:16:03 15   deal with subject matter that is not within the everyday

09:16:06 16   experience of most of us, I will additionally give you some

09:16:10 17   additional jury instructions regarding patents to assist you

09:16:13 18   in discharging your duties as jurors.

09:16:15 19            I expect that your commitment as jurors will

09:16:18 20   last approximately eight business days, until March 10th.

09:16:23 21   This case involves multiple issues and so we will break

09:16:26 22   those eight days into multiple phases.  During the first

09:16:31 23   phase, which we will begin today, the parties will address

09:16:34 24   patent infringement and patent invalidity.  I expect this

09:16:40 25   first phase will conclude early next week.  I will inform

09:16:43  1    you of the next steps as we get to them.

09:16:49  2                The parties and their contentions.

09:16:50  3                This is a patent case.  The plaintiff in this

09:16:53  4    case is W.L. Gore & Associates, Inc., which I will refer to

09:16:58  5    as "Gore."  The defendants in this case are C.R. Bard Inc.

09:17:04  6    and Bard Peripheral Vascular Inc., which I will refer to

09:17:08  7    collectively as "Bard."  Bard is also a counterclaim

09:17:12  8    plaintiff and Gore is the counterclaim defendant.

09:17:16  9                There is one patent in this case.  A copy of the

09:17:19 10    patent has been given to you along with these preliminary

09:17:23 11    instructions.  The copy of the patent is tabbed in your

09:17:27 12    juror notebook I handed you.

09:17:29 13                Gore is the owner of the patent in this case,

09:17:32 14    United States Patent No. 5,735,892.  Patents are usually

09:17:39 15    referred to by their last three digits.  Patent No.

09:17:43 16    5,735,892 is simply called "the '892 patent."  You may hear

09:17:48 17    the lawyers and witnesses in this case refer to Gore's

09:17:51 18    patent as the '892 patent.  This patent may also be referred

09:17:56 19    to as the "Gore patent," the "Asserted Patent," the "Gore

09:18:00 20    patent-in-suit," or the "Myers Patent."  Gore contends that

09:18:05 21    Bard infringes the '892 patent.  Bard denies that it

09:18:10 22    infringes the '892 patent, and also contends that the '892

09:18:13 23    patent is invalid.

09:18:16 24                Duties of the jury.

09:18:18 25                Let me now turn to the general rules that will

09:18:21  1    govern the discharge of your duties as jurors in this case.

09:18:25  2         It will be your duty to find what the facts are

09:18:28  3    from the evidence as presented at the trial.  You and you

09:18:32  4    alone will be the judges of the facts.  You will have to

09:18:35  5    apply those facts to the law as I will instruct you at the

09:18:39  6    close of the evidence.  You must follow that law whether you

09:18:43  7    agree with it or not.

09:18:45  8         In addition to instructing you about the law,

09:18:48  9    at the close of the evidence, I will provide you with

09:18:50 10    instructions as to what the claims of the patents mean.

09:18:55 11    Again, of course, you are bound by your oath as jurors to

09:18:58 12    follow these and all the instructions that I give you even

09:19:02 13    if you personally disagree with them.  All the instructions

09:19:07 14    are important, and you should consider them together as a

09:19:10 15    whole.

09:19:12 16         You are the judges of the facts.  I will decide

09:19:15 17    which rules of law apply to this case.  Perform these duties

09:19:21 18    fairly.  Do not let any bias, sympathy or prejudice that you

09:19:24 19    may feel toward one side or the other influence your

09:19:28 20    decision in any way.

09:19:30 21         Also, do not let anything I say or do during the

09:19:34 22    course of the trial influence you.  Nothing I say or do is

09:19:37 23    intended to indicate or should be taken by you as indicating

09:19:44 24    what your verdict should be.

09:19:45 25              Evidence.

09:19:46  1          The evidence from which you will find the facts

09:19:48  2    will consist of the testimony of witnesses and the documents

09:19:52  3    and other things admitted into evidence.  The evidence may

09:19:56  4    also include certain facts agreed to by the parties or that

09:19:59  5    I may instruct you to find.  Certain things are not evidence

09:20:04  6    and must not be considered by you.  I will list them for you

09:20:08  7    now:

09:20:08  8          1.  Statements, arguments, and questions by

09:20:13  9    lawyers are not evidence.

09:20:15 10          2.  Objections to questions are not evidence.

09:20:20 11    Lawyers have an obligation to their clients to make an

09:20:22 12    objection when they believe testimony or exhibits being

09:20:25 13    offered are not admissible under the Rules of Evidence.  You

09:20:29 14    should not be influenced by a lawyer's objection or by my

09:20:33 15    ruling on the objection.  If I sustain or uphold the

09:20:36 16    objection and find the matter is not admissible, you should

09:20:40 17    ignore the question or document.  If I overrule an objection

09:20:45 18    and allow the matter in evidence, you should treat the

09:20:47 19    testimony or document like any evidence.  If I instruct you

09:20:51 20    during the trial that some item of evidence is admitted for

09:20:55 21    a limited purpose, you must follow that instruction and

09:20:59 22    consider that evidence for that purpose only.  If this

09:21:03 23    occurs during the trial, I will try to clarify this for you

09:21:06 24    at that time.

09:21:36 25          Testimony that the Court has excluded or told

09:21:38  1    you to disregard is not evidence and must not be considered.

09:21:43  2             4.  During trial you will be shown charts and

09:21:46  3    animations to help illustrate the testimony of the

09:21:50  4    witnesses.  These illustrative exhibits, called

09:21:53  5    demonstrative exhibits, are not admitted into evidence and

09:21:57  6    should not be considered as evidence.

09:22:00  7             5.  Anything you see or hear outside the

09:22:03  8    courtroom is not evidence and must be disregarded.  You are

09:22:07  9    to decide this case solely on the evidence presented here in

09:22:11 10    the courtroom.

09:22:14 11             Direct and Circumstantial Evidence.

09:22:16 12             There are two kinds of evidence:  direct and

09:22:20 13    circumstantial.  Direct evidence is direct proof of a fact,

09:22:23 14    such as the testimony of an eyewitness.  If a witness

09:22:27 15    testified that he saw it raining outside, and you believed

09:22:30 16    him, that would be direct evidence that it was raining.

09:22:36 17             Circumstantial evidence is proof of facts from

09:22:38 18    which you may infer or conclude that other facts exist.  If

09:22:43 19    someone walked into the courtroom wearing a raincoat covered

09:22:46 20    with drops of water and carrying a wet umbrella, that would

09:22:49 21    be circumstantial evidence from which you could conclude

09:22:53 22    that it was raining outside.

09:22:55 23             As a general rule, the law makes no distinction

09:22:59 24    between these two types of evidence, but simply requires

09:23:03 25    that you find the facts from all the evidence in the case,

09:23:06  1    whether direct or circumstantial or a combination of the

09:23:10  2    two.  In judging the facts, it will be up to you to decide

09:23:14  3    which witnesses to believe, which witnesses not to believe,

09:23:18  4    and how much of any witness' testimony to accept or reject.

09:23:24  5            Credibility of Witnesses - Weighing Conflicting

09:23:26  6    Testimony.

09:23:28  7            You are the sole judges of each witness'

09:23:31  8    credibility.  You should consider each witness' means of

09:23:34  9    knowledge; strength of memory; opportunity to observe; how

09:23:38 10    reasonable or unreasonable the testimony is; whether it is

09:23:46 11    consistent or inconsistent; whether it has been

09:23:48 12    contradicted; the witness' biases, prejudices or interests;

09:23:51 13    the witness' manner or demeanor on the witness stand; and

09:23:56 14    all circumstances that, according to the evidence, could

09:23:58 15    affect the credibility of the testimony.

09:24:01 16            If you find the testimony to be contradictory,

09:24:03 17    you must try to reconcile it, if reasonably possible, so as

09:24:08 18    to make one harmonious story of it all.  But if you can't do

09:24:12 19    this, then it is your duty and privilege to believe the

09:24:16 20    testimony that, in your judgment, is most believable and

09:24:21 21    disregard any testimony that, in your judgment, is not

09:24:25 22    believable.  This instruction applies to the testimony of

09:24:28 23    all witnesses, including expert witnesses.

09:24:31 24            Expert Testimony.

09:24:33 25            Expert testimony is testimony from a person who

has a special skill or knowledge in some science,

profession, or business.  This skill or knowledge is not

common to the average person, but has been acquired by the

expert through special study or experience.  In weighing

expert testimony, you may consider the expert's

qualifications, the reasons for the expert's opinions, and

the reliability of the information supporting the expert's

opinions, as well as the factors that I have previously

mentioned for weighing testimony of any other witness.

Expert testimony should receive whatever weight and credit

you think appropriate, given all the other evidence in the

case.  You are free to accept or reject the testimony of

experts, just as with any other witness.

        Burden of Proof.

        In any legal action, facts must be proven by a

required standard of evidence, known as the burden of proof.

In a patent case such as this, there are two different

burdens of proof that are used.  The first is called

"preponderance of the evidence."  The second is called

"clear and convincing evidence."

        A party asserting patent infringement has the

burden of proving infringement by a preponderance of the

evidence.  That means the party asserting infringement has

to produce evidence that, when considered in light of all of

the factors, leads you to believe that what the party claims

09:26:06 1   is more likely true than not.  To put it differently, if you

09:26:10 2   were to put the parties' evidence on opposite sides of a

09:26:14 3   scale, the evidence supporting the claims of the party

09:26:17 4   asserting infringement must make the scales tip somewhat on

09:26:22 5   its side.

09:26:23 6        As I noted earlier, Bard contends that Gore's

09:26:26 7   patent is invalid.  A party challenging the validity of a

09:26:30 8   patent has the burden of proving by clear and convincing

09:26:33 9   evidence that the patent is invalid.  Clear and convincing

09:26:38 10  evidence is evidence that produces an abiding conviction

09:26:42 11  that the truth of a factual contention is highly probable.

09:26:46 12  Proof by clear and convincing evidence is, thus, a higher

09:26:50 13  burden than proof by a preponderance of the evidence.

09:26:54 14       Some of you may have heard the phrase "proof

09:26:57 15  beyond a reasonable doubt."  That burden of proof applies

09:27:00 16  only in criminal cases and has nothing to do with a civil

09:27:03 17  case like this.  You should, therefore, not consider it in

09:27:08 18  this case.

09:27:09 19       Patent Video.

09:27:11 20       At this time, we are going to show a 17-minute

09:27:15 21  video as an introduction to the patent system.  It contains

09:27:19 22  background information to help you understand what patents

09:27:22 23  are, why they are needed, the role of the Patent Office, and

09:27:26 24  why disputes over patents arise.  This was prepared by the

09:27:30 25  government, not by the parties.

09:27:32  1          The video references a sample patent that you

09:27:35  2   will find in your notebooks.  Also, many of the terms that

09:27:39  3   are used in the video are contained in a glossary of patent

09:27:42  4   terms, which is also in your notebooks.  Please feel free to

09:27:45  5   refer to the glossary throughout the trial.

09:27:49  6          Do we have the video ready to play?

09:27:52  7          Mr. Looby, we will have you turn down some of

09:27:56  8   the lights.  Go ahead and play it.

09:28:04  9          (At this point the patent video was played as

09:28:11 10   follows:)

09:28:23 11          "Hello.  I am Jeremy Fogel.  I have been a

09:28:44 12   United States District Judge since 1998.  And I am now the

09:28:48 13   Director of the Federal Judicial Center.

14          "As you probably know by now, this is a patent

15   case.  So you may be wondering, how can I sit in judgment on

16   a case like this, when I am not entirely sure what a patent

17   is?  We hope to answer that concern with this brief video,

18   which will give you some of the background needed to do your

19   job.

20          "This case will involve some special issues that

21   the judge and lawyers will explain to you.  But all patent

22   cases involve some basics that you will learn about.  This

23   video will discuss what patents are, why we have them, how

24   people get them, and why there are disputes that require us

25   to call in a jury like you.

1                    "We will also show you what patents look like.

2                    "The United States Constitution gives Congress

3      the power to pass laws relating to patents.  Article I,

4      Section VIII, Clause 8, allows Congress to promote the

5      progress of science and useful arts by securing for limited

6      times to authors and inventors the exclusive right to their

7      respective writings and discoveries.  A patent then is an

8      official grant given by the United States Government that

9      gives its owners certain rights to the invention.  Those

10     include the right to stop others from making, using,

11     selling, or offering for sale the invention that is claimed

12     in the patent.

13                    "A patent lasts for a specific period, usually

14     20 years from the date that the application is filed by the

15     inventor.  But because it takes an average of three years

16     for the Patent & Trademark Office to act on the application,

17     the effective life of the patent is closer to 17 years.

18                    "A patent represents a bargain made between the

19     government and the inventor.

20                    "In return for the right to prevent others from

21     using the invention, the inventor must enhance the public

22     knowledge, what will sometimes be called the state of the

23     art, by adding something new and useful to it.  A famous

24     example is Thomas Edison's invention of the light bulb.

25     Harnessing electrical power for illumination transformed

1    society and led to many other important breakthroughs.

2              "During the lifetime of the patent, its

3    disclosure may inspire new inventions, and after it expires,

4    the invention is free for anyone who to us.  It is this

5    combination of something new and valuable to the public that

6    justifies granting time limited protection to the inventor.

7    A patent is in many ways like a deed to a piece of property.

8              "It grants the owner the right to keep people

9    off the property or to charge them a fee like rent for using

10   it.  Just as a deed indicates boundaries, defined in the

11   landowner's property, the patented claim defines the

12   patentee's domain.

13             "The patent system works because the inventor is

14   required to describe the invention in clear and specific

15   terms so that the public knows what the boundaries of the

16   invention are.

17             "Once a patent is issued by the government, it

18   becomes available for public inspection.  In that way,

19   anyone who learns of the patent can read and understand

20   exactly what the inventor invented and the limits of the

21   patent set forth in the claims.

22             "Now that we understand what a patent is, let's

23   take a closer look at the term invention.  An invention is a

24   new way of solving a problem or a useful new machine,

25   manufacture, or composition of matter.

1          "The patent process begins in the mind of the

2     inventor.  In particular, when the invention is formulated

3     in the mind of the inventor.  Patent lawyers call this

4     conception.  This is when the idea occurs to the inventor

5     clearly enough that he or she can write it down and explain

6     it to someone.  To qualify for a patent, the invention needs

7     to be new and useful.  Also, it must not be obvious to one

8     of ordinary skill in the field.

9          "If the inventor believes these requirements are

10    met, he or she will prepare an application for filing at the

11    Patent and Trademark Office, whose headquartered are in

12    Alexandria, Virginia, just outside of Washington, D.C.

13         "The Patent and Trademark Office, often called

14    the PTO, is the agency of the federal government whose job

15    it is to examine patent applications, to make sure they are

16    in proper form and comply with the requirements of the law.

17    The inventor can prepare an application for filing with the

18    PTO, but usually it is drafted by a patent attorney or a

19    patent agent who specializes in what is called prosecuting

20    patent applications.  That is, the process by which they are

21    evaluated.

22         "The attorney or agent works with the inventor

23    to be sure the invention is described and claimed in a way

24    that complies with the law and the regulations of the PTO.

25         "98 percent of patent applications are made

1     online, using the PTO's electronic filing system, although a

2     few paper applications are still made.

3                    "When the PTO receives the inventor's

4     application, it is first checked to see if it is complete

5     and complies with all the PTO's application requirements.

6     It then assigns the submission to a patent examiner, a staff

7     person with a background within the field or art that the

8     invention falls in, to evaluate the application and decide

9     whether the patent can be granted.

10                   "You have been given a sample patent to refer to

11    as you watch this video, so you already have a sense of what

12    a patent looks like.  But now let's take a closer look at

13    the three main parts of a patent.

14                   "To begin with, there is some basic identifying

15    information on the first page.  This material is highlighted

16    in your handout.  On the upper right-hand side of the page

17    is the number assigned to the patent by the PTO.  On the

18    left side is the title that describes the invention and the

19    names of the inventors and sometimes the company to whom

20    they assign the patent.  Also on the left is the date when

21    the patent was filed, and back on the right, the date when

22    the patent was issued.  There also is more detailed

23    information on the first page, including a list of numbers

24    following the caption, field of search.  These numbers

25    identify previously issued patents the examiner looked at or

1    searched to make sure the applicant's claimed invention

2    really is something new, not obvious, and thus, patentable.

3    Also listed on the first page is what we call references,

4    that is, previous patents or articles that describe the

5    technology or prior art known at the time the application

6    was filed.

7            "It may seem strange to you that we call this

8    preexisting technology prior art, even though it has nothing

9    to do with artists.  We use the word art in its historical

10   sense, to include inventions and other subject matter

11   reasonably related to the claimed invention.

12           "We also refer to the latest technology as state

13   of the art, and we say of someone who can understand and

14   apply the technology that he or she is skilled in the art.

15           "The second major part of the patent is what we

16   call specification or written description.  As is the case

17   in your sample, it is usually the longest part of the

18   patent.

19           "It includes an abstract, which is a brief

20   summary of the invention, a background section that is

21   describes the nature of the problem the invention is

22   supposed to solve, one or more drawings, called figures,

23   that illustrate various aspects of the application, and a

24   detailed description of one or more embodiments of the

25   invention.  An embodiment is a specific device or method

1    that uses the invention, such as a particular form of light

2    bulb.

3              "The third and most important part of the patent

4    is the claims.  These are the numbered paragraphs that

5    appear at the end.  The claims are what give the public

6    notice of the boundaries of the invention.

7              "They are similar to the description of property

8    you may have seen in the deed, referring to precise

9    measurements taken on the ground.

10             "The Judge will instruct you further on how any

11   technical or ambiguous terms in the patent claims should be

12   understood.

13             "Now that we have discussed the main parts of a

14   patent, let's look at how the PTO processes patent

15   applications, what we referred to as prosecution of the

16   patent application.

17             "This process begins when the inventors'

18   application arrives at the PTO.  There, it receives a filing

19   date.  Under the American Events Act of 2011, filing dates

20   will determine who is awarded the patent if there are

21   competing valid applications.

22             "In 2012 the PTO received nearly 600,000 patent

23   applications and issued more than 270,000 patents.

24             "After determining that the application is

25   complete, the receiving branch also decides what field the

1   technology and application relates to and assigns it to the

2   appropriate examining group.  In order to make that

3   decision, the patent examiner usually looks at patents that

4   have been issued previously in the same or closely related

5   fields of art.

6           "The examiner has computer databases that

7   contain information used to accomplish this task.

8           "Another part of the job is to decide if the

9   inventor's description of the invention is complete and

10  clear enough to meet the requirements for a patent,

11  including the requirement that the description enables

12  someone of ordinary skill in the field to actually make and

13  use it.

14          "However, because the job of examining so many

15  applications is challenging, the law requires the applicant

16  to tell the examiner whatever he or she knows about the

17  prior art that might be important to the examiner's decision

18  on whether to allow the patent.  We call this the

19  applicant's duty of candor.  One way the applicant can

20  satisfy this duty is by bringing pertinent prior art the

21  attention of the examiner, either in the original

22  application or in another submission called information

23  disclosure statements.

24          "In this way, the decisions of the examiner with

25  are based on both the information provided by the applicant

1    and on the information the examiner finds during his or her

2    prior art search.

3              "Sometimes the examiner concludes that the

4    application meets all the requirements we have discussed and

5    allows the patent to issue at this first stage.  More

6    frequently, the examiner will reject the application as

7    deficient in some is respect.  This decision will be

8    communicated by the examiner in what is called an office

9    action, which is a preliminary notice to the applicant of

10   what the examiner finds insufficient or unpatentable.

11             For example, the examiner may reject certain

12   claims as being unpatentable because a journal article,

13   written and published by another person prior to the

14   effective filing date of the patent application disclosed

15   what the applicant was currently claiming.  At that point

16   the applicant prepares a written response either agreeing or

17   disagreeing with the examiner.

18             "An applicant who agrees with the examiner can

19   suggest amendments to the application, designed to overcome

20   the examiner's rejection.  Alternatively, an applicant who

21   disagrees with the examiner's office action can explain the

22   reasons for the disagreement.  This exchange of office

23   actions and responses goes on until the examiner issues a

24   final office action, which may reject or allow some or all

25   of the applicant's claims.  The overall process is referred

1    to as the prosecution history of the application.

2            "The written incoming and outgoing

3    correspondence between the PTO examiner and the applicant is

4    also called the file wrapper.  In the past, these files

5    wrappers were all in paper form, as were the submitted

6    applications.  Now, they are most often electronic, and may

7    occasionally be paper as well.

8            "Most patent applications filed on or after

9    November 29th, 2000 are published by the PTO 18 months after

10   the inventor has filed his or her application so that the

11   public may inspect it.  Once a final PTO office action has

12   occurred and one or more claims has been allowed, the

13   applicant is required to pay an issuance fee and the patent

14   is printed.  Then on the date shown on the upper right-hand

15   corner on the first page of the patent, it is issued by the

16   PTO, and the inventor receives all of the rights of a

17   patent.

18           "That date is highlighted on your sample.

19           "Once a patent is issued, the inventor or the

20   person or company the inventor has assigned the patent to,

21   can enforces the patent against anyone who uses the

22   invention without permission.  We call such unlawful use

23   infringement.  But the PTO and its Examiners have no

24   jurisdiction over questions relating to infringement of

25   patents.

1          "If there is a dispute about infringement, it is

2     brought to the Court to decide.  Sometimes in a court case

3     you are also asked to decide about validity.  That is,

4     whether the patent should have been allowed at all by the

5     PTO.

6          "A party accused of infringement is entitled to

7     challenge whether the asserted patent claims are

8     sufficiently new or nonobvious in light of the prior art or

9     whether other requirements of patentability have been met.

10    In other words, a defense to an infringement lawsuit is that

11    the patent in question is invalid.  You may wonder why it is

12    that you would be asked to consider such things when the

13    patent that has already been reviewed by a government

14    examiner.  There are several reasons for this.

15         "First, there may be facts or arguments that the

16    examiner did not consider, such as prior art that was not

17    located by the PTO or provided by the applicant.

18         "In addition, there is, of course, the

19    possibility that mistakes were made or important information

20    overlooked.  Examiners have a lot of work to do, and no

21    process is perfect.

22         "Also, unlike a Court proceeding, prosecution of

23    a patent application takes place without input from people

24    who might later be accused of infringement.  So it is

25    important that we provide a chance for someone who is

1       accused of infringement to challenge the patent in court.

2       In deciding issues of infringement and validity, it is your

3       job to decide the facts of the case.  The Judge will

4       instruct you about the law, which may include the meaning of

5       certain words or phrases contained in the patent.

6               "So it is your primary duty, as jurors, to

7       resolve any factual disputes, and in some cases, such as

8       infringement and validity, to apply the law to those facts.

9       To prove infringement, the patent holder must persuade you

10      by what is called a preponderance of the evidence related to

11      the facts of the case that the patent has been infringed.

12              "To prove invalidity, the alleged infringer must

13      persuade you by what is called clear and convincing evidence

14      that the patent is invalid.  The Judge in your case will

15      explain these and other terms and provide additional

16      specific instructions at the appropriate time.

17              "Good luck with your task, and thank you for

18      your service."

09:43:50  19            (Patent video ends.)

09:43:50  20            THE COURT:  Thank you.

09:43:51  21            All right.  Ladies and gentlemen, I'm going pick

09:43:53  22    up where I left off in reading the preliminary instructions

09:43:56  23    to you.  I'm at the very bottom of page 6.  The section

09:44:01  24    entitled General Guidance Regarding Patents.

09:44:05  25            Although you have heard much of this in the

09:44:08  1    video, I will now give you a general overview of what a

09:44:11  2    patent is and how one is obtained.

09:44:13  3                    A.   Constitutional Basis For Patent Grant.

09:44:16  4                    The United States Constitution, Article I,

09:44:20  5    Section 8, grants the Congress of the United States the

09:44:24  6    power to enact laws "to promote the progress of science and

09:44:28  7    the useful arts, by securing for limited times to authors

09:44:32  8    and inventors the exclusive right to their respective writes

09:44:35  9    and discoveries."

09:44:37 10                    B.   Exclusionary Right and Term of a Patent.

09:44:42 11                    The United States Patent and Trademark Office is

09:44:45 12    responsible for reviewing patent applications and granting

09:44:48 13    patents.  Once the "Patent Office" or "PTO" has issued a

09:44:54 14    patent, the patent owner has the right to exclude others

09:44:56 15    from making, using, selling, or offering for sale the

09:45:01 16    invention throughout the United States, or from importing

09:45:04 17    the invention into the United States, for the length of

09:45:07 18    the patent term.  A person who, without the patent owner's

09:45:11 19    authority, makes, uses, sells, offers to sell, or imports a

09:45:16 20    product that is covered by one or more of the claims of a

09:45:20 21    valid patent infringes the patent.

09:45:22 22                    C.   The Parts of a Patent.

09:45:25 23                    I will next briefly describe the parts of a

09:45:28 24    patent and some of the procedures followed by those

09:45:31 25    attempting to obtain patents.  Many of the terms I will

09:45:34 1   use in this description are contained in the "Glossary of

09:45:38 2   Patent Terms" I have given you along with a copy of these

09:45:41 3   preliminary instructions.  Feel free to refer to the

09:45:43 4   glossary throughout the trial.

09:45:45 5           For an invention to be patentable, it must be

09:45:48 6   new, useful, and, at the time the invention was made, must

09:45:51 7   not have been obvious to a person having ordinary skill in

09:45:54 8   the art to which the subject matter pertains.

09:45:56 9           Under the patent laws, the Patent Office

09:46:05 10  examines patent applications and issues patents.  A person

09:46:09 11  applying for a patent must include a number of items in his

09:46:13 12  or her application, including:  (1) a detailed description

09:46:18 13  of the inventions in terms sufficiently full, clear,

09:46:22 14  concise, and exact to enable any person skilled in the art

09:46:25 15  to which the invention pertains to make and use the

09:46:27 16  invention; and (2) one or more claims.

09:46:34 17          The application includes a written description

09:46:37 18  of the invention called a "specification" and may include

09:46:41 19  drawings that illustrate the invention.  The specification

09:46:45 20  concludes with one or more claims that particularly and

09:46:49 21  distinctly define the subject matter that the inventor

09:46:52 22  regards as his or her invention.

09:46:54 23          When a patent application is received at the

09:46:58 24  Patent Office, it is assigned to an Examiner, who examines

09:47:02 25  the application, including the claims, to determine whether

09:47:05 1    the application complies with the requirements of the U.S.

09:47:09 2    patent laws.  The Examiner reviews the prior work of others

09:47:14 3    in the form of voluminous files of patents and publications.

09:47:18 4    This type of material is called "prior art."  Prior art is

09:47:22 5    generally technical information and knowledge that was known

09:47:26 6    to the public either before the invention by the applicant

09:47:30 7    or more than one year before the filing date of the

09:47:33 8    application.  Documents found in the search of prior art are

09:47:38 9    called "references."  In conducting the search of prior art,

09:47:43 10   the Examiner notes in writing on the file the classes or

09:47:46 11   subclasses of art searched.

09:47:48 12              The compilation of the papers concerning the

09:47:51 13   proceedings before the Patent Office is called the

09:47:54 14   "prosecution history," "file wrapper," or "file history."

09:48:00 15   The Patent Office does not have its own laboratories or

09:48:02 16   testing facilities.

09:48:03 17              The Examiner may "reject" the patent application

09:48:07 18   claims if he or she believes that they are applications

09:48:09 19   for inventions that are not patentable in light of the

09:48:12 20   prior art, or because the patent specification does not

09:48:18 21   adequately describe the claimed inventions.  The applicant

09:48:22 22   may then amend the claims to respond to the Examiner's

09:48:25 23   rejections.  If, after reviewing the prior art maintained at

09:48:29 24   the Patent Office, the Examiner concludes that the claims

09:48:31 25   presented by the applicant define the applicant's claimed

09:48:35 1    invention over the most relevant known prior art in a manner

09:48:38 2    that is patentable and that the patent meets the other

09:48:41 3    requirements for patentability, the application is granted

09:48:46 4    as a U.S. patent.

09:48:47 5              D.   Infringement Disputes and Invalidity.

09:48:55 6              The Patent Office and its Examiners do not

09:48:58 7    decide infringement issues.   If there is a dispute about

09:49:02 8    infringement, it is brought to the Court to decide.   Here,

09:49:05 9    you are also asked to decide about validity, that is,

09:49:09 10   whether the patent should have been allowed by the Patent

09:49:12 11   Office.   A party accused of infringement is entitled to

09:49:16 12   challenge whether the asserted patent claims are

09:49:18 13   sufficiently new or nonobvious in light of the prior art or

09:49:22 14   whether other requirements of patentability have been met.

09:49:26 15   In other words, a defense to an infringement lawsuit is that

09:49:30 16   the patent in question is invalid.

09:49:32 17             Summary of the Patent Issues.

09:49:36 18             In this case, you must decide several things

09:49:40 19   according to the instructions I will give you at the end of

09:49:43 20   the trial.   Those instructions will repeat this summary and

09:49:46 21   will provide more detail.   You must decide:

09:49:50 22             1.   Whether Gore has proven by a preponderance

09:49:52 23   of the evidence that Bard's Fluency Plus and/or Flair

09:49:56 24   products infringe one or more of the asserted claims of the

09:49:59 25   '892 patent; and,

09:50:01  1          2.   Whether Bard has proven by clear and

09:50:04  2   convincing evidence that one or more of the asserted claims

09:50:07  3   of the '892 patent are invalid.

09:50:09  4          Conduct of the Jury.

09:50:17  5          Now a few words about your conduct as jurors.

09:50:20  6          First, I instruct you that during the trial you

09:50:23  7   are not to discuss the case with anyone or permit anyone to

09:50:27  8   discuss it with you.  Until you retire to the juryroom at

09:50:31  9   the end of the case to deliberate on your verdict, you

09:50:36 10   simply are not to talk about this case.  If any lawyer,

09:50:39 11   party, or witness does not speak to you when you pass in

09:50:41 12   the hall, ride the elevator, or the like, remember, it is

09:50:45 13   because they are not supposed to talk with you, nor you with

09:50:48 14   them.  In this way, any unwarranted and unnecessary

09:50:52 15   suspicion about your fairness can be avoided.  If anyone

09:50:55 16   should try to talk to you about the case, bring it to the

09:50:59 17   Court's attention appropriately.

09:51:01 18          Second, do not read or listen to anything

09:51:03 19   touching on this case in any way.  By that I mean, if there

09:51:08 20   may be a newspaper or Internet article or radio or

09:51:12 21   television report relating to this case, do not read the

09:51:16 22   article or watch or listen to the report.

09:51:18 23          Third, do not try to do any research or make any

09:51:21 24   investigation about the case on your own.  Let me elaborate.

09:51:25 25   During the course of the trial, you must not conduct any

09:51:28  1   independent research about the case, the matters in the

09:51:31  2   case, and the individuals or entities involved in the case.

09:51:35  3   In other words, you should not consult dictionaries or

09:51:39  4   reference materials, search the Internet, websites, blogs,

09:51:42  5   or any other electronic means.  Also, again, should there

09:51:46  6   happen to be a newspaper article or radio or television

09:51:49  7   report relating to this case, do not read the article or

09:51:53  8   watch or listen to the report.  It is important that you

09:51:55  9   decide this case based solely on the evidence presented in

09:52:01 10   the courtroom.  Please do not try to find out information

09:52:03 11   from any other sources.

09:52:04 12           I know that many, many of you use cellphones,

09:52:08 13   BlackBerries, iPhones, the Internet and other tools of

09:52:11 14   technology.  You also must not talk to anyone about this

09:52:14 15   case or use these tools to communicate electronically with

09:52:18 16   anyone about the case.  This includes your family and

09:52:20 17   friends.  You may not communicate with anyone about the

09:52:26 18   case on your cellphone, through e-mail, your BlackBerry or

09:52:30 19   iPhone, text messaging, or Twitter, through any blog or

09:52:34 20   website, through any Internet chatroom, or by way of any

09:52:38 21   social networking websites, including Facebook, MySpace,

09:52:42 22   LinkedIn, and YouTube.

09:52:45 23           Finally, do not form any opinion until all the

09:52:48 24   evidence is in.  Keep an open mind until you start your

09:52:51 25   deliberations at the end of the case.

09:52:53 1          During the trial, you may, but are not required

09:52:56 2   to, take notes regarding testimony; for example, exhibit

09:53:00 3   numbers, impressions of witnesses, or other things related

09:53:04 4   to the proceedings.  A word of caution is in order.  There

09:53:07 5   is generally I think a tendency to attach undue importance

09:53:11 6   to matters which one has written down.  Some testimony which

09:53:14 7   is considered, you know, important at the time presented,

09:53:18 8   and thus not written down, takes on greater importance later

09:53:22 9   in the trial in light of all the evidence presented.

09:53:25 10  Therefore, you are instructed that your notes are only a

09:53:29 11  tool to aid your own individual memory and you should not

09:53:33 12  compare your notes with other jurors in determining the

09:53:34 13  content of any testimony or in evaluating the importance of

09:53:38 14  any evidence.  Your notes are not evidence, and are by no

09:53:43 15  means a complete outline of the proceedings or a list of the

09:53:46 16  highlights of the trial.  Also, keep in mind that you will

09:53:50 17  not have a transcript of the testimony to review.  So, above

09:53:53 18  all, your memory will be your greatest asset when it comes

09:53:57 19  time to deliberate and render a decision in this case.

09:54:00 20          If you do take notes, you must leave them in the

09:54:04 21  jury deliberation room which is secured at the end of each

09:54:07 22  day.  And, remember that they are for your own personal use.

09:54:12 23          I will give you detailed instructions on the law

09:54:15 24  at the end of the case, and those instructions will control

09:54:17 25  your deliberations and decision.

09:54:22  1            Juror Notebook.

09:54:23  2            As I mentioned, as you know, to assist in your

09:54:28  3    deliberations, you have been provided with a notebook that

09:54:32  4    contains the following:

09:54:33  5            Glossary of patent terms.

09:54:35  6            Sample patent.

09:54:37  7            The Court's claim construction.  And,

09:54:39  8            A copy of the patent in suit.

09:54:40  9            These materials have been jointly submitted by

09:54:43 10    the parties.  Please refer to these materials to assist you

09:54:45 11    during the trial.

09:54:46 12            Sidebars.

09:54:47 13            During the trial it may be necessary for me to

09:54:50 14    talk with the lawyers out of your hearing by having a bench

09:54:53 15    conference, which is also called a sidebar.  If that

09:54:56 16    happens, please be patient.

09:54:59 17            We are not trying to keep important information

09:55:01 18    from you.  These conferences are necessary for me to fulfill

09:55:04 19    my responsibility to be sure that evidence is presented to

09:55:08 20    you correctly under the law.

09:55:09 21            We will, of course, do what we can to keep the

09:55:14 22    number and length of these conferences to a minimum.  If you

09:55:17 23    would like to stand or stretch or walk around the jury box

09:55:20 24    while we are at sidebar, you should feel free to do so.

09:55:23 25            I may not always grant an attorney's request for

09:55:26 1   a sidebar.  Do not consider my granting or denying a request

09:55:29 2   for a conference as any indication of my opinion of the case

09:55:33 3   or of what your verdict should be.

09:55:35 4            Course of the trial.

09:55:37 5            The trial will now begin.

09:55:39 6            First, Gore may make an opening statement

09:55:42 7   outlining its case.  Then Bard may make an opening statement

09:55:48 8   outlining its case.  Opening statements are not evidence;

09:55:52 9   their only purpose is to help you understand what the

09:55:55 10  evidence will be.

09:55:55 11           Next, the parties will present their evidence.

09:55:59 12  Gore will first introduce its evidence that it believes

09:56:02 13  supports its claim that Bard infringes the '892 patent.

09:56:06 14  When Gore is finished, Bard will introduce evidence to

09:56:10 15  defend against Gore's infringement claim and will introduce

09:56:13 16  evidence that it believes supports its claim that the '892

09:56:18 17  patent is invalid.  Gore will then have the opportunity to

09:56:22 18  introduce evidence to defend against Bard's claim of

09:56:25 19  invalidity and to offer rebuttal evidence related to its

09:56:29 20  infringement claims.  Bard will then have the opportunity to

09:56:32 21  offer rebuttal evidence related to its claim of invalidity.

09:56:38 22           After all of the evidence is in, the lawyers

09:56:40 23  will offer closing arguments.  The closing arguments are not

09:56:44 24  evidence.  Their purpose is to summarize and interpret the

09:56:47 25  evidence for you, and to tie the evidence to their story.  I

09:56:53 1    will give you instructions on the law and describe for you

09:56:55 2    the matters you must resolve.  You will then retire to the

09:56:59 3    juryroom to deliberate on your verdict.

09:57:01 4                Trial schedule.

09:57:03 5                Though you have heard me say this during the

09:57:07 6    jury selection process, I want to again outline the schedule

09:57:10 7    I expect to maintain during the course of this trial.

09:57:12 8                As I mentioned previously, once trial begins,

09:57:16 9    this case is expected to take up to eight business days to

09:57:20 10   try, between now and Friday, March 10.  Again, I expect the

09:57:24 11   first phase in which you will consider patent infringement

09:57:27 12   and patent validity to conclude next Monday or Tuesday, and

09:57:31 13   I will inform you of the next steps as we get to them.

09:57:34 14               We will normally begin the day at 9:00 a.m.  We

09:57:38 15   will go until around 12:30 p.m. and, after about a half hour

09:57:43 16   break for lunch, continue until 4:30 p.m.  There will be a

09:57:48 17   15 minute break in the morning and another 15 minute break

09:57:50 18   in the afternoon.

09:57:51 19               The only significant exception to this schedule

09:57:53 20   may occur when the case is submitted to you for your

09:57:57 21   deliberations.  At that point, you will be permitted to

09:58:02 22   deliberate as late as you wish.

09:58:04 23               Please keep in mind that this is a timed trial.

09:58:06 24   That means I have allocated each party a maximum number of

09:58:09 25   hours in which to present all portions of its case.  This

09:58:12  1    allows me to assure you that we expect to be completed with

09:58:15  2    this case by next Friday, March 10.  Of course, you can help

09:58:20  3    me keep on schedule by being here appropriately each morning

09:58:23  4    and being ready to proceed at the end of each break.

09:58:27  5              So you will see there on page 14 and 15, the

09:58:31  6    glossary of patents terms which you will also find in your

09:58:34  7    notebook.  Feel free to refer to that as you wish throughout

09:58:36  8    the trial.  And,

09:58:38  9              Finally, let me just direct your attention to

09:58:40 10    the trial schedule.  There actually are some deviations from

09:58:45 11    the schedule that I just told you generally.

09:58:47 12              Some of our days are actually shorter than what

09:58:50 13    I have indicated.

09:58:51 14              So this document indicates here is the schedule

09:58:55 15    we expect to keep during this trial.  The court will inform

09:58:58 16    you of any changes.

09:58:59 17              Today, we're only here until 3:00 o'clock.

09:59:03 18              Tomorrow we don't begin until 10:00 o'clock but

09:59:05 19    we will be here from 4:30.

09:59:08 20              On Friday, we'll have a regular 9:00 to 4:30

09:59:11 21    day.

09:59:11 22              The same on Monday, 9:00 to 4:30.  And,

09:59:15 23              Next Tuesday, we won't start until 11:00.  We

09:59:18 24    will be here until 430.

09:59:20 25              Wednesday, Thursday, and Friday will be 9:00 to

09:59:24 1    **4:30.**

09:59:24 2              **If there are any additional changes to that, I**

09:59:26 3    **will of course let you know.**

09:59:28 4              **One final word.  I told you when I intend to**

09:59:33 5    **take breaks and how often I aim to take breaks, but if any**

09:59:38 6    **of you need an additional break at any time, that is fine.**

09:59:42 7    **You just need to get my attention or my assistant's**

09:59:45 8    **attention.  That can be done usually by waving or raising a**

09:59:48 9    **hand or, if need be, standing.  And so if you need a break**

09:59:53 10   **for any reason at any other times, please just get our**

09:59:56 11   **attention and we'll ask for the whole jury out and then get**

10:00:02 12   **started.  Okay?**

10:00:03 13             **All right.  With that, we will turn to the**

10:00:06 14   **plaintiffs to give an opening statement, if they wish.**

10:00:10 15             **MS. RAZAVI:  Thank you, Your Honor.  May we**

10:00:11 16   **approach to set up the board?**

10:00:13 17             **THE COURT:  Yes, you may.**

10:00:14 18             **MS. RAZAVI:  Thank you very much.**

10:00:43 19             **(Poster boards placed in easel.)**

10:00:43 20             **MS. RAZAVI:  Thank you, Your Honor.  May I have**

10:00:44 21   **permission to move away from the podium?**

10:00:46 22             **THE COURT:  Not very far.**

10:00:47 23             **MS. RAZAVI:  Okay.  Thank you very much.**

10:00:48 24             **Good morning, ladies and gentlemen.  My name is**

10:00:51 25   **Kate Razavi.  I am an attorney for the plaintiff in this**

10:00:54  1    case, W.L. Gore and Associates.

10:00:55  2              This is a case about a large medical device

10:01:00  3    company that got caught behind its competitor.  And when it

10:01:05  4    got caught behind, that company used its competitors

10:01:08  5    technology, and it infringed a United States patent.

10:01:13  6              The company I'm talking about is the defendant

10:01:14  7    in this case, Bard.  And what you are going to here in this

10:01:18  8    case is about Bard's development of their products that

10:01:22  9    infringe Gore's United States patent.

10:01:24 10              So patent infringement cases are fundamentally

10:01:30 11    about inventions.  And you are going to see evidence in this

10:01:33 12    case about how Gore had an invention.  And both Gore and

10:01:39 13    Bard are medical device companies.  They are in the business

10:01:43 14    of making the kind of products that a doctor actually puts

10:01:46 15    inside your body, the kind of products that you sell that

10:01:48 16    can actually change somebody's life.

10:01:50 17              And the particular medical device we're going to

10:01:54 18    be talking about in this case is something called a stent

10:02:01 19    graft.  I have one in my hand.  I am showing them on the

10:02:08 20    screen.

10:02:08 21              And a stent graft, you are going to learn, is a

10:02:12 22    medical device that can be used for repairing blood vessels

10:02:14 23    in your body.  And in particular, in this case, you are

10:02:17 24    going to learn about a special kind of stent graft that was

10:02:23 25    developed to be used in some of the smallest blood vessels

10:02:27  1    in your body.

10:02:29  2              And what you are going to here in this case is

10:02:31  3    that for the longest time, there wasn't a great solution for

10:02:35  4    doctors to treat problems in smallest blood vessels in your

10:02:39  5    body.

10:02:40  6              As late as the early 1990s, options that doctors

10:02:43  7    were using to fix your small blood vessels involved surgery;

10:02:47  8    and for a lot of people, surgery was not a great option.

10:02:51  9    And so surgeons, and people in the medical community were --

10:02:56 10    we had something, but what people were hearing was there

10:03:01 11    must be something better.

10:03:02 12              And companies like Gore and Bard knew that if it

10:03:06 13    could develop a solution to that problem, ultrathin, tiny

10:03:12 14    stent grafts that can go into the smallest type of blood

10:03:16 15    vessels in your body, they knew that that would about a big

10:03:18 16    deal, because this was the type of technology that could

10:03:21 17    help a lot of people.

10:03:23 18              But there wasn't a solution out there.  And

10:03:26 19    what you are going to hear in this case is that what was

10:03:30 20    particularly frustrating about it was that people kind of

10:03:34 21    knew what they needed.  They just didn't know how to do it.

10:03:40 22              We just watched that patent video.  I don't know

10:03:43 23    if you remember, but at the beginning there was a reference

10:03:45 24    to the Thomas Edison light bulb, and I think that was

10:03:49 25    described as one of the most famous patents in U.S. history.

10:03:52  1        And even with that kind of iconic American

10:03:56  2   patent, you can kind of imagine a time before the invention

10:04:00  3   where people knew what they needed.  They were like sitting

10:04:03  4   in a dark room with a candle and they knew what they needed

10:04:06  5   was a brighter kind of light but they just didn't know how

10:04:10  6   to do it.

10:04:10  7        Well, what you are going to hear in this case is

10:04:13  8   that is kind of like where the medical community was in this

10:04:16  9   little area of medicine, kind of sitting in a dark room with

10:04:20 10   a candle, dreaming of a device that could actually work

10:04:24 11   without surgery in those small blood vessels of your body,

10:04:27 12   but people just didn't know how to do it.

10:04:29 13        What you are going to hear in this case is

10:04:34 14   that people in the medical community thought this kind of

10:04:36 15   technology was impossible.  And what you are actually going

10:04:40 16   to here in this case is that the defendant Bard thought that

10:04:44 17   this kind of technology was impossible.  So how many

10:04:51 18   times has that happened where somebody says something is

10:04:55 19   impossible and then somebody else turns on a light?

10:05:02 20        So in this case, you are going to hear about

10:05:06 21   Gore and how Gore is the kind of company that is really good

10:05:09 22   at taking "there must be something better" and turning it

10:05:14 23   into things that actually work.  And you might know already

10:05:17 24   that Gore is famous for making Gore-Tex, but maybe you

10:05:22 25   didn't know that Gore has a long history of solving problems

10:05:27  1    with things that actually work.

10:05:29  2           And in this case, you are going to hear about

10:05:32  3    how Gore developed a solution to the problem we have just

10:05:36  4    been talking about and how Gore was the first company in the

10:05:40  5    world to develop technology that was an ultrathin, tiny

10:05:46  6    stent graft that could work in the smallest blood vessels in

10:05:51  7    your body.

10:05:51  8           You are going to see evidence, documents and

10:05:53  9    hear testimony in this case about how when Gore had this

10:05:57 10    invention, it was a big deal.  And you are going to hear it

10:06:03 11    was a big deal at Gore.  You are going to hear it was a big

10:06:05 12    deal for doctors.  You are going to hear it was a big deal

10:06:08 13    for patients.  And you are going to hear that it was a big

10:06:11 14    deal for Bard.

10:06:16 15           Because when Bard learned about Gore's

10:06:19 16    invention, you are going to hear that Bard realized it was

10:06:23 17    in "catch up" mode.  You are going to see documents from

10:06:27 18    Bard's, Bard's own documents in this case, that show that

10:06:31 19    when Bard learned about Gore's technology, Bard was fixated

10:06:36 20    on learning about Gore's technology.

10:06:38 21           And as Bard started to develop its own product

10:06:41 22    to catch up with Gore, you are going to hear that it was

10:06:46 23    looking at Gore's products.  It was looking at Gore's

10:06:49 24    technology.  You are going to hear in this case from Bard's

10:06:53 25    own documents that when it was coming to doctors to talk

10:06:56 1   about its own invention or its own products, doctors were

10:07:00 2   telling Bard you need to be more like Gore's invention.  And

10:07:05 3   what you are going to hear in this case is that when Bard

10:07:08 4   actually developed a product, it trained its salespeople to

10:07:12 5   go out and sell it by telling doctors that it was like

10:07:14 6   Gore's invention.

10:07:16 7        And you are going to hear in this case that when

10:07:19 8   Gore got regulatory approval for its own medical devices, it

10:07:19 9   went out and told government that its products were like

10:07:25 10   Gore's invention.  And you are going to see documents in

10:07:27 11   this case, yourself, that show that internally at Bard,

10:07:32 12   Bard was doing test after test after test after thousands

10:07:37 13   of tests to confirm that its products were like Gore's

10:07:42 14   technology.

10:07:43 15        So that's why we're here in this patent

10:07:46 16   infringement case.  And we think that the evidence that

10:07:50 17   you are going to see during the course of this trial will

10:07:52 18   show that Bard got caught behind Gore, and then Bard used

10:07:59 19   Gore's technology, Gore's invention, and in doing so, Bard

10:08:04 20   infringed the rights that were given to Gore for its

10:08:07 21   invention by the United States Government.

10:08:10 22        So I want to talk to you about the details of

10:08:13 23   this case.  Okay.  First, let's talk about the technology

10:08:19 24   and a little bit of the science because in patent cases,

10:08:23 25   this science, we're going to keep it at a pretty high level

10:08:26  1    for now.  I want to talk to you a little bit about stent

10:08:30  2    grafts.  So we're going to start with Anatomy 101.

10:08:33  3            So this is your human body, and this is the

10:08:35  4    human vascular system.  Your vascular system, they're your

10:08:39  5    blood vessels, and they go throughout your body, they bring

10:08:42  6    oxygent and nutrients to where you need them.  And what you

10:08:45  7    may know is that in the core of your body, your blood

10:08:50  8    vessels are larger.  So your aorta in your body is about

10:08:54  9    this big (indicating).  As your blood vessels travel into

10:08:58 10    your arms and legs they get smaller, and those smaller blood

10:09:01 11    vessels are called peripheral vessels.  That is a word you

10:09:04 12    are going to hear a lot.

10:09:05 13            So healthy blood vessels look something like

10:09:09 14    this.  It's smooth and it's round and blood can travel

10:09:13 15    through it nice and smoothly.

10:09:15 16            You might have heard of something called

10:09:17 17    vascular disease, and vascular disease is when you are

10:09:21 18    having a problem with your blood vessels.

10:09:22 19            So one type of vascular disease you might have

10:09:25 20    heard about is something called an aneurism.  And an

10:09:29 21    aneurism is like a bulge in your blood vessel.  You are

10:09:32 22    going to hear it's kind of like a balloon blowing up and

10:09:35 23    when that bulge comes out the wall, the blood vessel gets a

10:09:40 24    little bit thinner, and that creates a dangerous situation

10:09:42 25    because potentially that can actually burst, and a burst

| | |
|---|---|
| 10:09:45 | 1 |

aneurism is a very, very large medical problem.  It can be

life threatening.

Another type of vascular disease is something

called an occlusion, which is kind of like the opposite

problem.  Instead of getting bigger, your blood vessels are

getting smaller because plaque is building up on the inside

of your blood vessels.  And as it gets smaller and smaller,

it can restrict the blood flow through your blood vessels.

So one example of an occlusion, like if you get

one in your leg.  Let's say, this would be called, this is

called a femoral occlusion, so like your femur in your leg.

So femoral occlusion, if you have this, it can cut off your

blood flow to the rest of your leg and now you are dealing

with a potential lost limb.

So these are examples of the types of vascular

disease that you might hear about in this case.

And what you are going to hear is that back in

the day, the only real solution for people who had vascular

disease was surgery, and the treatment that doctors were

using in surgery was something called a surgical graft.  And

I actually have one to kind of show you a little bit.

So a surgical graft is like an artificial blood

vessel.  And the way doctors would use a surgical graft is

if I have a problem with my blood vessel in my arm, is that

they would make an incision and they would probably clamp

10:11:08 1   off your blood vessel around that damp problem area, one on

10:11:11 2   each side.  They actually surgically remove that damaged

10:11:15 3   area, and put a portion of a surgical graft into it, and

10:11:19 4   then stitch that in there, stitch you up.  And that was one

10:11:23 5   solution that was out there.

10:11:25 6          The problem was that surgery is a big deal

10:11:29 7   for -- I mean surgery is a big deal for everybody.  Surgery

10:11:33 8   for some people is a really big deal, and the kind of

10:11:36 9   patients who sometimes get vascular disease are people who

10:11:39 10  have other medical problems.

10:11:42 11         And so that is what we're talking about when we

10:11:44 12  say the evidence in this case is going to show that doctors

10:11:48 13  who were working with surgical grafts, this was like a

10:11:51 14  solution that was out there, but there was this concept that

10:11:55 15  there must be something better.

10:11:56 16         And what started to be developed was something

10:12:00 17  that, they used something called a catheter, and it was a

10:12:03 18  totally, it was a different concept, it was an alternative

10:12:06 19  to surgery.  That instead of taking a medical device and

10:12:09 20  putting it in your body by giving you an incision and just

10:12:12 21  putting it in there, the idea was that let's find a way to

10:12:16 22  get a medical device into the inside of your existing blood

10:12:20 23  vessel in a much less invasive kind of way.  And this is an

10:12:25 24  example of a catheter.

10:12:28 25         And what doctors developed was this idea that

10:12:31  1    you can make, instead of a big incision, there would be like

10:12:33  2    a little hole, and the catheter, this actually has a medical

10:12:38  3    device at the end of it.  The catheter could deliver a

10:12:40  4    medical device with using your blood vessels like a highway

10:12:43  5    to get to a place where you have the damage.

10:12:46  6            And that was a big improvement over surgery,

10:12:50  7    certainly for a lot of people.  And the technology that was

10:12:55  8    being developed to get it into your body through a catheter

10:12:58  9    was something called a stent graft.

10:13:02 10            Now, what is a stent graft?  Maybe you have

10:13:04 11    heard of it before.

10:13:07 12            Well, it starts with stent.  And a stent is just

10:13:12 13    like the graft.  It kind of is shaped like a blood vessel.

10:13:15 14    And there, you are going to hear there was technology out

10:13:17 15    there where doctors were using a stent with a catheter and

10:13:21 16    actually instead of taking, like surgically removing your

10:13:25 17    blood vessel, they would take that catheter and put that

10:13:27 18    little wire cage up inside of your existing blood vessel as

10:13:31 19    a way to hold it open, which was a good solution for some

10:13:34 20    people.

10:13:35 21            However, it kind of looks like a chain link

10:13:38 22    fence.  There are holes in the walls of the stent.  So if

10:13:41 23    you have occlusion, there is not a lot to stop plaque built

10:13:44 24    up from coming through, and you are going to hear there is

10:13:47 25    not a lot to stop the blood flow from hitting over that

10:13:50  1    sensitive area of an aneurism.

10:13:52  2            So the idea with a stent graft would be to take

10:13:55  3    that kind of technology, take this graft technology and try

10:14:00  4    to bring them together with the best of both worlds by

10:14:04  5    combining them quite literally, and taking two stent grafts

10:14:08  6    or two grafts, two of those soft grafts, putting one inside

10:14:12  7    of the stent, one inside the metal and then one outside of

10:14:16  8    the metal, and in doing that kind of completely encapsulate

10:14:19  9    the metal.

10:14:20 10            So this is the concept of a stent graft.  This

10:14:24 11    is what I have shown you earlier.  This is an example of a

10:14:28 12    stent graft.  And what you are going to hear in this case,

10:14:31 13    what you are going to see in documents and hear through

10:14:34 14    witness testimony is that in the early 1990s, people were

10:14:39 15    working on stent grafts in the larger areas of your body.

10:14:45 16            But, what people were not figuring out how to

10:14:50 17    do is how to make a stent graft that would go into those

10:14:53 18    peripheral smaller vessels of your body.  And here is why.

10:14:57 19    Because those smaller blood vessels presented a few special

10:15:02 20    kind of challenges.

10:15:04 21            No. 1, the size.  So this is an example of what

10:15:10 22    an aortic valve or aortic blood vessel might look like

10:15:17 23    compared to a peripheral blood vessel.

10:15:19 24            So let's say you have a stent graft.  You have

10:15:21 25    a triple layer device.  You have a stent with two soft

10:15:25  1    coverings over it.  Let's say you put in that in an aorta.

10:15:29  2    It takes up a certain amount of space, so that blood can

10:15:33  3    move through it smoothly.

10:15:35  4         If you take that same thickness of a stent graft

10:15:41  5    and you put it into a peripheral blood vessel, it just takes

10:15:45  6    up more space.  You are kind of occluding your own blood

10:15:49  7    vessel.  It's like taking a big couch from your mansion and

10:15:52  8    putting it into your apartment.  That doesn't work in the

10:15:54  9    space.  That was the challenge.  That was the space

10:15:56 10    challenge with peripheral blood vessels.

10:16:00 11         And what you are going to hear is that it wasn't

10:16:02 12    just as easy as let's go superthin, because the last thing

10:16:09 13    you want to do is create a device that is really thin and

10:16:13 14    then it kind of falls apart when it is in your body.  Now

10:16:16 15    you may have a bigger medical problem.

10:16:19 16         So there was a challenge on getting it thin

10:16:21 17    enough.  There was a challenge on getting it thin enough so

10:16:23 18    it actually worked.  It's like a Goldilocks situation.

10:16:27 19         And then there was this challenge which was

10:16:30 20    the catheter.  And you are going to hear in this case that

10:16:34 21    doctors and people in the medical community knew that if

10:16:37 22    you wanted to access those peripheral blood vessels in your

10:16:41 23    body, you needed to use a small kind of catheter just to

10:16:44 24    kind of work with the blood vessels and make sure you

10:16:47 25    incision point wasn't too big.  And in order to get a triple

10:16:51 1    layer medical device into a tiny catheter, it was going to

10:16:57 2    have to be small and then it was going to have to be able to

10:17:00 3    be collapsed to be really darn small.

10:17:01 4            So that was the challenge of peripheral blood

10:17:06 5    vessels.  What you are going to hear in this case and see in

10:17:10 6    the documents is that people weren't finding solutions for

10:17:15 7    the peripheral blood vessel challenge.  They were hitting a

10:17:23 8    brick wall.

10:17:23 9            A desire among doctors and people in the medical

10:17:26 10   community, that Gore and Bard who were working on this, was

10:17:30 11   that we would develop something called a low profile stent

10:17:35 12   graft.  And it would be a stent graft that was small enough

10:17:41 13   and thin enough but durable enough to actually work in those

10:17:44 14   really small spaces.  A low profile stent graft, or an

10:17:50 15   ultrathin stent graft.

10:17:54 16           Gore was the first company to figure out how to

10:17:59 17   solve that problem.  So let me tell you about Gore.

10:18:03 18           So you might know about Gore's Gore-Tex product.

10:18:11 19   If you are an outdoors person whatsoever, you might have

10:18:14 20   some Gore-Tex products because they're well known for having

10:18:16 21   high quality material that can go in outerwear.  But what

10:18:20 22   you might not know about Gore is that Gore has been using

10:18:25 23   its innovative culture to solve problems in other areas,

10:18:29 24   including medical devices.

10:18:30 25           And Gore was actually started in the 1950s

10:18:34  1    here in Delaware.  They've got a facility in Newark where

10:18:36  2    thousands of people show up to work every morning.  But in

10:18:40  3    the 50s, it was Bill Gore and his wife Bev.  Bill Gore was

10:18:47  4    a former DuPont guy and he started a new company in the

10:18:50  5    basement of his house in Delaware, and it was an electronics

10:18:54  6    company at the time.

10:18:55  7            About 10 or 15 years later, their son, the guy

10:18:58  8    on the right, Bob Gore had a breakthrough in polymers, or

10:19:04  9    plastics.  And what Mr. Gore developed was, what he realized

10:19:12 10    was that if you take a certain kind of polymer or plastic

10:19:15 11    and you stretch it and you heat it in a really fast kind of

10:19:19 12    way, it turns into something different.  It turns into

10:19:21 13    something called expanded polytetrafluoroethylene, which

10:19:27 14    thankfully everybody just called ePTFE.  And that is a

10:19:31 15    word you will hear a lot in this case, because ePTFE was a

10:19:35 16    material that Gore learned how to use to solve problems.

10:19:39 17            And what you are going to hear is that in

10:19:43 18    Flagstaff, Arizona, like up in the mountains of Arizona, I

10:19:47 19    think 90 miles from the Grand Canyon, Gore has a facility

10:19:50 20    where they are using ePTFE to solve medical problems.

10:19:56 21            And so I have referenced the 1990s a couple

10:20:01 22    times.  And I want to talk to you about 1993.  And that was

10:20:06 23    an important year for this invention.  It was an important

10:20:10 24    year for this case.  So it might serve you well to try to

10:20:13 25    put yourself to where you were in 1993.  And if you weren't

10:20:16  1     born yet, you can just imagine.

10:20:18  2             But what was going on in 1993 in Flagstaff at

10:20:22  3     Gore, Gore was working on solving this problem of stent

10:20:29  4     grafts.  And what you are going to hear is that Gore

10:20:35  5     actually already had a product on the market.  Gore was

10:20:37  6     selling these surgical grafts that surgeons were using, and

10:20:41  7     they were making them out of ePTFE.  So you are going to

10:20:44  8     hear when doctors were expressing this desire for there must

10:20:48  9     be something better, Gore was listening and Gore was working

10:20:51 10     on it.

10:20:52 11             Let me introduce you to somebody named Dave

10:20:56 12     Myers.  So you are going to meet Dave Myers in this trial.

10:21:00 13     He is going to come in and talk to you.  Dave Myers is an

10:21:03 14     inventor at Gore.  And Dave will introduce himself.

10:21:09 15             What you are going to hear is that Dave is kind

10:21:11 16     of the classic inventor story at Gore.  And Dave started at

10:21:16 17     Gore in the 1970s as a machinist working in their machine

10:21:21 18     room.  But the thing about Dave is that he is really good

10:21:26 19     with his hands, kind of a tinkerer, and he was kind of a

10:21:29 20     magician with ePTFE, and it didn't take all that long for

10:21:33 21     him to move into research and development at Gore and over

10:21:37 22     the course of his career, he ended up as an inventor on

10:21:40 23     something like 40 patents.

10:21:41 24             In 1993, Dave Myers was working on stent grafts;

10:21:47 25     and I want to show you something.  This is something called

10:21:51 1    a lab notebook.  This is Dave Myers lab notebook from 1993.

10:21:57 2            What is a lab notebook?  You are going to hear

10:22:00 3    Dave talk about it, but a lab notebook is basically a

10:22:04 4    written record that scientists use to record the details of

10:22:08 5    their invention work.  So it's kind of a formal document

10:22:12 6    used in medical companies and other kind of inventive

10:22:15 7    companies where you write down what you are working on in a

10:22:18 8    formal way.  People sign and date it and have a witness come

10:22:21 9    in and sign and date it.

10:22:22 10           This was Dave Myers's lab notebook in 1993 where

10:22:26 11   Dave Myers was writing down the work he was doing.  I want

10:22:30 12   to show you one of Dave's lab notebook entries.

10:22:34 13           So we're going to let Dave read his own

10:22:38 14   handwriting to you in this case.  I just want to show you a

10:22:41 15   little bit about what Dave wrote on February 3rd, 1993,

10:22:47 16   2/3/93.

10:22:48 17           Because on 2/3/93, Dave Myers had a

10:22:53 18   breakthrough.  And you are going to see in his lab notebook,

10:22:57 19   he described a graft concept.  And the concept was that you

10:23:01 20   would take ePTFE grafts and you would put them on the inside

10:23:06 21   and the outside of a stent, and you would do it in a way so

10:23:11 22   that the combined thickness of the two grafts were in Dave's

10:23:18 23   words, ultrathin, less than .1 millimeter wall thickness but

10:23:25 24   that it would also have mechanical integrity.

10:23:29 25           So ultrathin, less than .1 millimeter wall

10:23:33  1   thickness.  That was, you are going to hear this, that was a

10:23:38  2   big step forward in the quest to go thin.

10:23:41  3           And how thin is less than .1 millimeters wall

10:23:45  4   thickness?  These standard grafts that were out there at

10:23:49  5   the time, at least at Gore, were about .4 millimeters each.

10:23:53  6   So if you were to use what was out there at the time that

10:23:58  7   is just a standard surgical graft, you are talking about

10:24:01  8   .8 millimeters total.

10:24:02  9           What Dave wrote in his lab notebook on 2/3/93

10:24:06 10   was this idea that you could have a combined thickness of

10:24:09 11   two grafts that together were less than .1 millimeter.  It's

10:24:13 12   a fraction.  How small is .1 millimeters?  You are going to

10:24:18 13   hear it's about the size of a human hair.

10:24:21 14           So Dave was writing in his notebook the concept

10:24:23 15   that he would have a stent graft where if you combine the

10:24:26 16   two ePTFE coverings together, they would have a thickness of

10:24:30 17   about the size of a human hair and they would still have

10:24:32 18   mechanical integrity.

10:24:34 19           Do you remember in the patent video we just

10:24:36 20   watched, they talked about an invention date or a conception

10:24:41 21   date and how that is the date on which an inventor has an

10:24:45 22   idea so fully formed in his or her mind that they can write

10:24:48 23   it down or tell somebody about it?  On 2/3/93, Dave actually

10:24:53 24   started to get to work and he did it.

10:24:55 25           And you are going to hear that he ran an

10:24:57 1   experiment that day.  And he did something he called, I'm

10:25:00 2   going to make a composite.  What is a composite?  We're

10:25:04 3   going to talk about it in this case.  A composite, the type

10:25:06 4   of composite Dave was talking about was taking two ePTFE

10:25:11 5   grafts or two sheets of ePTFE, putting them together and

10:25:14 6   placing them in an oven so that they kind of melt into each

10:25:18 7   other.  That is a composite.

10:25:19 8           And so Dave did that that day.  He is going to

10:25:22 9   tell you about it.  And what Dave found is that he was able

10:25:25 10   to achieve a total thickness of less than .1 millimeters

10:25:29 11   wall thickness.

10:25:30 12           Dave signed his notebook that day.  He had it

10:25:36 13   witnessed by a guy named Wayne House.  Wayne House would

10:25:39 14   eventually become Dave Myers's coinventor, and those two

10:25:44 15   would work with two other guys at Gore at Flagstaff.  And

10:25:48 16   over the next couple of months, they would develop features

10:25:52 17   and versions of that invention and they would figure out

10:25:55 18   a way to make it work.  And, six months later, Gore filed

10:25:59 19   an application with the United States Patent and Trademark

10:26:02 20   Office on this invention.  And that invention became the

10:26:07 21   '892 patent.

10:26:09 22           You saw patents in the video with the big gold

10:26:13 23   seal on it?  This is Gore's.  And the '892 patent, you can

10:26:17 24   see right on the cover of it, has up in the corner '892.

10:26:23 25   The date of the patent, it issued April 7th, 1998.  You can

10:26:28 1   see in the bottom left, it was actually filed August 18th,

10:26:30 2   1993.   There is Dave Myers's name with his other inventors

10:26:34 3   and the assignee, the company he belonged to, was Gore.

10:26:37 4   That was the '892 patent.

10:26:40 5            So let's start a timeline.

10:26:45 6            1993, Dave has his 2/3/93 lab notebook entry.

10:26:51 7            By 1998, Gore has an issued patent from the

10:26:54 8   United States Patent and Trademark Office.   They actually

10:26:57 9   filed their application about six months after the invention

10:26:59 10  date.

10:27:00 11           In between that invention date and the '892

10:27:04 12  patent issuance date, you are going to hear that Gore

10:27:08 13  launched a product.   And the product that Gore launched, it

10:27:13 14  was first launched in Europe.   It was called Hemobahn.   And

10:27:17 15  Hemobahn, you are also going to hear about Gore's product

10:27:21 16  Viabahn.   It's the same invention, different names.   Usually

10:27:27 17  called Viabahn.

10:27:29 18           Here is a picture of Gore's Viabahn product.

10:27:31 19  And what you are going to here in this case is that Viabahn

10:27:35 20  used the core key inventive technology from the '892 patent,

10:27:40 21  the concept of a combined -- ultrathin, combined thickness

10:27:44 22  of less than .1 millimeters and had those two ePTFEs

10:27:49 23  coverings that were affixed to the surface of that stent in

10:27:52 24  the middle.

10:27:53 25           This is kind of interesting.   You see the kind

10:27:56  1   of S-shape of Gore's stent, the metal part?  That was

10:28:01  2   actually covered by a different patent.  The '892 patent had

10:28:05  3   kind of a hash tag like.  You will take a look at it in the

10:28:10  4   packet.  It has a different type of shape.  So Gore used a

10:28:13  5   different patent to get the shape of its Viabahn product,

10:28:16  6   but this technology was using the ultrathin invention from

10:28:20  7   Dave Myers.

10:28:21  8          And what you are going to hear in the case is

10:28:24  9   that when Gore's product hit the market in Europe, when it

10:28:27 10   eventually came to the United States, it was a big deal.

10:28:30 11   And Gore, when it brought that product out, had an

10:28:34 12   expectation, with the United States patent in hand with its

10:28:38 13   family of United States patents in hand, that Gore would be

10:28:41 14   able to compete fairly in the market.

10:28:44 15          So let's talk about Bard.  What was Bard doing

10:28:52 16   during that time we just talked about?

10:28:56 17          Well, one thing you are going to hear is that

10:29:01 18   back in the day, if there were two companies that were good

10:29:05 19   at working with ePTFE, it was Gore and it was Bard.  And

10:29:08 20   actually Bard was on the market selling these ePTFE stent

10:29:12 21   grafts, too.  So when surgeons were saying there must be

10:29:15 22   something better, Bard was hearing that also.

10:29:18 23          What you are going to hear and see in this case

10:29:20 24   is that the difference between Gore and Bard is that while

10:29:23 25   Gore was figuring out how to solve that problem, Bard was

10:29:26  1    taking a different type of approach.

10:29:28  2              This is one of Bard's lab notebook entries.  And

10:29:32  3    Bard, I think you are going to hear them talk about how in

10:29:37  4    1993, they were doing work on stent grafts, too.

10:29:40  5              I want to show you a lab notebook entry from

10:29:44  6    Bard from 1993 to show you where Bard was at.

10:29:47  7              This is actually a lab notebook entry from

10:29:50  8    November of 1993.  So Dave had his invention background like

10:29:54  9    Valentines Day.  This is about Thanksgiving.  And you see

10:29:57 10    that logo in there, IMPRA?  IMPRA is a company acquired by

10:30:02 11    Bard.  So for the purpose of this lawsuit, if you see IMPRA,

10:30:06 12    that is Bard; okay?

10:30:08 13              So this is what IMPRA was doing back in

10:30:10 14    Thanksgiving 1993.  They had a lab notebook that talked

10:30:13 15    about a device with an ePTFE covering.  One.  And in the

10:30:20 16    device Bard was talking about in its lab notebooks, what

10:30:23 17    kind of wall thickness was Bard talking about?

10:30:29 18              '93, Bard's own lab notebooks were talking about

10:30:31 19    a wall thickness of a singular, one, ePTFE graft with an

10:30:37 20    average of .5, .4, .4.  Two of them, it's like ten times as

10:30:45 21    high that Gore was talking about.  So that is where Bard was

10:30:49 22    on stent grafts in 1993.

10:30:51 23              What you are going to hear is that by 1996,

10:30:58 24    about three years later, Bard had acquired IMPRA, who was

10:31:02 25    working on grafts.  And Bard had acquired another company

10:31:05  1    called Angiomed, and Angiomed had been working on stents.

10:31:08  2    And the idea at Bard was you would bring them together and

10:31:11  3    maybe we can make something work with stent graft technology.

10:31:14  4          So I want to show you where Bard was at in 1996

10:31:18  5    when it got these two companies together.  This is, these

10:31:21  6    are notes from -- these are internal Bard documents.  These

10:31:24  7    are notes from a Bard meeting with Angiomed and IMPRA in

10:31:27  8    October of 1996.

10:31:29  9          And what kind of questions was Bard asking about

10:31:34 10    this low profile ultrathin stent graft technology in 1996?

10:31:43 11          Can a "Saran Wrap" thickness be made in ePTFE?

10:31:48 12          Can we discover it without ripping the ePTFE?

10:31:51 13          Can we get it into the delivery system?

10:31:53 14          We are concerned that sintering or heating this

10:31:56 15    up will cause problems.

10:31:58 16          In Bard's words, any of these could make a

10:32:01 17    product impossible.

10:32:01 18          1996, Gore was in clinical trials in Europe

10:32:05 19    putting devices into human bodies.

10:32:07 20          In 1996, Bard in their own internal documents

10:32:10 21    was saying we think that technology might be impossible.

10:32:13 22          So that is where Bard was in 1996.  Bard was

10:32:17 23    hitting a brick wall.

10:32:19 24          So 1997, Gore finishes clinical trials in Europe

10:32:24 25    and actually gets a product on the market in Europe, their

10:32:27  1    Hemobahn product.   And what you are going to hear in this

10:32:31  2    case is that Bard knew about Gore's product and Bard was

10:32:34  3    interested in Gore's product.

10:32:36  4           Let's look at their documents from after Gore's

10:32:39  5    product launched.

10:32:40  6           What you are going to hear is that Bard sent two

10:32:43  7    of its employees to Germany to meet with a guy named

10:32:47  8    Dr. Blum.  Who is Dr. Blum?  Well, what you are going to

10:32:50  9    hear is Dr. Blum was the doctor who used to work with Gore

10:32:54 10    on their clinical trials.   When you are a medical device

10:32:57 11    company and you want to go through clinical trials, you get

10:32:59 12    a doctor to kind of help you lead through their clinical

10:33:03 13    trials, so in Europe that was Dr. Plum.

10:33:04 14           Bard sent two of its employees to go to Germany

10:33:08 15    to meet Dr. Blum.  And they brought a sample of their

10:33:11 16    prototype that Bard was working on, they knew that that

10:33:14 17    doctor knew about Gore's prototype, and they asked for

10:33:17 18    feedback.  And this is the feedback that Dr. Blum told them

10:33:20 19    in 1997.

10:33:21 20           Subject:  Hemobahn.  Gore stent graft.

10:33:26 21           Dr. Blum thinks that in order to get an optimal

10:33:30 22    healing response, the covering should be very thin, i.e.,

10:33:33 23    .1 millimeters.

10:33:34 24           Our current prototype will not be suitable for

10:33:39 25    femoral occlusive disease compared to the Hemobahn device.

10:33:42  1          Our current prototype, according to Dr. Blum,

10:33:45  2    Bard prototype will not be suitable for peripheral small

10:33:49  3    occlusive disease compared to the Gore device.

10:33:52  4          And the feedback from Dr. Blum to Bard in '97

10:33:58  5    was that the thicknesses of the stent and the ePTFE layers

10:34:01  6    in Bard's prototypes had to be reduced.

10:34:04  7          So that is what doctors were telling Bard in

10:34:06  8    1997.

10:34:09  9          Six months later, you are going to see that Bard

10:34:12 10    had started and finished a product -- a project at Bard that

10:34:15 11    they called the Hemobahn Characterization Report.  And what

10:34:19 12    is a Hemobahn Characterization Report?  Well, you are going

10:34:22 13    to hear that Bard had gotten samples of Gore's products and

10:34:22 14    internally at Bard, they put together page after page after

10:34:22 15    page of technical information about Gore's product, photos

10:34:34 16    of each stage of the investigation, component drawings,

10:34:37 17    testing.

10:34:37 18          And, by the way, the original technical report

10:34:39 19    with all of the pictures and the video is located in the

10:34:43 20    research and development department, so just contact Lisa

10:34:46 21    Grasso in the research and development if you need to.  That

10:34:49 22    is what was going on at Bard.

10:34:51 23          But a month later, where does the United States

10:34:56 24    patent issue?  And at that point, Gore had formal ownership

10:34:59 25    of this invention.

10:35:01 1            What you are going to hear is that internally at

10:35:04 2   Bard, their projects kept going.

10:35:07 3            One month later, May 1998, Bard internally

10:35:10 4   creates something called a product opportunity appraisal.

10:35:13 5            What is that?  They said a business rationale

10:35:16 6   for their peripheral stent graft business is this.  The

10:35:19 7   major competitors in this segment have already started to

10:35:22 8   leverage clinical devices.  When you look at that document,

10:35:25 9   it talks about Gore.

10:35:26 10           What was Bard saying about itself?  What was

10:35:28 11  IMPRA saying about itself?

10:35:30 12           IMPRA is in "catch up" mode.

10:35:33 13           That was May 29th, 1998.  They were in catch up

10:35:37 14  mode.

10:35:37 15           A few days later, they started.  June 1st, 1998,

10:35:43 16  product initiation request at IMPRA.

10:35:47 17           Begin development of an encapsulated stent.

10:35:49 18  This is June 1999, two months after Gore patent issued their

10:35:52 19  internal documents and say we need to begin.

10:35:56 20           How did Bard begin development of its first

10:36:00 21  ultrathin low profile peripheral stent graft?

10:36:03 22           Well, they met with another doctor.  A doctor

10:36:06 23  named Dr. Dolmatch.  Who is Dr. Dolmatch?  Do you remember

10:36:12 24  Dr. Blum who in Europe was helping out with Gore clinical

10:36:14 25  trials?  Dr. Dolmatch was like the Dr. Blum in the United

States.  Gore had been working with Dr. Dolmatch to get the clinical trials going in the United States.

And Bard, in developing their product, now reached out to Dr. Dolmatch.  And you are going to see in their documents, Bard visited with Dr. Dolmatch in August of '98.  Dr. Dolmatch gave design input on stent graft covering.

That project that they started on was ultimately going to result in a product called Flair.  And Flair is one of the products that is accused of patent infringement in this case.  You are going to hear a lot about Flair.  Kind of long story short about Flair is that over the next decade, it was kind of like a slow moving train, and there were different design iterations and clinical testing and they did not get a product to market on Flair for about ten years.

Bard did not stop working on their stent graft technology during those ten years.  What did they do?

Well, more Bard documents.  In December of 2000, Bard made a hire of a guy named G. Ray Martin who was going to be the new covered stent business unit manager.

Progressive times ahead.  Bard was going to be launching a second low profile stent graft product.

Who is G. Ray Martin?

Well, you are going to here in this case, it is

10:37:43 1      undisputed actually, that G. Ray Martin worked at Gore in a

10:37:49 2      variety of areas, including ePTFE stent grafts, up until

10:37:53 3      November of 1999.  And Dr. G. Ray Martin then worked at Bard

10:37:58 4      from July 2000 to July 2002.

10:38:01 5              And prompted in part by an issue with the

10:38:03 6      company that was unrelated to Bard, in October of 2000, Gore

10:38:07 7      wrote a letter to Bard seeking information from Bard about

10:38:11 8      what Dr. Martin's responsibilities are at IMPRA or Bard.

10:38:15 9              And in October of 2000, Bard wrote back to Gore

10:38:18 10     and stated:  Since his hiring, Dr. Martin has worked almost

10:38:22 11     exclusively in investigating an assessing radiation therapy

10:38:26 12     devices -- like x-ray.  These devices do not incorporate

10:38:30 13     ePTFE, nor would they be compatible with ePTFE.

10:38:34 14             That was in October.  By December, you are going

10:38:37 15     to hear that Bard had hired G. Ray Martin into their covered

10:38:41 16     stent business unit.  And they had actually made him the

10:38:44 17     head of their covered stent business unit.  And they were

10:38:48 18     saying progressive times ahead, because as you will see in

10:38:51 19     Bard's documents, a couple months later, Dr. G. Ray Martin

10:38:56 20     was at Bard and he was signing another project initiation

10:39:00 21     request.

10:39:01 22             And this was for their next stent graft product.

10:39:04 23     Another product that is accused of patent infringement in

10:39:07 24     this case.  You are going to hear that they started working

10:39:11 25     on a product called Fluency that would turn into something

10:39:15  1    later called Fluency Plus.

10:39:16  2               And what was G. Ray Martin telling people at

10:39:18  3    Gore when they were getting started on the second project?

10:39:21  4               Is this market real?

10:39:23  5               Yes.

10:39:23  6               We need to get on the map.

10:39:25  7               What is our market entry strategy?

10:39:30  8               Adopting competitors pathway strategy.

10:39:33  9               G. Ray Martin.  June 2001.

10:39:36 10               The table has been set.  I have leadership,

10:39:38 11    extremely bullish on stent graft potential.

10:39:41 12               The time is now.

10:39:43 13               Show us the money.

10:39:44 14               That was G. Ray Martin in 2001.

10:39:46 15               2001, October, you are going to see by this

10:39:49 16    time, Bard had actually renamed this company.  Now they are

10:39:52 17    called Bard Peripheral Vascular because they are working on

10:39:55 18    peripheral vascular solutions.

10:39:57 19               Subject:  Fluency, tracheobronchial stent graft

10:40:01 20    product.  That was Project No. 2.

10:40:03 21               What was Bard's team saying about the importance

10:40:05 22    of that project?  Get on the bus.  The plan was get on the

10:40:07 23    bus.  The opposite of the turtle theory.  So the turtle

10:40:10 24    theory like slow and steady wins the race.

10:40:13 25               You are going to hear and see in this case that

10:40:16  1    was not Bard's plan.  Bard's plan was get on the bus.

10:40:19  2    Because as Bard's documents show, as you are going to here

10:40:23  3    in this case, Gore's bus had left eight years ago.

10:40:27  4                   Here is back to our timeline.

10:40:29  5                   You are going to hear it took a couple more

10:40:31  6    years, Bard got a product on the market.

10:40:34  7                   In 2003, they launched something called Fluency.

10:40:38  8    Bard had some issues with Fluency and so it voluntarily took

10:40:41  9    that product off the market, and it is not a product at

10:40:43 10    issue in this case.

10:40:44 11                   The products that are accused of patent

10:40:47 12    infringement in this case are Fluency Plus and Flair.

10:40:51 13                   Flair was that slow moving train that took ten

10:40:53 14    years that launched in with 2008.

10:40:56 15                   Fluency Plus was that second project, moved a

10:40:59 16    little bit faster.  They got it out in 2005.  2005, about

10:41:03 17    eight years after Gore's Hemobahn product hit the market.

10:41:07 18                   This is the timeline we're talking about.

10:41:08 19                   And these are the devices.  This is Bard's

10:41:12 20    product.  This is Fluency Plus.

10:41:14 21                   The Fluency Plus hit the market first for Bard.

10:41:18 22    They sold the most of them.  This is the primary product

10:41:21 23    accused of patent infringement in this case.  And this is

10:41:23 24    Bard's Fluency Plus product.

10:41:25 25                   What you particular going to hear is that in

10:41:27 1    developing Fluency Plus, Bard used Gore's technology from

10:41:31 2    the '892 patent.

10:41:33 3             When Bard hit the market, they became a

10:41:36 4    competitor to Gore.

10:41:40 5             Let's talk about patent infringement, and the

10:41:45 6    two issues that a patent infringement that you, as a jury,

10:41:47 7    are going to be asked to decide in this case.

10:41:50 8             Okay.  So this is what we called the basic board

10:41:57 9    here.  We may have this up for some of our early witnesses

10:42:00 10   just in case you need to check on the fundamental stuff of

10:42:03 11   the case.

10:42:03 12            The patent in this case is called the '892

10:42:06 13   patent.  You can see there are two claims of the '892 patent

10:42:08 14   at issue.

10:42:09 15            So in the patent video, remember, they talked

10:42:11 16   about the different parts of the patent.  The claims are at

10:42:14 17   the back of the patent, and the claims are like those deeds

10:42:17 18   that mark the boundaries of what you actually own, and each

10:42:20 19   claim is a separate little deed for property.  And,

10:42:24 20            Claim 32 is the primary claim at issue in this

10:42:28 21   case.  You can see it's a long one.

10:42:31 22            Claim 40 is something called a dependent claim.

10:42:34 23   We'll talk about it a little bit here.

10:42:35 24            Here is what claim 32 said in the '892 patent

10:42:39 25   that Gore got from the United States Patent and Trademark

10:42:41 1    Office.  And so this is the claim you are going to be

10:42:43 2    looking at in this case.

10:42:45 3          You are going hear about it more later, so I

10:42:48 4    will kind of summarize it quickly for now.

10:42:50 5          You can see it is broken into different

10:42:53 6    sections.

10:42:53 7          The first section, you see it says Section A:  a

10:42:56 8    tubular diametrically adjustable stent.

10:42:59 9          So that is the metal part.  Okay?  Paragraph A

10:43:02 10   is dedicated to that metal part of that stent.

10:43:03 11         And it has an exterior surface, a luminal

10:43:06 12   surface, and a wall, and having a multiplicity of openings

10:43:09 13   through the wall the stent.

10:43:10 14         That multiplicity of openings goes to the shape

10:43:13 15   issue we talked about earlier, and you can look in the

10:43:15 16   patent.  We'll show you what that shape looked like.  Okay?

10:43:19 17         You are going to hear in this case, there is not

10:43:21 18   really a dispute about Section A.  Bard doesn't really had

10:43:25 19   haven an argument that they're not practicing section A of

10:43:28 20   the '892 patent.

10:43:29 21         Section B and section C are like the second and

10:43:31 22   third layers of the device.

10:43:33 23         And you can see each of them talk about the

10:43:35 24   first, a first tubular covering of porous expanded

10:43:43 25   polytetrafluoroethylene, ePTFE, that is affixed to the

10:43:45 1    exterior surface of the stent.  And then a second tube of

10:43:48 2    ePTFE that is affixed to the luminal inside surface of the

10:43:52 3    stent.

10:43:52 4              So that Sections B and C get to the soft ePTFE

10:43:57 5    coverings.

10:43:58 6              And what you are going to hear is that Bard

10:44:00 7    doesn't dispute that its products that are accused of patent

10:44:05 8    infringement have two coverings that are made of ePTFE.

10:44:09 9    What they dispute is whether their coverings are affixed to

10:44:12 10   the surface the stent.  That is the Question No. 1 for this

10:44:16 11   case.

10:44:17 12             You can see below Paragraph C there is another

10:44:21 13   paragraph that starts:  wherein the combined thickness of

10:44:24 14   the first and second tubular conversation is less than about

10:44:28 15   .1 millimeter thick exclusive of the stent.

10:44:30 16             So the Court is going to give you a definition

10:44:33 17   what that means.

10:44:33 18             What it means is looking at the thickness of

10:44:36 19   just two ePTFE soft layers together, so exclusive of the

10:44:40 20   stent included, you don't include how thick the stent is,

10:44:43 21   and that, this might sound familiar in the patent, the line

10:44:47 22   is, that it needs to be less than about .1 millimeters.

10:44:51 23   Okay?

10:44:52 24             That claim 40, you can see it incorporates

10:44:55 25   everything above, and then it says:  In addition, the stent

10:44:58  1    is made of something called nitinol.  And Bard don't dispute

10:45:02  2    their stent is made of nitinol, but that is an additional

10:45:05  3    claim that kind of brings in that additional part of the

10:45:08  4    invention.

10:45:09  5            Okay.  Let's talk about patent infringement and

10:45:13  6    the kind of evidence that we have in this case that you are

10:45:15  7    going to see that we think show that Bard's products are

10:45:19  8    doing what that patent says.

10:45:21  9            Let's start by talking about thickness.

10:45:25 10            So here is the Court's construction of claims.

10:45:28 11    This is going to be on a page in your juror notebooks.  You

10:45:32 12    can actually you go take a look at this definition

10:45:35 13    throughout the trial if you want to.

10:45:37 14            The important things to note here is that the

10:45:39 15    Court's construction of less than about .1 millimeters thick

10:45:42 16    is getting the average or overall thickness of the covering.

10:45:46 17    Again, that is just the coverings together, not the stent.

10:45:49 18            So you are looking at here, okay?  Those little

10:45:55 19    diamond areas, that is where the thickness matters.

10:45:58 20            So as you are looking at measurements, the

10:46:01 21    question is, is it above or below the infringement line?

10:46:03 22            If it is .1 and above, not infringing.

10:46:06 23            If it is .0 anything, you are at below .1, you

10:46:10 24    are in the infringement zone.

10:46:11 25            Let's start by talking about Bard's Fluency Plus

10:46:17  1    product.  That is the primary product accused of patent

10:46:22  2    infringement in this case.  The second product that they got

10:46:24  3    going when they were in product development.

10:46:28  4              Okay.  Fluency Plus.

10:46:30  5              Here is the thing about the evidence in this

10:46:32  6    case.  Bard is a medical device company.  And I don't think

10:46:39  7    anybody here would disagree Bard wouldn't disagree that you

10:46:43  8    don't become a medical device company in America without

10:46:45  9    creating a lot of documents.  And Bard, when Gore filed this

10:46:50 10    lawsuit six years ago, we had certain information about

10:46:53 11    their products that was very concerning.  And then in the

10:46:55 12    course of this lawsuit, they had to turn over their internal

10:46:58 13    documents.

10:46:59 14              And Bard, as a medical device company, in their

10:47:03 15    internal documents, you are going to hear that Bard had

10:47:06 16    recorded details about the devices it was selling to put in

10:47:10 17    human bodies.  And it had recorded details about the

10:47:14 18    thickness of the ePTFE coverings on the devices that they

10:47:18 19    were going to put in human bodies.  And what you are going

10:47:21 20    to see in Gore's documents in this case, starting this

10:47:25 21    afternoon, is that in their own documents internally, Bard,

10:47:29 22    No. 1, their engineers were saying this product is intended

10:47:32 23    to have coverings that are less than .1 millimeters.  And

10:47:36 24    that when Bard was training its salespeople to go out and

10:47:39 25    sell these products to doctors, Bard was training its

10:47:42  1    salespeople to say less than .1.  And that when Bard was

10:47:44  2    getting regulatory approval for its products, it was telling

10:47:47  3    government, this product has ePTFE coverings of less than .1

10:47:52  4    millimeters.  And Bard, in test after test after test

10:47:54  5    internally, Bard was confirming for itself that its products

10:47:57  6    had a combined thickness of less than .1 millimeters.

10:48:01  7              I'm going to show you what I'm talking about.

10:48:04  8    Bard's engineering documents.

10:48:05  9              This is a product called Product Proposed

10:48:08 10    Characterization.  This is for Fluency Plus.  Here are the

10:48:10 11    plans on Fluency Plus.  We want coverings that are, quote,

10:48:10 12    "as thin as possible."

10:48:15 13              What does that mean?  Here is one of Bard's lab

10:48:18 14    notebooks from one of its engineers:  What was the plan on

10:48:19 15    thickness?  This is from somebody named Alex Tessmer.  You

10:48:23 16    are going to watch his video by deposition either today or

10:48:24 17    tomorrow.

10:48:25 18              What did Mr. Tessmer say the plan was for

10:48:27 19    Fluency Plus?  .50, .05.

10:48:30 20              Below .1, below .1.  Internal testing.

10:48:35 21              That was the plan.  What did they actually come

10:48:37 22    up with their products?

10:48:38 23              Well, the evidence in this case is going to show

10:48:41 24    that Bard went through something called composite testing.

10:48:46 25    Remember composites, when Dave Myers made a composition on

10:48:50 1  that first day on 2/3/93?  He took two ePTFEs and put them

10:48:53 2  in an oven and laminated them together.  He called that a

10:48:56 3  composite and he tested that to see how thin it was.

10:48:58 4          You are going to hear in this case Bard has done

10:49:00 5  the same thing and that is that Bard eventually started

10:49:03 6  making products that it was going to sell to doctors to put

10:49:06 7  in human bodies, was doing quality testing to make sure that

10:49:09 8  its products were thin enough, and that internally at Bard,

10:49:11 9  when it was making its products, it would make something

10:49:14 10  called a composite.  And then it would test that composite

10:49:16 11  for thickness to make sure everything was working right.

10:49:18 12          This is one of Bard's spreadsheet where it was

10:49:23 13  recording their composite information.  Let's take a look at

10:49:25 14  something from the middle of the stack.

10:49:27 15          You can see work order over there, work order

10:49:30 16  for Bard products.

10:49:32 17              Look at Column F, wall thickness average.

10:49:36 18              .06, .06, .06, .06.

10:49:40 19              Below .1, below .1, below .1.

10:49:45 20          I'm going to show you a document.  It's called

10:49:48 21  Plaintiff's Trial Exhibit 21.  This is a 268 page document

10:49:53 22  with 6,000 of Bard's internal composite tests.  How many of

10:49:59 23  them are below .1?  All of them.

10:50:02 24          Those are Bard's internal tests on the product

10:50:05 25  they were selling to put in human bodies.

10:50:07  1          Oh.  For all the visual learners out there, if

10:50:10  2     you didn't want to review the spreadsheets, at the end of

10:50:12  3     that document Bard actually put them on a graph.

10:50:15  4          So all of these dots on this graph represent

10:50:18  5     those tests and those spreadsheets, okay?

10:50:21  6          The upper line on the graft was below .1.  How

10:50:24  7     many of those dots were in the yellow infringement zone

10:50:27  8     below the line?  All of them.

10:50:28  9          These are Bard's documents, Plaintiff's

10:50:31 10     Exhibit 21.

10:50:32 11          So Bard was selling products to doctors.  How do

10:50:36 12     doctors -- how do medical companies communicate with

10:50:39 13     doctors?  Through sales representatives.  So what was Bard

10:50:43 14     training its sales representatives to tell doctors about the

10:50:46 15     thickness of its devices?

10:50:50 16          Here is Bard's training presentation for Fluency

10:50:55 17     Plus.  And what Bard was saying about wall thickness?

10:50:58 18          Bard was training its salespeople to tell

10:51:01 19     doctors that the wall thickness of that diamond area was

10:51:06 20     .07 millimeters, below .1.

10:51:10 21          This afternoon you are going to watch some

10:51:13 22     videotape depositions that we took of Bard employees; and

10:51:16 23     Bard employees were quick to tell you that this document was

10:51:19 24     important.  And that internally at Bard, the representations

10:51:23 25     that they were making to doctors through their sales

10:51:26 1  representatives, it mattered to Bard to have that be

10:51:29 2  accurate.  And that internally at Bard, you are going to

10:51:31 3  hear a witness testify this afternoon that documents like

10:51:34 4  this through an auditing person from person and person after

10:51:39 5  person was checking it for accuracy.

10:51:41 6          This is what Bard was telling doctors about the

10:51:41 7  thickness of the product that is accused of patent

10:51:43 8  infringement in this case.

10:51:44 9          Here it is again.  Here it is again.

10:51:47 10          What was Bard telling the government when Bard

10:51:50 11  was seeking regulatory approval for these products that you

10:51:53 12  put in human bodies?

10:51:54 13          If you need to get a product into a body pretty

10:51:57 14  much anywhere, countries have regulatory authority that

10:52:01 15  requires you to provide certain information.  And in the

10:52:04 16  United States, you are going to hear in that process the

10:52:06 17  United States Government didn't ask about thickness.  When

10:52:08 18  Bard wanted to sell its products in China, arguably the

10:52:12 19  largest market in the world for anything, the Chinese

10:52:14 20  government did actually ask about Bard's wall thickness.

10:52:17 21          This is Bard's internal document regarding its

10:52:21 22  Fluency Plus registration in China.  And they were saying to

10:52:23 23  each other, we need the following information:  thickness of

10:52:26 24  the covering materials.

10:52:27 25          What should we provide them?  Well, I guess with

10:52:31  1    should provide the information on the composite materials.

10:52:34  2              What information did they provide to China to

10:52:37  3    get regulatory approval?

10:52:40  4              06, .06, .06; below .1, below .1, consistent

10:52:45  5    with their tests.  That is what Bard's documents talk about.

10:52:48  6              So that is Fluency Plus, the primary product

10:52:51  7    accused of patent infringement in this case.  And that is

10:52:53  8    the thickness issue.

10:52:54  9              So what about Flair, that slow moving train of

10:52:58 10    a product?  Flair, they did internal composite testing on,

10:53:01 11    too.

10:53:01 12              And you can see that Flair, at least at a

10:53:03 13    certain point in time, take a look at that right column

10:53:06 14    of composite testing.  At least for awhile, it was kind of

10:53:09 15    a mixed bag.  Some of the documents showed that they

10:53:13 16    definitely had Flair that was in the infringement zone.

10:53:17 17    Other tests were showing that other Flair products were

10:53:20 18    above.

10:53:21 19              Here is the thing.  This is the 2005 document.

10:53:24 20    2007, Bard had documents saying the plan of Flair was wall

10:53:28 21    thickness as thin as possible.

10:53:30 22              And you are going to hear in this case, Bard

10:53:32 23    provided us samples of Flair for this lawsuit.  And we hired

10:53:35 24    a guy named Dr. Gorman to go test them.

10:53:39 25              When Dr. Gorman tested them in this lawsuit,

10:53:41  1    all the products were below .1; and Dr. Gorman tested the

10:53:45  2    Fluency Plus product as well.  And it confirmed Bard's own

10:53:49  3    numbers, below .1.

10:53:50  4             Who is Dr. Gorman?  You are going to meet him

10:53:52  5    this afternoon.  He is a doctor.  He is a surgeon from the

10:53:55  6    University of Pennsylvania.

10:53:56  7             He is actually Director of Cardiac Surgical

10:53:58  8    Research there.  He is a Professor of Surgery.  And the

10:54:02  9    kind of interesting think about Dr. Gorman is he is like a

10:54:04 10    surgeon scientist.  He has got his medical practice.  He

10:54:08 11    also designs medical devices.  And so Dr. Gorman sometimes

10:54:11 12    consults on lawsuits involving medical technology to help

10:54:14 13    explain complicated things.

10:54:15 14             You are going to hear that our project in this

10:54:17 15    case for Dr. Gorman was something kind of simple, just tell

10:54:21 16    us what the thickness is on the devices.

10:54:23 17             Dr. Gorman is going to walk through the test

10:54:25 18    this afternoon and tell you that every sample Bard provided

10:54:28 19    us to test was below .1.

10:54:30 20             So that is why we think that we have a patent

10:54:32 21    infringement case for Bard on meeting the thickness

10:54:36 22    requirement of the '892 patent.  That is the kind of

10:54:38 23    evidence we're talking about.

10:54:39 24             Let's talk about the "affixed" limitation, and

10:54:42 25    Bard's other argument that it doesn't meet the '892 patent

claims.

So "affixed," that is the ePTFE section of the
patent.  And the Court has -- so here, so we're looking, you
can actually see here this is Bard's Fluency Plus device.
There is an ePTFE covering on the inside, there is one on
the outside, and the question on "affixed" is whether those
two coverings are affixed to the metal stent that you can
see through the ePTFE.

And the Court's construction or the definition
of "affixed" in this case, is that the coverings need to
contact the stent and be secured to the stent.

So I don't think you are going to hear from Bard
that on their devices, their coverings don't contact the
stent.  There is not a requirement that it contacts the
stent in every location.

The dispute is really over, I think what you are
going to hear from Bard, is whether their coverings are
secured to the stent.

But, again, Bard is a medical device company.
And it has internal documents that talked about what it was
doing to its ePTFE coverings when it was putting them on the
stent.

And what you are going to hear in this case --
oh, let me back up a minute, by the way.

This is the '892 patent.  You have the Court's

10:55:58 1    construction, what it means to be "affixed."  On the '892

10:56:02 2    patent in this middle part, it is called the specification.

10:56:06 3    It's more detailed information about the invention.  And the

10:56:09 4    '892 patent gave examples of the kind of things you could do

10:56:13 5    to a stent graft to make it affixed and some examples the

10:56:17 6    patent gave were here.

10:56:19 7         The patent said examples could be you could

10:56:23 8    thermally adhere, or heat, or laminate the ePTFE coverings

10:56:29 9    to each other, and that that could be a way that you could

10:56:32 10   affix the ePTFE coverings to the stent.

10:56:35 11        Or you could use an adhesive like a glue, or you

10:56:39 12   could actually do suturing, stitching.  So you would have a

10:56:44 13   tube on the inside, a tube on the inside and stitch them up

10:56:47 14   at the ends.  These are examples of what affixing meant,

10:56:50 15   examples of how you could do affixing within Gore's patent.

10:56:53 16        What you are going to here in this case is that

10:56:55 17   Bard uses thermal adhering processes to put their ePTFE

10:57:02 18   coverings on their stent.  And at Bard, they call it

10:57:05 19   lamination.

10:57:06 20        This is Bard's stent graft lamination procedure;

10:57:10 21   and internal documents at Bard show when Bard is making its

10:57:14 22   products, it takes this two ePTFE layers and it puts them on

10:57:17 23   the stent and it puts them in an oven.

10:57:19 24        There is a temperature that -- that is the

10:57:22 25   temperature Bard uses.  This is a picture of their oven, and

10:57:25  1   it goes through that heating process of taking two polymer

10:57:29  2   or plastic tubes and kind of meting them together.

10:57:32  3   Lamination, that is what Bard calls it.

10:57:34  4           How important is lamination to Bard?  Well, Bard

10:57:36  5   does quality testing on its own products.  And what you are

10:57:39  6   going to hear is part of Bard's quality testing is something

10:57:43  7   called delamination testing.

10:57:45  8           This is Bard's delamination protocol or testing

10:57:48  9   protocol.  And it says the two layers, what does

10:57:50 10   delamination mean?  The two layers of ePTFE did not bond

10:57:54 11   properly and separation has occurred.  According to Bard's

10:57:56 12   documents, that is a defect.

10:57:58 13           What does Bard do with products that have a

10:58:01 14   defect?  If defects are found, place rejected stent grafts

10:58:07 15   in a properly labeled rigid container marked rejects.

10:58:10 16           Bard takes defect products and it puts them in

10:58:13 17   the reject container.  And, according to Bard, if its

10:58:15 18   product is delaminated, that is a reject, and they would

10:58:18 19   never sell it to anybody.  That what are you going to see

10:58:21 20   in their own documents.

10:58:24 21           So the question of whether it is affixed, this

10:58:27 22   ePTFE covering is affixed to the stent through this

10:58:30 23   lamination process.  We think as you are looking at the

10:58:33 24   evidence, you are going to see that this is the way of

10:58:36 25   securing that we use in our lives all the time.

10:58:41  1         You have got ePTFE coverings, diamond -- ePTFE

10:58:46  2  covering diamonds and a stent down the middle.  Lamination,

10:58:50  3  you are going to hear, melts those layers together, melts

10:58:53  4  those layers together and it goes up and over that stent,

10:58:56  5  like putting something on the back of your truck and

10:58:59  6  strapping in.

10:59:00  7         It's like putting a seatbelt on except with

10:59:02  8  Bard's product what you are going to see is that that ePTFE

10:59:05  9  is like 100 seatbelts on every single metal wire on their

10:59:10 10  stent.  So that is why we think that the evidence shows that

10:59:13 11  Bard is affixing their coverings to the surface of the stent

10:59:18 12  graft that they are putting in human bodies.

10:59:21 13         Do you have any questions about that?  This

10:59:27 14  afternoon you are going to watch a deposition video, a

10:59:31 15  deposition we took in this case of a guy named John Reviere.

10:59:34 16  He works in Bard's clinical studies.

10:59:37 17         It's a pretty short video.  Listen for the last

10:59:40 18  question because we just asked Bard's clinical guy:  Are

10:59:46 19  your coverings affixed to the stent?  And Mr. Reviere said

10:59:50 20  yes.  So just listen for that.

10:59:52 21         I want to talk to you about Bard's defenses in

10:59:56 22  this case because set against all of Bard's documents, how

10:59:59 23  are they saying that they don't infringe the patent?  Let me

11:00:01 24  tell you a little about the kind of evidence we think you

11:00:04 25  are going to see from Bard.

```
11:00:05  1            First of all, Bard has hired an expert witness

11:00:10  2    in this case named Robert Calcote, and Mr. Calcote is going

11:00:13  3    to be here for Bard to testify an offer his opinion that he

11:00:17  4    thinks they don't infringe.

11:00:17  5            So who is Mr. Calcote?  This is a picture from

11:00:20  6    his deposition.  You will meet him in person I think.

11:00:23  7            Here is what you are going to learn about

11:00:26  8    Mr. Calcote.  So Bard's independent expert Mr. Calcote used

11:00:30  9    to work at Bard.  Do you remember that document I showed you

11:00:33 10    from I think 1996 for Bard internally was saying we think

11:00:38 11    this project, this technology might be impossible?  That is

11:00:41 12    Mr. Calcote.

11:00:43 13            So Mr. Calcote is back now as Bard's expert and

11:00:47 14    they asked him to look at the thickness and they asked him

11:00:49 15    to look at affixing; and I want to give you a preview of

11:00:52 16    what you are going to hear from Mr. Calcote for Bard's

11:00:55 17    defense.

11:00:55 18            Mr. Calcote looked at the thickness.  Here is

11:00:58 19    what you are going to hear:  Mr. Calcote did not measure a

11:01:03 20    single commercial Fluency Plus product, period.

11:01:07 21            That is Bard's product.  That is the primary

11:01:10 22    product accused of infringement in this case.  Mr. Calcote

11:01:12 23    will tell you he didn't measure a single commercial product.

11:01:15 24            Why?  You are going to her hear him testify.  He

11:01:19 25    ran out of time.  So that is Bard's defense for Mr. Calcote
```

11:01:22  1    on Fluency Plus infringement.  He has some stuff to talk

11:01:25  2    about on Flair that we're going to talk about.

11:01:27  3              What does Mr. Calcote say about all of Bard's

11:01:31  4    documents?  Nothing.  Literally nothing.  What you are going

11:01:35  5    to hear from Mr. Calcote is kind of a nuanced thing that I

11:01:39  6    think you are going to hear a lot about.

11:01:41  7              I will preview it for Mr. Calcote.  He has a --

11:01:45  8    his defense I think is that he has a problem with the

11:01:50  9    scientific tool that Dr. Gorman from the University of

11:01:53 10    Pennsylvania used when he came up with those tests that

11:01:56 11    confirmed Bard's documents, okay?  So I think that is

11:01:58 12    argument you are going to hear from Dr. Calcote is that

11:02:01 13    he doesn't like the scientific tool and the method that

11:02:04 14    Dr. Gorman performs when he ran those confirmation tests.

11:02:08 15              So Bard thinks that Dr. Gorman should have used

11:02:14 16    something called a snap gauge.  Dr. Gorman used something

11:02:16 17    call a micrometer.  What you are going to hear in this case

11:02:20 18    is that a micrometer is like a high tech version of a snap

11:02:24 19    gauge.  Bard's own expert says it can be a very accurate

11:02:27 20    tool.  And Bard, in a video this afternoon, is going to

11:02:29 21    tell you that is a tool they use internally at Bard to test

11:02:32 22    their own products.

11:02:33 23              So we think that the snap gauge issue you are

11:02:35 24    going to hear from Mr. Calcote is kind of a nonstarter, but

11:02:38 25    that is the noninfringement argument from Mr. Calcote.

He looked at affixing, too, this "affixed"
limitation.  And here is what I think you are going to hear
from Bard on the "affixed" limitation is something called
the pocket theory.

And Bard's, Bard's pocket theory is that, this
is their Flair device.  If you zoom in to this product at a
microscopic level, there are microscopic pockets of air
between the ePTFE and the stent.  And that those pockets
mean that this device is not, the coverings are not secured
to the surface of the stent.  That is Bard's defense, the
pocket theory.

Here is a thing about the pocket theory.
Mr. Calcote, when he set out to demonstrate that there are
pockets, he didn't, again, he didn't look at Bard's device.
What Mr.  Calcote is going to tell you himself is that he
took a wire cutters and he cut the device open and then he
took pictures of the damaged device, and those pictures are
Mr. Calcote's evidence of pockets.

So Mr. Calcote we think is going to show you a
bunch of these pictures and point to these black areas.
Okay?  You see those are pockets.  Mr. Calcote is going to
tell you those are pictures of a device that have been cut
open with wire cutters and Dr. Gorman and I think you can
see for yourself when you see this case.

What is that stuff on the left side?  That is

11:04:17  1    ePTFE.

11:04:17  2              That we think demonstrates that it's literally

11:04:20  3    been ripped away from the surface of the stent because what

11:04:22  4    are those little red guys?  You are going to hear Dr. --

11:04:27  5    Mr. Calcote say, yeah, that is ePTFE.

11:04:31  6              You heard on the patent video like what is

11:04:33  7    evidence that it's raining?  If somebody walks in with a wet

11:04:38  8    umbrella and they're dripping wet, it's circumstantial

11:04:41  9    evidence that it is raining.

11:04:42 10              We think it shows that ePTFE sitting on the

11:04:45 11    surface of the stent are like a soaking with the umbrella

11:04:47 12    that suggests that the ePTFE is in contact with the stent

11:04:51 13    if you weren't going to rip it open with the wire cutters.

11:04:55 14    That is what we think the evidence will show.

11:04:57 15              By the way, pockets, Bard own internal

11:05:02 16    documents, this is Bard's design input summary report.  Look

11:05:06 17    at what it says:

11:05:06 18              Product attribute:  No disruptions, i.e., flaps,

11:05:10 19    pockets, holes, et cetera.  How important is this?  Urgency,

11:05:15 20    E.  Essential.

11:05:17 21              Bard's documents say it is essential that they

11:05:19 22    don't have pockets in their documents.  So we think that

11:05:22 23    Bard 's internal documents contradict the opinion that

11:05:25 24    Mr. Calcote is going to offer on infringement in this case.

11:05:29 25              Let's talk about patent validity because that is

11:05:34 1   another one of our defenses.  You heard a little bit about

11:05:35 2   it in the patent video.  You are going to hear more about it

11:05:38 3   in this case.

11:05:38 4          And Bard is saying in this case that even if it

11:05:42 5   is infringing Bard's patent, it is not responsible because

11:05:45 6   it thinks Gore's United States patent is not valid.

11:05:48 7          What you have already heard from the Judge in

11:05:51 8   the video is that in order to come to court and say that a

11:05:56 9   United States patent is not valid, you have to have

11:05:59 10  something called clear and convincing evidence.  Because

11:06:04 11  when United States patent goes through the patent procedures

11:06:09 12  and the Patent Office reviews the prior art to see what is

11:06:15 13  out there and the Patent Office says you have a valid

11:06:19 14  patent, the law says there is what is called a presumption

11:06:22 15  of validity.  And the law presumes that the Patent Office

11:06:25 16  got it right unless somebody can come in with clear and

11:06:28 17  convincing evidence to demonstrate it's not valid.

11:06:31 18         So validity is on Bard for this case.  That is

11:06:35 19  their burden, if they want to invalidate this patent, to

11:06:38 20  come up with evidence.

11:06:39 21         And this is the kind of evidence that I think

11:06:40 22  you are going to hear from Bard on validity.

11:06:42 23         Bard hired another witness.  His name is

11:06:48 24  Dr. Nigel Buller.  And this is his picture from his

11:06:53 25  deposition.  Dr. Nigel Buller is a practicing physician in

11:06:57 1  England.  And Dr. Buller is going to come here and testify

11:07:01 2  for Bard that it is his opinion that Gore's invention was

11:07:06 3  obvious.  That is Dr. Buller's opinion.

11:07:10 4          And we think the evidence is going to show that

11:07:13 5  Dr. Buller's opinion that Gore's invention was obvious is

11:07:16 6  contradicted by Bard's own documents because we think the

11:07:21 7  documents are going to show you that people were saying in

11:07:25 8  the medical community, there must be something better.

11:07:28 9  People were trying and failing.

11:07:30 10          We think the evidence is going show that Bard

11:07:33 11  thought this technology was impossible.  We think the

11:07:35 12  evidence is going to show that when Gore actually invented

11:07:38 13  this, Bard didn't say it was obvious.  We think the evidence

11:07:41 14  is going to show that when Bard (sic) invented this, Gore

11:07:44 15  (sic) actually tried to copy Gore's product.  We think the

11:07:48 16  evidence is going to show that when these products, when

11:07:50 17  this technology, when this invention got out into the world

11:07:53 18  that nobody was saying this was obvious, that this was a big

11:07:56 19  deal.

11:07:56 20          That is why we think Bard's documents are going

11:07:58 21  to contradict the opinion of Dr. Buller that this invention

11:08:02 22  was obvious.

11:08:03 23          Dr. Lee and Dr. Vallbracht are two more

11:08:08 24  witnesses that Bard has hired to come and talk about

11:08:12 25  invalidity.  And I think you are going to get an opportunity

11:08:15 1   to meet them in this trial as well.

11:08:17 2           Here is a preview of Dr. Lee and Dr. Vallbracht.

11:08:21 3   These are two practicing physicians who back in their early

11:08:25 4   1990s, late '80s got patents on the stent graft technology

11:08:29 5   in other areas.

11:08:31 6           Here is something to know about Dr. Lee and Dr.

11:08:35 7   Vallbracht's patents.  They were considered by the United

11:08:39 8   States Patent Office when the Patent Office reviewed Bard's

11:08:43 9   patent.  And on the front, or Gore's patent, on the front of

11:08:47 10  Gore's patent, you can literally see Dr. Lee's name.  In

11:08:51 11  Germany, it's like the guy from Germany, that is

11:08:55 12  Dr. Vallbracht.  Those patent numbers are literally listed

11:08:58 13  on the patent.  That is what you are going to hear about Dr.

11:09:01 14  Lee and Dr. Vallbracht's patents.

11:09:03 15          What you are going to hear about the kind of

11:09:05 16  work that Dr. Lee and Dr. Vallbracht, as technical

11:09:08 17  clinicians, what they were doing on ultrathin low profile

11:09:12 18  stent grafts?  What you are going to hear is these doctors

11:09:15 19  were not ePTFE experts.  These doctors, to the extent they

11:09:20 20  were doing something, we think it is pretty rudimentary.

11:09:24 21          And these doctors, when they were experiencing

11:09:28 22  problems in making it work themselves, who did they go

11:09:31 23  talk to?  Gore.  The documents are going to show that Dr.

11:09:35 24  Vallbracht and Dr. Lee actually reached out to Gore for

11:09:40 25  help.

11:09:40  1        I think you are going to hear from Bard they

11:09:43  2   think that is a problem for patent validity.  But I want

11:09:46  3   you to know two things:  Dr. Lee and Dr. Vallbracht.

11:09:49  4   Dr. Vallbracht lives in Germany.  There is no evidence

11:09:51  5   in this case, literally none, that he ever met with, talked

11:09:53  6   with, e-mailed, had any contact with any inventor in this

11:09:56  7   case.  He met with some people in Germany.  They did their

11:09:58  8   own thing.  We think that is Dr. Vallbracht.

11:10:01  9        Dr. Peter Lee, you are going to hear, Dr. Lee

11:10:04 10   actually requested a meeting in Flagstaff, Arizona with Gore

11:10:07 11   and came down and met with some Gore people in the summer

11:10:10 12   of 1993, months and months after Dave Myers's 2/3/93 lab

11:10:19 13   notebook entry.

11:10:20 14        What you are going to hear in this case is that

11:10:22 15   by the time Dr. Lee got to Gore for a meeting, Gore was

11:10:27 16   already on the bus and was working on this stuff, and Gore

11:10:30 17   eventually said no thank you.

11:10:32 18        So that is what you are going to hear from Dr.

11:10:35 19   Lee and Dr. Vallbracht.  We don't think that that comes

11:10:38 20   anywhere near clear and convincing evidence that means that

11:10:41 21   it's appropriate to invalidate the '892 patent at this stage.

11:10:44 22        I want to talk to you about one more argument

11:10:49 23   that I think you are going to hear from Bard.

11:10:51 24        And I think you are going to hear from Bard that

11:10:54 25   it's their position that the '892 patent is not important to

11:11:02  1    Gore.   And I think you are going to hear from Bard that they

11:11:09  2    think that the '892 patent is not important to Gore because

11:11:12  3    we put it on something called the proud patent list.

11:11:16  4              And you are going to hear evidence in this case

11:11:19  5    that Bard (sic) worldwide has hundreds, thousands of

11:11:24  6    patents.   At a certain point in time, Bard went through a

11:11:28  7    ranking process and made a proud --

11:11:32  8              MR. PORADEK:   Gore.

11:11:33  9              MS. RAZAVI:   Sorry.   Thank you.   Gore went

11:11:36 10    through a ranking process and made a proud patent list and

11:11:38 11    that Gore put the '892 patent on the proud patent list.   And

11:11:42 12    what I think you are going to hear from Bard is an argument

11:11:44 13    that they think that this invention wasn't important to

11:11:47 14    Gore because it wasn't ranked high enough on the proud

11:11:50 15    patent list.   They think that because it was ranked minor

11:11:53 16    on the proud patent list that it means it's not important to

11:11:56 17    Gore.

11:11:56 18              And I'm going to tell you that in this case, you

11:11:59 19    are going to meet Gore employees.   You are going to see

11:12:03 20    documents to demonstrate that this invention was important

11:12:06 21    to Gore.   This patent is important to Gore.   This, we think

11:12:12 22    the evidence is going to show that this invention was

11:12:16 23    important to medicine.   This invention was important to Bard.

11:12:23 24    That is what we think the evidence is going to show.

11:12:26 25              And this lawsuit is important to Gore.   And so

11:12:30  1    at the end of this lawsuit, at the end of the trial, we're

11:12:34  2    going to ask you for a finding of patent infringement

11:12:37  3    against Gore, to enforce federal law and the protections

11:12:42  4    that the United States patent has fairly given to Gore for

11:12:45  5    its invention.

11:12:45  6              Here is the plan.

11:12:51  7              Bard is going to come and give their opening

11:12:53  8    statement.  After that, we're going to get started showing

11:12:55  9    you evidence; and starting this afternoon, we're going to

11:12:57 10    start showing you those documents that I have just gone

11:13:00 11    really quick with on the screen; and you are going to get a

11:13:03 12    chance to see them yourself; and you are going to get a

11:13:06 13    chance to hear from Bard's employees themselves.

11:13:08 14              Kind of an interesting thing in this case is a

11:13:11 15    lot of Bard's employees are going to testify by video

11:13:14 16    through depositions that were taken earlier in the case.

11:13:18 17    And this afternoon, we're going to bring in Dr. Gorman from

11:13:21 18    the University of Pennsylvania and have him talk about his

11:13:24 19    analysis of Bard's products.

11:13:26 20              So just as a head up, on videos, because they're

11:13:29 21    short, I think that the ones today are between five and

11:13:32 22    15 minutes apiece.

11:13:34 23              First you are going to hear from a guy named

11:13:38 24    Joshua Smale.  He worked at Bard in their clinical trials.

11:13:41 25    He is going to talk to you about that diamond document.

11:13:45 1    Remember that document that was Bard's sales training, told

11:13:50 2    doctors, told salespeople what to say to doctors?  Mr. Smale

11:13:54 3    is going to talk to you about the diamond document.

11:13:56 4              Then you are going to hear from somebody name

11:13:59 5    Uta Rosseck who is also going to talk to you about the

11:14:02 6    diamond document and tell you how that document at Bard was

11:14:05 7    audited at Bard by person after person.

11:14:07 8              You are going to hear from Mr. Reviere whose

11:14:09 9    last question is going to tell you that their coverings are

11:14:12 10   affixed to the surface the stent.

11:14:13 11             And then you are going to hear later this

11:14:15 12   afternoon from someone named Michelle Bushmire who was one

11:14:18 13   of Bard's engineers working on research and development; and

11:14:22 14   she is going to start to walk you through those internal

11:14:24 15   tests that Bard was doing, that chart that they put together.

11:14:28 16             And listen for Michelle Bushmire.  She is going

11:14:32 17   to tell you that internally at Bard, they were using

11:14:34 18   something called a micrometer to test their devices.

11:14:37 19             So that is what is coming up on videos this

11:14:39 20   afternoon.

11:14:40 21             It has been a pleasure to talk to you.  I want

11:14:43 22   to introduce you to the Gore team.

11:14:45 23             We have a kind of collaborative approach to

11:14:48 24   this.  I think you are going to hear or see most of them

11:14:51 25   over the next couple of days.

11:14:52 1            For now, I want to thank you for your time.

11:14:55 2     Thank you very much.

11:14:56 3            THE COURT:  Okay.  Thank you.  We're going to

11:14:58 4     give the jury their break at this point.  During the break,

11:15:03 5     of course no talking about the case.  We'll give you about

11:15:06 6     15 minutes, and then we'll come back and we will continue.

11:15:10 7            I'll ask Mr. Looby if you can clear a path for

11:15:13 8     the jurors.  Thank you.

11:15:15 9            (Jury left courtroom.)

11:15:45 10            THE COURT:  All right.  We will be in recess.

11:16:16 11            (Brief recess taken.)

11:16:16 12            *     *     *

11:32:23 13            (Proceedings reconvened after recess.)

11:32:23 14            THE COURT:  Let's bring the jury in.

11:32:28 15            (Jury enters courtroom and takes seats in jury

11:32:52 16     box.)

11:33:24 17            THE COURT:  Welcome back, ladies and gentlemen

11:33:25 18     of the jury.  We are now ready to hear the opening

11:33:28 19     statements from the defendant.

11:33:29 20            MR. CHERNY:  Welcome back, ladies and gentlemen

11:33:32 21     of the jury.  I would like to start off by thanking you all

11:33:35 22     for engaging in this journey with us, which I hope will be a

11:33:39 23     little interesting.  Hopefully, you will learn a little bit

11:33:40 24     about medicine, the patent system, and what some of the

11:33:43 25     medical device companies in this country do.

11:33:46  1          I am going to start off, before we get going

11:33:48  2     with the details, by introducing my team, because although I

11:33:52  3     am up here, I don't get to do what I do without them.

11:33:55  4          At counsel table, this is Jack Blumenfeld, this

11:33:59  5     is Amanda Hollis.  This is our corporate representative,

11:34:03  6     Scott Randall from Bard.  He is the head of R&D.  This is

11:34:06  7     Mr. John Strand.  Mr. Ed Donovan.

11:34:09  8          That is Mr. Ryan Fisher.  Without him nothing

11:34:12  9     works, because he is the one who helps me keep the pictures

11:34:16 10     going.  In the back we have Ms. Catherine Burke over there.

11:34:20 11     Mike Pearson.  Jason Wilcox is over there.

11:34:23 12          I wasn't able to introduce everybody.  But those

11:34:27 13     are the people that help me do what I do.

11:34:30 14          You are going to see a little bit of a

11:34:33 15     difference in style and a little difference in theme from

11:34:35 16     what Ms. Razavi did.

11:34:37 17          By the way, my name is Steve Cherny.  I should

11:34:41 18     have introduced myself.  I introduced the team.

11:34:43 19          Patent infringement, it can get a little gritty,

11:34:46 20     it tends to be detail work.  As you saw, the claims have

11:34:49 21     very set limitations.  It is really much more -- I am going

11:34:53 22     to take this more at like an engineering level, because what

11:34:59 23     this really is is talking about actual physical products and

11:35:02 24     comparing them to actual physical requirements.  What you

11:35:04 25     need to do to do it right is actually take it down to a very

11:35:08  1    strict engineering level.

11:35:10  2            It is not an issue of going back to 2002 like

11:35:13  3    you are trying to put together a puzzle or a detective

11:35:17  4    novel.

11:35:18  5            For example, you are going to see from my

11:35:20  6    presentation, when you want to determine whether, for

11:35:23  7    example, a stent graph has an average thickness, pursuant to

11:35:28  8    the Court's claim construction of "less than .1," the way

11:35:31  9    you do it is actually go like an engineer and you measure

11:35:34  10   the actual place that the patent tells you to do it to come

11:35:37  11   up with an answer.

11:35:38  12           This is not something where we have to go back

11:35:40  13   to 1996 or 2002, before the devices came out.  We can

11:35:45  14   literally take the devices that are at issue and test them.

11:35:49  15   I am going to show you.

11:35:50  16           I apologize in some respects.  I am going to be

11:35:53  17   at a little more detailed level than the presentation you

11:35:56  18   just saw, but I think it will help us focus the issues on

11:36:00  19   what we need to do in the next couple days.  Please bear

11:36:04  20   with me.

11:36:05  21           I am going to start off where the patent video

11:36:08  22   you saw ended a little bit.

11:36:10  23           There is a helpful analogy there that patent

11:36:12  24   lawyers often focus on, which is that a patent is like a

11:36:16  25   deed to land.  Why is that helpful?  Because what we are

11:36:20 1    basically here doing is a trespass case.  What we have here

11:36:24 2    is a patent, and the patent, just like a deed to land,

11:36:28 3    specifies where the borders are.

11:36:30 4         The real argument here is not about whether Bard

11:36:32 5    is a competitor of Gore's.  Of course, we are a competitor.

11:36:36 6    In fact, there is no doubt, we compete.  We are a good

11:36:39 7    competitor.  Would Gore rather we weren't a competitor?

11:36:43 8    Sure.

11:36:43 9         That is not the issue here.  It is not the issue

11:36:45 10   about whether Bard wants to sell stent grafts.  It is not

11:36:49 11   the issue whether Bard wants to sell stent grafts that are

11:36:52 12   thin or work in the peripheral vascular.  The question is

11:36:55 13   are we on Gore's land.

11:37:00 14        It is like anything else.  The reason they used

11:37:03 15   that video in that analogy is because it really helps people

11:37:07 16   who think of patents as a very abstract concept crystallize

11:37:11 17   it.

11:37:11 18        So Gore has its land, Bard has its land, which

11:37:15 19   is things that it does which are, for example, proprietary

11:37:19 20   to Bard.  There are other companies in the same space.  Then

11:37:23 21   there is the public land, which anybody can use.

11:37:27 22        It is important to understand, what we are

11:37:28 23   really trying to figure out is, has Bard been on Gore's

11:37:31 24   land, not whether in general it competes with Gore, not in

11:37:34 25   general whether it wants to have a stent graft.  Not whether

11:37:38  1    it uses its product.

11:37:40  2            It is really a survey to figure out, are we or

11:37:42  3    are we not on their land?  And it is determinable.  It is

11:37:46  4    quantitative.

11:37:46  5            What I am going to show you is actually

11:37:48  6    quantitative evidence that you are going to see from our

11:37:51  7    experts and from our fact witnesses in this proceedings.

11:37:53  8            I put this up here just because there is a

11:37:56  9    tendency for jurors in my experience to look at a patent and

11:38:00 10    say, wow, it is a patent.  Much like a deed to land, some

11:38:04 11    deeds cover beautiful land, some deeds cover average land,

11:38:08 12    some deeds to land cover not so great land.  I am not saying

11:38:13 13    that that is anything here.  What I am saying, it is

11:38:14 14    important to understand that just because someone has a

11:38:17 15    patent doesn't mean it's great.  It doesn't mean anything.

11:38:20 16    It just means someone has drawn a line around what somebody

11:38:24 17    has, just like that land.

11:38:26 18            That is why that analogy is really helpful.  So

11:38:31 19    you can't judge something by, well, the Patent Office gave a

11:38:33 20    patent because, as they start off with the patent -- they

11:38:36 21    point out the Edison patent.  That patent, everyone knows,

11:38:39 22    that is like that land on the left.

11:38:41 23            There are many patents that no one ever uses.

11:38:44 24            It is important to keep in mind that just

11:38:47 25    because someone has patent it just means you have a deed.

We are trying to figure out whether we are on that land.

Validity later on is whether you essentially should have been granted that land in the first place.

I hope that clarifies what our task is here today.

Who is Bard?  Bard is a medical device manufacturer, much like Gore.  They are competitors.  It was founded 110 years ago.  It's in New Jersey.  It's a pioneer in the medical device area.  It has thousands of patented inventions.  In fact, that is the box from the Flare accused product and a list of a bunch of patents.  And you will hear from Dr. Buller, one of our experts, for example, how we use our very own '217 patent process to make these products.

Again, we have patents.  They have a patent.  It is not an issue about the fact that -- the only question is, by making Flare or making Fluency, are we on their land?

This is important.  We heard a lot of general talk about stent grafts.  You would think from listening that Gore was a pioneer in the area of stent grafts, that Gore had invented the stent graft.

All those things you heard about in terms of the benefits you get from stent grafts, whether it is dealing with occlusion or an aneurysm, came from Gore.  You are going to hear that that is not the case and it's not consistent with history.

11:40:04  1          There were literally tens of different patents

11:40:07  2    in the areas of stent grafts before Gore ever did anything.

11:40:10  3    Why is that important?  Because the more work that has been

11:40:13  4    done in an area before someone does their work, the less,

11:40:18  5    the narrower the land they can try to get.  So if I am the

11:40:22  6    Wright Brothers or Thomas Edison, I can claim a patent that

11:40:26  7    is very broad and fundamental.  As the area filled in with

11:40:29  8    lots and lots of stent grafts, and some of those stent

11:40:31  9    grafts are peripheral stent grafts, some of those stent

11:40:34 10    grafts are more general, but Gore did not show up and all of

11:40:37 11    a sudden say, we are going to create a stent graft.

11:40:40 12          In fact, what you are going to find out -- and

11:40:42 13    this is from one week after they filed their patents.  And I

11:40:46 14    highlighted Jim Lewis's name because he is one of the

11:40:49 15    inventors, too.  And he wrote, "We are late entrants into

11:40:52 16    this field."

11:40:53 17          You might have been left thinking after Ms.

11:40:56 18    Razavi's opening, my God, Gore sat there, thinking, there is

11:41:00 19    a problem to be solved and we are the only ones that can

11:41:02 20    solve it.

11:41:03 21          There were many, many people who came up with

11:41:06 22    stent grafts.  These are all good stent grafts too, like any

11:41:10 23    number of problems, there are many ways to sole the

11:41:12 24    problems.

11:41:13 25          So you get to very detailed levels of

11:41:15 1    differences.  If you looked at each one of these designs,

11:41:18 2    they would have their own specifications of how to do a

11:41:20 3    stent graft.  Just because you had a stent graft doesn't

11:41:22 4    mean you do a stent graph.  As Gore says, "We are late

11:41:27 5    entrants into this field," because they recognized they were

11:41:31 6    behind.

11:41:31 7            There is nothing wrong with that.  They were not

11:41:33 8    pioneers.  They came to this field late and they say, we can

11:41:36 9    provide a superior graft, because that's the business Gore

11:41:39 10   was in, was making the material, the ePTFE, but "we must

11:41:43 11   acquire stent or other graft fixation technology and

11:41:47 12   quickly.  This approach would also enable us to circumvent

11:41:51 13   portions of the elaborate patent labyrinth that continues to

11:41:54 14   grow more complex."

11:41:56 15           What Gore is saying is, we need to come up with

11:41:59 16   some little differential for what we are doing so we don't

11:42:03 17   infringe all those other people's patents.

11:42:05 18           So it is important to understand the landscape

11:42:07 19   here so you understand just how broad or just how narrow

11:42:10 20   what Gore's alleged invention is here.

11:42:12 21           You heard Ms. Razavi talk about the proud

11:42:15 22   patents that she put at the end there.  I understand why she

11:42:18 23   put it at the end.  She is trying to address it.  It is not

11:42:22 24   something they are really that proud of because it doesn't

11:42:25 25   help them.

11:42:26  1        I think you can probably tell something by the

11:42:29  2   fact that I am putting something up front and theirs was at

11:42:33  3   the end of their presentation.

11:42:35  4        What happened was there was a legal proceeding,

11:42:37  5   not this here, a different leg proceeding, where Gore

11:42:40  6   created this list.  And in this list Gore listed a number of

11:42:44  7   its patents and it did it pursuant to a scheme, a system.

11:42:50  8        Again, this is an undisputed fact, this is

11:42:53  9   something everyone agrees to, this was in a different Court.

11:42:57 10   Gore had to rate these 108 patents.

11:43:00 11        "Revolutionary patents satisfy a long-felt

11:43:04 12   need."  Obviously, we can all agree that the Edison patent

11:43:07 13   was a revolutionary patent.

11:43:09 14        "Major improvement patents, significantly

11:43:11 15   enhanced quality or produced superiority in an existing

11:43:16 16   product."

11:43:17 17        "Minor improvements," there is nothing lower on

11:43:19 18   this, create an incremental improvement in an existing

11:43:21 19   product."

11:43:22 20        Again, there is nothing wrong with being an

11:43:24 21   incremental improvement.  I will show you later on that I

11:43:28 22   don't think Gore had any improvement and the patent is

11:43:31 23   invalid.

11:43:33 24        But put that aside for that moment.  We need to

11:43:36 25   start cabining on what Gore actually did as to the broad,

11:43:42  1    high-level discussion we just heard.  When they made this

11:43:45  2    statement, they put in that list, they identified three of

11:43:48  3    their patents as revolutionary.  Again, they are telling

11:43:51  4    this to a Court, 52 of the patents were major, 53 of those

11:43:56  5    108 were listed as minor.  And, of course, as you have seen

11:43:59  6    now, the '892 patent was minor.

11:44:01  7            So all that talk about how wonderful and

11:44:06  8    valuable the '892 patent is is somewhat undercut by the fact

11:44:10  9    that when they had to make a statement to a Court ranking

11:44:14 10    these patents, they ranked it minor, which means, if I can

11:44:17 11    do the math, it's at best No. 56, meaning the top of the

11:44:22 12    minor patents.  It obviously doesn't go there.  We

11:44:25 13    understand.  It means that this patent is at best one that

11:44:28 14    creates an incremental improvement, and when they made this

11:44:33 15    list, another undisputed fact, they had a financial

11:44:37 16    incentive to maximize the value of that patent, which means

11:44:41 17    if they could have told the Court in that proceeding that it

11:44:45 18    was major or revolutionary, they had an incentive to do so

11:44:49 19    in that case.

11:44:50 20            But it turns out that they had to label it as

11:44:54 21    minor.

11:44:56 22            This is fact.  It's an undisputed fact.  It's

11:44:59 23    not innuendo.  It is not suggestion.  It is not a

11:45:02 24    characterization in this case of how important this is.

11:45:06 25    It's a fact from the past.

11:45:09  1          Okay, here is another thing.  There was a little

11:45:12  2    bit of loose discussion about this during Gore's opening.

11:45:17  3          In a case, in this case, there are things called

11:45:20  4    interrogatories.  Interrogatories are when each party asked

11:45:24  5    the other one a question, a formal question.  We said

11:45:27  6    describe in detail each product that Gore ever made, by or

11:45:32  7    on behalf of Gore, that Gore contends practiced or practices

11:45:36  8    any claim of the '892 patent or related patents.

11:45:39  9          Very important questions, because what I am

11:45:42 10    asking, what we are asking Gore is, do you actually use this

11:45:45 11    patent?

11:45:45 12          There was a whole kind of a little bit of a

11:45:48 13    shuffle there where Ms. Razavi talked about how Gore

11:45:51 14    practices the core principles of the '892 patent and

11:45:55 15    Viabahn.  There is no such thing as practicing the core

11:45:58 16    principle.  You either infringe or you don't infringe.  You

11:46:02 17    either practice it or you don't practice it.  It's not like

11:46:05 18    a menu where you get to choose pieces.

11:46:07 19          In order to practice a patent, you have to

11:46:10 20    practice all the pieces.  And that's what you are going to

11:46:13 21    have to do in judging whether we practice their patent.

11:46:16 22          So what Gore is admitting here is Gore is not

11:46:19 23    presently aware of any Gore commercial product that

11:46:21 24    satisfies all limitations of the asserted claims of the '892

11:46:25 25    patent.

11:46:26  1          What they are saying, what they are swearing to

11:46:28  2     in this Court is that their products do not practice this

11:46:33  3     patent that they just told you was so revolutionary.  That

11:46:36  4     is fine, because what that really shows you is what I told

11:46:39  5     you.  There is lots of different ways to build stent grafts.

11:46:43  6     Lots of different ways to solve these problems.  They chose

11:46:45  7     a different one.  And it just happens they are now trying to

11:46:49  8     say that we chose their path, even though they didn't want

11:46:52  9     to use that path.

11:46:53 10          I am going to show you, we don't use this patent

11:46:56 11     either.  As far as we know, nobody has used this patent.

11:46:59 12          So it's important to focus on the details.

11:47:02 13          I know it's a little warm.  I know it's going to

11:47:06 14     get detailed.  This is at the heart of how we make these

11:47:09 15     decisions and how we make fair decisions, how we look at it

11:47:13 16     literally.  Are we inside or outside the land?  It would be

11:47:17 17     profoundly unfair if we are not on their land for a decision

11:47:21 18     to come out otherwise.

11:47:22 19          We rely on you to make that assessment.

11:47:24 20          The claim, you have already seen that.  There is

11:47:27 21     two elements.  Remember, when a patent is minor, when a

11:47:30 22     patent is late in the field, it gets narrower and narrower,

11:47:34 23     the land gets narrower, and there is more things added in to

11:47:40 24     substantially sub-define what your invention is, because you

11:47:43 25     can only at that point add increments to what happened in

11:47:45  1    the past.

11:47:46  2                 They have in here these two limitations.  One is

11:47:51  3    that it is affixed -- I will get back to this -- Ms. Razavi

11:47:56  4    was a little glib, she kept saying "affixed to the stent."

11:48:01  5    That is not what the claim requires.  It says specifically,

11:48:04  6    "affixed to the exterior surface of the stent and affixed to

11:48:07  7    the luminal surface.

11:48:08  8                 It is not enough to be on the stent.  As you

11:48:11  9    will hear, it will have been to be affixed to the actual

11:48:14 10    surfaces, front, upper and bottom, and as you heard it

11:48:18 11    actually has to have a combined thickness of less than about

11:48:23 12    .1 millimeters.

11:48:24 13                 One of the things you are going learn about is

11:48:26 14    how we make these products.  You didn't hear anything about

11:48:28 15    that before.  What you are going to hear about from Mr.

11:48:31 16    Randall, Bard's R&D director, is exactly how we make the two

11:48:34 17    products at issue, and why, if you actually wanted to do

11:48:39 18    Gore's '892, this would be a crazy way to do it.

11:48:43 19                 Literally, you can look at our manufacturing

11:48:45 20    process and determine that this process is not a process

11:48:48 21    calculated to lead to the result they are talking about.

11:48:51 22    But then we will go up above and beyond that and show you

11:48:55 23    actual measurements, actual measurements that show that we

11:49:00 24    don't end up in the '892 patent land.

11:49:02 25                 Here is a Flare.  Flare starts with two tubes.

11:49:08   1    The tubes are .1 to .25.  Remember the numbers.  Remember,

11:49:12   2    the combined tubes have to be a total of .1.  We start with

11:49:17   3    Flare of .1 to .25, with Fluency .08 to .15.  We are

11:49:23   4    starting -- we are starting, I will be absolutely straight

11:49:26   5    with you, it will get compressed somewhat, but we are

11:49:29   6    starting with pretty thick materials.  We are starting with

11:49:31   7    materials that are in the range of .2 to .5 total and .16 to

11:49:37   8    .3 in total.  Much bigger than the target in the patent.

11:49:41   9             Here is how we make a Fluency.

11:49:44  10             We take the inner tube and we put it into the

11:49:48  11    stent.  We take the outer covering, and we put it over the

11:49:52  12    stent.  I am going to show how we make a Fluency, the same

11:49:57  13    thing for Flare.

11:49:59  14             Flare is at the top and Fluency at the bottom.

11:50:01  15    One of the important things to understand here, you see

11:50:04  16    those is stent struts, those pieces of metal are did actual

11:50:07  17    authentication.  When you see them in the actual devices,

11:50:09  18    everything looks little.  In order to determine whether we

11:50:12  19    are infringing the patent, you actually have to get down and

11:50:16  20    dirty and look at the level that is really quite small and

11:50:19  21    can't be told by the human eye.

11:50:21  22             So there is no dispute that the stent struts in

11:50:25  23    Flare are .2 millimeters and the ones in Fluency are .24.

11:50:30  24    And the Flare on average starts with a material of .35

11:50:32  25    millimeters, Fluency starts at about .27.  Much larger than

11:50:38 1   we are talking about.

11:50:39 2            We add tape onto it.  We pull it down.  And we

11:50:44 3   compress those two layers together.

11:50:46 4            You are going to hear from Mr. Randall.  There

11:50:49 5   is no one in the world, not one expert here, who knows more

11:50:52 6   about how to make our products than Mr. Randall.

11:50:55 7            We remove the tape.  We then apply heat.  And

11:51:00 8   you heard about the pockets.  I am going to show you the

11:51:03 9   pockets.  You will have no doubt that those pockets exist

11:51:06 10  because we do it very deliberately, you see the pockets

11:51:10 11  happen here, because -- one of the reasons the pockets are

11:51:13 12  created by the way is this is Teflon.  EPTFE is stretched

11:51:17 13  Teflon.  It is about as nonstick as it gets.  The metal is

11:51:20 14  electro-polished metal.

11:51:22 15           So you have to work incredibly hard to actually

11:51:25 16  get the stuff to affix to the surfaces of the stent.

11:51:29 17           So here we are.  Now you have made a Flare.  Now

11:51:33 18  you have made a Fluency.

11:51:35 19           Pay attention to the struts, if you just took

11:51:37 20  ePTFE and pushed it together, you might be able to compress

11:51:40 21  it down to what Ms. Razavi is talking about.  She actually,

11:51:44 22  again, in a little bit of a trick, I guess, she showed you

11:51:48 23  some of our documents called composites.  The composites

11:51:51 24  are, if you take the materials and push them together

11:51:55 25  without the stent in there.  But that's not what the patent

11:51:58 1    is requiring.

11:51:59 2            It's got to be the material, once it's on the

11:52:02 3    stent.  What happens is those metal substrates are twice as

11:52:05 4    thick or more than the required thickness of .1.  So it is

11:52:11 5    prevented from ever getting down.  Even if you have

11:52:13 6    composite measurements, which are measurements in the

11:52:16 7    laboratory of taking the material and seeing if you can

11:52:19 8    compress it down, that is totally irrelevant to how thick

11:52:22 9    that material is on the stent graft, because you have these

11:52:26 10   metal poles that are literally holding it from compressing

11:52:31 11   past a certain point.

11:52:35 12           Noninfringement.  As you have heard, there are

11:52:37 13   two limitations we are focusing on.  They are independent.

11:52:40 14   Meaning that if we do not do either one of these, we do not

11:52:45 15   infringe.  In order to infringe, you have to do everything

11:52:47 16   in the claim.

11:52:50 17           Let's start with thickness.  The patent requires

11:52:54 18   a combined thickness of .1 in the area between the stent.

11:53:02 19   You can't count the metal.  You have to be in the area

11:53:04 20   between.  Remember, the metal is still is there, so you hare

11:53:06 21   taking it off once it's been made.

11:53:09 22           What are we measuring?  There.  We are managing

11:53:19 23   these pieces that are -- it has to be on the stent graft

11:53:23 24   already, we take them and we measure them and we have to

11:53:26 25   make sure that the average thickness of the entire stent

11:53:29 1    graft, an average, not at any one point -- I will tell you

11:53:31 2    that one of the documents that Ms. Razavi showed was at a

11:53:37 3    point, that's not relevant to this.

11:53:39 4           What we need to do is show the average thickness

11:53:42 5    throughout the graft.  Again, this is detail work.  It's

11:53:46 6    engineering.  We have to actually go and show throughout

11:53:48 7    this graft using established methodologies what the average

11:53:53 8    thickness is.

11:53:54 9           How do we do this?

11:53:56 10          Well, I will tell you, the patent actually tells

11:53:59 11   you how to do it.  You could also follow industry

11:54:02 12   measurement standards.  What is an industry measurement

11:54:05 13   standard?  The reason we follow standards in things like

11:54:08 14   this is so we are all on the same playing field.  So what

11:54:12 15   happens is in engineering often you have something called

11:54:14 16   standards where everybody has agreed how to do something.

11:54:16 17   You will find out, there actually is a standard way of

11:54:20 18   measuring wall thickness and standard tools to measure wall

11:54:22 19   thickness that people in this area use to measure it.

11:54:27 20          Or you can do the test that I will discuss later

11:54:30 21   that Dr. Gorman, their expert does, which is in stark

11:54:34 22   contrast to the first two.

11:54:35 23          What did we do?

11:54:36 24          The first thing we did, and you heard some

11:54:39 25   allusion to it, but Gore did not discuss actually where the

11:54:43 1    stent gauge comes from.  This is the patent.  It describes

11:54:47 2    one way to measure.  It doesn't mean it has to be the only

11:54:50 3    way, but it describes one way to measure thickness.  Wall

11:54:54 4    thickness measurements, wall thickness measurements of

11:55:05 5    intraluminal graft stent coverings were determined by

11:55:07 6    cutting away a portion of the covering that covered an

11:55:09 7    opening through the stent wall.

11:55:11 8          So we are starting with a stent graph, a

11:55:13 9    complete stent graft, and we are going to cut away portions.

11:55:16 10   The thickness of the sample portion was measured by placing

11:55:19 11   the sample portion between the pads of a Mitutoyo Model No.

11:55:28 12   804-10 stent gauge.  They later corrected it.  It's actually

11:55:32 13   a 2004-10, having a part number 7300 frame.

11:55:38 14         What do you do?  You take that little diamond.

11:55:40 15   It is not that hard.  We don't have to come up with that new

11:55:42 16   test.  We have a test that the Patent Office actually says

11:55:45 17   is how you do it.  We depress it using this, and I will tell

11:55:49 18   you, Gore has about 1000 of these stent gauges, probably.

11:55:53 19   This is a very, very common simple tool.

11:55:56 20         You open it up and lower it down and it's

11:55:58 21   calibrated to stop at a certain pressure.  Then what happens

11:56:02 22   is you put the diamond in, it goes down and it stops.  And

11:56:08 23   it measures.  And on this one, because it's in inches, we

11:56:12 24   convert to millimeters, it's .147 millimeters.  47 percent

11:56:18 25   bigger.  Numbers, quantitative.  We can just measure using

11:56:21 1    what the patent says the product is in suit.

11:56:25 2              So in this case it ended up being 47 percent

11:56:30 3    bigger.

11:56:31 4              You have heard that people have raised some

11:56:33 5    questions about the stent gauge.  I will tell you that early

11:56:35 6    on there were some questions raised that we said, well, the

11:56:38 7    only problem you might have with a stent gauge, the only

11:56:40 8    problem is, is that people will tend to say, it can possibly

11:56:44 9    be compressive, because if you lower it down too fast, the

11:56:49 10   pads will squeeze the ePTFE.  EPTFE is a compressible

11:56:54 11   material.  What does that mean?  If the stent gauge gives

11:56:57 12   you an answer, it is a conservative answer because it can

11:57:00 13   never make it bigger.  It can potentially compress the

11:57:05 14   ePTFE, which is a very spongy, slick material.

11:57:07 15             The snap gauge is a perfectly great tool.  It's

11:57:11 16   the only tool described in the patent, and it's a

11:57:15 17   standardized tool, as you will see.

11:57:18 18             What else did we look at to do?  We looked at

11:57:21 19   the standards.  These are very famous standard setting

11:57:25 20   bodies.  ANSI is the American National Standards Institute,

11:57:29 21   AAMI is a medical devices standards body.  What does it

11:57:34 22   specify:  Method for determination of the wall thickness.

11:57:38 23   This is not something we have to recreate.  There is

11:57:40 24   actually a standard way to measure wall thickness of graphs.

11:57:44 25   It says use a microscope or a stent gauge.

11:57:47 1          This is the 1994 version.  Here is the modern

11:57:50 2   version where they add another stent gauge manufacture

11:57:53 3   paragraph these are the standardized ways that people

11:57:56 4   measure wall thickness of graphs.  It is not hard.  It is

11:57:59 5   not rocket science.

11:58:01 6          You don't have to go back to 2002 to see what

11:58:03 7   someone said in a lab notebook.  You can take the commercial

11:58:07 8   products and test them exactly the way the patent and the

11:58:12 9   standards show.

11:58:13 10          We did hire Mr. Calcote.  Mr. Calcote is an

11:58:18 11  engineer.  Mr. Calcote probably has as much experience as

11:58:21 12  anyone in ePTFE, measuring ePTFE and applying standard ways

11:58:26 13  of measuring ePTFE.

11:58:27 14          He has got an advanced engineering degree.  Yes,

11:58:30 15  he worked at Bard many, many years ago.  I guess the

11:58:34 16  suggestion is somehow he would be dishonest because of that.

11:58:37 17          I will let you come to your own judgment.  This

11:58:40 18  guy is about as straight down the line as it gets.  He is an

11:58:45 19  engineer.  You will see what he did is went through and

11:58:49 20  applied the patent's way and standardized way of testing

11:58:53 21  thickness.  He took samples out.

11:58:55 22          There is the patent there.  Just like the patent

11:58:57 23  says, he wanted to measure the average across the graph by

11:59:01 24  taking samples throughout the graph, very quantitative.

11:59:04 25  Very systematic.

11:59:05  1          He measured them, and in this case, these are

11:59:09  2     Flares, and they were all above .1.  Every one of them.  You

11:59:14  3     don't have to guess.  This is a commercial product that's

11:59:18  4     accused in this case.

11:59:20  5          Another thing he did was, and he actually will

11:59:22  6     tell you was his preferred method, because it produces

11:59:26  7     pictures for the jury and because it is the gold standard of

11:59:29  8     measurement, he used a scanning electron microscope.  A

11:59:34  9     scanning electron microscope is about as high powered a

11:59:37 10     microscope you can get.  It can actually show you, in front

11:59:40 11     of you, the pictures of the thicknesses of these products.

11:59:44 12          So he took those diamonds, he put them into the

11:59:48 13     SEM.  And he took pictures.

11:59:51 14          That will be in stark contrast to anything you

11:59:53 15     will see from Gore.  You will not see pictures of the actual

11:59:56 16     commercial products that have been measured and taken a

11:59:59 17     picture on the microscope.  You will hear about their tests,

12:00:03 18     which left no pictures, which had no record.  And what Mr.

12:00:06 19     Calcote did was, he measured it.

12:00:08 20          So in this case, on this Flare, that part was

12:00:13 21     .216, more than two times as thick as the requirements.

12:00:17 22     That is the compressed area.

12:00:21 23          He sampled it.  And as you can see, he sampled

12:00:24 24     it at thinner years, thicker areas, and he came up with an

12:00:29 25     average of 1.66 millimeters.  That is not surprising, given

12:00:33 1    the starting materials, the stents, and there you go.  It is

12:00:37 2    66 percent higher than the requirement.  It is not on their

12:00:40 3    land.  It is 66 percent away from their land.  It does not

12:00:44 4    fall within under .1.  You can say, Dr. Bloom said you

12:00:49 5    should be at .1.  We don't have to think about what a doctor

12:00:53 6    in Germany suggests you should be at.  We don't have to talk

12:00:56 7    about what someone might have said in 2002.  We just

12:00:59 8    measured, and we measured it applying the Court's claim

12:01:02 9    construction, which nobody in the past had, which the Court

12:01:05 10   actually construed this patent and said, for this patent,

12:01:08 11   for this patent what you do is come up with an average

12:01:11 12   across the graft.

12:01:14 13            That's evidence.

12:01:15 14            As you can see, .129 over there, .15.  This is

12:01:20 15   about as precise and as systematic a way as you could come

12:01:25 16   to this conclusion as possible.  You will not see anything

12:01:27 17   on the other side, even though it is their burden to prove

12:01:30 18   infringement.  I can prove noninfringement, even though I

12:01:33 19   don't have to, by looking at this.  Fluency, we saw Fluency

12:01:36 20   starts with thinner materials.  If you recall, the Fluency

12:01:39 21   starts with slightly thinner coverings.  Here's the same

12:01:44 22   thing.

12:01:45 23            There was a suggestion we didn't measure a

12:01:46 24   Fluency Plus because we ran out of time, I don't know what

12:01:50 25   they were talking about.  There it is right there.  There is

1    the measurements.  And this shows you how honest he was.  On

2    the right one, there is a measurements of .097.  What he

3    would do is take each setting and try to go in the middle.

4    You can see, they were somewhat thicker on the right,

5    somewhat thinner on the left.  And he assembled an average

6    of the Fluency.  The Fluency, .126 millimeters, 26 percent

7    higher.  We are not below .1.

8            And he systematically put it together and

9    created a table.  You are not going see anything like that

10   from Gore.

11           When I get to what Gore did, I think you are

12   going to be shocked at the contrast between the systematic

13   quantitative nature of what we did and what Gore did.  And

14   I think that will say a lot for why Gore did what it did.

15           So what did Gore do?  Well, I will tell you what

16   it didn't do.

17           It didn't use a snap gauge.  Now, there is a lot

18   of, I heard some pooh-poohing about the snap gauge.  Mr. or

19   Dr. Lewis, who was one of the other inventors, when he was

20   asked at his deposition:  If I want to measure the wall

21   thickness of the coverings, once they've been applied, the

22   combined wall thickness, are you suggesting I should cut out

23   a piece of the openings and then measure that piece?

24           I'm suggesting that you ought to follow the

25   procedure that's taught in column 4, starting at line 31 in

12:02:43  1 my patent.

12:02:44  2    I will tell you that we did that, and I will

12:02:46  3 tell that Gore did not.  That should tell you something.

12:02:50  4    Here is how Gore actually measures its Viabahn

12:02:55  5 product, which although we all agree that Viabahn does not

12:02:59  6 practice the '892 patent, when they want to measure the wall

12:03:02  7 thickness they use a snap gauge.

12:03:04  8    When their aortic clinical coordinator was asked

12:03:09  9 what is the standard measure for measuring ultrathin

12:03:12 10 Wallgraft material?  Is it a snap gauge?

12:03:14 11    He said:  Yes.  My understanding is that the

12:03:15 12 standard method for UTW, ultrathin wall, is snap gauge.

12:03:20 13    Why are standards important?  It means we're all

12:03:20 14 on the same playing field.  That way, we all know how to

12:03:25 15 either get on your land or avoid your land, which is we're

12:03:27 16 all using the same way of measuring.

12:03:30 17    It is like the surveyor.  The surveyor uses a

12:03:34 18 set way to set the boundaries and that way we know.

12:03:35 19    The snap gauge is like the surveyors tool

12:03:38 20 here.  The patent discloses it, and it's a standard way.

12:03:42 21 Mr. Nilson, he went on and we asked him, we said, we raised

12:03:45 22 an issue:  Couldn't you compress the material a little bit?

12:03:48 23 Now, remember, compression only helps Gore because it only

12:03:50 24 makes the material thinner.

12:03:51 25    And he says:  Yes, all measurement methods have

12:03:55 1    some error, but the snap gauge from our perspective has the

12:03:58 2    least amount of error associated with it when measuring wall

12:04:01 3    thickness.

12:04:01 4            So it's not surprising that Gore in their

12:04:03 5    opening suggested, yeah, he is going to talk a lot about the

12:04:06 6    snap gauge.

12:04:06 7            This isn't coming from me, this is coming from

12:04:09 8    them.  This is coming from their patent.

12:04:14 9            You would think that the world would have a

12:04:16 10   right to take a look at that and say that is an acceptable

12:04:19 11   method to determine whether we're on your land.

12:04:22 12           Okay.  Look at their other patents.  These are

12:04:25 13   patents that are not an in this case.  Look how every one of

12:04:29 14   them that talks about measuring the wall thickness of

12:04:31 15   similar products use the snap gauge.

12:04:34 16           Now, again, I feel in some respects I'm like

12:04:37 17   beating a dead horse here, but this is a really important

12:04:40 18   case, and it is really important that we make sure it is

12:04:42 19   clear that this is something where we do not infringe.  We

12:04:47 20   are not under the limit.  And how do you determine that?

12:04:50 21           In another case that Gore had, against another

12:04:54 22   company, not against us, they went to a different court

12:04:57 23   and they gave a technology tutorial.  What is a technology

12:05:01 24   tutorial?  They're teaching the court there about the

12:05:04 25   technology of this patent.  And in there, Gore -- we weren't

12:05:09 1    even there -- said at any time you're talking about in a lot

12:05:14 2    of these claims, not all of them, in the Myers patent, but

12:05:17 3    in a lot of the claims, there are references to thickness

12:05:20 4    limitations, and any time thickness is at issue, one of the

12:05:24 5    considerations can be how do you measure that thickness.

12:05:28 6            And what do they tell the Court in that case?

12:05:31 7    The Myers patent itself describes a specific technique.  It

12:05:35 8    is using a snap gauge.

12:05:36 9            At this point, I might be a little surprised

12:05:38 10   why didn't I hear about the snap gauge in the other

12:05:41 11   presentation?

12:05:42 12           They also said:  One of the things to note about

12:05:44 13   the snap gauge is it is not surprising that Gore specified

12:05:47 14   this particular measurement technique in its patent.  Snap

12:05:51 15   gauge is a technique that Gore had used to measure ePTFE

12:05:55 16   materials dating back to the 70s and it uses it still to

12:05:59 17   this day.

12:05:59 18           I don't think Bard is crazy to think that

12:06:02 19   using a snap gauge is a perfectly acceptable and maybe even

12:06:05 20   preferable way in this regard to determine whether we

12:06:09 21   infringe the '892 patent.

12:06:10 22           And then they actually, without us even being

12:06:13 23   there, they said, you know, the other major medical device

12:06:17 24   companies also use the snap gauge to measure ePTFE: C.R.

12:06:21 25   Bard, Boston Scientific, Evera and then Atrium.

12:06:26 1          I think there is little doubt that the snap

12:06:29 2     gauge is one of the most acceptable ways to create a number

12:06:31 3     as to whether we are or not below .1 millimeters.  It is

12:06:35 4     quantitative.

12:06:36 5          In this case -- and this really is a little bit

12:06:41 6     interesting.  In this case, in December of 2013, remember

12:06:46 7     I told you what an interrogatory is.  We asked them a

12:06:49 8     question.  We said why do you think we infringe?  And they

12:06:53 9     wrote back:  Here is why we think you infringe.

12:06:55 10         They said:  Moreover, the '892 patent itself

12:06:58 11    describes measuring the thickness via snap gauge.

12:07:01 12         And Gore contends that when measured by snap

12:07:04 13    gauge, the combined thicknesses of Flair and Fluency will be

12:07:08 14    less than .1.

12:07:09 15         You would think that would suggest to the whole

12:07:12 16    world they're going to measure our products with snap gauge

12:07:14 17    and coming before you and say look at all our snap gauge

12:07:19 18    measurements.  It's probably not going to come as a great

12:07:21 19    surprise to find out Gore never once measured our products

12:07:24 20    with a snap gauge, even though something happened after

12:07:27 21    December 2013 that dissuaded them that the snap gauge would

12:07:31 22    give them a result that they felt comfortable going to the

12:07:34 23    jury with.

12:07:35 24         They didn't use the standard.  Remember I told

12:07:39 25    you about the standards?  But the standard gives you another

12:07:42 1    option, a microscope, which Mr. Calcote liked because it is

12:07:45 2    noncompressive and it produces a picture.  Even though they

12:07:49 3    helped write the standard.  They didn't use the SEM even

12:07:55 4    though Mr. Nilson said SEM is considered a very precise

12:07:58 5    measurement method.

12:07:59 6         So now I have told you, and you are probably

12:08:02 7    tired of hearing about snap gauges and standards.  You

12:08:04 8    probably are wondering what did they to?

12:08:08 9         They hired Dr. Gorman.  Dr. Gorman is an

12:08:11 10   excellent doctor, but Dr. Gorman is not actually an engineer

12:08:15 11   in practice.  He invents and works on medical devices, but

12:08:19 12   he has no experience in ePTFE, which is a very idiosyncratic

12:08:25 13   material, unlike Mr. Calcote who spent his life working on

12:08:28 14   this, he has no experience.

12:08:29 15        He has never even measured ePTFE before this

12:08:32 16   case.  Why?  There are people at Gore who spend their lives

12:08:36 17   measuring ePTFE.  Why would you go hire an expert who has

12:08:40 18   never, prior to this day, measured ePTFE?  Why?

12:08:45 19        And he created a new test.  He didn't use a

12:08:48 20   standard.  He didn't use the snap gauge.  He didn't use the

12:08:51 21   microscope.  He created an entire new test.

12:08:54 22        And I'm going to tell you something about this

12:08:57 23   test, and this test speaks volumes of whether Gore can argue

12:09:01 24   they met their burden that we infringe.

12:09:03 25        And so what did he do?

12:09:09  1                 Bear with me for a moment.

12:09:11  2                 Okay.  He took a point micrometer.  Now, a

12:09:15  3     micrometer is a way you can measure the thickness of

12:09:18  4     something.  You can use a micrometer.  You wouldn't use a

12:09:22  5     point micrometer on ePTFE because it's squishy.  There are

12:09:25  6     micrometers that have flat surfaces.  But he took a point

12:09:26  7     micrometer like that and set it at .097.  You didn't hear

12:09:31  8     anything from them about what he actually did.

12:09:33  9                 This test is at best interesting.  It

12:09:36 10     certainly -- and he admitted, by the way, it's a test that

12:09:38 11     no one, in his knowledge, has ever used to measure ePTFE.

12:09:42 12                 Now, you say why would you come up with a new

12:09:44 13     test?  I mean this is something that is standardized.  And

12:09:47 14     the best example I could come up with of what this is like,

12:09:50 15     it would be like if someone asked me, is this lectern

12:09:54 16     thinner than three feet on average?

12:09:57 17                 Well, I might say let me take out the tape

12:10:00 18     measure and measure it three different places.  And I'd

12:10:03 19     measure it.  And I might take down my recordings and say on

12:10:06 20     average it's, I don't know, two and-a-half feet or whatever.

12:10:08 21                 What he did was essentially the same as saying,

12:10:11 22     I know that that door is about three feet wide.  Let me see

12:10:15 23     if I can push it through the door.  And imagine this is made

12:10:19 24     of squishy material.  And he says, oh, if I can push it

12:10:21 25     through, then I guess I know whether it is three feet or

not.  Why would you do this when there are ways Gore itself tells everybody to do this?

So what happened is, here is what he did.  He set a micrometer at .097.  And I want to go back and forth. I want you to see how thin this is.  This is blown up ten times, 20 times.  That is the micrometer, of the same type he used, set at .97.  Do you see how thin that is.

What he did then was he took a little diamond, of this slick, squishy material, this pig, and said, I am going to see if I can pass it through there.  If I can pass it through, I will determine that it's less than .097.  And I will depend on my ability as a surgeon -- my tactile feel, and he will say I put the surgical hoops on and I could see on both sides.

Remember, the idea is that he is holding a forceps with this little diamond and he is saying, I am going to push it through and I will be able to feel, we all agree it is compressible and it's slick, so he is saying, I would feel if it goes through but if it's touching on either side, and I know it's not touching on either side.

That's the test.  Nobody has ever used this test before.  It is not in the standard.  Not in the patent.  No engineer has ever, to our knowledge, ever thought that this was a sensible way to measure the wall thickness of ePTFE for a stent graph.

12:12:20  1        He then opened up one and did the same thing

12:12:23  2   where he placed it in there and he could say, I can feel,

12:12:27  3   it's not touching.  He didn't come up with any measurements.

12:12:29  4   He never actually measured what it was.  He just says, I can

12:12:32  5   feel it.

12:12:33  6        Here, by the way, these are pictures from his

12:12:36  7   own expert opinion.  Here he is saying he can see on both

12:12:39  8   sides to see that that is a gap.  I don't know how anyone

12:12:42  9   could possibly -- even the picture shows that you can't see

12:12:45 10   on both sides.

12:12:46 11        So this is the test.  What's wrong with it?

12:12:49 12        First of all, it's subjective.  It depends on

12:12:52 13   Dr. Gorman's visual observations.  It depends on his

12:12:56 14   tactile -- what he says is his tactile -- it's not

12:13:01 15   reproducible because I guess each of us would have different

12:13:02 16   vision.  So everybody in the world who was trying to figure

12:13:05 17   out where the boundaries are would have to depend upon their

12:13:10 18   own visual observations, their tactile impressions.  It is

12:13:12 19   not reproducible, even between doctors.

12:13:15 20        But here, there are no measurements.  You will

12:13:17 21   not see anything from them that says that Dr. Gorman

12:13:20 22   determined that at different points on this graft this was

12:13:23 23   the thickness.  He just says, well, it either goes or

12:13:28 24   doesn't go.  But he admits that it could go through and

12:13:31 25   touch, but he said, I would feel if it touched.

12:13:34  1              My problem with that is, how do you know what

12:13:37  2     you are not feeling?  So how do you know if it touches and

12:13:41  3     you are not feeling it?  Because you are saying -- it is not

12:13:44  4     like he actually pushed something through and said, aha,

12:13:46  5     this is what it feels like when it doesn't go.  He literally

12:13:50  6     spent a day doing this and he said, I don't feel anything so

12:13:52  7     it must be less than .197.

12:13:56  8              From my perspective, this reminded me of the

12:13:58  9     game of Operation.  There were many, many times, and I don't

12:14:01 10     know who remembers that game, where I was sure I got the

12:14:04 11     funny bone out because of it was electrified and so the

12:14:08 12     answer is, I don't know what I am not feeling.  And Dr.

12:14:11 13     Gorman doesn't know what he is not feeling.

12:14:13 14              What is wrong is there is no documentation.  No

12:14:15 15     video.  It would have been the simplest thing to set up a

12:14:18 16     video of each one of these tests as they are going in and

12:14:21 17     out through this, through this.  He is sticking the forceps

12:14:28 18     and he could say, I can feel, I can see on both sides of

12:14:31 19     that.

12:14:31 20              You are going hear from our experts, including

12:14:33 21     Mr. Calcote, who has done -- not this, but has measured

12:14:39 22     ePTFE thickness a million times, you will hear that this is

12:14:42 23     not a feasible test -- I will try to be nice.  You can't do

12:14:45 24     it.

12:14:46 25              Why not just send a video so we can all see it?

12:14:50  1    You can blow it up.  You can have a video, that is two or

12:14:54  2    three times the surgery size, you can have a video blown up

12:14:58  3    20 or 30 or a hundred times, and we can all see that and

12:15:01  4    look to see, wow, there really is.  But there is nothing.

12:15:06  5              And, to end it all, to add insult to injury, he

12:15:09  6    threw out the samples he used.  So we couldn't even test

12:15:13  7    them ourselves using actual standardized tests.

12:15:18  8              So all we have to prove their burden to meet

12:15:20  9    this limitation is that Dr. Gorman saying I set this

12:15:23 10    micrometer at less than a human hair, I took these pieces, I

12:15:27 11    put them through, I didn't feel a touch.  Therefore, it must

12:15:29 12    be on the average less than .1.

12:15:35 13              Okay.

12:15:37 14              This is hard work.  Sorry about that.

12:15:39 15              Affixation.  Remember, these things are very

12:15:42 16    small, and I will show you proof that not only are we not

12:15:46 17    affixed to the surfaces, not tot stent, to the surfaces of

12:15:49 18    the stent, as the claim requires.

12:15:52 19              It has to be on both surfaces.  Not either/or.

12:15:55 20    Both surfaces.

12:15:55 21              Okay.  The Court has construed this, that means

12:16:01 22    interpreted in a way that we all have to abide by, as "must

12:16:04 23    be secured to both surfaces."  So it doesn't matter if the

12:16:09 24    ePTFE touches the surfaces.  It actually has to be secured,

12:16:12 25    affixed to both stent surfaces.

12:16:16 1              As Ms. Razavi accurately described, there are

12:16:18 2    three ways described.

12:16:20 3              One way is you can suture, sew it onto that

12:16:24 4    stent.

12:16:24 5              One way is you can adhere it with glue.  And one

12:16:27 6    way is you can bond together between the stent struts, but

12:16:34 7    you would have to do it so tightly that it actually secures

12:16:36 8    it to the metal.

12:16:40 9              They don't assert that we do either two or

12:16:43 10   three.  They say we do one.  As I said, you would have to

12:16:46 11   bond those layers together so it is actually secured to

12:16:51 12   those stents, both surfaces, not one, not the other, both.

12:16:55 13             As I am going to show you, the suggestion

12:16:57 14   somehow we mangled evidence in order to create this, it's

12:17:00 15   not right and it's not true.  I am going to show you, we

12:17:05 16   actually deliberately create pockets for a functional reason

12:17:09 17   that Mr. Randall will explain to you.  Otherwise our stent,

12:17:11 18   because of the type of stent we use, would not work.

12:17:15 19             So it's not enough that it just touches, which

12:17:18 20   is not even what we do.  It's got to be secured.  Keep that

12:17:22 21   in mind.

12:17:22 22             This is detail work.  Patent infringement cases

12:17:24 23   are detail work.  It's engineering.  It's science.

12:17:28 24             So we create, as I showed you before, these

12:17:31 25   pockets.  Why do we create pockets, very deliberately

12:17:34  1    between the ePTFE and the surfaces of the stents?  This

12:17:39  2    reason.

12:17:39  3          Because our stent, which is a rigid stent, it

12:17:43  4    needs to be able to move relative to the ePTFE.  What you

12:17:46  5    will hear Dr. Gorman admit, if you can move the stent

12:17:50  6    relative to the ePTFE, then it is not affixed.

12:17:55  7          If we affixed it, this is what would happen.

12:17:58  8    With our specific type of stent, which is different than the

12:18:02  9    type of stent that they used, as you saw, they use a

12:18:06 10    cylindrically key flexible coil stent, we use a very rigid

12:18:09 11    type of stent.  Our type of extent cannot work if it is

12:18:13 12    fixed.

12:18:14 13          I am going to show you evidence.  Actual

12:18:16 14    evidence, they talk about how I am making up this pockets

12:18:18 15    stuff, this is a Flare document given to doctors before this

12:18:21 16    case.  Every word on there, other than the title, is from

12:18:26 17    that document.  We didn't create this document for this

12:18:28 18    case.  This is not something Mr. Calcote created.  This is

12:18:30 19    evidence.

12:18:32 20          It says, Pockets within bonded ePTFE allow

12:18:36 21    extent expansion.  Do you see that?  It's not some made-up

12:18:39 22    pockets.  That's what it says.  You can see, this is an SEM

12:18:42 23    created by Bard years ago showing the pockets.

12:18:45 24          I can give you better from that same

12:18:47 25    presentation.  This is an actual appendix explant from a

364

12:18:52  1    pig.

12:18:52  2             What happened was, I guess, for the doctors,

12:18:56  3    they implanted a Flare into a pig, and they took it out to

12:19:00  4    show how it healed into the pig.

12:19:03  5             I don't know what happened to the pig, if anyone

12:19:05  6    is wondering.  I am sure it's fine.

12:19:08  7             So anyway, there are the stent struts.  Do you

12:19:11  8    see?  Those are the metal.  There is the pocket.

12:19:18  9             May I approach the screen for a minute, Your

12:19:21 10    Honor?

12:19:21 11             THE COURT:  You may.

12:19:22 12             MR. CHERNY:  As you can see, you can see the

12:19:24 13    space that has been very deliberately left so that the

12:19:27 14    struts are not fixed to the ePTFE, for the exact reason I

12:19:34 15    said earlier, so that our type of stent, our type of stent,

12:19:38 16    which is different from their type of stent, can expand and

12:19:41 17    it's not rigid.  Ours is rigid.  Theirs is not.

12:19:44 18             That's it.  This is evidence.  You don't have

12:19:46 19    to -- I think you will believe Mr. Calcote, but this wasn't

12:19:49 20    Mr. Calcote.  This was from somebody who created this years

12:19:53 21    ago.

12:19:54 22             But he did take SEM images.  Gore asserts that

12:19:59 23    somehow he must have done something underhanded despite his

12:20:05 24    professional reputation and essentially ripped this apart to

12:20:08 25    make these pockets.  We have already seen the pockets exist.

12:20:11  1   But he wanted to take pictures to show you the actual

12:20:13  2   evidence.

12:20:14  3               There you go.

12:20:17  4               Ms. Razavi talked about those little things.

12:20:19  5   Yes, there is little pieces of ePTFE attached onto the side.

12:20:22  6   That is not the ePTFE coverings being affixed, secured, to

12:20:28  7   the stent surfaces.

12:20:30  8               There you go.  There is another one.  You can

12:20:32  9   see, it's exactly what you saw in that historical document.

12:20:36 10   That's a Flare.  You can see.  Yes, it's very small.  But

12:20:40 11   that's the level we are at.  These are very small devices.

12:20:43 12   But there is no doubt.  We do not affix.  It will not work.

12:20:47 13               There is Fluency, which uses a different type of

12:20:49 14   stent.  It's more up and down.

12:20:52 15               You can see the pocket.  And it's not

12:20:54 16   surprising.  You are talking about Teflon.  It does not want

12:20:57 17   to stick.

12:20:58 18               The metal is electro-polished.  We are doing

12:21:01 19   everything we can to make sure it will not affix to the

12:21:04 20   surfaces because it will not work otherwise.

12:21:06 21               I told you, Viabahn, which they say does not

12:21:09 22   practice the patent, why doesn't it practice the patent?

12:21:12 23   Because they use that funky slinky stent.  That is the

12:21:15 24   reason why they say it doesn't practice the '892 patent.

12:21:19 25               They made their choice.  Their choice was, use

12:21:22  1    that flexible stent and affix, they definitely affix on

12:21:27  2    because they have got that flexible stent.  You see how

12:21:29  3    flexible it is compared to ours.

12:21:32  4         We chose a different type of stent, which is

12:21:34  5    more rigid, but you don't affix.  Nobody does both, as far

12:21:38  6    as we can tell.

12:21:40  7         That's what affixation looks like as an example

12:21:43  8    in the Viabahn because of the type of stent they used --

12:21:46  9    sorry to be at this detailed level, but this is what this

12:21:49 10    case is about, the details -- you can see it.  It's glued

12:21:53 11    on.  It's affixed.  It is secured.

12:21:57 12         Now, what did their expert, Dr. Gorman, do?  Did

12:22:01 13    he take any images?  No.  Much like his other test, which is

12:22:05 14    the one where he put it through the micrometer with no

12:22:10 15    measurements, no videos, he opened it up, looked at it with

12:22:15 16    the loops, I don't know how you can tell.  Again, the answer

12:22:19 17    is they keep saying, it doesn't delaminate it.  It stays on.

12:22:23 18    It encapsulates.  Yes, there is no doubt, it stays on,

12:22:27 19    encapsulates.

12:22:27 20         What happens is we bond through but we make sure

12:22:30 21    to leave those pockets around the surfaces of the extent for

12:22:33 22    the reasons I showed you.

12:22:34 23         They say, it doesn't come off.  It must be

12:22:36 24    affixed to the stent.  But that's not the question.  Is it

12:22:41 25    affixed to the stent surfaces?

12:22:42  1          The example I give is, look at my shirt.  It

12:22:45  2    doesn't come off.  It encapsulates me.  It's on me.  I

12:22:49  3    guarantee you, it is not affixed to me.  That's what we do

12:22:52  4    at the microscopic level.  But there is no microscopic

12:22:55  5    exception to patent infringement.  Meaning that from our

12:22:57  6    perspective, we have created pockets deliberately to not

12:23:01  7    affix, not because of their patent, not because of anything

12:23:03  8    having to do with Gore, because in our specific design it

12:23:07  9    doesn't work.

12:23:10 10          You are going to hear about infringement from

12:23:13 11    Dr. Buller, who I think was not given his due in terms of

12:23:17 12    his expertise in this area.  He is one of the pioneers in

12:23:20 13    stent and stent graft technology.  He will tell you exactly

12:23:24 14    why it is that our products do not infringe.  And he will go

12:23:27 15    on and tell you also about why the patent is invalid.

12:23:34 16          Okay.  We are getting to the home stretch.

12:23:37 17    Excuse me, I am going to take a little bit of water if you

12:23:40 18    don't mind.  Not only is patent infringement detail work, it

12:23:45 19    is hard work.

12:23:46 20          Invalidity.  Ms. Razavi accurately said that is

12:23:49 21    on us.  Infringement is on them.  They have to prove that we

12:23:54 22    meet both of those elements, that we affix and we also have

12:23:58 23    thicknesses on average less than the .1 number in the claim,

12:24:03 24    which is on them.  Invalidity is on us.

12:24:07 25          Invalidity is, as Ms. Razavi said, is us showing

12:24:09 1   that somebody did the invention before Gore or that someone

12:24:12 2   did something that was obvious from what they had done.

12:24:16 3       So what you are going to hear from Dr. Christian

12:24:20 4   Vallbracht.  You heard about 1993 as a year.  I have to

12:24:25 5   confess, not only was I alive in 1993, I was someone who was

12:24:32 6   out there.  But Dr. Vallbracht was doing his work in 1989.

12:24:37 7       He is really one of the pioneers of this area.

12:24:40 8   Four years before, at this time Gore hasn't even dreamed of

12:24:43 9   a stent graft.  There is not even an assertion that Gore has

12:24:46 10  conceived or did had done anything with stent graph

12:24:49 11  technology at this point.

12:24:50 12      What does Dr. Vallbracht do?  He files a patent

12:24:53 13  in Germany, which you heard about, and which the Patent

12:24:56 14  Office did consider, that describes exactly the type of

12:24:59 15  product we are talking about today.  He says, It's an object

12:25:03 16  of the present invention to develop a vascular

12:25:06 17  endoprosthesis, that is a stent, inside, endo means inside

12:25:11 18  the vein or the artery, and he says, we want to stop cells

12:25:14 19  from growing through the walls of the stent.  And he says,

12:25:17 20  We can accomplish that by coating a known stent on the

12:25:21 21  inside, and possibly on the outside, two layers, with a thin

12:25:26 22  layer of PTFE.

12:25:29 23      I know, it's shocking.  You thought the thin

12:25:31 24  layered EPTFE stent graft was invented in 1993.  It wasn't.

12:25:38 25      So they said he went to talk to Gore -- this is

12:25:40  1   the part that the Patent Office didn't hear about.  They

12:25:43  2   said he went to Gore to ask for their help.  That is not

12:25:47  3   true.  You will hear about that from Dr. Vallbracht.

12:25:49  4           What he did was after coming up with this idea,

12:25:52  5   he knew that the people that make ePTFE are Gore.  So he was

12:25:57  6   looking for the material to make his invention and maybe

12:25:59  7   work collaboratively.

12:26:01  8           He contacts this woman in Neufchatel in Germany.

12:26:05  9   And they have a meeting in December of 1989, years before

12:26:09 10   this alleged invention.  The Patent Office doesn't know

12:26:12 11   anything about this.

12:26:14 12           Then, she puts him in contact with a woman in

12:26:17 13   the United States named Barbara Boyce, and he writes to her

12:26:21 14   and says Uta Rosseck from Munich told me that you are the

12:26:26 15   person I should contact.  I am sure you have got already

12:26:29 16   some of the information about our new understand to close a

12:26:32 17   metal stent with a thin layer PTFE.  His idea.  We will get

12:26:37 18   it enclosed on both sides with ePTFE.

12:26:40 19           He says, to circumvent these problems we try to

12:26:43 20   develop a new stent, made from tantalum, which is closed

12:26:46 21   with .1 milligrams ePTFE and cannot be passed by cells.  So

12:26:51 22   we have .5 and .6.  When he says thin, that is the range he

12:26:58 23   is talking about, 1.  He sends a copy of the patent.  Again,

12:27:01 24   the Patent Office doesn't know anything about the fact that

12:27:03 25   Dr. Vallbracht sent this stuff to Gore.  Sent an actual

12:27:06  1    picture of his device implanted in an artery, or a vein.

12:27:11  2           You can see, there is the ePTFE.  There is the

12:27:14  3    stent.  He sent it to them.  He then says, in 1991, I am

12:27:18  4    going to tell you, I am proud to tell you that I am going to

12:27:22  5    be presenting my device at the RSNA, which is the largest

12:27:26  6    medical conference, I am told, in the United States, in

12:27:29  7    Chicago.  It's a huge medical conference.  Very prestigious.

12:27:34  8           In December of 1991, he presented, he said, we

12:27:38  9    have developed a new stent made from tantalum and enclosed

12:27:40 10    with a layer of .1 millimeter polytetrafluoroethylene which

12:27:45 11    cannot be passed by cells.

12:27:46 12           This is two years before Gore.  Believe me, the

12:27:49 13    Patent Office doesn't know about any of this.

12:27:50 14           So what happens?  He gives this presentation to

12:27:54 15    much acclaim, as you will hear from Dr. Vallbracht,

12:27:57 16    thinking, okay, we are ready to go.  We are ready to make a

12:28:01 17    device to help humanity.  And Gore writes back, two days

12:28:06 18    after his successful presentation, "At this time W.L. Gore

12:28:09 19    has dedicated its resources to production and modification

12:28:12 20    of existing products.  We currently do not have resources to

12:28:15 21    dedicate to further examination of an stent concept."

12:28:18 22           Remember that.

12:28:19 23           "Thank you for contacting us with the

12:28:21 24    possibility of working together with you on a stent concept.

12:28:23 25    Unfortunately, because of our current research directions

12:28:26 1    and limited resources" -- limited resources?  -- "we must

12:28:30 2    decline the opportunity."

12:28:32 3            They tell Dr. Vallbracht he doesn't understand

12:28:35 4    what is happening.  He has had the successful demonstration

12:28:37 5    of this product at the RSNA.

12:28:43 6            Unbeknownst to him, seven months later, Ms.

12:28:46 7    Barbara Boyce, contrary to the idea that they do not have

12:28:50 8    resources to dedicate to further examination of a stent

12:28:54 9    concept, she is with two of the inventors, Lewis and House,

12:28:57 10   and this is before Mr. Myers's notebook, they are running

12:29:00 11   through all the different stent concepts for the possibility

12:29:04 12   of making a stent graft.  And one of the stents that they

12:29:07 13   are talking about in this document when they had told him

12:29:11 14   several months before we don't have resources to look at

12:29:15 15   stents is the same stent that he used in his stent graft.

12:29:18 16           Then they filed in 1993.  Let's compare what Dr.

12:29:22 17   Vallbracht did, who you will hear, with what they did.

12:29:24 18           Did he have a stent with walls with openings?

12:29:27 19   Yes.  No doubt about it.

12:29:32 20           Did he have a version with a covering on the

12:29:34 21   inside?  Yes.  Same as they do.

12:29:39 22           Here is the important one.

12:29:41 23           Did he have one of the thin coverings on the

12:29:43 24   inside and outside?  Yes.  Figure 4 of his patent.  It is

12:29:47 25   Figure 4 of their patent, too.  The Patent Office didn't get

12:29:50 1    to hear any of this stuff.

12:29:52 2              It is true, you have to give deference to the

12:29:54 3    Patent Office.  You have to give deference to what they

12:29:56 4    knew.  They definitely saw Vallbracht's patent.  They did

12:30:01 5    not know anything about this back-and-forth where Dr.

12:30:02 6    Vallbracht was sending them materials and essentially

12:30:04 7    putting them into possession of a stent graft with thin

12:30:07 8    ePTFE walls.

12:30:09 9              What is their answer?  They say, well, his just

12:30:13 10   said thin.  His patent doesn't say .1.  Dr. Buller will tell

12:30:17 11   you that everybody who was in the business at the time would

12:30:20 12   have understood that to include under .1.  But we said,

12:30:25 13   okay, inventors, what's the magic of .1?  And you are going

12:30:30 14   to hear testimony from them where they each will say, they

12:30:34 15   don't know where the .1 came from.  They will say they

12:30:37 16   didn't know where the .1 came from, and I believe Mr. Myers

12:30:40 17   is going to testify, or he did testify that, from his

12:30:44 18   perspective, he still doesn't understand what the relevance

12:30:47 19   of .1 is.

12:30:48 20             You will hear all about .1 as this magic spot.

12:30:51 21   You will, see, where did the .1 come from?  It turns out

12:30:55 22   that during this time period, Gore was talking to lots of

12:30:58 23   other doctors, and again, gathering up what they had done.

12:31:02 24   And one of the doctors they talked to was Dr. Lee, who was

12:31:06 25   referenced earlier.  Dr. Lee, as of 1992, before Gore, he

had the .1 number, 50 micrometers plus 50 micrometers is .1.

And he went and met with them.  And he is going

tell you about his visit.  And he was led to believe, wow,

they really want to, they really want to do work with us.

And so up there you have a Gore notebook saying

Dr. Lee visit on Wednesday, July 14.

There is Dr. Lee's notes:  The company is quite

in enthusiastic about the whole deal.  They kept saying that

the patent was impressive.

One month later, they filed their patent and

it had the .1.  Nothing in this patent comes from Gore.

Nothing.  The .1 came from Dr. Lee and other doctors.  The

rest of it came from Dr. Vallbracht, and the Patent Office

didn't know anything about any of those things.

Okay.  You have heard a lot of innuendo that

somehow Gore -- I mean Bard copied Gore in terms of making a

stent graft.  That is not the case.  You will hear from the

head of R&D, Mr. Randall, that that is not the case.

We were independently doing our own work

developing a stent graft much like many other people, and

it's not surprising that we didn't end up infringing

because we took our own direction.  As you saw, we picked an

entirely different stent than they did.  Remember, they used

that Slinky step?  We used a stent that was incredibly

rigid.  We did our own thing.

12:31:59 1          Yes, in 1993, we started off with a stent cover

12:32:02 2   with a ePTFE lining in 1993.  Yes, it was after them.  We

12:32:07 3   are not claiming we were before them.  We were at the same

12:32:08 4   time.  While they were working on their design, we were

12:32:10 5   working on our design.  This is long before we ever heard of

12:32:14 6   Gore's patent or G. Ray Martin who came in 2000.

12:32:18 7          In '94, place stent between inner and outer.  No

12:32:23 8   one is claiming that what we were doing in 1994 was the

12:32:26 9   current product.

12:32:27 10          So they say, well, look how thick it was.  Yes,

12:32:30 11  we were working on our product at the time.

12:32:32 12          In 1995, encapsulated stent project.

12:32:36 13          2008.  Now, this is important.  This is actually

12:32:39 14  a rundown of how Flair was developed.  Development of Flair

12:32:43 15  stent graft, 1996 to 1999.

12:32:45 16          In August 1998, the original design of Flair was

12:32:49 17  finalized.  Finalized.  It doesn't make a difference it took

12:32:52 18  ten years to get through the FDA.  Flair was finalized in

12:32:55 19  1998 before Dr. Martin shows up, you know, months after the

12:33:02 20  patent publishes.  But, again, this was part, we didn't know

12:33:05 21  anything about their patent when we were designing Flair.

12:33:08 22          So this is just, this is just innuendo.  This is

12:33:11 23  just let's not have evidence.  Let's not have facts.  Let's

12:33:14 24  not have measurements.  Let's not have SEM pictures.

12:33:18 25          Let's just say you want to be in the business.

1   You were looking at our product.  You hired a former Gore

2   guy.  Therefore, you must have copied our stent.  Because

3   how else could you compete?

4            As opposed to Gore has a minor patent.  Gore

5   doesn't even claim to practice its own patent.  Gore uses a

6   totally different design.  We use a totally different

7   design.  We actually measured and show that we're thicker,

8   and that we don't affix, and we don't infringe.

9            Here are the witnesses you are going to hear

10  from in this trial from us.  There is Scott Randall, who you

11  have heard about; Mr. Calcote; Dr. Buller; Dr. Vallbracht,

12  and Dr. Lee.

13           I appreciate the time you spent at the lunchtime

14  area listening to my story; and I really appreciate how close

15  I could tell you were listening and watching the evidence.

16  And we understand that this is detailed work but we appreciate

17  you putting the time and effort to get down to the bottom of

18  this.

19           Thank you very much.

20           THE COURT:  Thank you.  It is in fact lunchtime,

21  ladies and gentlemen of the jury.  I understand your lunch

22  is here.  We'll bring it into the juryroom in just a few

23  minutes.

24           We'll give you about a half hour to eat lunch.

25  Of course, while you are eating, no talking about the case.

| | | |
|---|---|---|
| 12:34:31 | 1 | And we'll get you back in a little bit. |
| 12:34:33 | 2 | Enjoy your lunch. |
| 12:35:00 | 3 | (Jury left courtroom.) |
| 12:35:02 | 4 | THE COURT:  We will be in recess. |
| 12:42:56 | 5 | (Lunch recess taken.) |
| 12:42:56 | 6 | *      *      * |
| 01:07:19 | 7 | Afternoon Proceedings, 1:07 p.m. |
| 01:07:19 | 8 | THE COURT:  The jury is done with their lunch. |
| 01:07:22 | 9 | Are you prepared to call your first witness? |
| 01:07:23 | 10 | MR. PORADEK:  We are, Your Honor. |
| 01:07:24 | 11 | THE COURT:  Please bring the jury in. |
| 01:07:36 | 12 | (Jury returned.) |
| 01:10:13 | 13 | THE COURT:  Welcome back.  I hope lunch was |
| 01:10:15 | 14 | good, and we are ready to proceed.  Plaintiff will now call |
| 01:10:18 | 15 | their first witness. |
| 01:10:19 | 16 | MR. DROWN:  Your Honor, Gore calls Joshua Smale |
| 01:10:23 | 17 | by video deposition. |
| 01:10:25 | 18 | THE COURT:  Okay. |
| 01:10:26 | 19 | MR. DROWN:  And permission to put the deposition |
| 01:10:29 | 20 | board up? |
| 01:10:29 | 21 | THE COURT:  Yes, you may. |
| 01:10:30 | 22 | MR. DROWN:  Thank you, Your Honor. |
| 01:10:32 | 23 | MS. KRAMAN:  Your Honor, if I may have |
| 01:10:35 | 24 | permission to approach?  I have binders for you. |
| 01:10:37 | 25 | THE COURT:  Yes, you may. |

01:10:38  1                    (Documents passed forward.)

01:10:43  2                    THE COURT:  Ladies and gentlemen, before we play

01:10:44  3    this, you should understand a deposition is prior sworn

01:10:48  4    testimony that was given by a witness.  It's testimony under

01:10:53  5    oath, and it is just as if the testimony was given in court.

01:10:59  6    Of course, the person is not here in court and you will see

01:11:01  7    a video where someone will read to you what they said.

01:11:05  8                    MR. DROWN:  Thank you, Your Honor.

01:11:09  9                    And, as an introduction, Joshua Smale is a Bard

01:11:15 10    employee, and he was the Manager of Clinical Affairs at

01:11:19 11    Bard.  We have deposition board which refers to, sometimes

01:11:24 12    during the deposition, exhibit numbers will be referred to.

01:11:28 13    That correlates those to the trial exhibit numbers.  So

01:11:31 14    Deposition Exhibit Number 53, for example, is Plaintiff's

01:11:37 15    Trial Exhibit No. 6.  And that will just be for each

01:11:40 16    witness, we'll try to have that.

01:11:41 17                    And, Your Honor, at this time, we would move or

01:11:44 18    offer into evidence Plaintiff's Exhibit 6 and Plaintiff's

01:11:48 19    Exhibit 19.

01:11:50 20                    MR. CHERNY:  No objection, Your Honor.

01:11:52 21                    THE COURT:  Okay.  Those are both admitted.

01:11:54 22                    (PTX-6, PTX-19 were admitted into evidence.)

01:11:56 23                    MR. DROWN:  Thank you.

01:11:57 24                    THE COURT:  How long is this excerpt?

01:11:58 25                    MR. DROWN:  Mr. Smale's is about eight minutes.

Smale - designations

01:12:01  1            THE COURT:  All right.  You may play it.

01:12:01  2            (Deposition designations placed in record.)

01:12:07  3            "Question:  Please state your full name for

01:12:09  4    record and spell your last name.

01:12:13  5            "Answer:  My full name is Joshua Aaron Smale.

01:12:17  6    My last name is spelled S-M-A-L-E.

01:12:22  7            "Question:  And in September of 2005, you became

01:12:25  8    a regulatory affairs specialist, is that correct?

01:12:27  9            "Answer:  An associate and then a specialist,

01:12:28 10    but my duties did not change within those two titles.

01:12:32 11            "Question:  Which stent graft products did you

01:12:34 12    work on?

01:12:35 13            "Answer:  The Flair endovascular stent graft and

01:12:38 14    Fluency Plus.

01:12:44 15            "Question:  Were you -- according to Exhibit 51,

01:12:49 16    you left your position as a project manager of regulatory

01:12:53 17    affairs in March 2012.  What was your next position?

01:12:56 18            "Answer:  Project manager physician training.

01:13:22 19            "Question:  So did you do any work with the

01:13:24 20    Fluency Plus at this time?

01:13:26 21            "Answer:  No.

01:13:29 22            "Question:  And as a manager of clinical

01:13:33 23    affairs, do you also work on matters related to the Fluency

01:13:36 24    Plus stent graft?

01:13:37 25            "Answer:  Not directly.

Smale - designations

01:13:44  1          "Question:  Exhibit 53 is a document with bold

01:13:48  2     BARD 11-515-000464689.

01:13:52  3          "I'd like to turn your attention to the e-mail

01:13:54  4     message from Uta Rosseck to Mark Wilson, cc'ing a number of

01:13:58  5     people, including yourself, and the subject line is:

01:14:02  6     'Fluency Plus Training Manual For Sales Team.'

01:14:11  7          "Do you see that?

01:14:12  8          "Answer:  Yes.

01:14:12  9          "Question:  Who is Uta Rosseck?

01:14:16 10          "Answer:  Uta Rosseck is a marketing person.

01:14:18 11          "Question:  And do you work with Ms. Rosseck?

01:14:22 12          "Answer:  Yes.

01:14:24 13          "Question:  So what's the point of a training

01:14:26 14     manual?

01:14:27 15          "Answer:  I believe this training manual is to

01:14:29 16     train our sales force.

01:14:34 17          "Question:  Is it important that your sales

01:14:36 18     force have accurate information about Bard's products?

01:14:40 19          "Answer:  Yes.

01:14:40 20          "Question:  And why is that important?

01:14:43 21          "Answer:  Because they're the ones selling our

01:14:45 22     products so they'd better have accurate information.

01:14:47 23          "Question:  Have you seen similar training

01:14:49 24     manuals at Bard?

01:14:51 25          "Answer:  I believe so.

Smale - designations

01:14:54  1          "Question:  Let's turn to the next page ending

01:14:58  2   in 464697, and this is -- describes the Fluency Plus as a

01:15:06  3   'self-expanding LUMINEXX biliary stent encapsulated within

01:15:13  4   two ultrathin layers of ePTFE.'

01:15:16  5          Is this, based on your understanding, an

01:15:19  6   accurate description of the Fluency Plus device?

01:15:30  7          "Answer:  Yes.  To the sales force at the time,

01:15:32  8   yes.

01:15:32  9          "Question:  Is it your understanding that the

01:15:34 10   stent component of the Fluency Plus is encapsulated within

01:15:38 11   two ultrathin layers of ePTFE?

01:15:41 12          "Answer:  Yes.

01:15:43 13          "Question:  Do you have any understanding of why

01:15:47 14   Bard would characterize the two ePTFE layers as ultra thin?

01:15:53 15          "Answer:  I'm not sure of that adjective.  It

01:15:57 16   may be in reference -- I don't know why they use ultra thin

01:16:04 17   as opposed to thin.

01:16:07 18          "Question:  Do you have an understanding of why

01:16:16 19   -- the advantages of having a thin layer as opposed to the

01:16:24 20   old thicker surgical graft walls?

01:16:27 21          "Answer:  Yeah.  Well, the old surgical grafts

01:16:30 22   were so thick, they were artificial vessels.  So if you were

01:16:34 23   to try to exclude and encapsulate two very thick pieces of

01:16:40 24   tube over a stent, you wouldn't be able to fit into a

01:16:43 25   vessel.

01:16:44  1          "Question:  Moving down to below the first

01:16:57  2  picture where it says -- let's skip to the next page ending

01:17:01  3  in 464698.  And here is a reference to the wall thickness of

01:17:07  4  the Fluency Plus stent graft.

01:17:09  5          "Is wall thickness referring to the ePTFE layers

01:17:14  6  of the Fluency Plus stent graft?

01:17:52  7          "Question:  This says 'wall thickness on top of

01:18:03  8  the strut.'

01:18:06  9          "So that refers to -- it appears with the graft

01:18:12 10  material and the stent.

01:18:14 11          "Question:  And then when it says, 'In open

01:18:19 12  diamond area,' is that referring -- what that does that

01:18:24 13  mean?

01:18:25 14          "Answer:  That looks like it's the wall

01:18:27 15  thickness of the two extruded tubes together.

01:18:30 16          "Question:  Without the stent component?

01:18:32 17          "Answer:  That's what it looks like, from the

01:18:34 18  picture.

01:18:35 19          "Question:  Mr. Smale, I'm handing you what's

01:18:38 20  been marked as Exhibit 54.  Do you see that the first slide

01:18:43 21  in this presentation is titled, 'Bard Preferred Vascular

01:18:49 22  Training'?

01:18:50 23          "Answer:  Yes.

01:18:50 24          "Question:  Are you familiar with this training

01:18:53 25  presentation?

01:18:55  1          "Answer:  I don't recall this one, no.

01:18:56  2          "Question:  Does this appear to be similar to

01:19:00  3  training presentations you might have used in your physician

01:19:05  4  training role?

01:19:06  5          "Answer:  No.  This appears to be a sales

01:19:10  6  training.

01:19:16  7          "Question:  Turning to the page ending in

01:19:22  8  560714.  The purpose here, 'This course introduces a stent

01:19:26  9  graft franchise and competitive landscape.'

01:19:31 10          "'Objective:  Upon completion of this course the

01:19:36 11  learner will be able to clearly understand the design and

01:19:40 12  performance characteristics of the four major

01:19:42 13  tracheobronchial stent grafts commercially available in the

01:19:46 14  United States.'

01:19:48 15          "Do you see that?

01:20:01 16          "Answer:  Yes.

01:20:14 17          "Question:  I'd like to direct your attention to

01:20:17 18  the page ending in 560728.

01:20:29 19          "Answer:  Okay.

01:20:30 20          "Question:  Do you see here that this is the

01:20:33 21  same -- appears to be the same stent graft wall thickness

01:20:37 22  measurements that were referenced in the previous training

01:20:41 23  presentation that we looked at?

01:20:42 24          "Answer:  Appears so.

01:20:43 25          "Question:  Why would it be important for sales

Rosseck - designations

01:20:46  1    associates to have this information about stent graft wall

01:20:50  2    thickness?

01:20:51  3              "Answer:  I can't speak to it specifically

01:20:53  4    because I'm not a sales trainer, but we typically, as part

01:20:56  5    of a device description, you let your sales force know all

01:21:00  6    of your design components."

01:21:13  7              MR. DROWN:  That concludes the testimony of Mr.

01:21:15  8    Smale, Your Honor.

01:21:16  9              We would next call by video deposition who Uta

01:21:20 10    Rosseck.

01:21:31 11              THE COURT:  How long is this one?

01:21:33 12              MR. DROWN:  Longer, about 12 minutes.

01:21:54 13              (Deposition of Uta Rosseck read as follows.)

01:21:54 14              "Question:  Good morning.

01:21:59 15              MR. DROWN:  By way of introduction, Uta Rosseck

01:22:01 16    is a senior product manager at Bard.

01:22:08 17              Your Honor, we would at this time move to offer

01:22:12 18    into evidence Plaintiff's Exhibit 26 and Plaintiff's Exhibit

01:22:15 19    43.

01:22:18 20              MR. CHERNY:  No objection, Your Honor.

01:22:20 21              THE COURT:  Those are both admitted.

01:22:20 22              (PTX-26 and 43 received in evidence.)

01:22:23 23              (Designations placed in evidence.)

01:22:23 24              "Question:  Good morning, Ms. Rosseck.

01:22:24 25              "Answer:  Good morning, yes.

01:22:50  1    "Question:  Why would it be that physicians

01:22:53  2  would typically prefer a lower profile device?

01:22:58  3    "Answer:  Based on the market research we did,

01:23:00  4  the physicians prefer smaller catheter, because the puncture

01:23:04  5  hole they have to make it smaller, so, potentially, bleeding

01:23:09  6  complications would be less, compared to a big hole.

01:23:12  7    "There is a real difference what is big and

01:23:16  8  small.

01:23:16  9    "Question:  Do you have any understanding of why

01:23:19 10  it might be desire for a stent graft to have thinner PTFE?

01:23:24 11    "Answer:  It surprises me because I cannot

01:23:26 12  remember a doctor having told us that -- anything about

01:23:30 13  covering ePTFE thickness, so I would have to see if that is

01:23:35 14  a conclusion from physicians, because -- but it's what -- I

01:23:39 15  don't know why that would be relevant to a doctor.

01:23:47 16    "Question:  Sitting here today, do you have any

01:23:49 17  understanding of why you would have emphasized that the

01:23:52 18  ultra thin layers of ePTFE result in minimal wall thickness

01:23:57 19  of the entire Fluency Plus stent graft body?

01:24:00 20    "Answer:  It's a description.  These

01:24:01 21  sentences -- these statements do not necessarily have to be

01:24:04 22  used, but it's like a laundry of things you may want to say

01:24:09 23  to describe the device.  So --

01:24:29 24    "Question:  Welcome back, Ms. Rosseck.  Right

01:24:30 25  before the break, we marked Exhibit 167, and it's been

01:24:30  1   handed to you.  Do you recognize Exhibit 167?

01:24:32  2              "It's an e-mail from me to Mark Wilson about --

01:24:32  3              "Question:  Who's -- oh, sorry.

01:24:32  4              "Answer:  -- About a training presentation for

01:24:36  5   Fluency.

01:24:37  6              "Question:  Who would the training presentation

01:24:40  7   be for?

01:24:42  8              "Answer:  Mark Wilson was the sales training

01:24:45  9   manager, so I have to assume that this is intended to be a

01:24:50 10   sales training manual presentation.

01:24:51 11              "Question:  Who would receive -- who would

01:24:54 12   attend the sales training presentation?

01:24:57 13              "Answer:  Sales folks, sales representatives.

01:24:59 14              "Question:  And what's the purpose of doing a

01:25:02 15   training for sales -- the sales folks at Bard?

01:25:06 16              "Answer:  Every sales rep that begins working

01:25:09 17   with Bard will have a basic product training on all of the

01:25:13 18   products he will be selling, and he will understand the

01:25:17 19   device characteristics.

01:25:19 20              "Question:  In terms of the device

01:25:22 21   characteristics that are emphasized, would a sales training

01:25:25 22   presentation focus on product characteristics that were

01:25:28 23   unimportant?

01:25:30 24              "Answer:  It would not focus on that, but many

01:25:32 25   times you find in a sales training presentation important

01:25:36 1    stuff and unimportant stuff.

01:25:44 2              "Question:  So, then, in the end, the slides

01:25:56 3    that go into the presentation are those intended to be

01:25:59 4    helpful for the sales staff?

01:26:01 5              "Answer:  The overall thing is intended to be

01:26:03 6    helpful, yes.

01:26:05 7              "Question:  It's audited for accuracy?

01:26:07 8              "Answer:  That's to my knowledge, yes.

01:26:08 9              "Question:  Who does the auditing?

01:26:10 10             "Answer:  Bard has an approval procedure in

01:26:13 11   place that lists everyone who has to review a document and

01:26:18 12   approve on it before it can be used for internal use, even

01:26:23 13   for external use.  And I can tell you, it's not my

01:26:29 14   responsibility to assign all -- to select who is on that

01:26:33 15   approval panel.

01:26:33 16             "Question:  For a sales training presentation

01:26:37 17   such as this one, do you have a general sense of how many

01:26:40 18   people would have reviewed this training presentation to

01:26:43 19   ensure that it was accurate?

01:26:45 20             "Answer:  Internally, typically it would be a

01:26:49 21   regulatory person, a legal person, R&D, a patent person, and

01:26:54 22   then at corporate, so it would then go to corporate, another

01:26:58 23   four, five, six, seven-ish -- it depends on the -- on the

01:27:05 24   contents, who has to review this.

01:27:07 25             "Several people.  Everyone looks at his area of

387

Rosseck - designations

01:27:19  1    expertise.

01:27:21  2                    "Question:  Is another purpose of the -- is any

01:27:25  3    part of the purpose of the sales training presentation

01:27:28  4    intended to give the sales staff information that will be

01:27:33  5    helpful in selling the product to physicians or other

01:27:36  6    customers?

01:27:40  7                    "Answer:  They find something in it that helps

01:27:43  8    them selling the product, good.  They may find a set of

01:27:51  9    presentations that's totally useless to them.

01:27:56 10                    "It can happen.

01:27:58 11                    "Question:  If we look at -- it doesn't look

01:28:01 12    like it has a slide number, but Bates 831, titled Stent

01:28:09 13    Graft Wall Thickness.  Do you see this slide?

01:28:14 14                    "Answer:  Yes.

01:28:15 15                    "Question:  Do you have any understanding of who

01:28:19 16    would have prepared this slide?

01:28:22 17                    "Answer:  Such type of a very technical slide.

01:28:25 18    I cannot remember exactly who prepared that slide, but it

01:28:31 19    could be someone in R&D, because it's very technical.

01:28:35 20                    "Question:  Sitting here today, do you have any

01:28:41 21    understanding of why a slide on stent graft wall thickness

01:28:46 22    would have been included in the sales training manual for

01:28:51 23    Fluency Plus?

01:28:53 24                    "Answer:  This is dated 2007, right?  It's part

01:28:57 25    of a description of a device.  A device description, yes.

01:29:02  1    It's part of a description.

01:29:04  2              "Question:  Then do you see where the first

01:29:07  3    bullet it stays -- well, let me ask this.  Looking at the

01:29:18  4    information that's contained in the slide, sitting here

01:29:22  5    today, do you have any reason to believe that any of the

01:29:25  6    information in the stent graft wall thickness slide at Bates

01:29:30  7    No. ending in 831 is inaccurate?

01:29:38  8              "Answer:  I have no reason to believe it's

01:29:46  9    inaccurate, but what I see is it's very vague in its

01:29:52 10    definitions.

01:29:53 11              "Question:  Looking at the picture of a device

01:29:56 12    that's in the slide, stent graft wall thickness slide, do

01:30:00 13    you recognize that device?

01:30:01 14              "Answer:  In the right photo?

01:30:04 15              "Question:  Yes.

01:30:06 16              "Answer:  I believe it is a Fluency.

01:30:08 17              "Question:  And then do you see the middle

01:30:10 18    button in open diamond area, 0.07 millimeters, and then

01:30:17 19    there's an arrow to the right of that?  Do you see that

01:30:22 20    arrow?

01:30:23 21              "Answer:  I see that arrow, yes.

01:30:24 22              "Question:  Where is the arrow pointing?

01:30:27 23              "Answer:  The arrow appears to point to an area

01:30:31 24    of the covering.

01:30:31 25              "Question:  And is it pointing to an area of the

01:30:35  1    covering in between stent struts?

01:30:44  2              "Answer:  That's how it looks, yes.  Struts, in

01:30:49  3    between struts, yes:

01:32:10  4              "Question:  Welcome back, Ms. Rosseck.  I'm

01:32:13  5    handing you what's been previously marked as Plaintiff's

01:32:17  6    Exhibit 33.  Ms. Rosseck, do you recognize Exhibit 33?

01:32:20  7              "Answer:  I cannot remember, but I see that it

01:32:25  8    is an e-mail.

01:32:26  9              "Question:  And in the ' from' line it says Uta

01:32:32 10    Rosseck.  Do you believe that that is yourself?

01:32:35 11              "Answer:  Yes.

01:32:36 12              "Question:  Then, in the body of your e-mail,

01:32:38 13    the first full line is, The national sales meeting, I would

01:32:41 14    like to have the following information about the Fluency

01:32:45 15    device versus the Viabahn.  Do you see that?

01:32:55 16              "Answer:  Yes.

01:32:56 17              "Question:  What is the national sales meeting?

01:32:58 18              "Answer:  It's a meeting of all sales folks in

01:33:01 19    the United States, once a year, one big meeting.

01:33:04 20              "Question:  And approximately how many sales

01:33:07 21    folks would attend?

01:33:08 22              "Answer:  It's growing in the last years,

01:33:10 23    between 150, 200 today.

01:33:12 24              "Question:  But likely over 100 in the 2005 time

01:33:16 25    frame?

01:33:17 1              "Answer:  Roughly 100, yes.

01:33:19 2              "Question:  And then, below the statement, the

01:33:23 3  sentence that we looked, at, in parentheses, it says I get a

01:33:30 4  question on this almost every week from the sales team.

01:33:34 5  What are you referring to by a question on this?

01:33:37 6              "Answer:  This must mean one of the things I was

01:33:42 7  listing them.

01:33:43 8              "Question:  So it's your understanding that the

01:33:45 9  six numbered items you listed are the items that you got

01:33:48 10  sales -- that you got questions on from the sales team; is

01:33:53 11  that correct?

01:33:54 12              "Answer:  That's what I assume, yes.

01:33:55 13              "Question:  And, specifically, the questions

01:33:57 14  related to the Fluency device versus the Viabahn device; is

01:34:01 15  that correct?

01:34:02 16              "Answer:  This is what it appears to ask for,

01:34:05 17  yes.

01:34:05 18              "Question:  And then do you see the sixth item

01:34:09 19  that states wall thickness?

01:34:11 20              "Answer:  Yes.

01:34:11 21              "Question:  But sitting here today, it's your

01:34:14 22  understanding that, as indicated in this e-mail, wall

01:34:17 23  thickness was one of the items that the sales team had with

01:34:22 24  respect to Fluency versus Viabahn, correct?

01:34:25 25              "Answer:  That is what I have to assume when I

01:34:27  1      read this."

01:35:22  2                  MR. DROWN:   That concludes the testimony of Ms.

01:35:25  3      Rosseck, Your Honor.

01:35:26  4                  Plaintiffs would now call John Reviere from Bard

01:35:29  5      by video.

01:35:33  6                  Permission to approach?

01:35:34  7                  THE COURT:   You may.

01:35:57  8                  MR. DROWN:   Your Honor, by way of introduction,

01:35:59  9      John Reviere is a Bard employee.   He is the former director

01:36:03 10      of clinical affairs.   And at this time plaintiffs would

01:36:07 11      offer into evidence Plaintiff's Exhibit 406 and Plaintiff's

01:36:13 12      Exhibit 156.

01:36:15 13                  MR. CHERNY:   No objection, Your Honor.

01:36:16 14                  THE COURT:   Those are admitted.

01:36:16 15                  (PTX-406 and 156 received in evidence.)

01:36:20 16                  THE COURT:   About how long?

01:36:21 17                  MR. DROWN:   This is about five minutes.   Your

01:36:21 18      Honor.

01:36:21 19                  (Deposition of John Reviere played as follows.)

01:36:24 20                  "Question:   Could you please state your name and

01:36:26 21      spell your last name for the record?

01:36:28 22                  "Answer:   John Barton Reviere, R-e-v-i-e-r-e.

01:36:32 23                  "Question:   Okay.   During your time at Bard, am

01:36:34 24      I right that you worked as director of clinical affairs?

01:36:37 25                  "Answer:   That's correct.

01:36:42  1         "Question:  And this is a Bard produced

01:36:44  2   document.  I am just going to read the digits at the end,

01:36:46  3   because it's kind of a long string of numbers.

01:36:51  4         "Exhibit 35 runs from document Bates labeled

01:36:55  5   25695 through 25735.

01:36:58  6         "Do you see that?

01:36:59  7         "Answer:  Yes.

01:37:00  8         "Question:  And starting with the first page of

01:37:02  9   Exhibit 5, do you see at the bottom of that first page an

01:37:07 10   e-mail?

01:37:07 11         "Answer:  I do.

01:37:08 12         "Question:  And this states it's from John

01:37:10 13   Reviere.  I assume that's yourself --

01:37:13 14         "Answer:  Yes.

01:37:13 15         "Question:  -- to Uta Rosseck.  Do you see that?

01:37:16 16         "Answer:  I do.

01:37:17 17         "Question:  Who is Ms. Rosseck?

01:37:19 18         "Answer:  She was the upstream marketing

01:37:22 19   representative for the Fluency Plus product line.

01:37:29 20         "Question:  I would like to ask you, in

01:37:31 21   particular, about the customer presentation which begins on

01:37:36 22   the page Bates labeled ending 25698 in Exhibit 35.

01:37:41 23         "Are you there?

01:37:42 24         "Answer:  Yes.

01:37:42 25         "Question:  Would you expect a customer

01:37:44  1    presentation from Bard to present accurate information about

01:37:47  2    Bard's products?

01:37:48  3                    "Answer:  Yes.

01:37:48  4                    "Question:  Could you turn to the page Bates

01:37:51  5    labeled ending in 25702?

01:37:57  6                    "Answer:  Okay.

01:37:58  7                    "Question:  Are you there?

01:37:59  8                    "Answer:  Yes.

01:37:59  9                    "Question:  Do you see there a title of the

01:38:07 10    slide is 'Product Description'?

01:38:10 11                    "Answer:  Yes.

01:38:16 12                    "Question:  The text here describes 'Two ultra

01:38:21 13    thin layers of ePTFE that encapsulate the stent.'

01:38:26 14                    "Do you see that?

01:38:27 15                    "Answer:  Yes.

01:38:27 16                    "Question:  And is it your understanding that

01:38:29 17    Fluency Plus did use two layers of ePTFE?

01:38:33 18                    "Answer:  I'm not familiar with the

01:38:34 19    manufacturing process.  I understood the stent to be

01:38:37 20    encapsulated.  That's the stent that I was involved with

01:38:40 21    the -- the technical characteristics.

01:38:43 22                    "Question:  Okay.  And 'encapsulated,' did you

01:38:48 23    understand that there was a layer or covering of ePTFE on

01:38:52 24    the outside of the stent?

01:38:54 25                    "Answer:  I understood that the stent was fully

01:38:56 1    encased in ePTFE material.

01:38:58 2                "Question:  Meaning there was ePTFE on the

01:39:01 3    outside and ePTFE on the inside of the stent; correct?

01:39:06 4                "Answer:  I understood that all surfaces of the

01:39:08 5    stent, except the ends, were encased in ePTFE.

01:39:12 6                "Question:  Yeah.  So you talked about the stent

01:39:17 7    becoming encased or encapsulated with ePTFE.

01:39:20 8                "And my question is:  When the Fluency Plus

01:39:23 9    product was in use, the ePTFE didn't separate and come apart

01:39:28 10   from the stent, right?  It was affixed together?

01:39:31 11               "Answer:  That's my understanding.

01:39:32 12               "Question:  And is it consistent with your

01:39:34 13   understanding that there were, in fact, two layers of ePTFE

01:39:38 14   in the Fluency Plus?

01:39:40 15               "Answer:  I didn't have exposure or insight into

01:39:42 16   that process, so I can't confirm that statement.

01:39:44 17               "Question:  And is low profile one of the

01:39:47 18   features that Bard promoted to doctors about the Fluency

01:39:52 19   Plus product, to your understanding?

01:39:54 20               "Answer:  I don't recall specifically if that

01:39:55 21   was used with Fluency or not.

01:40:02 22               "Question:  The title of this investigator's

01:40:03 23   brochure is A Prospective, Randomized Concurrently[

01:40:07 24   Controlled Post-Approval study of the Flare Endovascular

01:40:11 25   Stent Graft (RENOVA study).

01:40:15  1          "Do you see that?

01:40:17  2          "Answer:  Yes, sir.

01:40:17  3          "Question:  Okay.  And who would the

01:40:19  4  investigator's brochure be distributed to?

01:40:24  5          "Answer:  It would be distributed primarily to

01:40:26  6  investigators participating in the RENOVA study and made

01:40:29  7  available to anyone as a sub-investigator at that facility

01:40:33  8  who had a role in conducting the study.

01:40:35  9          "Question:  Okay.  And just so our terminology

01:40:38 10  is straight, when you say it's given to investigators, does

01:40:42 11  that mean doctors who perform the --

01:40:44 12          "Answer:  That's correct, yes.

01:40:45 13          "Question:  Okay.  So when Bard distributed

01:40:47 14  documents such as an investigator's brochure to doctors who

01:40:52 15  are working on their clinical studies, I assume Bard tried

01:40:54 16  to give them information about their product; is that right?

01:40:56 17          "Answer:  Any document that would go through my

01:40:58 18  office would be verified for accuracy.

01:41:03 19          "Question:  If we look down at the second

01:41:05 20  paragraph on this page Bates labeled ending 199296, do you

01:41:11 21  see there the first sentence beginning, 'The Nitinol

01:41:14 22  Stent'?

01:41:16 23          "Answer:  Yes.

01:41:16 24          "Question:  Just read that sentence, as well.

01:41:19 25  'The Nitinol stent, including distal and proximal ends, is

01:41:23  1    fully encapsulated within two layers of ePTFE.'

01:41:28  2              "Do you see that?

01:41:29  3              "Answer:  Yes.

01:41:29  4              "Question:  So, again, this describes two layers

01:41:32  5    of ePTFE that are used with Flare?

01:41:34  6              "Answer:  That's -- that's what's stated here.

01:41:36  7              "Question:  And Exhibit 36 describes the Flare

01:41:38  8    product as being fully encapsulated with ePTFE, Correct?

01:41:43  9              "Answer:  That's what's stated here.

01:41:44 10              "Question:  So am I correct that it's your

01:41:46 11    understanding that that means that on the stent component on

01:41:49 12    the luminal surface, again, that luminal surface is covered

01:41:55 13    with ePTFE?

01:41:56 14              "Answer:  That's my understanding.

01:41:57 15              "Question:  And again, the exterior surface of

01:42:01 16    the Flare stent, that's also covered with ePTFE?

01:42:04 17              "Answer:  That's my understanding.

01:42:05 18              "Question:  And those layers of ePTFE are

01:42:08 19    affixed to the stent such that they don't separate from the

01:42:11 20    stent when it's in operation; correct?

01:42:13 21              "Answer:  That's my understanding."

01:42:24 22              (Designations end.)

01:42:24 23              MR. DROWN:  That concludes the testimony of Mr.

01:42:27 24    Reviere, Your Honor.

01:42:28 25              Permission to change up the boards.

Gorman - direct

| | | |
|---|---|---|
| 01:42:32 | 1 | THE COURT:  Yes. |
| 01:43:26 | 2 | You may call your next witness. |
| 01:43:32 | 3 | MR. PORADEK:  Thank you, Your Honor.  Gore calls |
| 01:43:34 | 4 | Dr. Robert Gorman. |
| 01:43:39 | 5 | ... ROBERT GORMAN, having been duly sworn as a |
| 01:44:12 | 6 | witness, was examined and testified as follows ... |
| 01:44:17 | 7 | THE COURT:  Welcome, Dr. Gorman.  Good afternoon |
| 01:44:20 | 8 | to you. |
| 01:44:21 | 9 | THE WITNESS:  Hi. |
| 01:44:22 | 10 | THE COURT:  You may approach. |
| 01:44:26 | 11 | DIRECT EXAMINATION |
| 01:44:33 | 12 | BY MR. PORADEK: |
| 01:44:38 | 13 | Q.     Good afternoon, Dr. Gorman. |
| 01:44:41 | 14 | A.     Good afternoon. |
| 01:44:41 | 15 | Q.     Did you spell your name for the record?  I couldn't |
| 01:44:43 | 16 | hear. |
| 01:44:43 | 17 | A.     I did. |
| 01:44:44 | 18 | Q.     Are you -- where do you work, sir? |
| 01:44:49 | 19 | A.     I work at the University of Pennsylvania. |
| 01:44:51 | 20 | Q.     And where is that located? |
| 01:44:54 | 21 | A.     Right off 95 in Philadelphia. |
| 01:44:56 | 22 | Q.     And what's your job at University of Pennsylvania? |
| 01:45:00 | 23 | A.     I am a professor of surgery at the Perelman Institute |
| 01:45:05 | 24 | of Medicine at the University of Pennsylvania. |
| 01:45:06 | 25 | Q.     Any other positions that you have? |

01:45:08 1  A.    Yes.  I co-direct the Cardiovascular Research Group

01:45:12 2  at Penn, along with my twin brother, Joe.

01:45:16 3  Q.    You have a twin brother who is a surgeon?

01:45:18 4  A.    Yes.  He is a cardiac surgeon, just like me.  Must be

01:45:22 5  something genetic.

01:45:23 6  Q.    You have been retained by Gore to provide testimony

01:45:27 7  in this case of the expert variety.  Correct?

01:45:30 8  A.    I have.

01:45:31 9  Q.    And could you just quickly describe the nature of the

01:45:35 10 project for which you were retained by Gore?

01:45:37 11 A.    Yes.  As far as I understand it, the participants in

01:45:42 12 this case dispute whether covered stent grafts that are sold

01:45:47 13 by Bard meet elements of Claims 32 and 40 of the Gore '892

01:45:55 14 patent, specifically concerning the thickness of the covered

01:46:01 15 stent being less than 0.1 millimeters, and the fact that

01:46:05 16 that covering is affixed to the stent.

01:46:07 17        MR. PORADEK:  Your Honor, I would like to offer

01:46:09 18 Plaintiff's Exhibit 1, which is the patent in the case.  I

01:46:12 19 don't know your procedure, if I should publish first or not.

01:46:16 20        THE COURT:  You should ask for it to be admitted

01:46:18 21 first, which you have done.  Any objection?

01:46:20 22        MR. CHERNY:  No, Your Honor.

01:46:21 23        THE COURT:  It is admitted.

01:46:23 24        (Plaintiff's Exhibit No. 1 received in

01:46:23 25 evidence.)

01:46:23  1        THE COURT:  Now you may publish it.

01:46:23  2    BY MR. PORADEK:

01:46:45  3    Q.        It turns out I had a small technical glitch.

01:46:48  4    Apologize.

01:46:50  5             This is the '892 patent.  Correct?

01:46:54  6    A.        Yes, it is.

01:46:54  7    Q.        And you have had a chance to review this in

01:46:56  8    connection with your work?

01:46:57  9    A.        Yes, I have.

01:46:58 10    Q.        You mentioned Claim 32.  Do you see that, sir?

01:47:01 11    A.        Yes.

01:47:01 12    Q.        This is the claim you mentioned?

01:47:05 13    A.        That's correct.

01:47:05 14    Q.        Can you explain what particular language you were

01:47:07 15    focusing on for this project?

01:47:09 16    A.        Yes.  The language that's highlighted at the bottom,

01:47:14 17    "the thickness of the first and second tubular coverings is

01:47:18 18    less than about 0.1 millimeter," and then the claim language

01:47:23 19    that talks about the covering being affixed to the stent.

01:47:27 20    Q.        And, sir, before you talk about this project, what

01:47:35 21    qualifications do you believe you bring to this?

01:47:38 22    A.        Yes.  I have training as a cardiovascular surgeon,

01:47:44 23    which I treat patients with conditions of damage to the

01:47:50 24    heart and vasculature.

01:47:52 25             I am an engineer who develops vascular devices.

01:47:56 1  Many of them are stent-based devices like we are talking

01:48:00 2  about today.  They tend to be a little bit larger.  They are

01:48:03 3  designed to carry stents to the heart, so you can get heart

01:48:07 4  valve replacement without having surgery.

01:48:09 5           That's one of the areas I really spend a lot of

01:48:12 6  time working in these days.

01:48:14 7           The other aspect of my career is that I am a

01:48:16 8  research scientist.  I have been funded by the National

01:48:19 9  Institutes of Health to study cardiovascular problems for

01:48:22 10 over 15 years.

01:48:25 11          So I have extensive experience in doing

01:48:29 12 scientific experiments, taking measurements and interpreting

01:48:33 13 data that is collected by me and others.

01:48:35 14 Q.    Sir, in the course of your project, did you have an

01:48:39 15 opportunity to read and review any Bard documents as you

01:48:43 16 were getting up to speed?

01:48:44 17 A.    I did, yes.

01:48:44 18 Q.    Do any particular documents stand out to you?

01:48:46 19 A.    Yes, there is one that particularly stands out.  I

01:48:49 20 believe it's the one that's labeled PTX-6.

01:48:51 21 Q.    Is this the document, sir?  Let's look right next to

01:48:59 22 you.  Is that the document you are referring to?

01:49:00 23 A.    Yes.  That is one page or element of the document,

01:49:04 24 yes.

01:49:05 25 Q.    Why did this in particular jump out at you as you

01:49:08  1    were reviewing things?

01:49:10  2    A.      Well, what it is is a training manual, a training

01:49:15  3    presentation that was put together to educate the sales

01:49:20  4    force so that they would have all the information they

01:49:24  5    needed, all the important information about the product, to

01:49:28  6    go out and talk to doctors about the important

01:49:30  7    characteristics of the product, so the physician could make

01:49:34  8    a decision as to whether he wanted to use this product in

01:49:38  9    one of his patients.

01:49:39 10    Q.      What particular information in there caught your

01:49:42 11    attention?

01:49:42 12    A.      Obviously, it's where it says -- may I use this

01:49:49 13    pointer?

01:49:49 14              THE COURT:   Sure.

01:49:51 15              THE WITNESS:   So here it says, This area of

01:49:54 16    covering on the stent, that is way from the struts, is less

01:50:00 17    than 0.07 millimeters.   That is 30 percent thinner than the

01:50:07 18    other patent.   I thought that was significant, because this

01:50:10 19    is, you know, data that I assume came from Bard's internal

01:50:17 20    measurements.

01:50:19 21              As we just saw with Rosseck and I think Mr.

01:50:22 22    Smale talked about how important Bard, how concerned they

01:50:27 23    were to make sure they got the information that was in the

01:50:30 24    this document correct.   I think Ms. Rosseck said it was

01:50:33 25    vetted or audited by up to seven people.

01:50:36 1        So, you know -- seeing documents like that as a

01:50:43 2   physician, you would assume they are backed up by data

01:50:46 3   appeared they are trustworthy.

01:49:35 4   BY MR. PORADEK:

01:50:22 5   Q.     Okay.  And this is the limitation in the claims that

01:50:26 6   you were looking at that would be relevant to that

01:50:28 7   information upon the board there?

01:50:30 8   A.     That's right.  Yes.

01:50:31 9   Q.     So the less than about .10 millimeter thick exclusive

01:50:35 10  of the stent?

01:50:36 11  A.     That's right.

01:50:37 12  Q.     Okay.  Any other internal Bard documents that you

01:50:41 13  reviewed in preparing for your work?

01:50:43 14  A.     I looked at documents about the composite testing.

01:50:47 15  Q.     Um-hmm.

01:50:50 16  A.     Specifically, the internal documents of composites

01:50:53 17  for the Fluency Plus device.  And there was a really large

01:50:56 18  spreadsheet with about 5 or 6,000 individual measurements of

01:51:01 19  thickness on Fluency Plus composites that were, all of them,

01:51:06 20  all of the 5 or 6,000 were less than 0.1 millimeter.

01:51:10 21  Q.     And did you see any Flair composite tests in your

01:51:14 22  review of the materials?

01:51:15 23  A.     Yes, there was.  Again, there were Flair composite

01:51:18 24  tests.  I believe there was 6,000 measurements, but there

01:51:22 25  was a lot, and several were less than 0.1 millimeter and

Gorman - direct

01:51:27 1    several were above 0.1 millimeter.

01:51:29 2    Q.      Okay.  And you were retained to perform your own

01:51:36 3    confirmatory testing of the information; correct?

01:51:38 4    A.      That was my primary responsibility, the primary task

01:51:41 5    I was presented with.

01:51:42 6    Q.      Okay.  Let's talk for a second just about the devices

01:51:46 7    you were testing.

01:51:48 8    A.      Okay.

01:51:48 9    Q.      Is this -- we put up -- by the way, you helped

01:51:52 10   prepare some of these slides so we could go through your

01:51:55 11   presentation officially; correct?

01:51:58 12   A.      Yes, that is true.

01:51:59 13   Q.      So this particular graft slide, what is that showing?

01:52:05 14   A.      This is, you know, representative of pictures of the

01:52:11 15   three covered stent grafts that are in question in this

01:52:15 16   case, Fluency Plus, and then there is the Flair design which

01:52:18 17   has two designs, a straight and a flared for obvious

01:52:22 18   reasons.

01:52:23 19   Q.      And, sir, if it's okay to approach with (indicating)?

01:52:31 20           THE COURT:  You may approach.

01:52:33 21           MR. PORADEK:  Okay.

01:52:36 22           (Demonstratives passed forward.)

01:52:36 23   BY MR. PORADEK:

01:52:40 24   Q.      Sir, I handed you PTX-530 and 540.  Do you see that?

01:52:47 25   A.      Yes.

Gorman - direct

01:52:47 1    Q.      And can you describe what in particular, what is

01:52:58 2    referred to there?

01:52:58 3    A.      Yes.  They're an example of, 540 is an example of

01:53:05 4    the Fluency Plus device, and PTX-530 is an example of the

01:53:10 5    straight Flair device.

01:53:11 6    Q.      And these are not the exact stent grafts that you

01:53:15 7    tested for your work on this case; correct?

01:53:17 8    A.      No, they're not.  No.

01:53:19 9    Q.      But they look to be substantially similar to you?

01:53:22 10   A.      They're very similar to what I tested.

01:53:24 11   Q.      And you, yourself, did you deploy those out of a

01:53:28 12   catheter?

01:53:28 13   A.      Yes, I did.

01:53:29 14   Q.      And about when did that happen?

01:53:32 15   A.      It was last December.

01:53:35 16           MR. PORADEK:  Your Honor, I would offer PTX-530

01:53:38 17   and 540 for admission.

01:53:40 18           MR. CHERNY:  No objection.

01:53:41 19           THE COURT:  Those are both admitted.

01:53:44 20           (PTX-530, PTX-540 were admitted into evidence.)

01:53:44 21   BY MR. PORADEK:

01:53:51 22   Q.      Sir, when we're looking at the less than

01:53:55 23   .10 millimeters thick limitation in the patent, do you

01:53:59 24   understand that there has been a definition given to that

01:54:01 25   particular limitation by the Court?

Gorman - direct

01:54:04 1   A.      I do, yes.

01:54:04 2   Q.      And this is it up on the slide?

01:54:06 3   A.      Yes.

01:54:07 4   Q.      Can you just read that and give your understanding of

01:54:10 5   what it means?

01:54:11 6   A.      Sure.  So this is the Court's claim construction.  So

01:54:14 7   basically it defines to everybody in the room, we all

01:54:18 8   understand what it means.  And the Court has construed or

01:54:21 9   defined this term as less than about 0.10 millimeter thick

01:54:27 10  equivalent to, the average, or overall thickness of the

01:54:31 11  covering is less than 0.10 millimeter thick; and thicknesses

01:54:35 12  of exactly 0.10 millimeter fall outside the scope of the

01:54:39 13  claim.

01:54:39 14  Q.      Sir, to your knowledge, was there any claim

01:54:41 15  construction from the Court that would limit your options in

01:54:43 16  terms of how you would test for the thickness of a stent

01:54:46 17  graft wall?

01:54:47 18  A.      No, I wasn't constrained with, as to what measurement

01:54:53 19  technique I could use to accomplish the task that I was

01:54:56 20  given.

01:54:56 21  Q.      Okay.  So we heard in the opening -- you were here

01:55:00 22  for the opening of Mr. Cherny?

01:55:02 23  A.      Yes, I was.

01:55:02 24  Q.      And you heard your testing methodology was the

01:55:05 25  subject of some of his presentation?

01:55:08  1      A.      Yes, I heard that.

01:55:08  2      Q.      Let's turn to your testing methodology.  Before we

01:55:11  3      describe exactly what you did, can you describe some of the

01:55:14  4      goals you had in devising a methodology to test?

01:55:16  5      A.      Sure.  Given the task that I was given, my concern

01:55:21  6      was that I wanted to be able to use a technique in which I

01:55:25  7      could measure thickness in many spots around the device that

01:55:28  8      I could, you know, assess to get a sense of what this

01:55:32  9      average thickness was.

01:55:33 10              And I very much wanted to use a technique that

01:55:36 11      didn't alter what you was trying to measure.  So I didn't

01:55:38 12      want to use technique that would in any way change or affect

01:55:43 13      the thickness of the covering that I was testing.

01:55:47 14      Q.      Any other goals you had in designing your test

01:55:50 15      methodology?

01:55:51 16      A.      Those were the primary ones.

01:55:56 17      Q.      And, sir, what methodology did you ultimately select?

01:55:59 18      A.      I used a technique that I have used in my device

01:56:04 19      development work.  I used a micrometer and what I call a

01:56:11 20      go/no go fashion.

01:56:13 21      Q.      Could you explain what you mean by "go/no go?"

01:56:18 22      A.      Yes.  It's what I think Mr. Cherney says a lot of,

01:56:20 23      when we've got to look at it today, it's not rocket science,

01:56:23 24      and a go/no go test is definitely not rocket science, but

01:56:26 25      what it is is basically a pass/fail test.  It's, you know,

Gorman - direct

01:56:31  1    for example, if the covering that I measure was less than

01:56:34  2    0.1 millimeter, that would be a pass or a go.  But if it was

01:56:40  3    thicker than 0. -- equal to or thicker than 0.1 millimeters,

01:56:44  4    then that would be a fail or a no go.

01:56:47  5              And just to give you a basic, you know, every

01:56:51  6    day example concept:

01:56:53  7              When you drive into a parking garage, there

01:56:56  8    are these bars that hang across.  They're usually painted

01:56:58  9    yellow.  They can say six feet, six inches.  When you drive

01:57:02 10    up, if your car doesn't bump into the bar, that's a pass and

01:57:06 11    a go, and you are pretty comfortable driving into the garage.

01:57:09 12              On the other hand, if you bump into the bar, you

01:57:12 13    know, with your truck, you probably are not going to fit and

01:57:14 14    you failed it, the go/no go test, and you probably should

01:57:19 15    look for another garage.

01:57:20 16              That is kind of stupid but it's a simple

01:57:23 17    explanation of what my goals were.  That was based on the

01:57:25 18    fact what I was asked to do was not to determine the

01:57:28 19    absolute thickness of any of these coverings, it was to

01:57:32 20    determine whether the thicknesses were less than 0.1

01:57:37 21    millimeter.  So given that question, the test that I

01:57:38 22    designed was well suited for the task that I was given.

01:57:41 23    Q.      Okay.  And then you mentioned you used a micrometer

01:57:45 24    for this purpose?

01:57:46 25    A.      Yes.

Gorman - direct

01:57:46 1    Q.      Can you describe what a micrometer is?

01:57:48 2    A.      Sure.  A micrometer is --

01:57:50 3    Q.      Oh, I think we have a picture of it up here that

01:57:53 4    might help you describe it.

01:57:54 5    A.      That is my micrometer.  Mr. Cherney showed it

01:57:57 6    earlier.

01:57:58 7            So this is an example of a Mitutoyo micrometer.

01:58:03 8    Just to give you an overview, the numbers on the front, the

01:58:05 9    0 to 25 millimeters.  So that is as far as the calipers

01:58:10 10   or -- I'll point this out.

01:58:14 11   Q.      Yes, I'll let you do it.

01:58:16 12   A.      So, you know, this 0 to 25 is how far the two

01:58:21 13   calipers can be moved apart.  And this is where you can see

01:58:23 14   like this is a very high precision instrument.  You make

01:58:27 15   very small measurements.  It can make its measurement out to

01:58:31 16   0.001 millimeters.  So that is a thousandth of a millimeter.

01:58:37 17   The sizes we're talking here are about a tenth of a millimeter.

01:58:42 18   So that's the thickness.

01:58:43 19           An overview.  Just to give you an idea how the

01:58:46 20   thing works, if you turn this knob here, you can move the

01:58:50 21   calipers either closer or further apart from each other and

01:58:53 22   they will stay there when you stop turning the caliper, the

01:58:57 23   screw here.  And that, the distance between those two

01:59:01 24   calipers or prongs is read out here on this digital gauge

01:59:07 25   right here.

01:59:08 1          As you can see, this one is set up for our, for

01:59:10 2     my go/no go test, and it was set at 0.097 millimeters, which

01:59:18 3     is slightly less than the critical number of 0.1 millimeter.

01:59:21 4     Q.     And you heard in the opening argument by Bard's

01:59:23 5     counsel some criticism of your use of, not using a snap gauge?

01:59:27 6     A.     Yes, I certainly did.  And I, to be honest, you know,

01:59:31 7     perfectly honest, I really don't understand the criticism

01:59:36 8     because a snap gauge and a micrometer are very similar devices.

01:59:43 9     Q.     And how do you mean?

01:59:45 10    A.     Well, they both, they're both designed to measure

01:59:50 11    thin objects, okay?  And they both are caliper devices in

01:59:53 12    which the calipers can move either closer or further away

01:59:56 13    from each other, and they all have a gauge that will read

01:59:59 14    out that distance between the calipers.

02:00:01 15    Q.     Okay.  And I think we have a picture of a snap gauge

02:00:06 16    here; correct?

02:00:07 17    A.     That's correct.  That's a snap gauge.

02:00:09 18    Q.     Can you walk the jury through the similarities

02:00:12 19    between these two devices?

02:00:13 20    A.     Sure.  So like I said, the similarities are, you

02:00:17 21    know, the calipers are pins that can be a variable distance

02:00:24 22    apart, and that distance --

02:00:25 23    Q.     Okay.  And let me just go back to that.  Can you show

02:00:28 24    that similar area on the micrometer?

02:00:30 25               THE COURT:  Mr. Poradek, you are going to have

02:00:33 1    to avoid interrupting your witness.

02:00:35 2              MR. PORADEK:  Oh, I apologize, Your Honor.

02:00:36 3              THE COURT:  State the question and let's get the

02:00:39 4    answer.

02:00:39 5              MR. PORADEK:  I apologize, Your Honor.

02:00:41 6    BY THE WITNESS:

02:00:41 7    A.      So these are the calipers on the micrometer and this

02:00:43 8    is the gauge.  And I'll show you the snap gauge photograph.

02:00:48 9              Again, these are the calipers from the snap

02:00:52 10   gauge.  This is an older device, so it's a gauge reading or

02:00:56 11   an analog reading, but they do make them out a little better

02:00:59 12   with the same digital readout as my Mitutoyo micrometer has.

02:01:05 13   So those are the way the things are similar.

02:01:08 14             Now, there are ways that they are different.

02:01:10 15   And I used those slight differences to my benefit here.  But

02:01:15 16   with a snap gauge, it is either open or it is closed.  You

02:01:19 17   can't do a go/no go test with a snap gauge because it is

02:01:23 18   either, you know, it's either being held open as you can

02:01:26 19   see here or it's released and it comes down, and it either

02:01:29 20   touches the other caliper or touches whatever is in between

02:01:34 21   its jaws.

02:01:36 22             And the other thing you will notice is that the

02:01:40 23   calipers on these snap gauge have these, you know, buttons

02:01:43 24   or pads on them.  They're about the size I guess of a dime.

02:01:47 25   And what that, the problem with that, that could make it

02:01:50  1    difficult is if you have a really small specimen that you

02:01:56  2    are measuring, you can't really see it in the, you know, in

02:02:01  3    the snap gauge.

02:02:01  4              So like I said, I want to use a go/no go test to

02:02:05  5    determine that the covering was less than 0.1 millimeter and

02:02:10  6    the micrometer, although it is very similar to a snap gauge,

02:02:14  7    was better for doing the go/no go test.

02:02:20  8    Q.    Sir, any other reasons that you can recall that you

02:02:25  9    thought the use of a micrometer would be appropriate for

02:02:28 10    this project?

02:02:29 11    A.    It's highly accurate, I believe.  I actually believe

02:02:36 12    Bard does internal testing of their devices with a micrometer.

02:02:40 13    I think Ms. Bushmire will reference that later today or

02:02:44 14    tomorrow.

02:02:44 15    Q.    So let's go to the actual testing that you did on the

02:02:51 16    samples that we showed, the samples from the three devices;

02:02:55 17    okay?

02:02:56 18    A.    Sure.

02:02:56 19    Q.    What were your first steps in kind of preparing the

02:02:59 20    samples?

02:02:59 21    A.    Okay.  So the first thing I did was I obtained the

02:03:02 22    samples.  And what I was given were commercially --

02:03:07 23    commercial devices, devices that were produced and packaged

02:03:13 24    and, you know, were ready to be approved for use in patients.

02:03:17 25    Q.    Is this the package, representative of the package

02:03:22 1    you had?

02:03:22 2    A.    Yes, that is a representative package from one of the

02:03:25 3    Fluency devices.  So that is the way I got it in a package

02:03:28 4    like that.

02:03:28 5    Q.    Then what was the next step?

02:03:32 6    A.    Well, the next step was to take the device out of the

02:03:36 7    package and, you know, move the device which is mounted when

02:03:42 8    it is in the package on a delivery catheter.  Because you

02:03:46 9    have to realize these devices are, you know, they look like

02:03:50 10   that outside the delivery catheter, but to get them in the

02:03:54 11   body, you have to squish them down and then put a sheath

02:03:56 12   over it and mount it on a catheter.  So there has got to be

02:04:00 13   a way to keep it collapsed and on the delivery device.  And

02:04:04 14   that is when you take it out the box, it is going to look

02:04:07 15   something like that (indicating).

02:04:08 16         And could you show them the end of the catheter?

02:04:11 17   Just the very tip.

02:04:12 18   Q.    Yes.   (Indicating).

02:04:14 19   A.    So that, at the very end of that, about that much is

02:04:16 20   where that catheter, where that covered stent is squished

02:04:21 21   down and resides at the end of that catheter, and then it is

02:04:23 22   long like that, so it can go almost anywhere on the body.

02:04:27 23   Q.    And, sir, you took, I understand you took some

02:04:30 24   photos of the project that you were working on for the

02:04:34 25   thickness testing?

02:04:35   1   A.       Yes, I tried to take photos of the entire process

02:04:39   2   just to give, you know, people an idea what my experimental

02:04:43   3   methods were.

02:04:44   4   Q.       Okay.  So let's walk through that now, sir.  And what

02:04:47   5   is this photo showing?

02:04:49   6   A.       Okay.  So like I said, when the device comes out of

02:04:52   7   the box and it is on the delivery catheter, it's totally

02:04:57   8   squished down on the end of that delivery catheter, so it is

02:05:00   9   really small, so it is really collapsed.

02:05:02  10            So if you remember what my goal was is I wanted

02:05:05  11   to measure the thickness, when it was in a condition like

02:05:08  12   that, when it was expanded.

02:05:09  13            So just to give you a real simple explanation,

02:05:13  14   when you crunch these things down, the covered stents kind

02:05:16  15   of gets like that and it gets squished in between the stent

02:05:20  16   struts.  And then when it is fully expanded, it looks

02:05:23  17   something like that (indicating using a piece of paper).  It's

02:05:24  18   like a flat single sheet.  And that is the thickness that I

02:05:28  19   was interested in measuring.

02:05:31  20            To ensure that the specimen was in that

02:05:34  21   condition, I took, paid meticulous condition to trying to

02:05:39  22   expand, to expanding the stent to its fully expanded state;

02:05:45  23   and to do that, the first thing I did was to put it in a

02:05:48  24   water bath that was heated to 37 degrees.  That is about

02:05:51  25   body temperature.  And the reason I did that is that in

Gorman - direct

02:05:55 1   addition to the covering of the stent, so it has the metal

02:05:59 2   stent struts, the metal they use is nitinol, it is

02:06:03 3   self-expanding, it is a really cool material that I use in

02:06:06 4   my devices, and the neat thing about it is when you squish

02:06:09 5   it down, you don't have to force it open.  It wants to come

02:06:12 6   back to that, that unsquished shape.  But it tends to do it

02:06:17 7   better at body temperature.  It will happen quickly.  If you

02:06:21 8   leave it out at room temperature, it will get out to full

02:06:24 9   expansion, but to do it more quickly, you can heat it up to

02:06:28 10  body temperature, and that is what I'm doing here.

02:06:30 11  Q.      Okay.  What are you doing here?

02:06:32 12  A.      Okay.  So remember I said the way these things are

02:06:35 13  loaded on to the delivery device is that they're squished

02:06:38 14  down and then you have to put it -- you squish it down, then

02:06:41 15  you have to put a sheath over it which kind of holds it in a

02:03:54 16  squished down fashion.  And then when you want to deliver

02:06:46 17  it, you pull that sheath back, and because it's squish made

02:06:49 18  out of nitinol, it wants to expand, and that is what you are

02:06:52 19  seeing here.  You see, you still have tiny ends, but when

02:06:58 20  you pull back the sheath, the stent blossoms out.

02:07:01 21  Q.      And then when are you doing here?

02:07:03 22  A.      Okay.  This is called a balloon touch up.  And that's

02:07:08 23  like a technical term because that is what we do clinically.

02:07:11 24          So because of the temperature and the

02:07:15 25  self-expanding nature, that stent wants to get out to its

02:07:18  1   expanded state.  But to ensure it is fully expanded, what

02:07:22  2   doctors do is they put a catheter inside that stent that

02:07:26  3   actually has a balloon on it that can blow up.  And I used

02:07:29  4   air, but in the body you use saline so you don't get the air

02:07:33  5   in the heart.

02:07:34  6        But what that does is provide a little internal

02:07:37  7   pressure just to round out the device and get it out to its

02:07:40  8   thickness that it was intended to be.

02:07:42  9   Q.    And then what are you doing here?

02:07:44 10   A.    So what I did here was I used a micrometer, because

02:07:48 11   it was handy and it makes good measurements, to determine

02:07:51 12   that I didn't overexpand the device.  These devices come

02:07:55 13   with, on the box, what their diameter should be, and I

02:07:58 14   wanted to make sure that I didn't expand the device beyond

02:08:00 15   that nominal diameter.

02:08:03 16   Q.    Okay.  And just to get, why the preparation and

02:08:06 17   the different steps you took, why did you feel that was

02:08:08 18   important?

02:08:08 19   A.    Well, it gets back to the folded paper, you know,

02:08:11 20   analogy.  It's you want to measure the flat expanded covering.

02:08:18 21   And I didn't want to measure a partially expanded, you know,

02:08:21 22   covering which, you know, could have any kind of contours.

02:08:26 23        And later on in this discussion, we'll see

02:08:29 24   evidence of what an unexpanded piece of, you know, Gore-Tex

02:08:33 25   may look like.

Gorman - direct

02:08:34 1   Q.      And so, sir, after you prepared the sample, can you

02:08:37 2   describe the test that you --

02:08:39 3   A.      Sure.

02:08:39 4   Q.      -- you did for measurements?

02:08:41 5   A.      So the first test I did is called the clearance test.

02:08:48 6   And what I did there was -- can you show the next slide,

02:08:50 7   please?

02:08:50 8   Q.      Sure.

02:08:51 9   A.      So this is a fully, one of the fully expanded stents.

02:08:56 10  That's, my hands are the ones on the left.  And that's, I'm

02:09:01 11  using a surgical forceps and a fine surgical scalpel to cut

02:09:07 12  out --

02:09:08 13              Can I?  Sir, can I go point at that?

02:09:11 14              THE COURT:  Yes.  Do you want to step down?

02:09:13 15              THE WITNESS:  Yes.

02:09:14 16              THE COURT:  Sure, you may.

02:09:14 17  BY THE WITNESS:

02:09:18 18  A.      What I did was I cut out using a scalpel these

02:09:23 19  diamond-shaped areas and I did it in three spots to try to

02:09:27 20  get a sense of the average covering.  I took one diamond

02:09:31 21  from one end and the other end and then one from the middle.

02:09:36 22  And that's what I'm doing here, and there.

02:09:40 23  Q.      Okay.

02:09:42 24  A.      (Witness retakes witness stand.)

02:09:43 25  Q.      What did you do after that?

Gorman - direct

02:09:44  1    A.      So now we're back to the micrometer.  So, again, this

02:09:48  2    go/no go concept.

02:09:51  3            What I did was this shows the same micrometer,

02:09:55  4    it's actually the same picture.  It shows that the calipers

02:09:58  5    are set a distance of 0.97 millimeters, or slightly less

02:10:03  6    than 0.1 millimeter.  And then the micrometer is supported

02:10:08  7    using some lab equipment.

02:10:12  8    Q.      And can you describe just finally what you ended up

02:10:15  9    doing?

02:10:16 10    A.      Sure.  So then I took these individual diamond-shaped

02:10:20 11    pieces of covering, and then with a fine surgical forceps

02:10:25 12    and with a direct visualization with my magnifying glasses,

02:10:31 13    or we call them surgical loops, I passed the specimens

02:10:37 14    through that, the gate that I set up with the micrometer

02:10:43 15    calipers.  And I was able to do that under direct

02:10:47 16    visualization with the magnifying glasses.

02:11:06 17    Q.      And you heard in the opening presentation there was

02:11:16 18    some skepticism about your ability to actually do this and

02:11:19 19    be able to do your clearance test.  Do you have any reaction

02:11:24 20    to that?

02:11:24 21    A.      I did.  I understand that.  I understand the concern

02:11:27 22    there.  But what I want to tell you is that, you know, this

02:11:32 23    0.1 millimeters is small, no doubt about it, but it is on

02:11:36 24    the scale that, as vascular and cardiac surgeons, we operate

02:11:40 25    on that scale every day.

02:11:43 1        So just to give you some examples, the arteries,

02:11:46 2   when you operate on the heart, have bypass surgery, in some

02:11:50 3   small window, those coronary arteries can be less than a

02:11:54 4   millimeter in diameter.  And some older and diseased vessels

02:11:58 5   can be a half a millimeter or three-quarters of a

02:12:03 6   millimeter.  To operate on those arteries, to suture them

02:12:05 7   and repair them, we routinely use sutures in these

02:12:11 8   microsurgical effects.  These sutures are half of what the

02:12:15 9   size of that opening is.

02:12:17 10        So they are 0.05 millimeters.  I know it sounds

02:12:22 11   to laymen like this can't be done and it is beyond, you

02:12:27 12   know, visualization.  But it really -- I can assure you that

02:12:31 13   it is not.

02:12:32 14        I can assure you, it took me ten years to become

02:12:35 15   a heart surgeon, with enough training, it is not any

02:12:40 16   God-given skill, it is basically learning how to use the

02:12:43 17   tools.  Getting used to working on the magnification.  And

02:12:48 18   while it is a skill, it's something that can be learned and

02:12:51 19   it's something that is done, I can assure you, every day in

02:12:55 20   cardiac surgery operating rooms, both in the United States

02:12:57 21   and around the world.

02:12:58 22   Q.    Any other reason that you feel confident that this

02:13:01 23   clearance test would not give you a false result?

02:13:04 24   A.    I use it in my own work.  I can explain what I use it

02:13:09 25   for.

Gorman - direct

02:13:09 1    Q.       Sure.

02:13:11 2    A.       Like I said, I design stent devices, they are bigger

02:13:15 3    than these, but they carry heart valves in the body.

02:13:20 4              So using a catheter, like Mr. Poradek showed

02:13:23 5    you, the device actually changes the heart valve, so you can

02:13:29 6    obviate the need for heart surgery.

02:13:31 7              To do that I use a pericardial tissue, which is

02:13:34 8    a tissue that is around the heart from animals, to construct

02:13:38 9    heart valves, so I can make the device be collapsible down

02:13:41 10   to a reasonable size.

02:13:46 11             Mine can't have any pericardial tissue where any

02:13:50 12   part is greater than 0.2 millimeters, about the size we are

02:13:54 13   talking about here.  Especially when I was developing the

02:13:57 14   first prototypes that I was making in the laboratory by

02:13:58 15   myself, I used this technique in those days on a daily basis

02:14:04 16   almost.  I still use it on a not-infrequent basis.

02:14:07 17             It is a technique that I am comfortable with,

02:14:11 18   and that has been effective for me in my work.

02:14:14 19   Q.       What about the criticism that perhaps you were able

02:14:18 20   to squeeze the sample through the two pins on the

02:14:22 21   micrometer?

02:14:23 22   A.       You know, that is not really -- the lawyer mentioned

02:14:30 23   that.  It was a flimsy material and it's not stiff.  That's

02:14:34 24   true.  It's not.

02:14:36 25             You know, you can't force it through.  I will

Gorman - direct

02:14:38  1    give you an example.

02:14:40  2              If you have a frayed shoelace and you want to

02:14:42  3    put it through the eye of your shoe, you try to do it, it

02:14:46  4    kind of goes everywhere but into the eye.  That's the kind

02:14:51  5    of tissue you would have.

02:14:53  6              I have had that with pericardial tissue where it

02:14:57  7    is just an absolute no go right from the start independent

02:15:00  8    of what my supplier said the thickness was.

02:15:03  9    Q.    Sir, after doing this clearance test, you did this

02:15:06 10    with all the samples that you were looking at?

02:15:09 11    A.    That's right.  I had three Fluency Plus samples.  I

02:15:13 12    had three Flare strays and three Flare Flares.  And I took

02:15:20 13    three specimens, three of those little diamonds from each

02:15:23 14    end and the middle on each and tested them in this way.

02:15:26 15    Q.    What were the results?

02:15:27 16    A.    All of the specimens that I assessed in this way were

02:15:30 17    a go, were a pass, they all passed through.

02:15:33 18    Q.    So they were less than what you set the micrometer

02:15:35 19    at?

02:15:35 20    A.    That's right.  So I was confident concluding that

02:15:40 21    they were less than 0.1 millimeters.

02:15:43 22    Q.    Did you do any other testing?

02:15:45 23    A.    I did.  One other test.

02:15:46 24    Q.    We have a slide that says Free Movement Test.  Maybe

02:15:50 25    you can describe that?

02:15:51  1   A.       Free movement test.

02:15:53  2           I had one concern.  It was that after I cut out

02:15:56  3   these diamonds, I was concerned whether that in any way

02:16:00  4   affected the thickness of the device -- of the covering.

02:16:03  5           So I used this technique to be able to assess

02:16:07  6   the thickness in multiple areas of the device while the

02:16:12  7   covering was still mounted on the stent.

02:16:14  8   Q.       And could you tell how you prepared the samples for

02:16:17  9   the free movement test?

02:16:18 10   A.       Yes.  Here, we are doing this.  This is me,

02:16:21 11   obviously.  And those are surgical, magnifying glasses,

02:16:29 12   three-power, I think.

02:16:30 13           You can see the stent down there, which is a

02:16:32 14   better picture coming up next.

02:16:35 15           What I did was, using the same devices that I

02:16:39 16   had cut the little diamonds out of, I opened the stent up

02:16:43 17   the long way and I was able to open it up so it became flat.

02:16:49 18           And then I tested it with a micrometer.  Next

02:16:52 19   slide, please.

02:16:54 20           So I used the micrometer a little differently in

02:16:59 21   this test.

02:17:00 22           So to get the device between the calipers, I had

02:17:05 23   to open up the calipers wider than 0.97.  You notice here

02:17:12 24   that the thickness over the struts is like 0.26 millimeters,

02:17:17 25   at least in the Fluency.  So that wouldn't pass that for the

Gorman - direct

02:17:21  1    go/no go.  So I had to open it up.

02:17:24  2              And I placed the device between the calipers.

02:17:28  3    And my goal here -- sir, may I get up?

02:17:31  4              THE COURT:  You may.

02:17:32  5              (Witness steps down from stand.)

02:17:33  6              THE WITNESS:  I put the caliper right in this

02:17:37  7    area, then what I did was moved it around under direct

02:17:44  8    visualization.  You get the idea, that I was trying to

02:17:47  9    localize it over that diamond shaped area.  Then I could

02:17:53 10    move the stent around under direct visualization and see

02:17:57 11    that it was not in contact with the calipers and also it

02:18:03 12    would move freely.

02:18:05 13              You could tell, the evidence of when it didn't

02:18:08 14    move freely, if you bumped into one of the stent fronts,

02:18:13 15    that was very obvious.  There was no other resistance to

02:18:17 16    movement, as long as I was away from the stent struts.

02:18:19 17    BY MR. PORADEK:

02:18:19 18    Q.    Do you recall if there were any other openings?

02:18:21 19    A.    I did.  I did one on either end and one in the

02:18:24 20    middle, for each one of the nine devices.

02:18:26 21    Q.    Here is another angle of it.  Correct?

02:18:28 22    A.    Yes.  This is not the best picture in the world.  But

02:18:32 23    that's basically how I handled the device.

02:18:34 24    Q.    And the results that you obtained from that free

02:18:40 25    movement test?

Gorman - direct

02:18:41  1    A.      Again, all of the measurements I made were a go.

02:18:45  2    There was no failures.

02:18:47  3    Q.      That would mean that they were less than where you

02:18:51  4    had said the micrometer?

02:18:52  5    A.      That's right.  So I could safely conclude that based

02:18:54  6    on this test, also, the covering was less than 0.1

02:18:58  7    millimeter.

02:18:58  8    Q.      Let me talk to you a second -- more than a second --

02:19:06  9    you know Bard has retained a testing expert as well.

02:19:10 10    A.      Yes.

02:19:10 11    Q.      Robert Calcote?

02:19:12 12    A.      Yes.

02:19:12 13    Q.      Have you had a chance to review the work he did in

02:19:15 14    connection with this case?

02:19:15 15    A.      I did.

02:19:16 16    Q.      Do you have any reactions to the work he has done?

02:19:18 17    A.      Yes, I do.  I have some concerns.

02:19:20 18    Q.      What are those concerns?

02:19:22 19    A.      The biggest concern is what he didn't test.

02:19:25 20    Q.      What do you mean by that?

02:19:27 21    A.      He didn't test any commercial Fluency Plus devices at

02:19:34 22    all.

02:19:34 23    Q.      Is that the Fluency Plus device?

02:19:36 24    A.      Yes.  That is the Fluency Plus.

02:19:38 25    Q.      So no commercial Fluency Plus devices that you had

Gorman - direct

02:19:44  1    been testing.  Right?

02:19:45  2    A.    Right.  All I was given were commercially available

02:19:50  3    devices.

02:19:51  4    Q.    There was a reference in the opening to there being I

02:19:55  5    think a single Fluency Plus device that had been tested.  Do

02:19:59  6    you remember that?

02:19:59  7    A.    Yes.

02:19:59  8    Q.    What was that?

02:20:01  9    A.    That is what they call an uneven device.  From Mr.

02:20:06 10    Calcote's report, I ascertained that what they mean by that

02:20:10 11    is something that has never been squished down and put on a

02:20:16 12    delivery device.

02:20:19 13            Also, I would assume that it didn't go through

02:20:22 14    whatever quality control is necessary for something to get

02:20:26 15    in one of those commercially available boxes and get out on

02:20:29 16    the shelf in the hospital.

02:20:30 17            It is unclear exactly how that device was

02:20:35 18    manufactured or how it was tested, or I was assured that it

02:20:39 19    was clinically -- would be used clinically.

02:20:42 20    Q.    There was testing of commercial Flare devices though,

02:20:46 21    correct, by Mr. Calcote?

02:20:48 22    A.    Yes, there was.

02:20:48 23    Q.    Any concerns about the testing of the Flare devices

02:20:52 24    by Mr. Calcote?

02:20:53 25    A.    Yes, I have some concerns about that, too.

Gorman - direct

02:20:56  1    Q.        What are those?

02:20:57  2    A.        Well, in a general sense, they are both Flare and

02:21:02  3    Fluency Plus devices, the commercial ones, it was a lack of

02:21:08  4    information in the report about how they were handled.  We

02:21:12  5    spent some time going over how I, you know, took the devices

02:21:16  6    out of the box and assured that they were fully expanded.

02:21:20  7             Again, essentially measuring something that was

02:21:23  8    not fully expanded, fully stretched out, covered.  So Mr.

02:21:30  9    Calcote, as far as I can tell, didn't do that, from figures

02:21:38 10    a few minutes as to how I think that might have influenced

02:21:42 11    his measurements.

02:21:43 12    Q.        Any other concerns you had about the commercial Flare

02:21:46 13    testing done by Mr. Calcote?

02:21:47 14    A.        Yes.  The commercial Flare test -- the issue was,

02:21:56 15    again, it relied on what we call scanning electron

02:22:01 16    microscopy.

02:22:01 17    Q.        What is that?

02:22:04 18    A.        The Bard lawyers described it very nicely.  It is a

02:22:07 19    way to magnify the surface of a small object so you can get,

02:22:12 20    you know, beautiful pictures of what the surface looks like.

02:22:16 21             The problem is you are really honed in on a

02:22:20 22    really tiny area of the device.

02:22:25 23             We will see that this is of concern to me.

02:22:29 24             We are trying to assess the average overall

02:22:32 25    thickness.  And I did my best to assess multiple areas of

Gorman - direct

02:22:35 1    the device.  You will see with these magnified pictures that

02:22:40 2    you really are honed in on a really small part of the

02:22:43 3    device.

02:22:43 4    Q.      Let's take a look at one of the pictures, Mr.

02:22:46 5    Calcote.  Do you recognize that, sir?

02:22:48 6    A.      Yes.

02:22:48 7    Q.      Can you describe what we are seeing there?

02:22:50 8    A.      Yes.  I asked to use this slide because this

02:22:56 9    describes, I think, for your concerns that I have with Mr.

02:23:01 10   Calcote's measurements.

02:23:02 11           The first one was the one I just discussed about

02:23:05 12   preparation, about making sure that the covering was

02:23:07 13   expanded.

02:23:09 14           This is a really good example, that makes me

02:23:13 15   concerned that the devices weren't prepared well before the

02:23:16 16   specimens were harvested for measurement.  As you can see,

02:23:23 17   you have these bumps here, it looks like, you know, it's not

02:23:27 18   homogeneous or it's not the same all the way through.  There

02:23:30 19   is a bump here and a bump there.  That makes me concerned

02:23:33 20   that, you know, the stent was not fully expanded and you got

02:23:38 21   bumps.

02:23:39 22           The other issue, again, I was worried about

02:23:43 23   magnification.  This looks big, this is really small.

02:23:48 24           The distance from here to here, that is 200

02:23:52 25   microns, or two-tenths of a millimeter.  So the whole

02:23:55  1    distance from here to here is about half a millimeter.  So I

02:23:59  2    don't know if you guys are familiar with the metric system.

02:24:01  3    The way I like to explain the scale on millimeters is the

02:24:05  4    eraser on a pencil is about six millimeters.  So this is

02:24:09  5    about one-tenth of the width of an eraser on a pencil.

02:24:12  6            So really high magnification, so you are really

02:24:15  7    only looking at a small portion of the device.

02:24:18  8            A real big problem I had with what Mr. Calcote

02:24:21  9    did is he only assessed or imaged edges of the devices that

02:24:27 10    were traumatized or cut.  For some of the measurements he

02:24:29 11    made, he cut the covering with a scalpel.  Like I did, we

02:24:37 12    will see these a little later when we talks about

02:24:39 13    affixation, sometimes he cut it with a wire cutter.

02:24:43 14            What that does is traumatizes the edge.

02:24:46 15            This picture also has an example of what I think

02:24:49 16    is trauma, you see this -- that looks like something that

02:24:53 17    got ripped off, one of the edges here and is kind of flipped

02:24:57 18    off over the top.

02:24:59 19            That is another problem I had.

02:25:00 20            Then, the next issue is really important.  I

02:25:04 21    call this the selection bias.  Where do you -- say you got

02:25:09 22    this picture and it's all magnified.  But there is an

02:25:13 23    infinite amount of choices on where you can measure this

02:25:17 24    thing.

02:25:18 25            I think the Bard lawyer made some reference that

02:25:22  1    he always took the middle.  In the middle, we are a lot

02:25:27  2    thinner there.  There was some motivation for going here and

02:25:30  3    not there (indicating).

02:25:32  4         We are pretty close to 0.1 millimeters here.  I

02:25:37  5    didn't make a measurement.  You can imagine that is at least

02:25:40  6    closer to 0.1 millimeters.

02:25:43  7         In summary, my concerns with Mr. Calcote's

02:25:47  8    methodology is, one, failures to prepare the device

02:25:52  9    appropriately, didn't fully expand, always assessing a cut

02:25:56 10    or traumatized edge.  That is like a no-no when you are

02:25:59 11    measuring something.

02:26:00 12         You don't want to have your measurement

02:26:03 13    technique affect the measurement you are interested in.

02:26:06 14    That is one of the reasons I use that go/no go test.  I know

02:26:10 15    I have been criticized for it this morning and I am sure you

02:26:14 16    will hear me criticized until the end of this process.  That

02:26:17 17    is what Mr. Calcote did not take into account.  He only

02:26:19 18    measured this traumatized edge.

02:26:22 19         And the other issue is the intense magnification

02:26:25 20    and the limited amount of device you can measure.

02:26:27 21         The key thing, and you will see this a lot,

02:26:29 22    especially if you go through Mr. Calcote's report, is the

02:26:32 23    selection bias.

02:26:34 24         I was a little concerned, you know, when I

02:26:37 25    looked at his report I wanted to try to understand why he

02:26:41 1    made these measurements.  He didn't always take the

02:26:43 2    thickest, but he never took the thinnest.

02:26:46 3                I heard earlier today from Bard saying he always

02:26:49 4    took the middle.  And I was thinking, I don't think that's

02:26:52 5    the case.  This is an example of one he is taking from the

02:26:55 6    middle.

02:26:55 7    Q.    Let's look at another picture.  I think you asked to

02:26:59 8    show this one.  Why were you interested in this?

02:27:02 9    A.    There is a couple reasons.  The Bard comment earlier

02:27:08 10   makes it even more important.

02:27:11 11               This is an example, a trunk.  This is not the

02:27:16 12   way these devices likely look when they are in the body and

02:27:22 13   in a functioning device.

02:27:24 14               This is certainly the result of being cut with

02:27:29 15   either a knife or a wire cutter.

02:27:31 16   Q.    What tells you that?

02:27:33 17   A.    Well, I mean, look.  That looks like a piece that got

02:27:37 18   ripped off here and wrapped this up here.  Then the other

02:27:40 19   issue here is this demonstrates selection bias again.

02:27:44 20   Obviously, this is not as thick as this is (indicating).

02:27:47 21               Again, it is not in the middle of the specimen.

02:27:51 22               THE COURT:  For the record, we were looking at

02:27:53 23   DTX-428.  Isn't that right?

02:27:55 24               MR. PORADEK:  That's right.  You know, Your

02:27:57 25   Honor, I apologize about that.  These are actually exhibits

Gorman - direct

02:28:00  1    that I should have offered.  DTX-428 I would offer.

02:28:05  2            MR. CHERNY:  Given where we are it would be

02:28:07  3    easier, I don't know if this continues and afterwards, he

02:28:13  4    says this is what we offer.

02:28:14  5            THE COURT:  As long as we are making clear what

02:28:16  6    the witness is talking about.  What were we looking at

02:28:18  7    before.  DTX-428?

02:28:21  8            MR. PORADEK:  These are all exhibits -- the

02:28:24  9    first one that he was discussing of the SEM images was 429.

02:28:32 10    It is one of several images there.  Then 428, one of several

02:28:37 11    images.

02:28:38 12            Then if I will turn to the next slide, this is

02:28:41 13    DTX-429, another image at that exhibit.

02:28:50 14    BY MR. PORADEK:

02:28:50 15    Q.     Please describe this?

02:28:51 16    A.     The last one, you will see this.  Because this shows

02:28:54 17    you an example of how the covering is kind of convoluted and

02:28:57 18    not flat.

02:28:59 19            You know, that produces the quandary I am

02:29:02 20    talking about with selection bias.

02:29:05 21            It shows here, again, here he is in the middle.

02:29:09 22            But this obviously would have been thinner, and

02:29:13 23    so it would be thinner.

02:29:14 24            Again, the take-home message here is to point

02:29:18 25    out that lack of preparation, or at least a lack of

Gorman - direct

02:29:22  1  attention to detail about trying to get the covering fully

02:29:26  2  expanded.

02:29:28  3  Q.      Thank you.  So in sum, how are you reviewing Dr.

02:29:34  4  Calcote's opinion in relation to yours as you sit here

02:29:37  5  today?

02:29:38  6  A.      Can you repeat that?

02:29:39  7  Q.      How does Dr. Calcote's opinion affect your opinion as

02:29:42  8  you sit here today?

02:29:44  9  A.      It doesn't change my opinion.

02:29:47 10  Q.      And then I understand you also looked at the

02:29:51 11  affixation limitation?

02:29:54 12  A.      That's correct.

02:29:54 13  Q.      Let's go back to the language at PTX-01.  Is this the

02:30:00 14  relevant language for the affixation limitation?

02:30:03 15  A.      Yes.

02:30:03 16  Q.      There was a claim construction the Court gave to this

02:30:05 17  as well.  Correct, sir?

02:30:09 18  A.      Yes.

02:30:09 19  Q.      Is this what you understood it to be?

02:30:12 20  A.      Right.  It defines affixed as the coverings must

02:30:17 21  contact the stent surface, and be secured to the stent

02:30:20 22  surface.

02:30:21 23  Q.      Any information in the patent about ways that

02:30:25 24  something could be secured to the stent surface and be in

02:30:28 25  contact with the stent surface?

02:30:29  1    A.      Yes.

02:30:29  2    Q.      And this is Page 11 of PTX-01.  Correct?

02:30:38  3    A.      It looks to be, yes.

02:30:39  4    Q.      Why did you find this information relevant?

02:30:41  5    A.      It describes how the coverings can be affixed.  It

02:30:46  6    lists three potential ways of doing it.  One is to thermally

02:30:52  7    bond the covering together.  Another is to actually use an

02:30:56  8    adhesive of some kind.  And then the third one is

02:31:01  9    interesting in that you can use sutures to affix the

02:31:08 10    covering to the stent.

02:31:08 11    Q.      Why do you find that interesting?

02:31:13 12    A.      It's -- you know, sutures -- when -- if you use the

02:31:18 13    adhesive or the thermal bonding, there is going to be

02:31:21 14    multiple areas, you know, where things would be, with the

02:31:25 15    covering, would be affixed.  But with sutures it has to be a

02:31:28 16    finite amount.

02:31:29 17            There is only so many sutures that you can put

02:31:31 18    in.

02:31:31 19    Q.      Any understanding of whether there is a requirement

02:31:33 20    in the patent to actually glue the covering to the stent

02:31:38 21    surface in order for it to meet the affixing limitation?

02:31:42 22    A.      I don't think so.

02:31:43 23    Q.      Could you -- describe your test and what you did in

02:31:49 24    terms of analyzing affixing?

02:31:51 25    A.      So with regard to affixing, it is very

02:31:54 1  straightforward, and I think simple.  Again, not rocket

02:31:58 2  science.

02:31:58 3          The idea was to determine whether the covering

02:32:04 4  was secured to the stent.  In my mind, that is not a

02:32:09 5  microscopic diagnosis.  That is a macroscopic total device

02:32:12 6  level assessment, to see whether the covering is secured to

02:32:17 7  the stent.

02:32:18 8          By secured, what I did was I just visually

02:32:22 9  looked at it.  And a couple of things obviously come to mind

02:32:26 10 when you look at this.  Move to the outside here, the

02:32:32 11 coverings such to make contact with the stent struts that

02:32:35 12 you can actually see the stent struts through the covering.

02:32:38 13         This is a good picture, because we have a look

02:32:41 14 from the inside and it looks the same.

02:32:44 15         Just from a physical visualization, it appears

02:32:49 16 to be secured.

02:32:27 17         The other thing I did was to handle one of these

02:32:30 18 devices.  You can see that it's, really the thing has one

02:32:36 19 wall, the stent covering.  They don't move in relationship

02:32:38 20 to each other at all.

02:32:40 21 Q.      And, sir, did you put this photo up here?

02:32:48 22 A.      Yes.

02:32:49 23 Q.      And why did you do that?

02:32:50 24 A.      This is one of the devices we used for the free

02:32:54 25 movement test.  Again, so it's a round cylinder stent that

Gorman - direct

02:33:00 1    was opened the long way to allow it to become flat.  And

02:33:04 2    what you can do there, you can just put it between your

02:33:06 3    finger and there was just one wall there.  There was no

02:33:10 4    slack or no movement between the covering and the stent.

02:33:14 5    Q.      So, sir, is this more of an indication that it's

02:33:19 6    secured to the surface of the stent, the covering?

02:33:22 7    A.      Very much so.  It's secured to the -- the covering

02:33:25 8    is secured to the stent, just like it says in the claim

02:33:28 9    language.

02:33:28 10   Q.      And Mr. Calcote performed some affixing testing of

02:33:33 11   his own; correct?

02:33:34 12   A.      He did, yes.

02:33:34 13   Q.      And your reaction?

02:33:36 14   A.      Well, I had concerns.

02:33:37 15   Q.      What are those?

02:33:38 16   A.      Again, it's preparation, and, again, that he only

02:33:43 17   assessed the cut edge.  In the affixation test, the cut is

02:33:50 18   done with a wire cutter.

02:33:51 19   Q.      And why is that a concern for you?

02:33:52 20   A.      Well, I'll show you.  Again, it's that concept of

02:33:56 21   trauma.  And then, again, you're going to see the reliance

02:34:03 22   on microscopic assessment of affixation.

02:34:07 23            Like I said, in my mind, affixation is something

02:34:10 24   you assess on a macroscopic scale.  And I think that is

02:34:15 25   the -- you know, the quality control that gets done on these

Gorman - direct

02:34:18  1  devices at Bard is a macroscopic assessment.  I don't think

02:34:22  2  they're testing whether the stent is affixed or secured, you

02:34:26  3  know, with a microscope.  I may be wrong.

02:34:29  4          But this is an example, okay?  This is a cut

02:34:34  5  end of the stent.  It was cut with a wire cutter.  And what

02:34:39  6  Mr. Calcote is bringing about is these gaps.  And they say

02:34:43  7  that this is a part of their design, and this is how the

02:34:47  8  device is engineered.  I think that it's what we call, you

02:34:56  9  know, an artifact, meaning it is a result of how the

02:34:59 10  specimen was cut.  And I think what happens is when he cuts

02:35:02 11  the stent and the covering, you know, you fundamentally

02:35:06 12  alter the material, and then when you get an image, you

02:35:10 13  know, you can't really make an assessment.

02:35:13 14  Q.      And then you asked to look at this picture.  Can you

02:35:17 15  describe what this is?

02:35:18 16  A.      This is just a magnified view of the figure that we

02:35:21 17  just looked at.

02:35:22 18          And, again, he is trying to make his case.  I

02:35:25 19  think he is a little guilty of selection bias here.  He is

02:35:29 20  trying to highlight the bigger gap as opposed to if you go

02:35:32 21  back, you know, he is not looking over, he is not showing

02:35:34 22  this is a higher magnitude or this.  He is showing this over

02:35:37 23  here.

02:35:37 24          And the other thing you want to look at, is that

02:35:41 25  there is covering material that is still stuck on this

Gorman - direct

02:35:45 1    stent.  And I know that Bard will say this stuff is really

02:35:51 2    slippery, but it is stuck there.  And you can imagine that

02:35:55 3    once it was connected to there.  I can't say for sure but it

02:35:58 4    sure looks like it.

02:35:59 5                    THE COURT:  Just for the record, the last few

02:36:01 6    images are also from DTX-429; right?

02:36:05 7                    MR. PORADEK:  Exactly, Your Honor.  So let me

02:36:07 8    confirm that.

02:36:07 9                    Yes, one is a blowup -- the second is a blowup

02:36:12 10   of the first one from DTX-429.

02:36:12 11   BY MR. PORADEK:

02:36:17 12   Q.      Sir, let me show you another image from DTX-429.  Can

02:36:21 13   you describe what is going on here?

02:36:22 14   A.      Yes.  I think this is a great example of my case for

02:36:26 15   the fact that the device has been traumatically been altered

02:36:31 16   by a wire cutter.

02:36:32 17                   What you can see here is this stent has actually

02:36:36 18   been cut by the wire cutter.  You can see the ridge here.

02:36:39 19   It's kind of pinched together.  So that was cut there.

02:36:43 20                   And then what you see is that the covering has,

02:36:47 21   has, in my mind has sprung away from the stent itself.  And,

02:36:53 22   you know, this, I like this representation.  To me, it seems

02:36:59 23   like it is quite likely that this covering once will break

02:37:06 24   down on this stent strut.  It is like a hand in a glove at

02:37:08 25   this point.  That shave fits right into there (indicating).

Gorman - direct

02:37:11   1          So I really think that the changes, that these

02:37:15   2   gaps that Mr. Calcote is describing are a result of

02:37:20   3   traumatic injury to the device that was produced by using a

02:37:24   4   wire cutter.

02:37:26   5   Q.     And, finally, there is another, looks like another

02:37:30   6   couple slides from DTX-429.  Can you describe what is going

02:37:34   7   on here?

02:37:35   8   A.     Yes.  This is very similar to the first one we looked

02:37:37   9   at except the gaps are a little bit smaller.  And down here,

02:37:42  10   there is no gap.

02:37:43  11          And just, this is again selection bias,

02:37:47  12   increased exposure to this bigger area which I think is over

02:37:50  13   here.  But I like to draw your attention to this stuff I

02:37:55  14   guess which I think it is covering, that is still stuck on

02:37:59  15   the stent strut.

02:38:00  16   Q.     Sir, just in summary, can you give the kind of bottom

02:38:07  17   line opinions you have with respect to the "affixation"

02:38:09  18   limitation and how they compared to the accused Bard devices?

02:38:14  19   A.     Yes.  I believe the coverings that I assessed were

02:38:18  20   all less than 0.1 millimeter.  And I believe all the

02:38:22  21   coverings that I examined were secured or affixed to the

02:38:26  22   stent struts.

02:38:27  23          MR. PORADEK:  Thank you very much.

02:38:28  24          THE COURT:  All right.  Did you want to offer

02:38:31  25   the exhibits into evidence?

02:38:32 1          MR. PORADEK:  Yes.  I believe --

02:38:37 2          (Counsel confer.)

02:38:41 3          MR. CHERNY:  If it would help, I would be happy

02:38:43 4    to do it afterwards, if it would make things faster for you.

02:38:46 5          THE COURT:  That's fine.  But before

02:38:48 6    cross-examination doctor, I have a question.  I may have

02:38:50 7    misheard, but if I heard you say in describing some of your

02:38:53 8    tests that you set the distance at 0.97.

02:38:59 9          THE WITNESS:  Yes, sir.

02:39:00 10          THE COURT:  As opposed to .097.

02:39:02 11          THE WITNESS:  It should be .09 -- 0.097.

02:39:07 12          THE COURT:  I may be wrong, but if I heard you

02:39:09 13    say, you said it at 0.97?

02:39:11 14          THE WITNESS:  That was an error.

02:39:13 15          THE COURT:  That's a mistake.

02:39:14 16          THE WITNESS:  Thank you for pointing that out.

02:39:16 17          THE COURT:  Is there anything else?

02:39:16 18          MR. PORADEK:  No, Your Honor.

02:39:17 19          THE COURT:  All right.  Cross-examination.

02:39:27 20          MR. CHERNY:  If I may have a second, Your Honor.

02:39:29 21          THE COURT:  Sure.

02:39:41 22          MR. CHERNY:  Your Honor, everyone does this

02:39:43 23    differently.  Do you mind if I give Dr. Gorman a binder of

02:39:47 24    materials I expect to use on cross so I don't have to keep

02:39:51 25    going up and down?

02:39:52 1          THE COURT:  Yes, that would be fine.  You have

02:39:54 2   leave to approach to do that.

02:39:56 3          MR. CHERNY:  Thank you, Your Honor.

02:39:57 4          (Binders passed forward.)

02:40:18 5          MR. CHERNY:  And, Your Honor, I also anticipate

02:40:21 6   asking some questions by the board.  Is there any objection

02:40:23 7   to me taking the board so I can point to it directly so I

02:40:25 8   don't have to point across the room?

02:40:27 9          THE COURT:  That's fine.  And if the witness has

02:40:29 10  trouble seeing it, let us know.

02:40:31 11         MR. CHERNY:  Thank you, Your Honor.

02:40:44 12         (Board moved by podium.)

02:41:04 13         MR. CHERNY:  Okay.  I apologize, Your Honor.

02:41:06 14  And we're up and running, Mr. Fisher?

02:41:10 15         MR. FISHER:  Yes, sir.

02:41:12 16              CROSS-EXAMINATION

02:41:12 17  BY MR. CHERNY:

02:41:13 18  Q.     Hello, Dr. Forman.  I'm Steve Cherney.  Nice to meet

02:41:18 19  you.

02:41:18 20  A.     Nice to meet you.

02:41:18 21  Q.     Okay.  I was going to start with some other stuff,

02:41:20 22  but some of the things you said about affixing caught my eye

02:41:24 23  so I want to ask some questions about that, if that is

02:41:26 24  okay?

02:41:26 25  A.     Okay.

02:41:26  1    Q.      Can we put up the slides from, slide 84.

02:41:36  2            Okay.  I just want to know, Dr. Gorman, during

02:41:41  3    your testimony today, you were in the court for the opening;

02:41:45  4    correct?

02:41:46  5    A.      I heard you speak, yes.

02:41:48  6    Q.      Oh.  You only listened to me?

02:41:50  7    A.      Yes.

02:41:50  8    Q.      I'm honored.

02:41:52  9            So anyway, and you saw me put this document up;

02:41:52 10    correct?

02:41:56 11    A.      Yes.

02:41:57 12    Q.      And you saw the Flair endovascular stent graft

02:42:02 13    document from Bard; correct?

02:42:04 14    A.      Excuse me.  Down one line.

02:42:06 15    Q.      I want to identify the slide so I don't get in

02:42:08 16    trouble.  This is a document, DTX-1598.  Do you see that?

02:42:11 17    A.      Yes, I do.

02:42:12 18    Q.      And I referenced this I think a little bit during the

02:42:14 19    opening; correct?

02:42:15 20    A.      I think I remember that.  Yes.

02:42:17 21    Q.      And this is a document that I will represent was

02:42:20 22    produced to Gore.  Do you know that?

02:42:22 23    A.      I didn't see it until now.

02:42:24 24    Q.      Exactly what I want.  So you have never seen this

02:42:27 25    document; correct?

Gorman - cross

02:42:27  1    A.      That's correct.

02:42:27  2    Q.      So if Gore had it, that means they didn't show it to

02:42:30  3    you; correct?

02:42:31  4    A.      They may have provided to me but I don't remember

02:42:34  5    seeing it.

02:42:35  6    Q.      So either you don't remember seeing it or they didn't

02:42:37  7    provide it to you; correct?

02:42:38  8    A.      That's correct.

02:42:39  9    Q.      Okay.  And you remember my discussion about this

02:42:41 10    regarding affixing; correct?

02:42:43 11    A.      I do, but could you -- basically, yes.

02:42:46 12    Q.      I'm not going to try to repeat it.  I'll just ask you

02:42:49 13    questions.  And so -- and you do recall that I pointed to

02:42:53 14    this as a historical document; correct?

02:42:56 15    A.      I think that is right.  Yes.

02:42:57 16    Q.      And I guess since you have never seen it, you have no

02:43:00 17    basis to doubt that; correct?

02:43:02 18    A.      You just have to remind me a little bit.  Once you

02:43:05 19    stopped talking about me, I wasn't listening as closely.

02:43:07 20    Q.      Okay.  They hurt my feelings a little bit.

02:43:11 21            Okay.  So you see this document is labeled Flair

02:43:17 22    endovascular stent graft; correct?

02:43:19 23    A.      Yes.

02:43:19 24    Q.      And you agree that Flair is one of the products that

02:43:21 25    you analyzed; correct?

02:43:23  1    A.    Yes.

02:43:23  2    Q.    And it's one of the products that Gore has asserted

02:43:27  3    infringes; correct?

02:43:27  4    A.    Yes.

02:43:28  5    Q.    Okay.  And I understand that I wasn't talking about

02:43:32  6    you at this time, but do you recall my discussion about the

02:43:38  7    slide that says pockets within bonded ePTFE; correct?

02:43:42  8    A.    That's right.

02:43:42  9    Q.    Now, because you didn't, you don't remember ever

02:43:47 10    seeing this, you certainly did not consider this in

02:43:49 11    rendering your opinion; correct?

02:43:51 12    A.    That's right.

02:43:51 13    Q.    Okay.  And, can I get the next slide?

02:43:59 14         From that same document, DTX-1598.  Do you

02:44:03 15    recall this as well?  This is the explanted Flair graft.

02:44:08 16    A.    Right.  This was in the pig, right?

02:44:09 17    Q.    Yes, you remember the pig.  Apparently you remember

02:44:13 18    the pig and my talking about you.

02:44:17 19    A.    I don't have any equality there.

02:44:19 20    Q.    No.  But anyway, you do recall it, Dr. Gorman?

02:44:21 21    A.    Yes.

02:44:22 22    Q.    And you do recall where I showed the pockets in the

02:44:27 23    Flair graft; correct?

02:44:29 24    A.    Yes.

02:44:29 25    Q.    And, again, since you didn't ever see DTX-1598, for

Gorman - cross

02:44:34  1   whatever reason, you did not consider this in rendering your

02:44:37  2   opinion of affixation; correct?

02:44:39  3   A.      I did not, no.

02:44:40  4   Q.      Okay.  So if we can take that down, Mr. Fisher.

02:44:48  5              Now, I always start these types of examinations

02:44:52  6   thinking I've got a plan, and then the witness testifies a

02:44:56  7   little bit, and then I start focusing what the witness said

02:44:58  8   a little bit.  So I'm going to start with what you started

02:45:00  9   with, if that is okay.

02:45:01 10   A.      Sure.

02:45:02 11   Q.      And I have a tendency to speak quickly; and if I

02:45:05 12   speak too quickly, please just tell me to slow down or

02:45:08 13   repeat myself.  Is that fair?

02:45:09 14   A.      If I don't understand, I'll ask you to repeat it.

02:45:11 15   Q.      Okay.  Now, you and I think some of the prior videos

02:45:18 16   referenced this one picture.  Do you recall?

02:45:20 17   A.      I can't see what you are pointing at.

02:45:21 18   Q.      It's your picture.

02:45:25 19   A.      It is, but ...

02:45:27 20   Q.      I can bring it closer.

02:45:29 21              THE COURT:  Why don't you --

02:45:30 22   BY THE WITNESS:

02:45:30 23   A.      No.  If you do it that way, I can look at it.  I

02:45:31 24   agree it's the thing that was here.

02:45:33 25   Q.      That's all I was asking.

Gorman - cross

| 02:45:34 | 1 | A. | That's it.  Yes.  I agree.  Sorry. |

02:45:34  1    A.    That's it.  Yes.  I agree.  Sorry.

02:45:36  2    Q.    I apologize.

02:45:38  3    A.    I thought you were going to point out something on it.

02:45:41  4    Q.    No, no.  At the moment, I wanted to confirm that.

02:45:43  5    A.    No, that's right.

02:45:44  6    Q.    Were you here when the videos were played?

02:45:46  7    A.    The ones just before I ...

02:45:48  8    Q.    Correct.

02:45:48  9    A.    Yes, I was.  Yes.

02:45:50 10    Q.    Now, you saw the same documents referenced in those

02:45:55 11    videos; correct?

02:45:56 12    A.    That's correct.

02:45:57 13    Q.    Okay.  Now, this document is from 2007; correct?

02:46:00 14    A.    I'm not sure of that.

02:46:02 15    Q.    You don't recall?

02:46:03 16    A.    I don't recall.

02:46:04 17    Q.    Okay.  So certainly it was before the claim

02:46:08 18    construction in this case, correct?

02:46:10 19    A.    I'm not sure, but, you know, I can take your word for

02:46:14 20    it.

02:46:14 21    Q.    You can take my word for it at the moment.

02:46:16 22    A.    Okay.

02:46:16 23    Q.    Okay.  Now, you recall that the Judge specifically

02:46:19 24    construed the claims of the '892 patent; correct?

02:46:22 25    A.    Right.  The claim constructions, yes.

02:46:24 1    Q.      The Judge went through the different terms such as

02:46:27 2    "affixation," "thickness," and actually gave meaning to

02:46:30 3    those words; correct?

02:46:31 4    A.      That's correct.

02:46:32 5    Q.      And actually explained what, how we should be

02:46:35 6    applying the words; correct?

02:46:37 7    A.      Right.

02:46:37 8    Q.      And you tried to follow that, I assume?

02:46:41 9    A.      I did my best.

02:46:42 10   Q.      Now, in the definition of wall thickness, you do --

02:46:48 11   which was relevant to the '892 patent, you do remember that

02:46:52 12   it requires an average; correct?

02:46:55 13   A.      Right.  That is what was in the claim construction.

02:46:57 14   Q.      And, in fact, you referenced that you, yourself tried

02:46:59 15   to make measurements -- or not measurements but did your

02:47:02 16   test at various places because of that; correct?

02:47:06 17   A.      That's right, to get a sense of what the, you know, a

02:47:10 18   sense of what the average thickness was.  That is what we

02:47:12 19   were trying to do.

02:47:13 20   Q.      And you acknowledge that the thickness of the

02:47:16 21   coverings is variable.  I think you pointed out, you said it

02:47:19 22   gets thicker as it gets closer to the struts?  Unless you

02:47:24 23   believe it is homogeneous.  Whatever you think.

02:47:26 24   A.      I think it is homogenous.

02:47:29 25   Q.      So you believe the thickness of the ePTFE is exactly

02:47:33 1    the same everywhere except where it is on top of the struts?

02:47:36 2    A.    Well, I wouldn't say exactly the same.

02:47:37 3    Q.    Okay.  So it's not homogeneous?

02:47:41 4    A.    I would concede there is likely some variability at

02:47:44 5    some level.  I agree.

02:47:46 6    Q.    Okay.  In fact, that is why you take it different

02:47:48 7    places to take an average?

02:47:50 8    A.    That's right.  And that's what the claim construction

02:47:53 9    was, so I think I would have been criticized if I stayed in

02:47:56 10   one area otherwise.

02:47:57 11   Q.    And I note earlier on, you felt criticized and I

02:48:00 12   assume you don't take it personally.

02:48:02 13   A.    I do not, absolutely.

02:48:03 14   Q.    So this document gives no evidence that there is an

02:48:07 15   average being taken here; correct?  The one, the slide you

02:48:12 16   referenced during your testimony; correct?

02:48:14 17   A.    Right.  There is just one number there.  You know, in

02:48:16 18   scientific journals, if we present data like that, we give

02:48:20 19   like plus or minus, give standard deviation, use an idea of

02:48:23 20   how consistent or constant it was, but that is not provided

02:48:26 21   in this document.

02:48:26 22   Q.    Because this is not from a scientific journal;

02:48:29 23   correct?

02:48:29 24   A.    It's training a manual.

02:48:30 25   Q.    It's not a scientific journal; correct?

Gorman - cross

A.      It's not.

Q.      And it is pointing to one point in the dead center of

that diamond; correct?

A.      Well, I don't think it is referring to that point.  I

don't think they're saying that in this device, this was 0.7

millimeters.  You know, maybe it is, but if somebody came, a

sale rep came and showed me that, I would not assume he was

talking about one little point there.  I would assume he is

talking about the entire device.

Q.      You would assume there was an average.

A.      I would assume that that number was representative

of what I could, what I could expect that thickness to be.

Q.      But there is no -- there is nothing on this document

indicating that this is an average or how this was done;

correct?

A.      I mean, you say that.  Then, you know, that, you

know, would be tantamount to an intention to deceive a

physician about your device.

Q.      That's not the question I asked you.  There is no

evidence on this document that discusses how this

measurement was done; correct?

A.      That's correct.

Q.      And whether it was an average; correct?

A.      I'll give you that.  But I'm telling you that is

not -- you know, if you asked a bunch of surgeons or

Gorman - cross

02:49:35 1    doctors, you know, what do you think that means, and they're

02:49:38 2    going to tell you, I bet a bunch would say that is probably

02:49:42 3    covering all the way around.

02:49:44 4    Q.    Can I ask you to indulge me by answering my question

02:49:47 5    and not going beyond?

02:49:48 6    A.    Okay.

02:49:48 7    Q.    Okay.  Look, I understand you are expostulating about

02:49:52 8    that; correct?  You say what you say assume.

02:49:55 9    A.    Yes, I'm pretty sure on that.

02:50:16 10   Q.    Can you focus on the question I am asking.  I don't

02:50:22 11   want to cut you off.

02:50:23 12         Again, there is nothing on here that indicates

02:50:25 13   how this measurement was taken.  Correct?

02:50:28 14   A.    That's right.

02:50:28 15   Q.    And there is no evidence that it was done pursuant to

02:50:32 16   the Court's claim construction.  Correct?

02:50:37 17   A.    I doubt that it was.

02:50:39 18   Q.    Okay.  And there is no evidence that whoever made

02:50:43 19   this one document was attempting to average it throughout

02:50:46 20   the graft.  It doesn't say anything about it, does it?

02:50:52 21   A.    There is one number there.  There is two numbers

02:50:54 22   there.  One is on the stent and over the strut there is not.

02:50:58 23   I am telling you, as a physician, I would assume that, you

02:51:02 24   know, I could -- I could go to bed at night and know I put a

02:51:09 25   graft that was 0.7 millimeters thick in the patient.

Gorman - cross

02:51:12  1   Q.      You said you could assume.  But one could also

02:51:15  2   actually measure the device pursuant to the Judge's claim

02:51:17  3   construction.  Correct?

02:51:21  4   A.      Sure.

02:51:21  5   Q.      You could actually measure it.  You wouldn't have to

02:51:23  6   make an assumption, if one is in the business of testing the

02:51:27  7   thickness of ePTFE one could actually test it.  Correct?

02:51:31  8   A.      That's right.  And that is what was done.

02:51:33  9   Q.      Okay.  Let me put this here.  Let's get past that

02:51:41 10   document, which you provided your testimony about what you

02:51:45 11   assume it means and let's move on to what you started off

02:51:48 12   with, which I think was composites.  Correct?

02:51:50 13   A.      I mentioned composites.

02:51:51 14   Q.      The composites are two layers of ePTFE with no stent.

02:51:56 15   Correct?

02:51:56 16   A.      Yes, that's right.

02:51:57 17   Q.      And it's clear from the patent that you actually have

02:52:00 18   to measure the thickness of ePTFE that is on the stent

02:52:05 19   graft.  Correct?

02:52:06 20   A.      Yes, that's right.

02:52:06 21   Q.      So -- I am going to go through a couple more --

02:52:14 22   A.      That's all I measured.  I know Mr. Calcote measured

02:52:16 23   some things that weren't mounted on stents.

02:52:21 24   Q.      Dr. Gorman, Your Honor -- your lawyer will be able to

02:52:26 25   ask you further questions.

450

Gorman - cross

02:52:27  1    A.      I am sorry.

02:52:28  2    Q.      You didn't measure composites, did you?

02:52:30  3    A.      No, I didn't.

02:52:30  4    Q.      We all agree that what's relevant here is

02:52:33  5    measurements on the stent graft.  Correct?

02:52:36  6    A.      Yes, that's right.

02:52:36  7    Q.      And the stent graft actually has in between the ePTFE

02:52:43  8    the metal struts.  Correct?

02:52:45  9    A.      That's right.  But the patent says we are concerned

02:52:48 10    about the thickness not inclusive of the metal struts.

02:52:52 11    Q.      I understand it is not inclusive of the metal struts.

02:52:55 12    But it is on the metal.  Correct?  For example, there is

02:52:57 13    that structure, as I showed during my opening, where you

02:53:00 14    have ePTFE on both sides but you also have the metal in

02:53:03 15    between it.  Correct?

02:53:06 16            Can you answer, Dr. Gorman?

02:53:08 17    A.      Yes.

02:53:09 18    Q.      Thank you.  That is different than the composites.

02:53:12 19    Correct?

02:53:13 20    A.      Absolutely.

02:53:14 21    Q.      You also testified that your testing was

02:53:24 22    confirmatory.  Do you recall that?

02:53:27 23    A.      I don't think I used that today.

02:53:29 24    Q.      We looked at the transcript.  It said your testing

02:53:32 25    was confirmatory that it was below .1.  Would that be

Gorman - cross

02:53:36  1    correct?

02:53:36  2    A.      I confirmed that the coverings that I measured were

02:53:39  3    less than 0.1.

02:53:41  4    Q.      So you started with the preconception that they were

02:53:44  5    less than .1?

02:53:45  6    A.      That's right.  Because that was the claim language.

02:53:47  7    That was the -- the claim construction.

02:53:50  8    Q.      You start with the preconception that it would meet

02:53:53  9    the claim construction?

02:53:53 10    A.      No.  I started with -- remember, I said my goal was

02:53:58 11    not to measure the exact thickness but to assess whether the

02:54:02 12    covering on average was less than 0.1 millimeter?  That's

02:54:08 13    why -- I was going to do the go/no go test and set the

02:54:16 14    micrometer at the distance that I did.

02:54:18 15    Q.      I understand the test that you employed.  But you

02:54:20 16    started out with the preconception that you remember

02:54:23 17    confirming that that was the fact, that it was less than .1?

02:54:27 18    A.      I didn't bring any preconceived conceptions that it

02:54:30 19    was more or less than 0.1 millimeters.  I was asked to

02:54:33 20    determine if it was less than 0.1 millimeters.  And the test

02:54:39 21    that I used answered that question.

02:54:42 22    Q.      Let's go back to basics.  You were not asked to

02:54:44 23    determine whether Bard's products, the Fluency and Flare,

02:54:48 24    infringe the '892 patent.  Correct?

02:54:51 25    A.      I was asked whether it met the claim elements that

Gorman - cross

02:54:54  1    were discussed in Claims 32 and 40 with regard to thickness

02:54:59  2    and affixation on the covering.

02:55:01  3    Q.    You were not asked to determine whether the Flare and

02:55:06  4    Fluency infringed the '892 patent.  Correct?

02:55:08  5    A.    That's correct.

02:55:08  6    Q.    And you don't actually opine in your expert reports

02:55:11  7    that they infringe.  Correct?

02:55:13  8    A.    No.  I had given opinions on average thickness being

02:55:18  9    less than 0.1 millimeters and that in my opinion the

02:55:23 10    coverings are secured or affixed to the stent.

02:55:26 11    Q.    Again, if you can please go along with the question.

02:55:30 12          You did not actually opine that they infringe.

02:55:33 13    I am asking a question.  I am not trying to be difficult

02:55:36 14    with you, Doctor.  I understand you very much want to get

02:55:39 15    out your perspective.  Part of it is I have to ask you

02:55:43 16    questions.

02:55:43 17          One of the questions I just asked you is you

02:55:45 18    never opined that the Bard products infringed.  Correct?

02:55:48 19    A.    That's correct.

02:55:48 20    Q.    Let's talk a little bit about your background.

02:55:53 21          You are a doctor.  Correct?

02:55:54 22    A.    That's right.

02:55:54 23    Q.    Now, you don't have an advanced degree in

02:55:59 24    engineering.  Correct?

02:56:00 25    A.    Well, I have a Bachelor's degree in chemical

Gorman - cross

02:56:02  1   engineering.  I have done graduate work in biomechanical

02:56:05  2   engineering.  But I don't have a Master's or a Ph.D. in

02:56:08  3   engineering.

02:56:08  4   Q.     As a yes-no question, the answer is, no, you do not

02:56:15  5   have an advanced degree in engineering.  Correct?

02:56:17  6   A.     I don't have a Master's or Ph.D., if that's what you

02:56:21  7   mean by advanced.

02:56:22  8   Q.     Can we put up Dr. Gorman's deposition, Page 224, Line

02:56:27  9   20.

02:56:30 10          MR. PORADEK:  Objection, Your Honor.  Improper

02:56:32 11   impeachment.

02:56:33 12          MR. CHERNY:  I will ask.

02:56:33 13   BY MR. CHERNY:

02:56:35 14   Q.     You would agree you do not have an advanced degree in

02:56:37 15   engineering.  Correct?

02:56:40 16          THE COURT:  This is a good point to break.  We

02:56:42 17   are near to 3:00 as it is, in any event.

02:56:46 18          Ladies and gentlemen, before I let you go, just

02:56:48 19   a few words about where we are and about tomorrow.  I am

02:56:54 20   going to be letting you go today, as promised.

02:56:58 21          While you are away from us, no talking, of

02:57:01 22   course, about the case to one another or anybody else.

02:57:04 23   Don't do any research about anything relating to the case.

02:57:07 24   If there happens to be any coverage in the media of the

02:57:11 25   case, don't read that or listen to it.

02:57:14 1          Tomorrow, we will be together from 10:00 o'clock

02:57:19 2   until 4:30.  So if you could plan to be here a little before

02:57:23 3   10 so we can order lunch just as we did for you today.

02:57:27 4          I apologize, it got very hot in here this

02:57:31 5   afternoon.  I will be complaining.  I don't control the

02:57:33 6   temperature.  But I will certainly make our concerns and

02:57:38 7   complaints known and hopefully it will be better tomorrow.

02:57:42 8          With that, I wish you all a good night.  And I

02:57:45 9   will see you tomorrow.

02:57:47 10          (Jury leaves courtroom at 2:58 p.m.)

02:58:14 11          THE COURT:  You can step down, Doctor, if you

02:58:16 12   want.

02:58:17 13          Have a seat.  We will talk for a moment about

02:58:19 14   this issue of impeachment.

02:58:23 15          The way we are going to do that is, whoever

02:58:26 16   wants to impeach is going to need to identify what page,

02:58:30 17   what deposition, whatever it is, give the other side a

02:58:34 18   moment to look at it, review it.  If you have an objection,

02:58:37 19   either that it is incomplete or it's not actually

02:58:41 20   inconsistent, you can state that objection and if need be

02:58:46 21   you are going to have to be able to provide me a copy so I

02:58:49 22   can evaluate it.

02:58:50 23          I will tell you, it's pretty hard to prevail on

02:58:54 24   an objection that it's not consistent, even if the tiniest

02:59:00 25   bit it's different.  I am probably going to allow the jury

02:59:03  1  to decide whether it is inconsistent.  But if you want to go

02:59:05  2  ahead and make the objection, fine.  But I will have that

02:59:08  3  pretty broad view of the issue and I will apply it to both

02:59:11  4  sides.

02:59:12  5          Any questions about that?

02:59:13  6          MR. CHERNY:  Only the question, I take it, that

02:59:16  7  is obviously a perfectly sensible procedure, is then I take

02:59:20  8  it you would like some time before the deposition is

02:59:23  9  published up on the screen for the objections.

02:59:25 10          THE COURT:  Yes.  You need to first identify it,

02:59:28 11  give the other side a chance to look at it.  I need to get a

02:59:32 12  sense fairly quickly whether they are going to object or

02:59:35 13  not.  Once it becomes clear they are not objecting, go ahead

02:59:38 14  and play it or read it.  If they are objecting, we will deal

02:59:41 15  with that objection.

02:59:45 16          MR. PORADEK:  Should I do anything about the

02:59:47 17  exhibits?

02:59:47 18          THE COURT:  Do that in front of the jury some

02:59:50 19  time tomorrow.

02:59:51 20          (Court adjourned at 3:00 p.m.)

         21

         22      I hereby certify the foregoing is a true and accurate
             transcript from my stenographic notes in the proceeding.

         23

         24                  /s/ Brian P. Gaffigan
                          Official Court Reporter
         25                  U.S. District Court